## <u>EXHIBIT 1</u>

**Hoberman Answer**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | CASE NO. 21-10355-tmd |
| CCS ASSET MANAGEMENT, INC., | § | |
| Debtor | § | CHAPTER 11 |
| | § | |
| | § | |
| CCS ASSET MANAGEMENT, INC., | § | ADV. PROC. NO. 21-10130-tmd |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| JOHN HOBERMAN AND | § | |
| SUSAN HOBERMAN, ET AL., | § | |
| Defendants | § | |

### DEFENDANTS, JOHN HOBERMAN AND SUSAN HOBERMAN'S ANSWER TO DEBTOR'S ORIGINAL COMPLAINT AND COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME JOHN HOBERMAN AND SUSAN HOBERMAN, Defendants in the above-entitled and numbered cause, and, without waiving their right to seek remand or abstention, file this, their Original Answer replying to Debtor's Original Complaint, and for same would show unto the Court the following:

1. Defendants admit the allegations of paragraph 1 of the Debtor's Original Complaint to the extent it alleges that this court has original, non-exclusive jurisdiction over this matter, but asserts that this court should deny the exercise of jurisdiction.

2. Defendants admit the allegations of paragraph 2 of the Debtor's Original Complaint.

3. Defendants admit the allegations of paragraph 3 of the Debtor's Original Complaint.

4. Paragraph 4 contains a statement of Debtor's requested relief and need not be admitted or denied. To the extent of any factual allegations, Defendants deny the allegations of paragraph 4 of the Debtor's Original Complaint and deny that Debtor is entitled to the relief requested.

5. Defendants admit the allegations of paragraph 5 of the Debtor's Original Complaint.

6. Defendants admit the allegations of paragraph 6 of the Debtor's Original Complaint.

7. Defendants admit the allegations in paragraph 7 of the Debtor's Original Complaint.

8. Defendants are without sufficient information to admit or deny the allegations of paragraph 8 of the Debtor's Original Complaint.

9. Defendants admit the allegations of paragraph 9 of the Debtor's Original Complaint.

10. Defendants admit the allegations in paragraph 10 of the Complaint.

11. Defendants are without sufficient information to admit or deny the allegations of paragraph 11 of the Debtor's Original Complaint.

12. Defendants deny that the deed was executed on January 9, 2019. Defendants are without sufficient information to admit or deny the remaining allegations of paragraph 12 of the Debtor's Original Complaint.

13. Defendants admit the allegations of paragraph 13 of the Debtor's Original Complaint.

14. Defendants admit that Debtor's deed was expressly subject to deed of trust of record and for Defendants' benefit. Defendants deny Debtor did not assume the underlying payment obligations secured by the lien documents. In fact, the Debtor's deed on its face is expressly subject to Debtors assumption of the obligations and provides:

> "But it is expressly agreed that the VENDOR'S LIEN, as well as the Superior Title in and to the above described premises, is retained against the above described property, premises and improvements until the above described note and all

interests thereon is fully paid according to the face, tenor, effect and reading thereof, when this deed shall become absolute."

15. Defendants admit the allegations of paragraph 15 of the Debtor's Original Complaint.

16. Defendants admit the allegations of paragraph 16 of the Debtor's Original Complaint.

17. Defendants admit the allegations of paragraph 17 of the Debtor's Original Complaint.

18. Defendants admit the allegations of paragraph 18 of the Debtor's Original Complaint.

19. Defendants admit the allegations of paragraph 19 of the Debtor's Original Complaint.

20. Defendants admit the allegations of paragraph 20 of the Debtor's Original Complaint.

21. Defendants deny the allegations contained in paragraph 21 of the Debtor's Original Complaint.

22. Defendants deny the allegations contained in paragraph 22 of the Debtor's Original Complaint.

23. Defendants admit the allegations contained in paragraph 23 of the Debtor's Original Complaint.

24. Defendants deny the allegations contained in paragraph 24 of the Debtor's Original Complaint that no suit was brought, but admit that no sale was conducted.

25. Defendants admit the allegations contained in paragraph 25 of the Debtor's Original Complaint.

26. Defendants admit the allegations contained in paragraph 26 of the Debtor's Original Complaint.

27. Defendants admit the allegations contained in paragraph 27 of the Debtor's Original Complaint.

28. Defendants deny the allegations contained in paragraph 28 of the Debtor's Original Complaint.

29. Defendants deny the allegations contained in paragraph 29 of the Debtor's Original Complaint.

30. Defendants admit the allegations contained in paragraph 30 of the Debtor's Original Complaint.

31. Defendants deny the allegations contained in paragraph 31 of the Debtor's Original Complaint.

32. Defendants admit that they have an enforceable lien as documented in the September 5, 2013 note, but otherwise deny the allegations contained in paragraph 32 of the Debtor's Original Complaint.

33. Defendants deny the allegations contained in paragraph 33 of the Debtor's Original Complaint.

34. Defendants admit that they are the party in interest with respect to the September 2013 note, but deny that the Hoberman IRA or the Strata Trust maintained any interest in the note after May 8, 2015, and therefore deny the allegations in Paragraph 34 of Debtors Original Complaint.

35. Defendants admit the allegations contained in paragraph 35 of the Debtor's Original Complaint.

36. Defendants admit the allegations contained in paragraph 36 of the Debtor's Original Complaint.

37. Defendants deny the allegations contained in paragraph 37 of the Debtor's Original Complaint.

38. Defendants deny the allegations contained in paragraph 38 of the Debtor's Original Complaint.

39. Defendants admit the allegations contained in paragraph 39 of the Debtor's Original Complaint.

40. Defendants deny the allegations contained in paragraph 40 of the Debtor's Original Complaint. Defendants specifically requested, and were granted leave to foreclose against the real estate by the Probate Court in a case where Plaintiff was a party and the issue of the validity of the liens held by Defendants was an issue. See Cause No. C-1-PB-19-002179 in Probate Court No. 1 of Travis County, Texas.

41. Defendants admit the allegations contained in paragraph 41 of the Debtor's Original Complaint related to the filing of the bankruptcy case by 4709 Inc., but is without sufficient information to admit or deny when the referenced Deed was actually given to the Debtor.

42. Defendants admit the allegations contained in paragraph 42 of the Debtor's Original Complaint.

43. Defendants admits that John Hoberman participated in the bankruptcy by filing a proof of claim but otherwise denies the allegations contained in paragraph 43 of the Debtor's Original Complaint.

44. Defendants admit the allegations contained in paragraph 44 of the Debtor's Original Complaint.

45. Defendants admits the allegations contained in paragraph 45 of the Debtor's Original Complaint.

46. Defendants admit the allegations contained in paragraph 46 of the Debtor's Original Complaint.

47. Defendants admit the allegations contained in paragraph 47 of the Debtor's Original Complaint to the extent that a deed would transfer the real estate to Defendants. However, the Plan does not specify that a deed would be delivered to effectuate such transfer.

48. Paragraph 48 is a statement of law which Defendants need not admit or deny. To the extent of any factual allegations, Defendants deny the allegations contained in paragraph 48 of the Debtor's Original Complaint in that there are no provisions in the Plan that provide for enforcement upon default by Class 5.

49. Defendants deny the allegations contained in paragraph 49 of the Debtor's Original Complaint.

50. Defendants deny the allegations contained in paragraph 50 of the Debtor's Original Complaint.

51. Defendants admit the allegations contained in paragraph 51 of the Debtor's Original Complaint.

52. Paragraph 52 contains statements of law which Defendants need not admit or deny. To the extent of any factual allegations, Defendants deny the allegations contained in paragraph 52 of the Debtor's Original Complaint since the Plan required the conveyance of the real estate in satisfaction of the liens, which did not occur.

53. Defendants admit the allegations contained in paragraph 53 of the Debtor's Original Complaint to the extent that the Plan does not specifically state that liens would be retained, but contemplates that the Cameron Road Property would be conveyed in satisfaction of liens, which did not occur.

54. Defendants admit the allegations contained in paragraph 54 of the Debtor's Original Complaint.

55. Defendants are without sufficient information to admit or deny the allegations in paragraph 55.

56. Defendants admit and deny the allegations contained in paragraph 56 of the Debtor's Original Complaint in conformity with their prior answers.

57. Defendants deny the allegations contained in paragraph 57 of the Debtor's Original Complaint.

58. Without admitting the Deed was effective or authorized, Defendants are without sufficient information to admit or deny the allegations in paragraph 58 of the Complaint.

59. Defendants admit that they have an enforceable lien on the subject property but otherwise deny the allegations contained in paragraph 59 of the Debtor's Original Complaint.

60. Paragraph 60 contains statements of legal conclusion that need not be admitted or denied. To the extent of any factual allegations, Defendants admit that they have facially valid liens on the subject property but otherwise deny the allegations contained in paragraph 60 of the Debtor's Original Complaint.

61. Paragraph 61 contains statements of legal contentions that need not be admitted or denied. To the extent of any factual allegations, Defendants deny the allegations contained in paragraph 61 of the Debtor's Original Complaint and deny that Plaintiff is entitled to the relief stated.

62. Paragraph 62 contains statements of legal contentions that need not be admitted or denied. To the extent of any factual allegations, Defendants admit that both they and Pride of Austin filed proofs of claim and participated in the 2014 4709 bankruptcy case, but otherwise deny the allegations contained in paragraph 62 of the Debtor's Original Complaint or that Plaintiff is entitled to the relief requested.

63. Paragraph 63 contains legal conclusions that need not be admitted or denied. To the extent of any factual allegations, Defendants deny the allegations contained in paragraph 63 of the Debtor's Original Complaint and deny that Plaintiff is entitled to the relief stated.

64. Paragraph 64 contains a request for relief that need not be admitted or denied. To the extent of any factual allegations, Defendants deny the allegations contained in paragraph 64 of the Debtor's Original Complaint and deny that Plaintiff is entitled to the relief requested.

65. Defendants admit and deny the allegations contained in paragraph 65 of the Debtor's Original Complaint consistent with their prior answers to the paragraphs incorporated.

66. Defendants admit that the POA note was executed by 4709. Defendants deny the allegations contained in paragraph 66 of the Debtor's Original Complaint.

67. Defendants deny the allegations contained in paragraph 67 of the Debtor's Original Complaint.

68. Defendants deny the allegations contained in paragraph 68 of the Debtor's Original Complaint.

69. Defendants deny the allegations contained in paragraph 69 of the Debtor's Original Complaint.

70. Defendants deny the allegations contained in paragraph 70 of the Debtor's Original Complaint.

71. Defendants deny the allegations contained in paragraph 71 of the Debtor's Original Complaint.

72. Defendants deny the allegations contained in paragraph 72 of the Debtor's Original Complaint.

73. Defendants deny the allegations contained in paragraph 73 of the Debtor's Original Complaint.

74. Defendants deny the allegations contained in paragraph 74 of the Debtor's Original Complaint.

## Affirmative Defenses

75. By way of affirmative defense, Defendants would show that there exist currently pending, in Travis County Probate Court, and recently removed to this court, an action relating to the enforceability of Defendants' liens and ability of Defendants to foreclose on said property.

76. Suit was filed and Defendant was joined and made an appearance on March 6, 2020.

77. The Travis County Probate Court, over Debtor's objection, has adjudicated Defendant(s)' right to foreclose and issued an order in that respect. In fact, Debtor's bankruptcy was filed with the intent to avoid the permitted foreclosure.

78. Under Texas law, any claim, defense or challenge by debtor to the ability to enforce the lien were necessary and compulsory cross claims. TRCP 97.

79. Thus, Debtor's claims is barred by failing to assert a compulsory cross claim or counter claim, based estoppel, res judicata and collateral estoppel.

80. On two prior occasions, this Court has considered the dispute between Debtor, Debtor's principal, Anthony Sheridan and creditors relating to the right to title and claims arising out of the asset in question. On each occasion, this court has elected to abstain from considering the matter under the abstention doctrine. Thus, this court should abstain from considering this dispute and order that any rights and titles made subject of this suit be remanded for consideration before the Travis County Probate Court.

### Counter-claim

81. This counter-claim is filed within thirty days of the claims being asserted by Debtor herein, and specifically relates to the occurrences, transactions and subject matter of the claims asserted by Debtor in Debtors' Complaint, thus, pursuant to 16.004, 16.035, and 16.069 and every other applicable provision of the Texas Civil Practice and Remedies Code, is filed within the applicable statute of limitations.

82. On June 12, 2012 and September 13, 2013, Defendant(s) entered into loan agreements secured through deeds of trust on the Cameron Road Property.

83. On February 13, 2015, Defendant was assigned the note and deed of trust from a loan obtained from Pride of Austin.

84. Anthony Sheridan, who is an officer of Debtor and also served as an officer of 4709, Inc. Debtor's alleged predecessor interest participated in the events leading to the February 13, 2015 assignment of the Pride of Austin note and deed of trust.

85. On December 3, 2017, Anthony Sheridan who then served as both a fiduciary of 4709, Inc. and as an officer of Debtor entered into a written and signed Management and Financial Agreement which, among other things, agreed that to prevent foreclosure or to force transfer of deed in lieu foreclosure, that Anthony Sheridan would manage 4709,

Inc., restore 4709, Inc.'s financial integrity, maintain clear and transparent financial records for the benefit of 4709, Inc.'s principal and John Hoberman, to a moratorium period on the debt to Defendants and that any delayed or forestalled payments would be added to the original principal balances of John Hoberman's note.

86. While the December 3, 2017 agreement referenced Mamalama, Defendants were the true party in interest.

87. On January 9, 2018, Anthony Sheridan who at that time was an officer and vice principal of both 4709, Inc., and Debtor, transferred 4709, Inc.'s interest to Debtor, subject to Defendants interest.

88. The transfer deed provided:

"But it is expressly agreed that the VENDOR"S LIEN, as well as the Superior Title in and to the above described premises, is retained against the above described property, premises and improvements until the above described note and all interests thereon is fully paid according to the face, tenor, effect and reading thereof, when this deed shall become absolute."

89. In consideration of the transfer, Debtor's predecessor in interest, and then Debtor agreed that Debtor would assume the obligations owed to Defendants. Debtor made payments on obligations secured by the Cameron Property, based on the notes and deeds of trust through December 1, 2019, after which Debtor, and its predecessor in interest, both of which have common management have breached the obligation to continue to make payments and are now in default.

90. The deed of trust in question, in favor of Defendants provides:

This conveyance is made in trust also to secure payment of all other present and future debts that Grantor may owe to Lender, regardless of how any other such

debt is incurred or evidenced. This conveyance is also made to secure payment of any renewal or extension of any present of future debt that Grantor owes lender, including any loan and advancements from lender to Grantor under the provisions of this deed of trust. When Grantor repays all debts owed to lender, this deed-of-trust lien will terminate only if lender releases this deed of trust at the request of Grantor. Until lender releases it, this deed of trust will remain fully in effect to secure present and future advances and debts regardless of any additional security given for any debt and regardless of any modifications. Grantor is not entitled to any partial releases of this deed-of-trust without the express, written consent of Lender.

91. The amount due and currently outstanding on the loans is no less than $2,268.241.64.

92. While Hoberman contends that the dismissal of the 4709, Inc. bankruptcy referenced in the Debtor's complaint returned the parties to their pre-petition status, to the extent Debtor seeks to avail itself of the confirmation of the 2nd Amended Reorganization Plan, that same plan divested 4709 Incorporated of interest in the land, with the exception of a potential leasehold. The plan specifically provided:

6.05.01 Ownership of the Property shall be transferred and the leases in the Property (as described below in Article VIII) shall be assumed by the Debtor and assigned to Hoberman and/or his designated assignee(s) on the Effective Date, but effective as of February 2, 2015, by a deed-in-lieu of foreclosure.

**Causes of action**

93. Should this court choose to exercise jurisdiction in this matter, than Defendant respectfully assert the following cause of action:

94. Declaratory judgment:     A declaration that the defendants debt is valid, enforceable, fully secured and due.

95. Breach of contract and enforcement of deed of trust(s) in favor of Defendants, subject to this Court's lift of stay.

96. In the unlikely event that this court views that the 2nd Amended Reorganization Plan of 4709, Inc. constitutes and enforceable contract or agreement, than an order compelling

conveyance to Defendants effective February 2, 2015, or alternatively judgment that title vested in favor of Defendants exclusive to the rights of Debtor or its predecessor in interest effective February 2, 2015.

**FOR THE ABOVE REASONS,** Defendant respectfully prays that:

A.    The case be dismissed

B.    Debtor take nothing from them by way of this action;

C.    Judgment declaratory the validity and enforceability of their debt, deed of trust and security interests, or that title is vested in Defendants in the property effective February 2, 2015.

D.    Judgment for their outstanding debt, attorney fees and costs; and

D.    Such other and further relief to which this Defendant may be entitled.

Respectfully submitted,

BURNS ANDERSON JURY & BRENNER, L.L.P.
P.O. Box 26300
Austin, Texas 78755-0300
512-338-5322
512-338-5363 telecopier

By:    _____
David Brenner
State Bar No. 02958020
dbrenner@bajb.com

Attorneys for John and Susan Hoberman

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of Hoberman's Answer to Debtor's Original

Complaint has been filed with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to all counsel of record

David Brenner

## **EXHIBIT 2**

**Highlighted Complaint Showing Admissions and Denials**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| In re:<br><br>CCS ASSET MANAGEMENT, INC.<br><br>Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>) |
| CCS ASSET MANAGEMENT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>JOHN HOBERMAN, SUSAN HOBERMAN,<br>and STRATA TRUST COMPANY<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 21-10355

Chapter 11

Adv. Pro. No. 21-_____

**DEBTOR'S ORIGINAL COMPLAINT**

CCS Asset Management, Inc., the debtor and debtor-in-possession in the above captioned bankruptcy case (the "Debtor"), and alleges, on information and belief, as follows:

**JURISDICTION AND VENUE**

1.      This Court (the "Bankruptcy Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), which is a civil proceeding arising in or related to a case under title 11 of the United States Code (the "Bankruptcy Code").

*Note: Asserts that the Court should decline jurisdiction.*

2.      This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (K), and (O).

3.      Venue of the Debtor's bankruptcy case and this adversary proceeding is properly in this district pursuant to 28 U.S.C. § 1409(a).

**NATURE OF ACTION**

4.      The Debtor seeks (a) judgment quieting title and decreeing that John Hoberman, Susan Hoberman (collectively, "Hoberman" or the "Hobermans") and/or Strata Trust Company

("Strata Trust") have no enforceable liens or other interest in the Debtor's real property located at 7400 Cameron Road, Austin, Texas (the "Cameron Road Property") pursuant to operation of Bankruptcy Code § 544(a), Bankruptcy Code § 1141(c), and/or Tex. Civ. Prac. & Rem. Code §§ 16.035 and 16.037 and (b) declaratory judgment that the Debtor has no obligation under (i) the notes issued by 4709 Incorporated to the Hobermans or related entities for the benefit of the Hobermans.

*Note: Dispute that need to respond. Denied to the extent this contains factual allegations and that Debtor is entitled to relief requested*

## **PARTIES**

5.      The Debtor is the debtor-in-possession in the above-captioned bankruptcy case.

6.      Defendant John Hoberman is an individual residing in the State of Texas. John Hoberman may be served pursuant to Bankruptcy Rule 7004(b) by mailing a copy of this Complaint and summons issued to him at 7801 Chimney Corners, Austin, TX, 78731, which is John Hoberman's usual place of abode and/or the place where John Hoberman regularly conducts a business.

7.      Defendant Susan Hoberman is an individual residing in the State of Texas. Susan Hoberman may be served pursuant to Bankruptcy Rule 7004(b) by mailing a copy of this Complaint and summons issued to her at 7801 Chimney Corners, Austin, TX, 78731, which is Susan Hoberman's usual place of abode and/or the place where Susan Hoberman regularly conducts a business.

8.      Defendant Strata Trust Company is a state trust company chartered by the Texas Department of Banking and is the surviving entity after a merger with Self Directed IRA Services, Inc. Strata Trust may be served pursuant to Bankruptcy Rule 7004(b) by mailing a copy of this Complaint and summons issued to its CEO, Kelli Click, at 600 Congress Avenue, Suite 600, Austin, Texas 78701.

2

## FACTUAL BACKGROUND

### A. Bankruptcy and Procedural Background

9. On May 3, 2021, (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10. The Debtor is managing the assets of the bankruptcy estate as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. The Court has not appointed any trustee, examiner, or any official committee in this case.

11. The Debtor's business comprises buying and selling real estate and renting units of the Cameron Road Property to commercial tenants.

### B. The Cameron Road Property

12. On January 9, 2019, 4709 Incorporated executed a deed (the "Deed") to the Cameron Road Property, more specifically described as follows:

> Lot 2, Re-subdivision of Lot 11, Reagan Hill, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas

13. The Deed was recorded on January 11, 2018, as Document #2018005497 of the Official Public Records of Travis County. A true and correct copy of the Deed, as recorded, is attached as **Exhibit A** hereto.

14. The Deed of the Cameron Road Property was expressly subject to those certain deed of trust, extensions of maturity date, and transfer recorded as Document #2011137642, #2012004604, #2013019734, and #2015025866 of the Official Public Records of Travis County (collectively, the "POA Lien Documents"). As set out in the Deed, however, the Debtor did not assume the underlying payment obligations secured by the POA Lien Documents.

3

## C. Liens Asserted by Hoberman Against the Cameron Road Property

### i.) *Lien Securing Pride of Austin Note*

15.     The Hobermans assert that they have an enforceable lien securing the obligations under the note made by 4709 Incorporated and delivered to Pride of Austin High Yield Fund I, LLC ("Pride of Austin") dated September 9, 2011, in the original amount of $1,100,000 (the "POA Note") under to the POA Lien Documents.

16.     A true and correct copy of the POA Note is attached hereto as **Exhibit B** hereto.

17.     Document #2011137642 referenced in the Deed is the Deed of Trust, Security Agreement, and Assignment of Rents granted by 4709 Incorporated to or for the benefit of Pride of Austin for the Cameron Road Property and purporting to secure the obligations under the POA Note (the "POA Deed of Trust"). A true and correct copy of the POA Deed of Trust, as recorded, is attached as **Exhibit C** hereto.

18.     Document #2012004604 referenced in the Deed is the Renewal and Extension Deed of Trust, Security Agreement, and Assignment of Rents, dated January 10, 2012, between Pride of Austin and 4709 Incorporated, extending the maturity date of the POA Note from October 1, 2012, to February 1, 2013 (the "January 2012 POA Extension Agreement"). A true and correct copy of the January 2012 POA Extension Agreement, as recorded, is attached as **Exhibit D** hereto.

19.     Document #2013019734 referenced in the Deed is the Modification and Extension Agreement dated January 31, 2013, between Pride of Austin and 4709 Incorporated, extending the maturity date of the POA Note from February 1, 2013, to January 1, 2014 (the "January 2013 POA Extension Agreement"). A true and correct copy of the January 2013 POA Extension Agreement, as recorded, is attached as **Exhibit E** hereto.

20.     Document #2015025866 referenced in the Deed is the Transfer of Note and Lien (and Other Rights) dated February 13, 2015, transferring the POA Note and POA Deed of Trust

4

from Pride of Austin to John Hoberman (the "POA Transfer"). A true and correct copy of the recorded transfer document, as recorded, is attached hereto as **Exhibit F** hereto (the "POA Transfer").

21.     No written agreement extending the maturity date of the POA Note was signed and acknowledged by 4709 Incorporated at any time after the January 2013 POA Extension Agreement.

22.     No written agreement extending the maturity date of the POA Note was filed for record in the Travis County Clerk's office at any time after the January 2013 POA Extension Agreement.

23.     The maturity date of the POA Note, as extended, was January 1, 2014.

24.     As of the Petition Date, the Hobermans had not (a) brought a suit for the recovery under or foreclosure of their asserted liens securing the POA Note or (b) held a sale of the collateral under the POA Deed of Trust.

*ii.) Note Dated June 5, 2012*

25.     The Hobermans also assert that they have an enforceable lien securing the obligations under the Real Estate Lien Note made by 4709 Incorporated and delivered to John and Susan Hoberman dated June 5, 2012, in the original amount of $150,000.00 (the "June 2012 Note").

26.     A true and correct copy of the June 2012 Note is attached hereto as **Exhibit G**.

27.     A true and correct copy of the Deed of Trust granted by 4709 Incorporated to or for the benefit of John and Susan Hoberman for the Cameron Road Property and purporting to secure the obligations under the June 2012 Note (the "June 2012 Note Deed of Trust"), as recorded as Document #2012173363 of the Official Public Records of Travis County, is attached as **Exhibit H** hereto.

28. No written agreement extending the maturity date of the June 2012 Note was signed and acknowledged by 4709 Incorporated.

29. No written agreement extending the maturity date of the June 2012 Note was ever filed for record in the Travis County Clerk's office.

30. The maturity date of the June 2012 Note was June 5, 2014.

31. As of the Petition Date, the Hobermans had not (a) brought a suit for the recovery under or foreclosure of their asserted liens securing the POA Note or (b) held a sale of the collateral under the June 2012 Note Deed of Trust.

*iii.) Note Dated September 5, 2013*

32. The Hobermans further assert that they have an enforceable lien securing the obligations under the Loan Agreement entered into by 4709 Incorporated and Self Directed IRA Services Inc. Custodian FBO John Hoberman IRA 201314763 (the "Hoberman IRA") dated September 5, 2013, memorializing the obligations of 4709 Incorporated to the Hoberman IRA for the loan extended by the Hoberman IRA to 4709 Incorporated in the amount of $100,000.00 (the "September 2013 Note").

33. The Hoberman IRA merged with Strata Trust on or about September 1, 2017. A true and correct copy of the Certificate of Merger field in the Office of the Secretary of State of Texas is attached as **Exhibit I** hereto.

34. Although the Hoberman IRA is the party indicated on the September 2013 Note, and Strata Trust is the successor to the Hoberman IRA, the Hobermans are the real parties in interest with respect to the September 2013 Note and any liens securing the obligations of 4709 Incorporated thereunder.

35. A true and correct copy of the September 2013 Note is attached as **Exhibit J** hereto.

6

36.     A true and correct copy of the Deed of Trust granted by 4709 Incorporated to or for the benefit of the Hoberman IRA to the Cameron Road Property and purporting to secure the obligations under the September 2013 Note (the "September 2013 Note Deed of Trust"), as recorded as Document #2013166967 of the Official Public Records of Travis County, is attached as **Exhibit K** hereto.

37.     No written agreement extending the maturity date of the September 2013 Note was ever signed and acknowledged by 4709 Incorporated.

38.     No written agreement extending the maturity date of the September 2013 Note was ever filed for record in the Travis County Clerk's office.

39.     The maturity date of the September 2013 Note was September 5, 2016.

40.     As of the Petition Date, the Hobermans had not (a) brought a suit for the recovery under or foreclosure of their asserted liens securing the September 2013 Note or (b) held a sale of the collateral under the September 2013 Note Deed of Trust.

**D.  4709 Incorporated's 2014 Chapter 11 Bankruptcy Case**

41.     On March 3, 2014, after 4709 Incorporated made and delivered the POA Note, June 2012 Note, and September 2013 Note, but before 4709 Incorporated grade the Deed to the Debtor, 4709 Incorporated filed a petition for chapter 11 bankruptcy protection, commencing case 14-10340-tmd before the United States Bankruptcy Court for the Western District of Texas (the "2014 Bankruptcy Case").

42.     Both Pride of Austin and John Hoberman filed proofs of claim in the 2014 Bankruptcy Case asserting secured claims therein.

43. John Hoberman further participated in the 2014 Bankruptcy Case, including acquiring Pride of Austin's claim and taking an active role in the formulation of a plan of reorganization in that case.

44. The U.S. Bankruptcy Court for the Western District of Texas confirmed a plan of reorganization in the 2014 Bankruptcy Case on November 9, 2015 (the "4709 Incorporated Plan").

45. The 4709 Incorporated Plan became effective on December 8, 2015, according to the its terms.

46. A true and correct copy of the Court's order confirming the 4709 Incorporated Plan is attached as **Exhibit L** hereto.

47. Under the 4709 Incorporated Plan, 4709 Incorporated was obligated to deliver a deed transferring ownership of the Cameron Road Property to John Hoberman. *Note: Further answer that no need for deed.*

48. In the event of a default, claimants, including the Hobermans, could enforce the 4709 Incorporated Plan as a contract. *Note: Further answer that "no provisions in the Plan that provide for enforcement upon default by Class 5."*

49. The Hobermans have taken no action to enforce the 4709 Incorporated Plan against 4709 Incorporated, or any other party, as of the Petition Date.

50. More than four years elapsed from the effective date of the 4709 Incorporated Plan became effective and the Petition Date.

51. More than four years have elapsed since the 2014 Bankruptcy Case was dismissed and the Petition Date.

52. The 4709 Incorporated Plan did not provide that the liens asserted by the Hobermans against the Cameron Road Property would be retained.

53. The 4709 Incorporated Plan provided that the Cameron Road Property would be free and clear of all liens except for the liens of tax authorities. *Note: Admitted "to the extent that the Plan does not specifically state that the liens would be retained, but contemplates that the Cameron Road Property would be conveyed in satisfaction of liens, which did not occur."*

54.    The 4709 Incorporated Plan did not provide for the liquidation of all or substantially all of the property of the 4709 Incorporated's bankruptcy estate.

55.    4709 Incorporated continued to engage in business after consummation of the 4709 Incorporated Plan.

## COUNT ONE

*Quiet Title and Judgement Decreeing that the Hobermans
Have no Enforceable Interest in the Cameron Road Property*

56.    The Debtor repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if the same were fully set forth herein at length. *Note: Admitted and denied as in referenced paragraph.*

57.    The Debtor has an interest in the Cameron Road Property pursuant to the Deed.

58.    The Deed has not been rescinded or set aside pursuant to the order of any court.

59.    The Hobermans' claims to enforceable liens against the Cameron Road Property securing the POA Note, the June 2012 Note, and the September 2013 Note affect the Debtor's title. The asserted liens appear on their face to be superior to the Debtor's title and are thus a cloud on the Debtor's title.

60.    Although the Hobermans' claimed liens are facially valid, they are unenforceable and void by operating of Tex. Civ. Prac. & Rem. Code § 16.035 because more than four (4) years has passed since the maturity date occurred under each the notes and, as of the Petition Date, there was no agreement that was (a) signed and acknowledged by 4709 Incorporated and (b) filed for record with the Travis County Clerk.

61.    Any extension agreement from 4709 Incorporated that was not acknowledged, filed, and recorded before the Petition Date is void with respect to the Debtor as debtor-in-possession pursuant to Bankruptcy Code § 544(a), which provides that debtors-in-possession have rights and powers of a lien creditor and bona fide purchaser of real property under applicable state

9

law, and Tex. Civ. Prac. & Rem. Code § 16.037, which provides that an extension agreement is void as to a bona fide purchaser for value or a lienholder without actual notice of the agreement and before the agreement is acknowledged, filed, and recorded.

62. The Hobermans' claimed liens are also unenforceable and void because, under Bankruptcy Code § 1141(c), the Cameron Road Property was vested in the 4709 Incorporated free and clear of all claims and interests, including Hobermans liens. The Cameron Road Property was expressly dealt with in the 4709 Incorporated Plan and both the Hobermans and Pride of Austin filed proofs of claim and actively participated in the 2014 Bankruptcy Case.

63. Any rights of the Hobermans to enforce the 4709 Incorporated Plan as a contract, including seeking specific performance thereof were unenforceable and void as of the Petition Date because the four (4) year statute of limitations under Tex. Civ. Prac. & Rem. Code § 16.004(a)(1) to bring suit for the specific performance of a contract for the conveyance of real property. Further, the Hobermans' rights, if they existed, would be against 4709 Incorporated.

64. Based upon the foregoing, the Debtor seeks entry of judgment quieting title and ruling that that the Hobermans have no enforceable lien or other interest in the Cameron Road Property.

**COUNT TWO**

*Declaratory Judgment that the Debtor Has No Obligation*
*Under the Notes Made by 4709 Incorporated Held by the Hobermans*

65. Debtor repeats and re-alleges the allegations contained in all of the preceding paragraphs of this Complaint as if the same were fully set forth herein at length.

*Note: Admitted and denied as in referenced paragraph.*

66. The POA Note was issued by 4709 Incorporated to Pride of Austin. The obligations to perform under the POA Note, if any, are obligations of 4709 Incorporated.

67.     Although the Debtor took the Deed subject to the POA Lien Documents, the Deed expressly stated that the Debtor did not assume the underlying liability.

68.     The maturity date of the POA Note, as extended, was January 1, 2014. The statue of limitations to bring an action to enforce payment under the POA Note was January 1, 2020, pursuant Tex. Bus. & Com. Code § 3.118.

69.     The June 2012 Note was issued by 4709 Incorporated to the Hobermans. The obligations under the June 2012, if any, are obligations of 4709 Incorporated.

70.     The maturity date of the June 2012 Note was June 5, 2014. The statute of limitations to bring an action to enforce payment under the June 2012 Note was June 5, 2020.

71.     The September 2013 Note was issued by 4709 Incorporated to the Hoberman IRA for the benefit of the Hobermans. The obligations under the September 2013 Note, if any, are obligations of 4709 Incorporated.

72.     The confirmation and effective date of the 4709 Incorporated Plan, effectuated a discharge of 4709 Incorporated's obligations under the POA Note, June 2012 Note, and September 2013 Note.

73.     Based upon the foregoing, declaratory judgment decreeing that the Debtor has no obligations under the POA Note, June 2012 Note, or September 2013 Note is appropriate and should be issued by the Court.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Debtor prays that judgment be entered (a) quieting title with respect to the Hobermans' asserted liens and decreeing that the Hobermans Strata Trust have no lien or other interest in the Cameron Road Property, (b) declaratory judgment

decreeing that the Debtor has no obligations under the POA Note, June 2012 Note, or September 2013 Note, and (c) any other relief that the Court deems just and equitable.

Dated:  July 6, 2021

Respectfully submitted,

PARKINS LEE & RUBIO LLP

*/s/R. J. Shannon*
R. J. Shannon (TBA No. 24108062)
Pennzoil Place
700 Milam Street, Suite 1300
Houston, Texas 77002
Telephone: 713-715-1664
Email: rshannon@parkinslee.com

*Proposed Attorneys for the Debtor*

# **EXHIBIT 3**

**Cameron Road Deed**

# ASSUMPTION WARRANTY DEED WITH VENDOR'S LIEN

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

Date:      January 9, 2018                                                TRV      2018005497
                                                                         3 PGS

Grantor:      **4709 Incorporated, d/b/a Midtown Live, a Texas corporation**

Grantor's Mailing Address (including county): **7602 Brookhollow Cove**
                                              **Austin Texas 78752**
                                              **Travis County**

Grantee:      **CCS Asset Management Inc., a Texas corporation**

Grantee's Mailing Address (including county): **111 Congress Avenue 4th Floor**
                                              **Austin Texas 78701**
                                              **Travis County**

Consideration: TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration, and a wrap around note of even date that is in the principal amount of **Note Amount** DOLLARS ($1,700,000.00) and is executed by Grantee, payable to the order of **Seller**. It is secured by a vendor's lien retained in this deed and by a deed of trust of even date from Grantee to Daniel Nelson, Trustee.

Property (including any improvements):

**Lot 2, Re-subdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County.**

Reservations from and Exceptions to conveyance and Warranty:

This conveyance is made and accepted subject to conditions, restrictions, and easements appearing of record, if any, in Travis County, Texas, which affect the hereinabove described property; and

Grantee understands and agrees that Grantee is buying the Property "as is-- where is" with no representations or warranties as to fitness or use for a particular purpose. Grantee has made an examination of the Property prior to closing and has had reasonable access to the property prior to closing to determine the condition and prior use of the Property. The purchase price of the Property was negotiated based upon the current condition of the Property. Grantor makes no representations or warranties and specifically disclaims having made any representations or warranties of any kind or nature about the condition or prior use of the Property, including, but not limited to any environmental matters. Grantee is not relying on any representations made by Grantor concerning any prior use or condition of the Property. After closing, Grantee and Grantee's successors and assigns, will make no claim against Grantor concerning the condition of the Property and/or any prior use of the Property and shall indemnify and save Grantor harmless from any and all claims made after closing by, through or under Grantee, including attorney's fees.

Grantor, for the consideration and subject to the reservations from and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee the property, together with all and singular the rights and appurtenance thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

But it is expressly agreed that the VENDOR'S LIEN, as well as the Superior Title in and to the above described premises, is retained against the above described property, premises and improvements until the above described note and all interest thereon is fully paid according to the face, tenor, effect and reading thereof, when this Deed shall become absolute.

**Seller**, at Grantee's request, has paid in cash to Grantor that portion of the purchase price of the property that is evidenced by the note described. The vendor's lien and superior title to the property are retained for the benefit of **Seller** and are transferred to that party without recourse on Grantor.

This conveyance is made subject to the prior lien secured by Deed of Trust, Extensions and a Transfer recorded in Document #2011137642, #2012004604, #2013019734 and #2015025866 of the Official Public Records of Travis County, Texas, from **Seller** to **Original County Trustee**, Trustee, which secures payment of a promissory note in the original principal amount of **Original Loan Amount** DOLLARS **($1,100,000.00)**. Grantee in this deed does not assume payment of that **$Orig. Loan Amt.** note. Payee of the wraparound note is obligated to pay all installments on the **$Orig. Loan Amt** note as they fall due. In the event of default in payment of that **$Orig. Loan Amt.** note, Grantee shall have the right to cure any such default as long as Grantee is not in default in payment of the wraparound note or in performance of the covenants of the deed of trust securing it. If Grantee cures a default in payment of the **$Orig. Loan Amt.** note, Grantee may receive credit on the wraparound note for all amounts so paid as of the date of the payment, in the manner that Grantee directs.

When the context requires, singular nouns and pronouns include the plural.

EXECUTED this the 9th day of January, A.D. 2018,

**4709 INCORPORATED D/B/A**
**MIDTOWN LIVE**

BY: _____

Selena Cash, Director and President

STATE OF TEXAS          §
COUNTY OF TRAVIS       §

This instrument was acknowledged before me on the 9th day of January, 2018, by Selena Cash as a Director and President of 4709 Incorporated d/b/a Midtown Live, a Texas corporation, on behalf of that corporation.

TODD VOYLES
My Commission Expires
June 9, 2019

_____
NOTARY PUBLIC, STATE OF TEXAS

**Return:**

Anthony Sheridan
111 Congress Ave #400
Austin TX 78701

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Jan 11, 2018  02:55 PM
GONZALESM: $34.00    2018005497
Dana DeBeauvoir, County Clerk
Travis County  TEXAS

# <u>EXHIBIT 4</u>

**POA Note**

### Real Estate Lien Note

Date: September ___9___, 2011

Borrower: 4709 Incorporated, d/b/a Midtown Live, a Texas corporation

Borrowers' Mailing Address: 7602 Brookhollow Cv., Austin, Travis County, Texas 78752-2103

Lender: Pride of Austin High Yield Fund I, LLC

Place for Payment: 401 Congress Ave., Suite 1540, Austin, Travis County, Texas 78701-3851

Principal Amount: One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00)

Annual Interest Rate: Fourteen percent (14%)

Maturity Date: October 1, 2012. The Maturity Date may be extended, at the option of the Borrower, until April 1, 2013. In order to exercise that option, the Borrower must give the Lender written notice of the Borrower's intent to exercise the option on or before March 1, 2013, and must pay to the Lender, on or before March 1, 2013, an amount equal to two percent (2%) of the principal balance of this note on the date of that payment. Such a payment will be deemed to be a fee that is used to defray the Lender's expenses in extending the loan and this promissory note, and shall not be credited toward principal or interest due under this promissory note. Notwithstanding any of the foregoing, the Borrower may not exercise the option to extend the Maturity Date if the Borrower is in default under the terms of this note or has been in default under the terms of this note at any time before the Maturity Date, without the express, written consent and waiver of default by the Lender.

Annual Interest Rate on Matured, Unpaid Amounts: Eighteen percent (18%) or the highest amount allowed by law, whichever is less

Terms of Payment (principal and interest): The Principal Amount, or if a lesser amount has been advanced under the Commercial Construction Loan Agreement between the Borrower and the Lender, which is dated on or before the date of this note, as of the Maturity Date, that lesser amount, is due and payable on the Maturity Date. Interest accrues at the Annual Interest Rate on each amount advanced under the Commercial Construction Loan Agreement between the Borrower and the Lender from the date of the advance until the principal amount of that advance is repaid. Accrued interest is due and payable monthly on the first day of each calendar month, beginning on November 1, 2011 and ending on the Maturity Date, when all principal and accrued interest is due and payable. Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

Prepayment: The Borrower may not prepay any portion of this note prior to the 180th day after the date of this note, unless the Borrower pays a prepayment penalty equal to three percent (3%) of

that prepayment amount. After the 180th day from the date of this note, the Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium. Prepayments will be applied first to accrued interest and the remainder to the principal balance of this note.

Security for Payment: This note is secured by the liens contained in a deed of trust and security agreement, which has the same date as this note, from the Borrower, to Bruce R. Hardesty, Trustee, for the benefit of the Lender, which covers the real property located at 7400 Cameron Rd., Austin, Travis County, Texas 78752 (including all improvements and fixtures on that real property), which has the following legal description:

> Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas.

(the "Real Property"),

> Together with the following personal property: All fixtures, supplies, building materials, and other goods of every nature now or hereafter located, used, or intended to be located or used on the Real Property; all plans and specifications for development or construction of improvements on the Real Property; all contracts and subcontracts relating to the construction of improvements on the Real Property; all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions relating to the Real Property; all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Real Property; all proceeds payable or to be payable under each policy of insurance relating to the Real Property; and all products and proceeds of the foregoing. The Real Property and the personal property described in this paragraph are collectively referred to in this note as the "Property". Notwithstanding any other provision in this note, the term "Property" does not include personal effects used primarily for personal, family, or household purposes.

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

Borrower will be in default under this note if a payment is not actually received by Lender within five (5) days after that payment is due. If any payment is not received by that deadline, Lender may, at its sole and absolute option, accept the late payment if Borrower pays a late fee equal to five percent (5%) of the amount of the payment. Such a late fee may be charged in order

2

to defray the expense of handling the delinquent payment, and shall not be deemed to be interest.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on any property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party (subject to the immediately preceding paragraph of this note); (2) any warranty, covenant, or representation in this note or in any other written agreement between Lender and Borrower or any Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is dissolved, begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; or (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees, taxable court costs, and other collection and litigation expenses incurred by the Lender if this note is placed in the hands of an attorney who is not an employee of lender to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or,

if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

4709 INCORPORATED,
D/B/A MIDTOWN LIVE

By: _____
Selena Cash, Director and President

4

## EXHIBIT 5

**POA Deed of Trust**

**ELECTRONICALLY RECORDED**     **2011137642**

TRV    **11**    PGS

## 9/First American Title/GF# 166375

### Deed of Trust, Security Agreement, and Assignment of Rents

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

### Terms

Date: September 9, 2011

Grantor: 4709 Incorporated, d/b/a Midtown Live, a Texas corporation

Grantors' Mailing Address: 7602 Brookhollow Cv., Austin, Travis County, Texas 78752-2103

Trustee: Bruce R. Hardesty

Trustee's Mailing Address: 1411 West Ave., Suite 100, Austin, Travis County, Texas 78701-1537

Lender: Pride of Austin High Yield Fund 1, LLC

Lender's Mailing Address: 401 Congress Ave., Suite 1540, Austin, Travis County, Texas 78701-3851

Obligations

    1. Note

        Date: The same date as this deed of trust

        Original principal amount: One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00)

        Borrower: 4709 Incorporated, d/b/a Midtown Live

        Lender: Pride of Austin High Yield Fund I, LLC

        Maturity date: October 1, 2012

    2.    Commercial Construction Loan Agreement between Pride of Austin High Yield Fund I, LLC, as Lender, and 4709 Incorporated, d/b/a Midtown Live, as Borrower, which is dated on or before this deed of trust.

Property:

    Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas

(the "Real Property"),

    Together with the following personal property: All fixtures, supplies, building materials, and other goods of every nature now or hereafter located, used, or intended to be located or used on the Real Property; all plans and specifications for development or construction of improvements on the Real Property; all contracts and subcontracts relating to the construction of improvements on the Real Property; all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions relating to the Real Property; all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Real Property; all proceeds payable or to be payable under each policy of insurance relating to the Real Property; and all products and proceeds of the foregoing. The Real Property and the personal property described in this paragraph are sometimes collectively referred to in this deed of trust as the "Property". Notwithstanding any other provision in this deed of trust, the term "Property" does not include personal effects used primarily for personal, family, or household purposes.

Exceptions to Conveyance and Warranty: Validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; and all presently recorded and validly existing instruments, other than conveyances of the surface fee estate.

Prior Liens: None

    For value received and to secure payment of the Obligations, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Exceptions to Conveyance and Warranty. On payment of the Obligations and all other amounts secured by this deed of trust, and upon satisfaction of all other covenants and conditions in the Obligations, this deed of trust will have no further effect, and Lender will release it at Grantor's expense. In addition to creating a deed-of-trust lien on all the real and other property described above, to secure the Obligations Grantor also grants to Lender a security interest in all of the above-described personal property and all its proceeds, pursuant to and to the greatest extent permitted by the Texas Uniform Commercial Code. Grantor authorizes Lender to file one or more financing statements describing that collateral. In the event of a default under the Obligations, whether or not there is a foreclosure sale under this deed of trust, Grantor agrees that all or part of the personal property described above may be sold as a whole or in parcels at Lender's option, and that the property to be sold need not be present at the place of sale.

## Clauses and Covenants

### A.    Grantor's Obligations

Grantor agrees to—

1.    keep the Property in good repair and condition;

2.    pay all taxes and assessments on the Property before delinquency;

3.    defend title to the Property subject to the Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4.    maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;

5.    obey all laws, ordinances, and restrictive covenants applicable to the Property;

6.    keep any buildings occupied as required by the Required Insurance Coverages;

7.    if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8.    notify Lender of any change of address.

### B.    Lender's Rights

1.    Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee. Such written appointments need not be filed in the Official Public Records of the county where the Property is located or in any other public or governmental records in order to be effective.

2.    If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3.    Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligations or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender

3

reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

4.  Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligations or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligations, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5.  If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.  If there is a default in any of the Obligations or if Grantor fails to perform any of Grantor's other obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may—

      a.  declare the unpaid principal balance and earned interest on the Obligations immediately due;

      b.  direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

      c.  purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligations.

7.  Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

C.  **Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will—

1.  either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.  sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.    from the proceeds of the sale, pay, in this order—

    a.    expenses of foreclosure, including a reasonable commission to Trustee;

    b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

    c.    any amounts required by law to be paid before payment to Grantor; and

    d.    to Grantor, any balance; and

4.    be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**D.    General Provisions**

1.    If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.    Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.    This lien will remain superior to liens later created even if the time of payment of all or part of the Obligations is extended or part of the Property is released.

5.    If any portion of the Obligations cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6.    Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligations. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.    Grantor assigns to Lender absolutely, not only as collateral, all present and future

5

rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default with respect to the Obligations or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Obligations and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligations and the deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Obligations or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations with respect to the Obligations and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law. This section is intended to create an assignment of rents to the greatest extent permitted under Chapter 64 of the Texas Property Code, and to grant to Lender all rights of an assignee under that chapter.

8.     Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9.     In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.     Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

Grantor may not cause or permit any Property to be encumbered by any liens, security

6

interests, or encumbrances other than the liens securing the Obligations and the liens securing ad valorem taxes not yet due and payable without the prior written consent of Lender. If granted, consent may be conditioned upon Grantor's executing, before granting such lien, a written modification agreement containing any terms Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

Grantor may not grant any lien, security interest, or other encumbrance (a "Subordinate Instrument") covering the Property that is subordinate to the liens created by this deed of trust without the prior written consent of Lender. If granted, consent may be conditioned upon the Subordinate Instrument's containing express covenants to the effect that—

    a.    the Subordinate Instrument is unconditionally subordinate to this deed of trust;

    b.    if any action is instituted to foreclose or otherwise enforce the Subordinate Instrument, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of Lender, and that consent, if granted, may be conditioned in any manner Lender determines;

    c.    rents, if collected by or for the holder of the Subordinate Instrument, will be applied first to the payment of the Obligations then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order Lender may determine, before being applied to any indebtedness secured by the Subordinate Instrument;

    d.    written notice of default under the Subordinate Instrument and written notice of the commencement of any action to foreclose or otherwise enforce the Subordinate Instrument must be given to Lender concurrently with or immediately after the occurrence of any such default or commencement; and

    e.    in the event of the bankruptcy of Grantor, all amounts due on or with respect to the Obligations and this deed of trust will be payable in full before any payments on the indebtedness secured by the Subordinate Instrument.

Grantor may not cause or permit any of the following events to occur without the prior written consent of Lender: if Grantor is (a) a corporation, the dissolution of the corporation or the sale, pledge, encumbrance, or assignment of any shares of its stock; (b) a limited liability company, the dissolution of the company or the sale, pledge, encumbrance, or assignment of any of its membership interests; (c) a general partnership or joint venture, the dissolution of the

partnership or venture or the sale, pledge, encumbrance, or assignment of any of its partnership or joint venture interests, or the withdrawal from or admission into it of any general partner or joint venturer; or (d) a limited partnership, (1) the dissolution of the partnership, (2) the sale, pledge, encumbrance, or assignment of any of its general partnership interests, or the withdrawal from or admission into it of any general partner, (3) the sale, pledge, encumbrance, or assignment of a controlling portion of its limited partnership interests, or (4) the withdrawal from or admission into it of any controlling limited partner or partners. If granted, consent may be conditioned upon (a) the integrity, reputation, character, creditworthiness, and management ability of the person succeeding to the ownership interest in Grantor (or security interest in such ownership) being satisfactory to Lender; and (b) the execution, before such event, by the person succeeding to the interest of Grantor in the Property or ownership interest in Grantor (or security interest in such ownership) of a written modification or assumption agreement containing such terms as Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

11.    When the context requires, singular nouns and pronouns include the plural.

12.    The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

13.    This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

14.    If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

15.    Grantor and each surety, endorser, and guarantor of the Obligation waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

16.    This conveyance is made in trust also to secure payment of all other present and future debts that Grantor may owe to Lender, regardless of how any other such debt is incurred or evidenced. This conveyance is also made to secure payment of any renewal or extension of any present or future debt that Grantor owes to Lender, including any loans and advancements from Lender to Grantor under the provisions of this deed of trust. When Grantor repays all debts owed to Lender, this deed-of-trust lien will terminate only if Lender releases this deed of trust at the request of Grantor. Until Lender releases it, this deed of trust will remain fully in effect to secure other present and future advances and debts, regardless of any additional security given for any debt and regardless of any modification. Grantor is not entitled to any partial releases of this deed-of-trust lien without the express, written consent of Lender.

17.    Grantor agrees to make an initial deposit in a reasonable amount to be determined

8

by Lender and then make monthly payments to an escrow fund for taxes and insurance premiums on the Property. Monthly payments will be thereafter made on the first day of each calendar month, and each payment will be one-twelfth of the amount that Lender estimates will be required annually for payment of taxes and insurance premiums. The fund will accrue no interest, and Lender will hold it without bond in escrow and use it to pay the taxes and insurance premiums. If Grantor has complied with the requirements of this paragraph, Lender must pay taxes before delinquency. Grantor agrees to make additional deposits on demand if the fund is ever insufficient for its purpose. If an excess accumulates in the fund, Lender may either credit it to future monthly deposits until the excess is exhausted or refund it to Grantor. When Grantor makes the final payment on the Note, Lender will credit to that payment the whole amount then in the fund or, at Lender's option, refund it after the Note is paid. If this deed of trust is foreclosed, any balance in the fund over that needed to pay taxes, including taxes accruing but not yet payable, and to pay insurance premiums will be paid under part C, "Trustee's Rights and Duties." If the Property is transferred, any balance then in the fund will still be subject to the provisions of this paragraph and will inure to the benefit of the transferee. Deposits to the fund described in this paragraph are in addition to the payments provided for in the Note.

18.     Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

19.     In case any one or more of the provisions contained in this deed of trust shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, to the extent that the unenforceability does not destroy the basis of the bargain among the parties to this deed of trust, such invalidity, illegality, or unenforceability shall not affect any other provision of this deed of trust, and this deed of trust shall be construed as if the invalid, illegal, or unenforceable provision had never been included in this deed of trust.

20.     The term *Lender* includes any mortgage servicer for Lender.

**E.     Construction Loan Mortgage**

1.     This deed of trust is a "construction mortgage" within the meaning of section 9.334 of the Texas Business and Commerce Code. The liens and security interests created and granted by this deed of trust secure an obligation incurred for the construction of improvements on land, including the acquisition cost of the land.

2.     Grantor agrees to comply with the covenants and conditions of the commercial construction loan agreement, if any, executed in connection with the Note and this deed of trust. All advances made by Lender under the commercial construction loan agreement will be indebtedness of Grantor secured by the liens created by this deed of trust, and such advances are conditioned as provided in the commercial construction loan agreement.

3.     All amounts disbursed by Lender before completion of the improvements to protect the security of this deed of trust up to the principal amount of the Note will be treated as disbursements under the commercial construction loan agreement. All such amounts will bear interest from the date of disbursement at the rate stated in the Note, unless collections from Grantor of interest at that rate would be contrary to applicable law, in which event such amounts will bear interest at the rate stated in the Note for matured, unpaid amounts and will be payable on notice from Lender to Grantor requesting payment.

4.     From time to time as Lender deems necessary to protect Lender's interests, Grantor will, on request of Lender, execute and deliver to Lender, in such form as Lender directs, assignments of any and all rights or claims that relate to the construction of improvements on the Property.

5.     In case of breach by Grantor of the covenants and conditions of the construction loan agreement, Lender, at its option, with or without entry on the Property, may (a) invoke any of the rights or remedies provided in the construction loan agreement, (b) accelerate the amounts secured by this deed of trust and invoke the remedies provided in this deed of trust, or (c) do both.

6.     If, after commencement of amortization of the Note, the Note and this deed of trust are sold by Lender, after the sale the commercial construction loan agreement will cease to be a part of this deed of trust, and Grantor will not assert any right of setoff, counterclaim, or other claim or defense arising out of or in connection with the commercial construction loan agreement against the obligations of the Note and this deed of trust.

                           4709 INCORPORATED,
                           D/B/A MIDTOWN LIVE


                           By
                           Selena Cash, Director and President

10

**Acknowledgment**

STATE OF TEXAS                    §
                                 §
COUNTY OF TRAVIS                 §

This instrument was acknowledged before me on September 9___, 2011 by Selena Cash,
as a director and the president of 4709 Incorporated, d/b/a Midtown Live, a Texas corporation,
on behalf of that corporation.

_____
Notary Public, State of Texas

DEBBIE J. PEEK
MY COMMISSION EXPIRES
June 3, 2014

AFTER RECORDING, RETURN TO:

First American Title
1221 S. MoPac Expy Ste 150
Austin TX 78746

11

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
September 21 2011 10:21 AM

FEE: $  56.00  **2011137642**

## <u>EXHIBIT 6</u>

**January 2012 POA Extension Agreement**



TRV    2012004604
11 PGS

# Renewal and Extension
# Deed of Trust, Security Agreement, and Assignment of Rents

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

## Terms

Date: January *10*, 2012

Grantor: 4709 Incorporated, d/b/a Midtown Live, a Texas corporation

Grantors' Mailing Address: 7602 Brookhollow Cv., Austin, Travis County, Texas 78752-2103

Trustee: Bruce R. Hardesty

Trustee's Mailing Address: 1411 West Ave., Suite 100, Austin, Travis County, Texas 78701-1537

Lender: Pride of Austin High Yield Fund I, LLC

Lender's Mailing Address: 401 Congress Ave., Suite 1540, Austin, Travis County, Texas 78701-3851

Obligations

    1. Renewal and Extension Promissory Note

        Date: The same date as this deed of trust

        Original principal amount: One Million Two Hundred Thirty-Six Thousand Nine Hundred Fifty-Six and 52/100 Dollars ($1,236,956.52)

        Borrower: 4709 Incorporated, d/b/a Midtown Live

        Lender: Pride of Austin High Yield Fund I, LLC

        Maturity date: February 1, 2013

    2.    Commercial Construction Loan Agreement between Pride of Austin High Yield Fund I, LLC, as Lender, and 4709 Incorporated, d/b/a Midtown Live, as Borrower, which is dated on or before this deed of trust.

Property:

> Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County,
> Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the
> Plat Records of Travis County, Texas

(the "Real Property"),

> Together with the following personal property: All fixtures, supplies, building
> materials, and other goods of every nature now or hereafter located, used, or
> intended to be located or used on the Real Property; all plans and specifications for
> development or construction of improvements on the Real Property; all contracts
> and subcontracts relating to the construction of improvements on the Real Property;
> all accounts, contract rights, instruments, documents, general intangibles, and
> chattel paper arising from or by virtue of any transactions relating to the Real
> Property; all permits, licenses, franchises, certificates, and other rights and
> privileges obtained in connection with the Real Property; all proceeds payable or
> to be payable under each policy of insurance relating to the Real Property; and all
> products and proceeds of the foregoing. The Real Property and the personal
> property described in this paragraph are sometimes collectively referred to in this
> deed of trust as the "Property". Notwithstanding any other provision in this deed
> of trust, the term "Property" does not include personal effects used primarily for
> personal, family, or household purposes.

Exceptions to Conveyance and Warranty: Validly existing easements, rights-of-way, and
prescriptive rights, whether of record or not; and all presently recorded and validly existing
instruments, other than conveyances of the surface fee estate.

Prior Liens: None

For value received and to secure payment of the Obligations, Grantor conveys the Property
to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the
Exceptions to Conveyance and Warranty. On payment of the Obligations and all other amounts
secured by this deed of trust, and upon satisfaction of all other covenants and conditions in the
Obligations, this deed of trust will have no further effect, and Lender will release it at Grantor's
expense. In addition to creating a deed-of-trust lien on all the real and other property described
above, to secure the Obligations Grantor also grants to Lender a security interest in all of the
above-described personal property and all its proceeds, pursuant to and to the greatest extent
permitted by the Texas Uniform Commercial Code. Grantor authorizes Lender to file one or more
financing statements describing that collateral. In the event of a default under the Obligations,
whether or not there is a foreclosure sale under this deed of trust, Grantor agrees that all or part
of the personal property described above may be sold as a whole or in parcels at Lender's option,
and that the property to be sold need not be present at the place of sale.

2

## Clauses and Covenants

### A.  Grantor's Obligations

Grantor agrees to—

1.    keep the Property in good repair and condition;

2.    pay all taxes and assessments on the Property before delinquency;

3.    defend title to the Property subject to the Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4.    maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;

5.    obey all laws, ordinances, and restrictive covenants applicable to the Property;

6.    keep any buildings occupied as required by the Required Insurance Coverages;

7.    if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8.    notify Lender of any change of address.

### B.  Lender's Rights

1.    Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee. Such written appointments need not be filed in the Official Public Records of the county where the Property is located or in any other public or governmental records in order to be effective.

2.    If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3.    Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligations or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender

3

reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

4.     Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligations or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligations, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5.     If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.     If there is a default in any of the Obligations or if Grantor fails to perform any of Grantor's other obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may—

      a.     declare the unpaid principal balance and earned interest on the Obligations immediately due;

      b.     direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

      c.     purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligations.

7.     Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

**C.     Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will—

1.     either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.     sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

4

3.    from the proceeds of the sale, pay, in this order—

a.    expenses of foreclosure, including a reasonable commission to Trustee;

b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c.    any amounts required by law to be paid before payment to Grantor; and

d.    to Grantor, any balance; and

4.    be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## D.    General Provisions

1.    If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.    Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.    This lien will remain superior to liens later created even if the time of payment of all or part of the Obligations is extended or part of the Property is released.

5.    If any portion of the Obligations cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6.    Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligations. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.    Grantor assigns to Lender absolutely, not only as collateral, all present and future

5

rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default with respect to the Obligations or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Obligations and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligations and the deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Obligations or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations with respect to the Obligations and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law. This section is intended to create an assignment of rents to the greatest extent permitted under Chapter 64 of the Texas Property Code, and to grant to Lender all rights of an assignee under that chapter.

8.      Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9.      In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.      Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

Grantor may not cause or permit any Property to be encumbered by any liens, security

6

interests, or encumbrances other than the liens securing the Obligations and the liens securing ad valorem taxes not yet due and payable without the prior written consent of Lender. If granted, consent may be conditioned upon Grantor's executing, before granting such lien, a written modification agreement containing any terms Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

Grantor may not grant any lien, security interest, or other encumbrance (a "Subordinate Instrument") covering the Property that is subordinate to the liens created by this deed of trust without the prior written consent of Lender. If granted, consent may be conditioned upon the Subordinate Instrument's containing express covenants to the effect that—

a.  the Subordinate Instrument is unconditionally subordinate to this deed of trust;

b.  if any action is instituted to foreclose or otherwise enforce the Subordinate Instrument, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of Lender, and that consent, if granted, may be conditioned in any manner Lender determines;

c.  rents, if collected by or for the holder of the Subordinate Instrument, will be applied first to the payment of the Obligations then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order Lender may determine, before being applied to any indebtedness secured by the Subordinate Instrument;

d.  written notice of default under the Subordinate Instrument and written notice of the commencement of any action to foreclose or otherwise enforce the Subordinate Instrument must be given to Lender concurrently with or immediately after the occurrence of any such default or commencement; and

e.  in the event of the bankruptcy of Grantor, all amounts due on or with respect to the Obligations and this deed of trust will be payable in full before any payments on the indebtedness secured by the Subordinate Instrument.

Grantor may not cause or permit any of the following events to occur without the prior written consent of Lender: if Grantor is (a) a corporation, the dissolution of the corporation or the sale, pledge, encumbrance, or assignment of any shares of its stock; (b) a limited liability company, the dissolution of the company or the sale, pledge, encumbrance, or assignment of any of its membership interests; (c) a general partnership or joint venture, the dissolution of the

7

partnership or venture or the sale, pledge, encumbrance, or assignment of any of its partnership or joint venture interests, or the withdrawal from or admission into it of any general partner or joint venturer; or (d) a limited partnership, (1) the dissolution of the partnership, (2) the sale, pledge, encumbrance, or assignment of any of its general partnership interests, or the withdrawal from or admission into it of any general partner, (3) the sale, pledge, encumbrance, or assignment of a controlling portion of its limited partnership interests, or (4) the withdrawal from or admission into it of any controlling limited partner or partners. If granted, consent may be conditioned upon (a) the integrity, reputation, character, creditworthiness, and management ability of the person succeeding to the ownership interest in Grantor (or security interest in such ownership) being satisfactory to Lender; and (b) the execution, before such event, by the person succeeding to the interest of Grantor in the Property or ownership interest in Grantor (or security interest in such ownership) of a written modification or assumption agreement containing such terms as Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

11.     When the context requires, singular nouns and pronouns include the plural.

12.     The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

13.     This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

14.     If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

15.     Grantor and each surety, endorser, and guarantor of the Obligation waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

16.     This conveyance is made in trust also to secure payment of all other present and future debts that Grantor may owe to Lender, regardless of how any other such debt is incurred or evidenced. This conveyance is also made to secure payment of any renewal or extension of any present or future debt that Grantor owes to Lender, including any loans and advancements from Lender to Grantor under the provisions of this deed of trust. When Grantor repays all debts owed to Lender, this deed-of-trust lien will terminate only if Lender releases this deed of trust at the request of Grantor. Until Lender releases it, this deed of trust will remain fully in effect to secure other present and future advances and debts, regardless of any additional security given for any debt and regardless of any modification. Grantor is not entitled to any partial releases of this deed-of-trust lien without the express, written consent of Lender.

17.     Grantor agrees to make an initial deposit in a reasonable amount to be determined

8

by Lender and then make monthly payments to an escrow fund for taxes and insurance premiums
on the Property. Monthly payments will be thereafter made on the first day of each calendar
month, and each payment will be one-twelfth of the amount that Lender estimates will be required
annually for payment of taxes and insurance premiums. The fund will accrue no interest, and
Lender will hold it without bond in escrow and use it to pay the taxes and insurance premiums.
If Grantor has complied with the requirements of this paragraph, Lender must pay taxes before
delinquency. Grantor agrees to make additional deposits on demand if the fund is ever insufficient
for its purpose. If an excess accumulates in the fund, Lender may either credit it to future monthly
deposits until the excess is exhausted or refund it to Grantor. When Grantor makes the final
payment on the Note, Lender will credit to that payment the whole amount then in the fund or,
at Lender's option, refund it after the Note is paid. If this deed of trust is foreclosed, any balance
in the fund over that needed to pay taxes, including taxes accruing but not yet payable, and to pay
insurance premiums will be paid under part C, "Trustee's Rights and Duties." If the Property is
transferred, any balance then in the fund will still be subject to the provisions of this paragraph
and will inure to the benefit of the transferee. Deposits to the fund described in this paragraph are
in addition to the payments provided for in the Note.

18.     Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other
costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the
hands of an attorney for enforcement.

19.     In case any one or more of the provisions contained in this deed of trust shall for
any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in
any respect, to the extent that the unenforceability does not destroy the basis of the bargain among
the parties to this deed of trust, such invalidity, illegality, or unenforceability shall not affect any
other provision of this deed of trust, and this deed of trust shall be construed as if the invalid,
illegal, or unenforceable provision had never been included in this deed of trust.

20.     The term *Lender* includes any mortgage servicer for Lender.

21.     Grantor represents that this deed of trust and the Renewal and Extension Promissory
Note are given for the following purposes:
1. To renew and extend the principal balance of One Million One Hundred Thousand and
No/100 Dollars ($1,100,000.00) that Borrower owes on a prior promissory note in the original
principal amount of One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00),
which is dated on or about September 9, 2011, executed by 4709 Incorporated, d/b/a Midtown
Live, a Texas corporation, and payable to the order of Pride of Austin High Yield Fund I, LLC.
That prior note is more fully described in and secured by a lien on the Property that was granted
by the Borrower in a Deed of Trust, Security Agreement, and Assignment of Rents, which is dated
September 9, 2011, and recorded under document number 2011137642 in the Official Public
Records of Travis County, Texas.
2. To provide evidence of the Borrower's promise to repay an additional One Hundred
Thirty-Six Thousand Nine Hundred Fifty-Six and 52/100 Dollars ($136,956.52) loaned by the

9

Lender to the Borrower. The Renewal and Extension Promissory Note supplements the Commercial Construction Loan Agreement between the Lender and the Borrower that is described in this deed of trust.

Grantor acknowledges that the lien securing the prior note described above is valid; that that lien subsists against the Property; and that by this Renewal and Extension Deed of Trust, Security Agreement, and Assignment of Rents that lien will be renewed and extended in full force to secure the payment of the Renewal and Extension Promissory Note.

## E.    Construction Loan Mortgage

1.    This deed of trust is a "construction mortgage" within the meaning of section 9.334 of the Texas Business and Commerce Code. The liens and security interests created and granted by this deed of trust secure an obligation incurred for the construction of improvements on land, including the acquisition cost of the land.

2.    Grantor agrees to comply with the covenants and conditions of the commercial construction loan agreement, if any, executed in connection with the Note and this deed of trust. All advances made by Lender under the commercial construction loan agreement will be indebtedness of Grantor secured by the liens created by this deed of trust, and such advances are conditioned as provided in the commercial construction loan agreement.

3.    All amounts disbursed by Lender before completion of the improvements to protect the security of this deed of trust up to the principal amount of the Note will be treated as disbursements under the commercial construction loan agreement. All such amounts will bear interest from the date of disbursement at the rate stated in the Note, unless collections from Grantor of interest at that rate would be contrary to applicable law, in which event such amounts will bear interest at the rate stated in the Note for matured, unpaid amounts and will be payable on notice from Lender to Grantor requesting payment.

4.    From time to time as Lender deems necessary to protect Lender's interests, Grantor will, on request of Lender, execute and deliver to Lender, in such form as Lender directs, assignments of any and all rights or claims that relate to the construction of improvements on the Property.

5.    In case of breach by Grantor of the covenants and conditions of the construction loan agreement, Lender, at its option, with or without entry on the Property, may (a) invoke any of the rights or remedies provided in the construction loan agreement, (b) accelerate the amounts secured by this deed of trust and invoke the remedies provided in this deed of trust, or (c) do both.

6.    If, after commencement of amortization of the Note, the Note and this deed of trust are sold by Lender, after the sale the commercial construction loan agreement will cease to be a part of this deed of trust, and Grantor will not assert any right of setoff, counterclaim, or other claim or defense arising out of or in connection with the commercial construction loan agreement

10

against the obligations of the Note and this deed of trust.

4709 INCORPORATED,
D/B/A MIDTOWN LIVE

By: _____
Selena Cash, Director and President

## Acknowledgment

STATE OF TEXAS          §
                                    §

COUNTY OF TRAVIS     §

      This instrument was acknowledged before me on January ꞏ10ꞏ , 2012 by Selena Cash, as a director and the president of 4709 Incorporated, d/b/a Midtown Live, a Texas corporation, on behalf of that corporation.

_____
Notary Public, State of Texas

AFTER RECORDING, RETURN TO:

Bruce R. Hardesty
1411 West Ave Ste 100
Austin TX 78701-1537

LINDA ASHLEY HESTER
Notary Public, State of Texas
My Commission Expires
July 07, 2015

## FILED AND RECORDED

OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Jan 11, 2012  02:19 PM  2012004604
HAYWOODK: $56.00
Dana DeBeauvoir, County Clerk
Travis County  TEXAS

## <u>EXHIBIT 7</u>

**January 2013 POA Extension Agreement**

ELECTRONICALLY RECORDED          2013019734

TRV          3          PGS          —

9/First American Title/GF# /7ℱ3912-Au20

## MODIFICATION AND EXTENSION AGREEMENT

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**Date:** January 3, 2013

**Holder of Note and Lien:** PRIDE OF AUSTIN HIGH YIELD FUND I, LLC

**Holder's Mailing Address:** 401 Congress Ave, Suite 1540, Austin, Travis County, TX 78701-3851

**Obligor:** 4709 INCORPORATED, d/b/a MIDTOWN LIVE, a Texas corporation

**Obligor's Mailing Address:** 7602 Brookhollow Cv, Austin, Travis County, TX 78752-2103

**Note:**

> **Date:** January 9, 2012
>
> **Original principal amount:** $1,236,956.52
>
> **Maturity Date:** February 1, 2013

**Unpaid Principal and Interest on Note:** $1,360,214.57

**Lien Documents:**  Deed of Trust dated January 10, 2012, executed by 4709 INCORPORATED, d/b/a MIDTOWN LIVE, a Texas corporation, to BRUCE R. HARDESTY, Trustee, for the benefit of PRIDE OF AUSTIN HIGH YIELD FUND I, LLC, recorded on January 11, 2012 in County Clerk's File No. 2012004604, Official Public Records, Travis County, Texas.

**Property (including any improvements):** Lot 2, RESUBDIVISION OF LOT 11, REAGAN HILL, Travis County, Texas, according to the map or plat thereof, recorded in Volume 92, Page 65, Plat Records, Travis County, Texas.

**Extended Maturity Date of Note:** January 1, 2014

**Modified Terms:**  Interest accrues at the annual Interest Rate of 12.9% on the unpaid balance and is payable monthly beginning March 1, 2013, and continuing on the same day of each month until Extended Maturity Date, when all principal and unpaid interest will be fully due and payable.

The Lien described herein is renewed as a first and superior lien and the second lien indebtedness payable to JOHN HOBERMAN and SUSAN HOBERMAN remains second and inferior to the Lien evidenced hereby.

The Note is secured by liens against the Property. Whether Obligor is primarily liable on the Note or not, Obligor nevertheless agrees to pay the Note and comply with the obligations expressed in the Lien Documents.

For value received, Obligor renews the Note and promises to pay to the order of Holder of Note and Lien, according to the Modified Terms, the Unpaid Principal and Interest on Note. All unpaid amounts are due by the Extended Maturity Date of Note. Obligor also extends the liens described in the Lien Documents.

The Note and Lien Documents continue as written, except as provided in this agreement.

Obligor warrants to Holder of Note and Lien that the Note and the Lien Documents, as modified, are valid and enforceable and represents that they are not subject to rights of offset, rescission, or other claims.

Guarantor affirms the extension of the Note and extends Guarantor's obligations as described in Guaranty dated January 9, 2012.

When the context requires, singular nouns and pronouns include the plural.

**Obligor**

4709 INCORPORATED, d/b/a MIDTOWN LIVE, a Texas corporation

SELENA CASH, Director and President

**Guarantor**

SELENA CASH

**Holder**

PRIDE OF AUSTIN HIGH YIELD FUND I, LLC, a Texas limited liability company
By: PRIDE OF AUSTIN CAPITAL PARTNERS, LLC, a Texas limited Liability company, its Manager

DAVID F. OWEN, Manager

Page 2 of 3

**STATE OF TEXAS**          §

                           §

**COUNTY OF TRAVIS**        §

This instrument was acknowledged before me on January 31, 2013, by SELENA CASH, Director and President, of 4709 INCORPORATED, d/b/a MIDTOWN LIVE, a Texas corporation, on behalf of said corporation.



_____

Notary Public, State of Texas

My commission expires: _____

**STATE OF TEXAS**          §

                           §

**COUNTY OF TRAVIS**        §

This instrument was acknowledged before me on January 31, 2013, by SELENA CASH.

_____

Notary Public, State of Texas

My commission expires: _____

**STATE OF TEXAS**          §

                           §

**COUNTY OF TRAVIS**        §

This instrument was acknowledged before me on January 31, 2013, by DAVID F. OWEN, Manager of PRIDE OF AUSTIN CAPITAL PARTNERS, LLC, a Texas limited Liability Company, Manager of PRIDE OF AUSTIN HIGH YIELD FUND I, LLC, a Texas limited liability company, on behalf of said company.

_____

Notary Public, State of Texas

My commission expires: July 07, 2015

LINDA ASHLEY HESTER
Notary Public, State of Texas
My Commission Expires
July 07, 2015

Page 3 of 3

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
February 01 2013 12:26 PM
FEE: $ 24.00   2013019734

# EXHIBIT 8

**POA Transfer**

ELECTRONICALLY RECORDED          2015025866

TRV          6          PGS

## Transfer of Note and Lien (and Other Rights)

| | |
|---|---|
| Effective Date: | February 13, 2015 |
| Holder of Note and Lien (and Other Rights): | Pride of Austin High Yield Fund I LLC, a Texas limited liability company |
| Holder's Mailing Address: | c/o Robert J. Buchanan<br>401 Congress Avenue, Suite 1540<br>Austin, Travis County, Texas 78701-3851 |
| Transferee: | John W. Hoberman |
| Transferee's Mailing Address: | 2413 Thornton Road<br>Austin, Travis County, Texas 78704 |

Real Estate Lien Note

| | |
|---|---|
| Original Date: | September 9, 2011 |
| Original Principal Amount: | $1,100,000.00 |
| Borrower: | 4709, Incorporated d/b/a Midtown Live, a Texas corporation |
| Lender: | Pride of Austin High Yield Fund I LLC |

Renewal and Extension Promissory Note

| | |
|---|---|
| Renewal & Extension Date: | January 9, 2012 |
| Renewal & Extension Amt.: | $1,236,956.52 |
| Borrower: | 4709, Incorporated d/b/a Midtown Live, a Texas corporation |
| Lender: | Pride of Austin High Yield Fund I LLC |
| Unpaid principal and interest as of March 3, 2014: | $1,401,432.59 |

Note and Lien (and Other Rights)
of Holder Are Described in the
Following Documents:

1.  Commercial Construction Loan Agreement dated September 9, 2011 (the "Loan Agreement") entered into by and between Borrower and Lender;

2.  Deed of Trust, Security Agreement, and Assignment of Rents dated September 9, 2011 (the "Deed of Trust") executed by Borrower as Grantor naming Bruce R. Hardesty as Trustee for the benefit of Lender and which Deed of Trust is recorded under Document No. 2011137642 of the Official Public Records of Travis County, Texas;

3.  The Deed of Trust was renewed and extended by that certain Renewal and Extension Deed of Trust, Security Agreement, and Assignment of Rents dated January 10, 2012 (the "Renewal Deed of Trust") executed by Borrower as Grantor naming Bruce R. Hardesty as Trustee for the benefit of Lender and which Renewal Deed of Trust is recorded under Document No. 2012004604 of the Official Public Records of Travis County, Texas;

4.  The Real Estate Lien Note, the Renewal and Extension Promissory Note, the Deed of Trust, and the Renewal Deed of Trust were further modified by the terms of that certain Modification and Extension Agreement dated January 31, 2013 (the "Modification Agreement") executed by Borrower, Lender, and Selena Cash as Guarantor;

5.  Assignment of Rights, Warranties, Permits, Licenses , and Contracts dated September 9, 2011 (the "Assignment of Rights") entered into by and between Borrower and Capital City Homes, LLC for the benefit of Lender;

6.  The personal Guaranty of Selena Cash dated September 9, 2011 (the "Guaranty"); and

7.  The personal Guaranty of Selena Cash dated January 9, 2012 (the "Updated Guaranty").

Property (including
any improvements):

Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas.

Prior Lien(s):          None

Pending Bankruptcy Proceeding
and Rights Related Thereto:        Holder and Transferee acknowledge that there is a pending
bankruptcy Court proceeding of Borrower filed on March 3,
2014 under case number 14-10340-tmd in the United States
Bankruptcy Court - Western District of Texas - Austin
Division (the "Bankruptcy Case"). Holder has filed a proof
of claim (the "Claim") in the Bankruptcy Case. With regards
to the Property, Holder and Borrower entered into an Agreed
Motion for Relief From the Automatic Stay Against Real
Estate and Related Property on September 2, 2014 (the
"Agreed Motion"). The Agreed Motion was approved by the
Court by Order dated September 22, 2014 (the "Lift Stay
Order"). In connection with the Agreed Motion, Holder
agreed to waive any deficiency claim or recovery against
Selena Cash under the Guaranty or the Updated Guaranty in
connection with Selena Cash's individual Chapter 13
bankruptcy proceeding. Based on the Motion and as allowed
by the Lift Stay Order, Holder posted the Property for
foreclosure on February 3, 2015. Pursuant to agreement and
at the request of Transferee, Holder passed the scheduled
February 3, 2015 foreclosure sale setting without waiving its
right to re-post the Property again for foreclosure on any date
thereafter. Holder acknowledges that it has been paid in full
by Transferee for the transfer of the Note and Lien (and Other
Rights) as set forth herein. In addition to the Lift Stay Order
related to the Agreed Motion, Holder and Transferee
acknowledge that there is also and Agreed Final Order on
Debtor's Motion to Use of Cash Collateral (the "Cash
Collateral Order"). Accordingly, and as part of the transfer of
rights to Transferee contemplated herein, Holder transfers and
assigns over to Transferee, as of the Effective Date, any and
all additional rights that may have accrued to Holder under
the pending Bankruptcy Case specifically including by way of
example but not limitation, all rights to any other payments to
be made to Holder from Borrower under the Cash Collateral
Order after the Effective Date. For the purposes hereof, the
rights outlined herein related to the pending Bankruptcy Case
specifically those rights accruing to Holder under the Lift Stay
Order and the Cash Collateral Order shall be considered part
of the "Other Rights" held by Holder and transferred hereby
to Transferee.

For value received, Holder of Note and Lien (and Other Rights) transfers them to Transferee. Such transfer is without any representation or warranty of any kind and character, including, without limitation, validity or priority of the Deed of Trust, the Renewal Deed of Trust, the amount of the debt on the Real Estate Lien Note, the collectability of the Real Estate Lien Note, or the appropriateness of Purchaser's purchase of the Note and Lien (and Other Rights), the enforceability of the Claim or any other rights transferred hereby. Seller's sole warranty is that Seller owns the Real Estate Lien Note, the Deed of Trust, the Renewal Deed of Trust, and the Claim and has not transferred the Real Estate Lien Note, the Deed of Trust, the Renewal Deed of Trust, or the Claim prior to the Effective Date. Transferee warrants and represents that he has conducted his own investigation of the facts and circumstances surrounding the purchase of the Note and Lien (and Other Rights) and has not relied upon any representation or statement of Holder of Note and Lien (and Other Rights). Specifically, Transferee has conducted his own investigation of the events that have occurred in the Bankruptcy Case, and is relying on the advice of his own counsel in proceeding with the purchase of the Note and Lien (and Other Rights) as provided herein and not on any representations of Holder of Note and Lien (and Other Rights), except the limited representation of ownership of the Note and Lien (and Other Rights) provided in this paragraph alone.

Except as specifically enumerated herein, this transfer is without recourse on Holder of Note and Lien (and Other Rights).

Holder of Note and Lien (and Other Rights) expressly waives and releases all present and future rights to establish or enforce the Lien (and Other Rights) described in this instrument as security for payment of any future or other indebtedness and for any other reason.

When the context requires, singular nouns and pronouns include the plural.

Pride of Austin High Yield Fund I LLC,
a Texas limited liability company

By: _____

　　　　Robert J. Buchanan
Its:　　Manager

Transfer of Note and Lien (and Other Rights)　　　　　　　　　　　　　　　　Page 4 of 5

STATE OF TEXAS                    §
                                 §
COUNTY OF TRAVIS                 §


    This instrument was acknowledged before me on the 13 day of February, 2015 by Robert J. Buchanan, Manager of Pride of Austin High Yield Fund I LLC, a Texas limited liability company, on behalf of said limited liability company.



SHERRI A. SAVALA
NOTARY PUBLIC
State of Texas
Comm. Exp. 07-25-2017

Notary Public, The State of Texas

AFTER RECORDING RETURN TO:

Christopher M. Benjamin
McLeroy, Alberts & Benjamin, PC
608 W. 12th Street
Austin, TX  78701

Transfer of Note and Lien (and Other Rights)                                    Page 5 of 5

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS

February 24 2015 11:42 AM

FEE: $   46.00   **2015025866**

# EXHIBIT 9

**June 2012 Note**

## REAL ESTATE LIEN NOTE

**DATE:**    June **5** , 2012

**MAKER:**    4709 INCORPORATED dba MIDTOWN LIVE

**MAKER'S MAILING ADDRESS**:

  7602 Brookhollow Cove
  Austin, Texas 78752

**PAYEE:**    JOHN HOBERMAN and SUSAN HOBERMAN

**PLACE FOR PAYMENT**:

  7801 Chimney Corners
  Austin, Texas 78731

**PRINCIPAL AMOUNT**:    ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS
  ($150,000.00)

**ANNUAL INTEREST RATE ON UNPAID PRINCIPAL FROM DATE**:

  A fixed rate of fifteen percent (15.0%).

**ANNUAL INTEREST RATE ON MATURED, UNPAID AMOUNTS**:

  Highest interest rate allowed by applicable law.

**TERMS OF PAYMENT** (principal and interest):

  The principal shall be due and payable two years after the date hereof, and interest shall
be payable monthly as it accrues, on the first day of each month, beginning August 1, 2012 and
continuing regularly thereafter.

  Payment will be applied first to accrued interest and other non-principal amounts due and
owing pursuant to this Note or a related document, then to reduction of principal.

**SECURITY FOR PAYMENT**:

1

Deed of Trust of even date herewith, executed by Maker, to ROBERT E. BLACK, Trustee, upon the following property:

Lot 2, RESUBDIVISION of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 92, Page(s) 65 of the Plat Records of Travis County, Texas.

Maker promises to pay to the order of Payee at the place for payment and according to the terms of payment the principal amount plus interest at the rates stated above. All unpaid amounts shall be due by the final scheduled payment date.

If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues after Payee gives Maker notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Payee may declare the unpaid principal balance and earned interest on this note immediately due. Maker and each surety, endorser, and guarantor waive all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

If this note or any instrument securing or collateral to it is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Maker shall pay Payee all costs of collection and enforcement, including reasonable attorney's fees and court costs, in addition to other amounts due.

Interest on the debt evidenced by this note shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. However, prior to any such credit or refund, the total of all consideration which constitutes interest under applicable law that is contracted for, charged or received, shall be amortized, prorated, allocated and spread through the entire period that the indebtedness evidenced by this note is outstanding to the extent possible without exceeding the maximum lawful rate in effect from time-to-time during such period. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Each Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

Interest shall be computed on the basis of a year of three hundred sixty (360) days, and accrued on the number of days funds are actually outstanding.

Maker reserves the right to prepay this Note in any amount at any time prior to maturity. All prepayments shall be applied to the installments last falling due under the terms hereof.

**Late Charge**.  If any payment or installment becomes overdue for more than ten (10) days, at Payee's option, five percent (5%) of the overdue payment, with a minimum of $25.00, may be charged in order to defray the expense of handling the delinquent payment.

**This loan is payable in full on or before two years after date hereof.  At maturity you, as Borrower, must repay the entire principal balance of the loan and unpaid interest then due. The Lender is under no obligation to refinance the loan at that time.  You will, therefore, be required to make payments out of other assets that you might own, or you will have to find a Lender, which may be the Lender you have the loan with, willing to lend you the money.  If you refinance this loan at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain refinancing from the same Lender.**

4709 INCORPORATED dba MIDTOWN LIVE

By: _____

SELENA CASH, Its President

3

# EXHIBIT 10

**June 2012 Note Deed of Trust**

ELECTRONICALLY RECORDED          2012173363

TRV      7      PGS

# DEED OF TRUST

**"NOTICE OF CONFIDENTIALITY RIGHTS:**
**IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL**
**OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT**
**TRANSFERS ANY INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR**
**RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR**
**YOUR DRIVER'S LICENSE NUMBER."** 2431000 3343

**DATE:**      June 5, 2012

**GRANTOR:** 4709 INCORPORATED dba MIDTOWN LIVE

**GRANTOR'S MAILING ADDRESS:**

  7602 Brookhollow Cove
  Austin, Travis County, Texas 78752

**TRUSTEE:** ROBERT E. BLACK

**TRUSTEE'S MAILING ADDRESS:**

  500 W. 16th Street, Suite 120
  Austin, Travis County, Texas 78701

**LENDER:** JOHN HOBERMAN and SUSAN HOBERMAN

**LENDER'S MAILING ADDRESS:**

  7801 Chimney Corners
  Austin, Travis County, Texas 78731

**NOTE(S):**

  Date: EVEN DATE HEREWITH

  Original Principal Amount: $150,000.00

  Borrower: GRANTOR

Lender:  BENEFICIARY

Maturity Date:  TWO YEARS AFTER DATE HEREOF

## PROPERTY (including any improvements):

Lot 2, RESUBDIVISION of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 92, Page(s) 65 of the Plat Records of Travis County, Texas.

## PRIOR LIEN (S):

Deed of Trust recorded under Document No. 2011137642, Official Public Records of Travis County, Texas, securing a Note in the original principal sum of $1,100,000.00, executed by Grantor, and payable to the order of Pride of Austin High Yield Fund I, LLC.

Other Exceptions to Conveyance and Warranty:

Easements, rights of way, and prescriptive rights, whether of record or not; All presently recorded instruments, other than liens and conveyances, that affect the Property.

For value received and to secure payment of the Note, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Note and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

### Clauses and Covenants

A.  **Grantor's Obligations**

Grantor agrees to:

1. keep the Property in good repair and condition;
2. pay all taxes and assessments on the Property before delinquency;
3. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;
4. maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;
5. obey all laws, ordinances, and restrictive covenants applicable to the Property;
6. keep any buildings occupied as required by the Required Insurance Coverages;

7.    if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8.    notify Lender of any change of address.

**B.    Lender's Rights**

1.    Lender may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

2.    If the proceeds of the Note are used to pay any debt secured by prior liens, Lender is subrogated to all of the rights and liens of the holders of any debt so paid.

3.    Lender may apply any proceeds received under the insurance policy either to reduce the Note or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the insurance proceeds available to Grantor for repairs.

4.    Notwithstanding Note terms to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor under the Note or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender under the Note, to be applied to late charges, principal, or interest in the order Lender in it's discretion determines.

5.    If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.    If there is a default on the Note or if Grantor fails to perform any of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may:

a.    declare the unpaid principal balance and earned interest on the Note immediately due;

b.    direct Trustee to foreclose this lien, in which case Lender or Lender's agent will give notice of the foreclosure sale as provided by the Texas Property Code as then in effect; and

c.    purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Note.

7.    Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

**C.    Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will:

1.    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Liens and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by

Trustee;

3.    from the proceeds of the sale, pay, in this order:

    a.    expenses of foreclosure, including a reasonable commission to Trustee;

    b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

    c.    any amounts required by law to be paid before payment to Grantor; and

    d.    to Grantor, any balance.

4.    be indemnified by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## D.    General Provisions

1.    If any of the Property is sold under this deed of trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.    Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.    This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the Property is released.

5.    If any portion of the Note cannot be lawfully secured by this deed of trust, payments shall be applied first to discharge that portion.

6.    Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees, Lender will either release any remaining sums to Grantor or apply such amounts to reduce the Note. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.    Grantor assigns to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default under the Note or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Note and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due under the Note and deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Note or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender shall apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations under the Note and this deed of

trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

      8.      Interest on the debt secured by this deed of trust shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. However, prior to any such credit or refund, the total of all consideration which constitutes interest under applicable law that is contracted for, charged or received, shall be amortized, prorated, allocated and spread through the entire period that the indebtedness evidenced by this note is outstanding to the extent possible without exceeding the maximum lawful rate in effect from time-to-time during such period. This provision overrides other provisions in this and all other instruments concerning the debt.

      9.      In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

      10.     When the context requires, singular nouns and pronouns include the plural.

      11.     The term *Note* includes all extensions and renewals of the Note and all amount secured by this deed of trust.

      12.     This deed of trust binds, benefits, and may be enforced by the successor in interest of all parties.

      13.     If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

      14.     Grantor and each surety, endorser, and guarantor of the Note waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

      15.     Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

      16.     If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

      17.     Grantor represents that this deed of trust and the Note are given for the following purposes, and/or with the following covenants, conditions and terms:

          a.     Lender may remedy any default, without waiving same, or may waive any default without waiving any prior or subsequent default.

          b.     Lender may declare the debt secured by this deed of trust immediately payable and invoke any remedies provided in this deed of trust for default if Grantor transfers any of the Property to a person who is not a permitted transferee without Lenders consent or, if Grantor is not a natural person, if any person owning a direct or indirect interest in Grantor transfers such interest to a person that is not a "permitted transferee" without Lender's consent. "Permitted transferee" for a natural person means that person's spouse or children, any trust for that person's benefit or the benefit of the person's spouse or children, any trust for that person's benefit or the

benefit of the person's spouse or children, or any corporation, partnership, or limited liability company in which the direct and beneficial owner of all the equity interest is a natural person or that person's spouse or children or any trust for the benefit of them; and the heirs, beneficiaries, executors, administrators, or personal representatives of a natural person on the death of that person or on the incompetency or disability of that person for purposes of the protection and management of that person's assets; and for a person that is not a natural person, any other person controlling, controlled by, or under common control with that person.

c.   In the event any portion of the indebtedness herein described cannot be lawfully secured by the liens herein given and created upon the herein described Property, it is agreed that the first payments made on said indebtedness shall be applied to the discharge of that portion of said indebtedness.

d.   Hazardous Substances.  Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property.  Grantor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law.  The preceding two sentences shall not apply to the presence, use, or storage on the Property of quantities of Hazardous Substances that are generally recognized to be appropriate to normal uses appropriate to the Property and to maintenance of the Property.

Grantor shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantor has actual knowledge.  If Grantor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Grantor shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

4709 INCORPORATED dba MIDTOWN LIVE

By: _____
SELENA CASH, Its President

STATE OF TEXAS        §
                              §

COUNTY OF _TRAVIS_    §

This instrument was acknowledged before me on the _5ғ4_ day of _June_, 2012, by Selena Cash, as President of 4709 Incorporated dba Midtown Live.



NOTARY PUBLIC

**AFTER RECORDING RETURN TO:**

AUSTIN TITLE COMPANY
901 Cypress Creek Road, Suite 204
Cedar Park, TX 78613

**PREPARED IN THE LAW OFFICE OF:**

ROBERT E. BLACK
500 W. 16th Street, Suite 120
Austin, Texas 78701
(512) 477-1964

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
October 12 2012 03:30 PM
FEE: $  40.00   **2012173363**

# EXHIBIT 11

**September 2013 Note**

## REAL ESTATE LIEN NOTE

**DATE**:          September 5, 2013

**MAKER**:       4709 INCORPORATED dba MIDTOWN LIVE

**MAKER'S MAILING ADDRESS**:

  7602 Brookhollow Cove
  Austin, Texas 78752

**PAYEE**:       JOHN HOBERMAN

**PLACE FOR PAYMENT**:

  7801 Chimney Corners
  Austin, Texas 78731

**PRINCIPAL AMOUNT**:     ONE HUNDRED THOUSAND AND NO/100 DOLLARS
                         ($100,000.00)

**ANNUAL INTEREST RATE ON UNPAID PRINCIPAL FROM DATE**:

  A fixed rate of fifteen percent (15.0%).

**ANNUAL INTEREST RATE ON MATURED, UNPAID AMOUNTS**:

  Highest interest rate allowed by applicable law.

**TERMS OF PAYMENT** (principal and interest):

  Principal and interest are payable in monthly installments of ONE THOUSAND EIGHT
HUNDRED TWENTY-TWO AND 50/100 DOLLARS ($1,822.50), each, on the 11th day of
every month, beginning the 11th day of October, 2013 and continuing regularly thereafter until
the expiration of three years after the date hereof when the entire amount of principal and interest
remaining unpaid shall be due and payable.

  Payment will be applied first to accrued interest and other non-principal amounts due and
owing pursuant to this Note or a related document, then to reduction of principal.

1

**SECURITY FOR PAYMENT**:

Deed of Trust of even date herewith, executed by Maker, to ROBERT E. BLACK, Trustee, upon the following property:

Lot 2, RESUBDIVISION of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 92, Page(s) 65 of the Plat Records of Travis County, Texas.

Maker promises to pay to the order of Payee at the place for payment and according to the terms of payment the principal amount plus interest at the rates stated above. All unpaid amounts shall be due by the final scheduled payment date.

If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues after Payee gives Maker notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Payee may declare the unpaid principal balance and earned interest on this note immediately due. Maker and each surety, endorser, and guarantor waive all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

If this note or any instrument securing or collateral to it is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Maker shall pay Payee all costs of collection and enforcement, including reasonable attorney's fees and court costs, in addition to other amounts due.

Interest on the debt evidenced by this note shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. However, prior to any such credit or refund, the total of all consideration which constitutes interest under applicable law that is contracted for, charged or received, shall be amortized, prorated, allocated and spread through the entire period that the indebtedness evidenced by this note is outstanding to the extent possible without exceeding the maximum lawful rate in effect from time-to-time during such period. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Each Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

Interest shall be computed on the basis of a year of three hundred sixty (360) days, and accrued on the number of days funds are actually outstanding.

Maker reserves the right to prepay this Note in any amount at any time prior to maturity. All prepayments shall be applied to the installments last falling due under the terms hereof.

**Late Charge**.  If any payment or installment becomes overdue for more than ten (10) days, at Payee's option, five percent (5%) of the overdue payment, with a minimum of $25.00, may be charged in order to defray the expense of handling the delinquent payment.

**This loan is payable in full on or before three years after date hereof.  At maturity you, as Borrower, must repay the entire principal balance of the loan and unpaid interest then due. The Lender is under no obligation to refinance the loan at that time.  You will, therefore, be required to make payments out of other assets that you might own, or you will have to find a Lender, which may be the Lender you have the loan with, willing to lend you the money.  If you refinance this loan at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain refinancing from the same Lender.**

4709 INCORPORATED dba MIDTOWN LIVE

By: _____

SELENA CASH, Its President

# **EXHIBIT 12**

**September 2013 Note Deed of Trust**

TRV

7 PGS

2013166967

# DEED OF TRUST

**"NOTICE OF CONFIDENTIALITY RIGHTS:
IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS ANY INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER."**

**DATE:** ~~August~~ September 5, 2013

**GRANTOR:** 4709 INCORPORATED dba MIDTOWN LIVE

**GRANTOR'S MAILING ADDRESS:**

> 7602 Brookhollow Cove
> Austin, Texas 78752

**TRUSTEE:** ROBERT E. BLACK

**TRUSTEE'S MAILING ADDRESS:**

> 500 W. 16th Street, Suite 120
> Austin, Travis County, Texas 78701

**LENDER:** JOHN HOBERMAN

**LENDER'S MAILING ADDRESS:**

> 7801 Chimney Corners
> Austin, Texas 78731

**NOTE(S):**

> Date: EVEN DATE HEREWITH
>
> Original Principal Amount: $100,000.00
>
> Borrower: GRANTOR

Lender:       BENEFICIARY

Maturity Date:       THREE YEARS AFTER DATE HEREOF

**PROPERTY (including any improvements)**:

Lot 2, RESUBDIVISION of Lot 11, REAGAN HILL, a subdivision in Travis
County, Texas, according to the map or plat thereof, recorded in Volume 92,
Page(s) 65 of the Plat Records of Travis County, Texas.

**PRIOR LIEN(S):**

Deed of Trust recorded under Document No. 2011137642, Official Public Records of
Travis County, Texas, securing a Note in the original principal sum of $1,100,000.00
executed by Grantor and payable to the order of Pride of Austin High Yield Fund I, LLC.
Deed of Trust recorded among the Real Property Records of Travis County, Texas,
securing a Note in the original principal sum of $100,000.00, executed by Grantor, dated
June 5, 2012, and payable to the order of John Hoberman and Susan Hoberman

Other Exceptions to Conveyance and Warranty:

Easements, rights of way, and prescriptive rights, whether of record or not; All presently
recorded instruments, other than liens and conveyances, that affect the Property.

For value received and to secure payment of the Note, Grantor conveys the Property to
Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the
Other Exceptions to Conveyance and Warranty. On payment of the Note and all other amounts
secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it
at Grantor's expense.

### Clauses and Covenants

A.       **Grantor's Obligations**

Grantor agrees to:

1.       keep the Property in good repair and condition;
2.       pay all taxes and assessments on the Property before delinquency;
3.       defend title to the Property subject to the Other Exceptions to Conveyance and
         Warranty and preserve the lien's priority as it is established in this deed of trust;
4.       maintain all insurance coverages with respect to the Property, revenues generated
         by the Property, and operations on the Property that Lender reasonably requires
         ("Required Insurance Coverages"), issued by insurers and written on policy forms
         acceptable to lender, and deliver evidence of the Required Insurance Coverages in a
         form acceptable to Lender at least ten days before the expiration of the Required
         Insurance Coverages;

5.      obey all laws, ordinances, and restrictive covenants applicable to the Property;
6.      keep any buildings occupied as required by the Required Insurance Coverages;
7.      if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and
8.      notify Lender of any change of address.

B.    **Lender's Rights**

1.      Lender may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

2.      If the proceeds of the Note are used to pay any debt secured by prior liens, Lender is subrogated to all of the rights and liens of the holders of any debt so paid.

3.      Lender may apply any proceeds received under the insurance policy either to reduce the Note or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the insurance proceeds available to Grantor for repairs.

4.      Notwithstanding Note terms to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor under the Note or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender under the Note, to be applied to late charges, principal, or interest in the order Lender in it's discretion determines.

5.      If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.      If there is a default on the Note or if Grantor fails to perform any of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may:

a.      declare the unpaid principal balance and earned interest on the Note immediately due;

b.      direct Trustee to foreclose this lien, in which case Lender or Lender's agent will give notice of the foreclosure sale as provided by the Texas Property Code as then in effect; and

c.      purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Note.

7.   Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

C.    **Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will:

1.      either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.      sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Liens and to the Other Exceptions to

Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

    3.      from the proceeds of the sale, pay, in this order:

        a.      expenses of foreclosure, including a reasonable commission to Trustee;

        b.      to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

        c.      any amounts required by law to be paid before payment to Grantor; and

        d.      to Grantor, any balance.

    4.      be indemnified by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**D.    General Provisions**

    1.      If any of the Property is sold under this deed of trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

    2.      Recitals in any trustee's deed conveying the Property will be presumed to be true.

    3.      Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

    4.      This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the Property is released.

    5.      If any portion of the Note cannot be lawfully secured by this deed of trust, payments shall be applied first to discharge that portion.

    6.      Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees, Lender will either release any remaining sums to Grantor or apply such amounts to reduce the Note. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

    7.      Grantor assigns to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default under the Note or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Note and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due under the Note and deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Note or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender shall apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations under the Note and this deed of trust in the order

determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

       8.      Interest on the debt secured by this deed of trust shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. However, prior to any such credit or refund, the total of all consideration which constitutes interest under applicable law that is contracted for, charged or received, shall be amortized, prorated, allocated and spread through the entire period that the indebtedness evidenced by this note is outstanding to the extent possible without exceeding the maximum lawful rate in effect from time-to-time during such period. This provision overrides other provisions in this and all other instruments concerning the debt.

       9.      In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

     10.     When the context requires, singular nouns and pronouns include the plural.

     11.     The term *Note* includes all extensions and renewals of the Note and all amount secured by this deed of trust.

     12.     This deed of trust binds, benefits, and may be enforced by the successor in interest of all parties.

     13.     If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

     14.     Grantor and each surety, endorser, and guarantor of the Note waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

     15.     Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

     16.     If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

     17.     Grantor represents that this deed of trust and the Note are given for the following purposes, and/or with the following covenants, conditions and terms:

          a.     Lender may remedy any default, without waiving same, or may waive any default without waiving any prior or subsequent default.

          b.     Lender may declare the debt secured by this deed of trust immediately payable and invoke any remedies provided in this deed of trust for default if Grantor transfers any of the Property to a person who is not a permitted transferee without Lenders consent or, if Grantor is not a natural person, if any person owning a direct or indirect interest in Grantor transfers such interest to a person that is not a "permitted transferee" without Lender's consent. "Permitted transferee" for a natural person means that person's spouse or children, any trust for that person's benefit or the benefit of the person's spouse or children, any trust for that person's benefit or the benefit

of the person's spouse or children, or any corporation, partnership, or limited liability company in which the direct and beneficial owner of all the equity interest is a natural person or that person's spouse or children or any trust for the benefit of them; and the heirs, beneficiaries, executors, administrators, or personal representatives of a natural person on the death of that person or on the incompetency or disability of that person for purposes of the protection and management of that person's assets; and for a person that is not a natural person, any other person controlling, controlled by, or under common control with that person.

c.  In the event any portion of the indebtedness herein described cannot be lawfully secured by the liens herein given and created upon the herein described Property, it is agreed that the first payments made on said indebtedness shall be applied to the discharge of that portion of said indebtedness.

d.  Hazardous Substances. Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Grantor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of quantities of Hazardous Substances that are generally recognized to be appropriate to normal uses appropriate to the Property and to maintenance of the Property.

Grantor shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantor has actual knowledge. If Grantor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Grantor shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

4709 INCORPORATED dba MIDTOWN LIVE

By: _____

SELENA CASH, Its President

STATE OF TEXAS § 

§

COUNTY OF _TRAVIS_ §

    This instrument was acknowledged before me on the ___5th___ day of ___September___, 2013, by Selena Cash, as President of 4709 Incorporated dba Midtown Live.



ROBERT EARL BLACK
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
04-29-2014

_____
NOTARY PUBLIC

**AFTER RECORDING RETURN TO:**

LAW OFFICE OF ROBERT E. BLACK
500 W. 16TH ST., STE. 120
AUSTIN, TX 78701

**PREPARED IN THE LAW OFFICE OF:**

ROBERT E. BLACK
500 W. 16th Street, Suite 120
Austin, Texas 78701
(512) 477-1964

## FILED AND RECORDED

OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir

Sep 06, 2013  02:26 PM     2013166967
GONZALESM: $50.00
Dana DeBeauvoir, County Clerk
Travis County  TEXAS

## __EXHIBIT 13__

**Order Confirming 4709 Plan (with Plan Attached)**



**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: November 23, 2015.**

_____
**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|                              |   |                         |
|------------------------------|---|-------------------------|
| In re:                       | § |                         |
|                              | § |                         |
| **4709 INCORPORATED, d/b/a** | § | **Case No. 14-10340-TMD** |
| **Midtown Live Sports Cafe,** | § |                         |
|                              | § | **(Chapter 11)**        |
| _Debtor in Possession_.      | § |                         |

**AMENDED\* ORDER CONFIRMING**
**DEBTOR'S AMENDED PLAN OF REORGANIZATION DATED JULY 15, 2015,**
**AS MODIFIED ON NOVEMBER 6, 2015**

On November 9, 2015, at Austin, Texas, the above entitled and numbered Chapter 11 proceeding came before the Court for hearing on confirmation of the Debtor's Amended Plan of Reorganization Dated July 15, 2015, as Modified on November 6, 2015 [the "Plan," Document No. 145 on the Court's docket in this case], filed by the Debtor in Possession, 4709 Incorporated, d/b/a Midtown Live Sports Cafe (the "Debtor").

The Debtor's creditors voted on the Debtor's Amended Plan of Reorganization Dated July 15, 2015 (the "Amended Plan"), which was modified by the Debtor twice after voting. The

_____
\* The only difference between this Amended Order and the original Order is the attachment of the Amended Plan, which was previously inadvertently omitted.

Court finds that notice of the changes made was proper and adequate under the circumstances and, after reviewing the redline of the changes made after the voting (Document No. 115 on the Court's docket), finds that no creditor is adversely affected by the changes made except John Hoberman and related persons, the Classes 5, 6 and 7 Claimants, and that those Claimants have voted in favor of the Plan after those changes were made. Having considered the arguments and evidence presented at the hearing, including the testimony of Mernet Cash, the Court further finds that such Amended Plan of Reorganization Dated July 15, 2015, as Modified on November 6, 2015, docket entry # 145 (a copy of which is attached hereto), should be confirmed.

In addition, the Court makes the following further findings with respect to the Plan:

1.      The Plan, as it applies to the Debtor, complies with the applicable provisions of Title 11, United States Code ("Bankruptcy Code"); and

2.      The Debtor, as proponent of the Plan, is in compliance with the applicable provisions of the Bankruptcy Code; and

3.      The Plan has been proposed in good faith and not by any means forbidden by law; and

4.      Any payment made or to be made by the Debtor (no person is issuing securities or, other than the Reorganized Debtor, acquiring property under the Plan) for services or for costs and expenses in or in connection with the case, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable; and

5.      The identity and compensation of Selena Cash and Mernet Cash, the only insiders who will be retained, employed or compensated by the Debtor following confirmation, has been disclosed, and therefore subsection (5) of § 1129(a) is satisfied; and

6.      The provisions of 11 U.S.C. § 1129(a)(6), regarding certain governmental regulatory commissions, are not applicable in this case; and

7.     With respect to each class of claims or interests that is impaired under the Plan, each holder of a claim or interest of such class has either accepted the Plan, or will receive or retain under such Plan on account of such claim or interest property of a value, as of the Effective Date of the Plan (as defined in the Plan), that is not less than the amount that such holder would receive or retain if the assets of the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date; and

8.     Every class of claims has either accepted the Plan or is not impaired under the Plan; and

9.     The Plan's treatment of priority claims specified in § 507 of the Bankruptcy Code is in conformity with the treatment required by § 1129(a)(9) of the Bankruptcy Code or the holders of such claims have agreed to a different treatment as specified in the Plan; and

10.     Classes 5-10 are the impaired classes of claims. The late vote of the Classes 5, 6 and 7 Claimants should be counted in those Classes, and each of those Classes has accepted the Plan. Classes 8 and 9 are not receiving anything under the Plan, but because the value of the collateral securing those Claims, as of the Petition Date, is less than the amount paid in principal to the Class 8 Claimant in adequate protection payments during the case, there is no value left to secure the balance of the Class 8 Claim or the Class 9 Claim (which is junior to the Class 8 Claim).  There are therefore no Claims in those Classes as of Confirmation. Finally, Class 10, the Class of Unsecured Creditors, voted to accept the Plan; and

11.     None of the creditors in Classes 5, 6, 7 and 10 that voted are insiders. Therefore, at least one class of impaired claims against the Debtor has accepted the Plan, determined without including any acceptance of the Plan by any insider; and

11.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor except as provided under the Plan; and

3

12.     All fees due and owing to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) as of the confirmation hearing have been paid; and

13.     The provisions of 11 U.S.C. § 1129(a)(13), regarding retiree benefits, are not applicable in the case; and

14.      The provisions of 11 U.S.C. § 1129(a)(14), regarding the payment of domestic support obligations, are not applicable in the case; and

15.     The provisions of 11 U.S.C. § 1129(a)(15), regarding the application of an individual debtor's disposable income to make plan payments, are not applicable in the case; and

16.     The provisions of U.S.C. § 1129(a)(16), regarding transfers under a plan of property by non-moneyed, non-business or non-commercial corporations or trusts, are not applicable in the case; and

17.     Notice of the Plan, the assumption of leases, the applicable deadlines, the two modifications made after voting, and the confirmation hearing, are adequate and proper under the circumstances; and

18.     Assumption of the leases provided under the Plan is in the best interests of the Debtor and should be approved.

IT IS, THEREFORE, ORDERED that the Court hereby CONFIRMS the Debtor's Amended Plan of Reorganization Dated July 15, 2015, as Modified on November 6, 2015 [docket entry # 145], a copy of which is attached.

IT IS FURTHER ORDERED that the Debtor is hereby DISCHARGED of all debts arising before the date of entry of this Order.

IT IS FURTHER ORDERED that assumption of the leases provided under the Plan is hereby APPROVED.

IT IS FURTHER ORDERED that the setoff rights of the Texas Comptroller of Public Accounts (the "Comptroller") pursuant to 11 U.S.C. § 553 are preserved.

IT IS FURTHER ORDERED that, as provided by 11 U.S.C. § 503(b)(1)(D), the Comptroller is not required to file a request for allowance or payment of administrative claims in this case to preserve and collect any such claim.

IT IS FURTHER ORDERED that within ten (10) days of the date of entry of this Order, the Debtor shall mail a notice to all parties in interest of:

    (a) the confirmation of the Plan, and

    (b) the calendar date of the Effective Date under the Plan, and

    (c) notice that under Paragraph 3.05 of the Plan, any administrative claim, other than a claim under Paragraph 3.07, must be filed no later than thirty (30) days after the Effective Date (such notice shall include the calendar date of that deadline), or shall be barred, and

    (d) notice that, under Paragraph 3.07 of the Plan, any requests for allowance of post-petition fees or costs pursuant to 11 U.S.C. § 506(b), must be filed no later than sixty (60) days after the Effective Date (such notice shall include the calendar date of that deadline) or shall be barred, and

    (e) notice that, under Paragraph 3.08 of the Plan, any objection to any pre-petition claim must be filed no later than the later of sixty (60) days after the Effective Date (such notice shall include the calendar date of that deadline) or thirty (30) days after such claim is filed, or shall be barred,

and a notice to the other parties to the executor contracts and unexpired leases assumed under the Plan that those leases have been assumed and will be assigned and that, under Paragraph 8.04 of the Plan, the deadline for parties to unexpired leases and executory contracts that are assumed for objecting to the proposed treatment of any Cure Claims (as defined in the Plan) they may have, and for filing a Cure Claim, is 45 days from the Effective Date, with such actual calendar date being specified in the notice.

#  #  #

*Order submitted by:*

Frank B. Lyon
LAW OFFICES OF FRANK B. LYON
3508 Far West Blvd., Ste. 170
Austin, Texas 78731
512-345-8964 / 512-697-0047 (fax)
frank@franklyon.com

ATTORNEY FOR THE DEBTOR

14-10340-tmd Doc#159 Filed 11/08/15 Entered 11/08/15 21:45:55 Main Document Pg 7 of
14-10340-tmd Doc#149 Filed 11/06/15 Entered 11/06/15 14:47:57 Main Document Pg 1 of
Exhibits 1 - 22 Pg 104 of 330

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| *In re:* | § | |
| | § | |
| **4709 INCORPORATED, d/b/a** | § | **Case No. 14-10340-TMD** |
| **Midtown Live Sports Cafe,** | § | |
| | § | **(Chapter 11)** |
| *Debtor in Possession.* | § | |

## DEBTOR'S AMENDED PLAN OF REORGANIZATION DATED JULY 15, 2015, AS MODIFIED ON NOVEMBER 6, 2015

DATED:     November 6, 2015          Frank B. Lyon
                     Austin, Texas               Texas Bar No. 12739800
                                        TWO FAR WEST PLAZA, Suite 170
                                        3508 Far West Boulevard
                                        Austin, Texas 78731
                                        512-345-8964  /  512-697-0047 (fax)
                                        frank@franklyon.com

                                        ATTORNEY FOR 4709 INCORPORATED,
                                        DEBTOR IN POSSESSION

14-10340-tmd Doc#158 Filed 11/08/15 Entered 11/08/15 21:45:57 Main Document Pg 2 of
14-10340-tmd Doc#149 Filed 11/06/15 Entered 11/06/15 14:57 Main Document Pg 2 of
Exhibits 1 - 28 Pg 105 of 330

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| 4709 INCORPORATED, d/b/a | § | Case No. 14-10340-TMD |
| Midtown Live Sports Cafe, | § | |
| | § | (Chapter 11) |
| *Debtor in Possession.* | § | |

DEBTOR'S AMENDED PLAN OF REORGANIZATION DATED JULY 15, 2015,
AS MODIFIED ON NOVEMBER 6, 2015

**COMES NOW** 4709 INCORPORATED (the "Debtor"), as debtor in possession in this
Bankruptcy Case and pursuant to Chapter 11, Title 11, United States Code (the "Bankruptcy
Code") proposes the following Amended Plan of Reorganization Dated July 15, 2015, as Modified
on November 6, 2015 (the "Modified Plan" or the "Plan").

ARTICLE I
**DEFINITIONS AND USE OF TERMS**

1.01    **Defined Terms.**   Unless the context otherwise requires, capitalized terms shall
have the meanings set forth in this Section 1.01.

1.01(a)        **Administrative Expense Claim** means an administrative expense or Claim
described in 11 U.S.C. § 503, that arose on or after March 3, 2014, and that is entitled to
administrative priority under to 11 U.S.C. § 507(a)(1), including but not limited to Claims for
compensation of professionals made pursuant to 11 U.S.C. §§ 330 and 331, and all fees and
charges assessed against the Debtor and the Debtor's property under 28 U.S.C. § 1930.

1.01(b)        **Allowed Claim** means either: (i) a Claim against the Debtor or its property
that is allowable under the Bankruptcy Code to the extent that a proof of claim, proof of interest,
or request for payment was timely filed or, with leave of the Bankruptcy Court, was late filed and
as to which no objection has been filed or, if an objection has been filed, is allowed by a Final
Order, unless otherwise provided in this Plan, or (ii) a Claim against the Debtor or its property that
is scheduled and not listed as disputed, contingent or unliquidated, and as to which Claim no
objection has been filed or, if an objection is filed, is allowed by a Final Order.

1.01(c)        **Bankruptcy Case** means the Debtor's Chapter 11 case pending in the
Bankruptcy Court.

1.01(d)        **Bankruptcy Code** means the United States Bankruptcy Code, 11 U.S.C.
§ 101 *et seq.*

1.01(e)        **Bankruptcy Court** means the United States Bankruptcy Court for the
Western District of Texas, Austin Division, or such other Court that may have jurisdiction with
respect to Debtor's Bankruptcy Case.

1.01(f)    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended, promulgated under 28 U.S.C. § 2075, and the Local Rules of the Bankruptcy Court, as applicable from time to time to the Debtor's Bankruptcy Case.

1.01(g)    **Bar Date** means the date subsequent to which proof of a pre-petition Claim against the Debtor may not timely be filed or, with respect to proofs of claims held by governmental agencies, the date by which those must be filed.  The Bar Date for government agencies' Claims in the Debtor's Bankruptcy Case is August 30, 2014, and the Bar Date for all other Claims was June 30, 2014.

1.01(h)    **Business Day** means a day that the office of the Clerk of the Bankruptcy Court is open for business as usual.

1.01(i)    **Claim** means (i) any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.01(j)    **Claimant** means any Person or entity having or asserting a Claim in this Case.

1.01(k)    **Class** or **Classes** mean all of the holders of Claims or Equity Interests that the Debtor has designated pursuant to 11 U.S.C. § 1123(a)(1) as having substantially similar characteristics as described in Articles V and VI of this Plan.

1.01(l)    **Club** means Midtown Live Sports Café, the restaurant/bar operated by the Debtor.

1.01(m)    **Confirmation** means the entry by the Bankruptcy Court of the Confirmation Order.

1.01(n)    **Confirmation Date** means the date on which the Confirmation Order is entered.

1.01(o)    **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to 11 U.S.C. § 1129.

1.01(p)    **Contested Claim** means a Claim against the Debtor or its property that either (a) is listed in the Debtor's schedules of assets and liabilities as disputed, contingent or unliquidated; (b) is the subject of a pending action in a forum other than the Bankruptcy Court, unless such Claim has been determined by Final Order in such other forum and Allowed by Final Order of the Bankruptcy Court; or (c) has had or is subject to a pending objection or request for estimation filed by the Debtor or by any other party in interest in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.01(q)     **Creditor** shall have the meaning specified by 11 U.S.C. § 101(9) of the Bankruptcy Code.

1.01(r)     **Cure Claim** means a Claim in the amount necessary to cure any default or arrearage, together with the amount necessary to compensate for damages suffered as a result of such default or arrearage, on an unexpired lease or executory contract that has been assumed by the Debtor pursuant to 11 U.S.C. § 365.

1.01(s)     **Debtor** means 4709 Incorporated, Texas limited liability company, which is the debtor in possession in the above-captioned Bankruptcy Case.

1.01(t)     **Effective Date** means the first Business Day after the Confirmation Order becomes a Final Order.

1.01(u)     **Estate** means the estate of the Debtor created pursuant to 11 U.S.C. § 541.

1.01(v)     **Equity Interest** means the interest of Selena Cash in the Debtor as the sole shareholder of the corporation, and all rights associated therewith, and all Claims arising from or relating to such Equity Interest, including but not limited to Claims for rescission.

1.01(w)     **Final Order** means an order or judgment entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties, as to which the time to appeal (generally, fourteen days after entry) has expired and as to which a stay pending appeal has not been granted.

1.01(x)     **General Unsecured Claim** means an Unsecured Claim that is not entitled to priority under 11 U.S.C. § 507(a).

1.01(y)     **Hoberman** means John Hoberman of Austin, Texas, and his wife, Susan, the holders of the second Lien on the Property as of the Petition Date, and/or Hoberman's Self-Directed IRA Services Inc., Custodian FBO John Hoberman IRA 20131XXXX, the holder of the third Lien on the Property as of the Petition Date, and the/or Hoberman as the post-petition purchaser of the first Lien on the Property previously held by Pride of Austin High Yield Fund 1, LLC.

1.01(z)     **Impaired** means the treatment of an Allowed Claim pursuant to the Plan *unless,* with respect to such Claim, either (a) the Plan leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder of such Claim or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after occurrence of a default, the Reorganized Debtor (i) cures any default that occurred before or after the commencement of the Case on the Petition Date, other than default of the kind specified in 11 U.S.C. § 365(b)(2), (ii) reinstates the maturity of such Claim as such maturity existed before such default, (iii) compensates the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) does not otherwise alter the legal, equitable or contractual rights to which such Claim entitles the holder of such Claim; or (c) the Plan provides that on the Effective Date the holder of such Claim receives, on account of such Claim, cash equal to the amount of such Allowed Claim.

1.01(aa)   **Insider** has the meaning in § 101(31) of the Code.  Insiders of the Debtor include, but are not necessarily limited to, Selena Cash, Michael Cash, and Arletha Mernet Guerrero.

1.01(bb)   **Lien** shall mean a contractual or statutory lien against or security interest in an interest of the Debtor in real or personal property.

1.01(cc)   **Midtown Live** means Midtown Live Sports Café, that certain bar and restaurant located in Suite E of the Meadowglen Shopping Center, owned and operated by the Debtor.

1.01(dd)   **Person** means an individual, partnership, or corporation, but does not include a governmental unit unless the government unit acquires an asset as a result of operation of a loan guarantee agreement, or as receiver or liquidating agent, in which case such governmental unit shall be considered a Person for purposes of 11 U.S.C. § 1102.

1.01(ee)   **Petition Date** means March 3, 2014, the date on which the Debtor filed its petition for relief, commencing its Bankruptcy Case.

1.01(ff)   **Plan** means the Debtor's Amended Plan of Reorganization Dated July 15, 2015, as Modified on November 6, 2015, of as it may be further amended, modified or supplemented by the Debtor from time to time as permitted herein and by the Bankruptcy Court.

1.01(gg)   **Plan Documents** means the Asset Purchase Agreement, Lease, Guaranty and related documents between the Debtor, Selena Cash, and Hoberman and/or his designated assignee(s), in the form attached hereto as Exhibit "A," that are executed by those parties to implement the terms of the Plan.

1.01(hh)   **Pride of Austin High Yield Fund 1, LLC**, or **POA** was the holder of the Claim secured by a first Lien on the Property as of the Petition Date.

1.01(ii)   **Priority Creditor** means a Creditor whose Claim is entitled to priority under 11 U.S.C. § 507.

1.01(jj)   **Property** means the Meadow Glen Shopping Center and all personal property associated with it.

1.01(kk)   **Property of the Estate** means all property in which the Debtor holds a legal or an equitable interest, including all property described in 11 U.S.C. § 541.

1.01(ll)   **Reorganized Debtor** means 4709 Incorporated, following Confirmation of the Plan.

1.01(mm)   **Secured Claim** means any Claim secured by a Lien or other charge or interest in property in which the Debtor has an interest, to the extent of the value thereof as determined in accordance with 11 U.S.C. § 506(a).

1.01(nn)   **Secured Creditor** or **Secured Claimant** means any Claimant holding a Secured Claim.

1.01(oo)     **Shopping Center** or the **Center** means the Meadowglen Shopping Center located at 7408 Cameron Road, Austin, Texas 78752, owned by the Debtor, and the associated personal property.

1.01(pp)     **Unsecured Claim** means a Claim that is not a Secured Claim.

1.01(qq)     **Unsecured Creditor** or **Unsecured Claimant** means any Claimant holding an Unsecured Claim.

1.02     **Gender.**  Whenever the singular number is used, it shall include the plural, and the plural shall include the singular, as appropriate to the context.  Words of any gender shall include each other gender where appropriate.

1.03     **Terms Defined in the Bankruptcy Code.**  Capitalized terms not specifically defined in Section 1.01 of the Plan shall have the definitions, if any, given those terms in the Bankruptcy Code.

1.04     **Headings.**  The headings and captions used in the Plan are for convenience only and shall not be deemed to limit, amplify or modify the terms of this Plan nor affect the meaning thereof.

1.05     **Computation of Time.**  In computing any time prescribed herein the provision of Fed. R. Bankr. P. 9006(a) shall apply.

ARTICLE II
**BASIS OF PLAN**

2.01     **Generally.** The Plan is a plan of reorganization.  The Debtor will continue to own and operate the Midtown Live Sports Café ("Midtown Live" or the "Club"). Selena Cash, Michael Cash and/or Mernet Cash will continue to manage the Reorganized Debtor. The income from the Club and the collection, as the manager of the Property, of rents from other tenants, will be used to pay operating expenses including rent, and Creditors under the Plan.

2.02     **Treatment of the Claims of Hoberman.** It will, however, transfer ownership of the Meadowglen Shopping Center (the "Property") to John Hoberman, the holder of first, second (with his wife, Susan) and (through his IRA) third Liens on that Property as of the filing of the Plan (collectively, "Hoberman"), and/or his designated assignee(s), in partial satisfaction of that indebtedness and in exchange for a new lease of that portion of the Property currently occupied by the Club, under terms agreed by the parties.  Those terms are set out in detail in the Plan and Plan Documents, copies of which are attached to and made a part of this Plan.  In connection with the transfer of the Property, the Debtor will assume and assign to Hoberman and/or his designated assignee(s) the leases of the other tenants in the Property.  The Debtor will continue to manage the Property and collect the rents of the other tenants and remit them to Hoberman.

2.03     **Treatment of Secured Claims.** The other Secured Claims against the Debtor will be paid monthly over one year (CAN Capital) or five years (Yellowstone Capital) with interest. The Claims for taxes, whether Secured or Unsecured Priority, will be paid monthly with interest at the rates specified by the non-bankruptcy statute, as required by the Bankruptcy Code, over a period ending no later than the 60th month following the filing of the Debtor's Bankruptcy Case.

2.04    **Treatment of Unsecured Claims.** The Unsecured Claims against the Debtor will be paid in full, in quarterly payments over five years, with interest at 5.25%. The treatment is described in detail in Paragraph 6.08 in Section VI below.

2.05    **Treatment of Equity.** Finally, Selena Cash will retain her Equity Interest in the Debtor, but will not be entitled to any distributions during the 60-month term of the Plan.

ARTICLE II
**PROVISIONS APPLICABLE TO ALL CLAIM**

3.01    **Treatment of Claims.**  This Plan is intended to resolve all Claims against the Debtor and/or its property of whatever character, whether contingent or liquidated, or whether or not allowed by the Bankruptcy Court pursuant to 11 U.S.C. § 502(a).  However, only Allowed Claims will receive treatment afforded by the Plan. The Plan is designed to insure that Claimants will receive at least as much pursuant to this Plan as they would receive in a liquidation of the Debtor pursuant to chapter 7 of the Bankruptcy Code.

3.02    **Allowed Claims**.  To receive a distribution under the Plan, a Creditor must have an Allowed Claim.

3.03    **Amount of Claims**.  If the Debtor has scheduled a Claim and has not scheduled such Claim as disputed, contingent, or unliquidated, then the amount scheduled shall control, unless the Creditor files a proof of claim in a different amount or a party in interest files an objection to the scheduled Claim.  If a Creditor files a proof of claim, then the amount stated in the proof of claim shall control, unless a party in interest files an objection to the Claim.  If a party in interest files an objection to a Claim for which a proof of claim is filed, or to a scheduled Claim, then the amount determined by the Bankruptcy Court in a Final Order shall control. If a Claim has been scheduled as disputed, contingent or unliquidated and the Creditor has not filed a proof of claim by the applicable Bar Date, the Claim shall be deemed to be disallowed unless this Plan specifically provides otherwise.

3.04    **Allowance of Post-Petition Interest, Fees and Costs**.  Unless otherwise provided in the Plan, a Claim shall not be entitled to post-petition interest, fees or costs.

3.05    **Filing of Administrative Claims**.  Any requests for allowance of Administrative Expense Claims, other than a request for post-petition fees or costs as described in Paragraph 3.07 below, shall be filed within thirty (30) days after the Effective Date or shall be barred.

3.06    **Cure Claims**. Any Cure Claims not scheduled as undisputed, liquidated and non-contingent Claims shall be filed within thirty (45) days after the Effective Date or shall be barred, unless otherwise agreed by the parties.

3.07    **Filing of Requests for Post-Petition Fees or Costs**.  Any requests for allowance of post-petition fees or costs pursuant to 11 U.S.C. § 506(b) shall be filed within sixty (60) days after the Effective Date or shall be barred.

3.08    **Objections to Claims.**  Any party authorized by the Bankruptcy Code may object to the allowance of a pre-petition Claim at any time prior to the later of sixty (60) days after the Effective Date or thirty (30) days after such proof of claim is filed.  Any proof of claim filed after

the Bar Date set by the Bankruptcy Court and applicable to such Claim shall be of no force and
effect and shall be deemed disallowed.  All Contested Claims shall be litigated to Final Order;
provided, however, that the Reorganized Debtor may compromise and settle any Contested Claim,
subject to the approval of the Bankruptcy Court and further provided that if a Claim has been
scheduled as disputed, contingent or unliquidated and the Creditor has not filed a proof of claim
by the applicable Bar Date, the Claim shall be deemed to be disallowed unless this Plan
specifically provides otherwise.

     **3.09**    **Distributions on Contested Claims.** No distributions under this Plan shall be
made to the holder of a Claim that is in dispute, unless and until such Claim becomes an Allowed
Claim.  When and if a Contested Claim becomes an Allowed Claim, the Reorganized Debtor shall
at the next scheduled distribution under the Plan to the Class of Creditors into which the Claim
falls pay the newly Allowed Claim a sum sufficient to bring that Claimant current as if it had been
paid according to the Plan since the Effective Date. If a Claim is disputed in whole or in part
because the Debtor asserts a right of offset against such Claim or recoupment against the holder of
such Claim, then, if and to the extent the Claim giving rise to the offset or recoupment is sustained
by Final Order, the Claim in dispute shall be reduced or eliminated and, if applicable, the holder of
such Claim shall be required to pay the amount of such offset or recoupment, less the amount of
the Allowed Claim.  In addition, any party authorized by the Bankruptcy Code may request that
the Bankruptcy Court estimate any contingent, disputed or unliquidated Claim pursuant to 11
U.S.C. § 502(c) at any time.

ARTICLE IV
**ADMINISTRATIVE AND PRIORITY CREDITORS**

     **4.01**    **Administrative Expense Claims and Other § 507(a)(2) Priority Claims.** Where
required by the Bankruptcy Code, and upon approval by the Bankruptcy Court, the Reorganized
Debtor shall pay the Administrative Expense Claims of the Bankruptcy Case, allowed pursuant to
§ 503 of the Code, and each Allowed Claim entitled to priority pursuant to § 507(a)(2) of the
Code, on a current basis.

ARTICLE V
**CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**

     **5.01**    **Classification.**  Claims and Equity Interests are classified as follows:

Class 1.  Allowed Administrative Claims under § 503(b)(2) of the Bankruptcy Code.

Class 2.  Allowed Priority Claims, including those of the Internal Revenue Service (if any),
the Texas Alcoholic Beverage Commission, the Texas Comptroller of Public
Accounts, and the Texas Workforce Commission.

Class 3.  Allowed Secured Claims against the Debtor for personal property taxes for the
years 2013 and 2014.

Class 4.  Allowed Secured Claims against the Debtor for real property taxes for the years
2013 and 2014.

Class 5.  Allowed Secured Claim of John Hoberman against the Debtor, secured by a deed of trust Lien on the Property, second only to the ad valorem tax Liens.

Class 6.  Allowed Secured Claim of John Hoberman and Susan Hoberman against the Debtor, secured by a deed of trust Lien on the Property, junior to the ad valorem tax Liens and the Lien securing the Class 4 Claim.

Class 7.  Allowed Secured Claim of the Self-Directed IRA Services Inc., Custodian FBO John Hoberman IRA 20131XXXX, against the Debtor, secured by a deed of trust Lien on the Property, junior to the ad valorem tax Liens and the Liens securing the Classes 4 and 5 Claims.

Class 8.  Allowed Secured Claim of Can Capital, f/k/a AdvanceMe, against the Debtor and secured by the Debtor's accounts receivable.

Class 9.  Allowed Secured Claim of Yellowstone Capital against the Debtor and secured by the Debtor's accounts receivable, junior to the security interest of the Class 7 Claimant.

Class 10.  Allowed General Unsecured Claims against the Debtor.

Class 11.  Allowed Interest of Selena Cash in the Debtor.

ARTICLE VI
**TREATMENT OF CLAIMS AND THE EQUITY INTEREST**

6.01.01        **Class 1 Claims - Allowed Administrative Claims.**  The Allowed Amount of each Administrative Claim allowed under §§ 503(b)(2) through (b)(6) of the Code shall be paid in cash in full on the Effective Date, or on such other terms as the parties may agree.  In particular, the following Class 1 Claimants have agreed to the following alternative terms for treatment of their Claims.

6.01.02        Hoberman has agreed to accept payment of his Class 1 Claim for one month's unpaid post-petition rent in 60 equal monthly payments with 9.0% interest, beginning in April of 2016.

6.01.03        Travis County has agreed to accept payment of its Class 1 Claim for 2015 Secured ad valorem taxes on the Property as follows.

(1)      The Debtor will have begun in October, 2015, to escrow for these taxes, depositing in a designated interest-bearing account $1100 per month on the 20th of each month, until January 20th. That amount, totaling $4400, will be paid to the County on or before January 31, 2016.

(2)      The balance of what will be owed for 2015 taxes, plus applicable statutory interest and penalties, will be paid with interest at 12.0% in 60 equal monthly payments beginning on the first day of the first month after the Effective Date. The County will retain its lien until these taxes are paid in full, but agrees to not attempt to foreclose that lien so long as

payments are made as promised. Special default provisions, set forth in Section XII below, apply to Travis County's Class 1 Claim.

6.01.04        Because the Claimants have agreed to their treatment, Class 1 is not Impaired.

6.02    **Class 2 Claims – Allowed Priority Claims.**  The Allowed Class 2 Claims tax years shall be paid in full, with interest at the fixed rate that is equal to the rate as of the Effective Date determined under Tex. Tax Code § 111.060 ("prime rate plus one percent, as published in The Wall Street Journal on the first day of each calendar year that is not a Saturday, Sunday, or legal holiday"), estimated at 4.25% per annum, in equal monthly installments sufficient to fully amortize the balance of each of those Claims over a period beginning on the date one month before the date the first payment is due and ending on March 1, 2019. Payments will begin on the first day of the first month after the Effective Date. Taxes for years 2015 forward will be paid when due.  Special default provisions applicable to the Class 2 Claims of any agency of the State of Texas are included in Article XII below, "Default." Class 2 is not Impaired.

6.03    **Class 3 Claims – Allowed Secured Claims for personal property taxes.**  The Allowed Secured Class 3 Claims shall be paid in full, with all accrued pre- and post-petition penalty and pre- and post-petition interest at statutory rate of 12.0% per year, in a lump sum on the first day of the first month after the Bankruptcy Case is closed. The Class 3 Claimant shall retain its Lien on the property securing the Claims, as well as its Lien securing the 2015 personal property taxes. Such taxes for the years 2015 forward will be paid by the Debtor when due. Special default provisions, set forth in Section XII below, apply to Class 3. Class 3 is Impaired.

6.04    **Class 4 Claims – Allowed Claims for real property taxes secured by the Property**. The Allowed Secured Class 4 Claims shall be paid in full, with all accrued pre- and post-petition penalty and pre- and post-petition interest at statutory rate of 12.0% per year, in equal monthly installments sufficient to fully amortize the Claims over sixty (60) months at 12.0% per annum. Payments shall begin on the first day of the first month after the Effective Date. The Class 4 Claimant shall retain its statutory tax lien until all taxes, penalty and interest are paid in full. Taxes for 2016 and later tax years will be paid in full as they accrue by Hoberman or his designated assignee(s). Special default provisions, set forth in Section XII below, apply to Class 4. Class 4 is not Impaired.

6.05    **Classes 5, 6 and 7 Claims – Allowed Secured Claims of Hoberman.** The Allowed Classes 4, 5 and 6 Claims shall be treated as follows:

6.05.01        Ownership of the Property shall be transferred and the leases in the Property (as described below in Article VIII) shall be assumed by the Debtor and assigned to Hoberman and/or his designated assignee(s) on the Effective Date, but effective as of February 2, 2015, by a deed-in-lieu of foreclosure.

6.05.02        On the Effective Date, as the new owner of the Property, Hoberman and/or his designated assignee(s) shall grant the Debtor, as the owner and operator of the Midtown Live Sports Café, a lease of Suite E in the Property, with a ten-year initial term with an option to renew for one five-year term, with triple net rent and other terms as set forth in detail in the form of the lease included in Exhibit "A" hereto (the "Lease").

6.05.03     In the Lease, Hoberman shall also grant an option for the Debtor, Selena Cash, Michael Cash and/or Mernet Cash to purchase the Property at any time, as described in detail in the Lease.

6.05.04     Hoberman shall also grant the Debtor, Selena Cash, Michael Cash and/or Mernet Cash a right of first refusal to match the terms of a bona fide offer from a third party to purchase the Property, as described in detail in the Lease.

6.05.05     In addition to the foregoing, Hoberman's post-petition attorneys fees of not more than $12,000.00 shall be paid in 60 equal monthly payments with 9.0% interest, beginning in April of 2016.

6.05.06     Classes 5, 6 and 7 are Impaired.

6.06     **Class 8 Claim – Allowed Secured Claim of CAN Capital, f/k/a AdvanceMe, against the Debtor, secured by a first priority security interest the Debtor's credit card receivables.** The Allowed Class 8 Claim shall be paid in full, with interest at 5.0% per annum, in twelve (12) equal monthly payments of principal and interest. Payments will begin on the first day of the first month following the Effective Date. On or before Confirmation, the Debtor will file and request a ruling on a motion to value the collateral securing the Class 8 Claim as of the Petition Date, in order to determine the amount of the Class 8 Allowed Secured Claim.  To the extent the Class 8 Claimant is owed more than the amount of its Allowed Secured Claim, that Claim shall be treated as part of the Class 10 General Unsecured Claims as described below. Class 8 is Impaired.

6.07     **Class 9 Claim – Allowed Secured Claim of Yellowstone Capital against the Debtor, secured by a second priority security interest in the Debtor's accounts receivable.** The Allowed Class 9 Secured Claim shall be paid in full, together with interest at the rate of 5.0% per annum, in 60 equal monthly payments of principal and interest. Payments will begin on the first day of the first month following the Effective Date. On or before Confirmation, the Debtor will file and request a ruling on a motion to value the collateral securing the Class 9 Claim as of the Petition Date, in order to determine the amount of the Class 9 Allowed Secured Claim.  To the extent the Class 9 Claimant is owed more than the amount of its Allowed Secured Claim, that Claim shall be treated as part of the Class 10 General Unsecured Claims as described below. Class 9 is Impaired.

6.08     **Class 10 Claims – The Allowed General Unsecured Claims against the Debtor.** The Allowed Class 10 Claims shall be paid in full, together with interest, at the fixed rate of WSJ prime as of the Effective Date, plus 2.0% per year (currently 5.25%), *pro rata* from 20 quarterly payments of principal and interest, as follows: $2,500.00 each in the first year of the Plan; $4,000.00 each in the second year; $5,000.00 each in the third year; $6,000.00 each in the fourth year; and $8,000 for each of the first three payments in the fifth year, and the balance owed on the Claims (estimated at $18,000.00) as the final payment.  Payments will begin on the first day of the first month following the Effective Date, and will continue every 90 days thereafter. Class 10 is Impaired.

6.09     **Class 11 – Allowed Interest of Selena Cash in the Debtor.** Selena Cash shall retain her Equity Interest in the Debtor, but shall not receive any distributions on account of such interest during the 60-month term of the Plan. Class 11 is Impaired.

6.10 **Pre-Payment.** Any Claim may be pre-paid at any time, at the discretion of the Reorganized Debtor.

ARTICLE VII
**IMPLEMENTATION OF THE PLAN**

7.01 **Implementation of the Plan.** The Plan will be implemented pursuant to 11 U.S.C. § 1123(a) as set forth above, that is, the payments to Creditors and the satisfaction of the Liens and security interests of Secured Creditors with Allowed Claims.

7.02 **In General.** If the Plan is approved by the Court, a Confirmation Order will be entered. The Debtor will continue to operate as a debtor in possession and discharge its duties under Chapter 11 until the Effective Date of the Plan.

7.03 **Sources of Funds for Implementation of the Plan.** The Reorganized Debtor will continue to operate the Club. The income from the Club will be used to fund the operating expenses of the Club and the net income will be used to pay the amounts necessary to fund the Plan payments.

7.04 **Authorization**. The Reorganized Debtor shall be responsible for complying with the terms and provisions of the Plan as it may be modified as allowed by the Bankruptcy Code. To this end, the Reorganized Debtor is authorized and directed to execute all documents necessary or appropriate to effectuate the terms of the Plan.

ARTICLE VIII
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

8.01 **Assumption of Personal Property Leases and Contracts.** The Debtor is a party to a three executory contracts as follows:

| Lessor | Property | Terms | Status/Proposed Action |
|---|---|---|---|
| Mid-Tex Sales & Services | Ice machine | 24 month rent to own | Debtor is current; to be assumed |
| | Used margarita machine | 36 month lease | Debtor is current; to be assumed |
| | Used margarita machine | 24 month rent to own | Debtor is current; to be assumed |

8.02 **Assumption of Real Property Leases.** The Debtor is also the lessor under three real property leases, as follows:

| Tenant | Property | Terms | Status/Proposed Action |
|---|---|---|---|
| Jhovani & Yojana Alvarado-Castillo | Meadowglen Shopping Center, Suite G | Nail salon | Tenant is current; to be assumed and assigned to Hoberman and/or his assignee(s) |

| Tenant | Property | Terms | Status/Proposed Action |
|--------|----------|-------|------------------------|
| Santiago A. Zamora, MD, PA | Meadowglen Shopping Center, Suites A, B and C | Medical clinic | Tenant is current; to be assumed and assigned to Hoberman and/or his assignee(s) |
| Yojana Alvardo-Castillo and Virgilio I. Alvarado | Meadowglen Shopping Center, Suite F | Hair salon | Tenant is current; to be assumed and assigned to Hoberman and/or his assignee(s) |

In addition, the Debtor is the lessee of a lease of a portion of the parking lot located 7517 Cameron Road in Austin, across the street from the Club. The landlord is Austin Cameron Oaks, Ltd., and the lease is to month to month. As of the filing of this Plan, the Debtor is current. The lease, as a month to month lease, is now a post-petition lease to which assumption or rejection under the Bankruptcy Code does not apply. The Debtor will continue to perform under the lease after Confirmation.

8.03   Any lease or contract not listed will be assumed by the Debtor.

8.04   **Cure Claims.** The Debtor believes that is not in default under any of its contracts and leases, and that therefore there are no cure claims against it as a result of its assumption of those contracts and leases. However, if one or more cure claims is allowed then, unless the other party to the contract or lease objects, any unpaid pre- and post-petition amounts due by the Debtor under any assumed unexpired lease or executory contract, together with any applicable late fees, will be "rolled" to the end of the lease or executory contract, such that the term shall be extended by one month for each such unpaid monthly payment or portion thereof and the monthly payments will remain unchanged with any late fees divided between the extended payments. The deadline for objecting to such treatment, and for filing a Cure Claim, shall be 45 days from the Effective Date. The Debtor shall be responsible for giving specific notice of the actual calendar date that is that deadline.

ARTICLE IX
**EFFECT OF CONFIRMATION**

9.01   **Vesting of Property**. As of the Effective Date, the Reorganized Debtor shall be vested with all Property of the Estate, free and clear of all Liens, Claims and encumbrances except as expressly provided under the Plan. The transfer of the Property to Hoberman and/or his designated assignee(s) shall be free and clear of all Liens, Claims and encumbrances except those of the Class 3 Claimant for real property taxes secured by that Property. Property of the Estate that the Debtor retains shall include all claims or causes of action arising in favor of the Debtor, under the Bankruptcy Code or any other applicable law; provided, however, that if after Confirmation the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code and there is an uncured default by the Reorganized Debtor under the Plan, all of such property and claims shall revest in the Estate upon such conversion.

9.02   **Plan Binding.** Pursuant to 11 U.S.C. § 1141, the provisions of the confirmed Plan shall bind the Reorganized Debtor, the Debtor's Creditors, and the holder of the Equity Interest in

the Debtor, whether or not the Claim or Equity Interest is impaired under the Plan and whether or not such Creditor or Equity Interest holder has accepted the Plan.

   9.03   **Reliance on Other Parties.** In connection with the Plan, the Debtor and its shareholder, officers, directors, representatives, attorneys, accountant, and agents may rely upon the opinions of counsel, certified public accountants, and other experts or professionals employed by the Debtor, and such reliance shall presumptively establish good faith.

   9.04   **Discharge.** Confirmation of the Plan shall discharge the Debtor of all its pre-Confirmation debts.

   9.05   **Permanent Injunction.** Confirmation of the Plan shall result in the issuance of a permanent injunction against the commencement or continuation of any judicial, administrative, or other action or proceeding on account of any Claims against the Reorganized Debtor. From and after Confirmation, all holders of Claims against the Debtor are permanently restrained and enjoined (a) from commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim against the Debtor or the Reorganized Debtor or their assets; (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Debtor or the Reorganized Debtor or their assets; (c) from creating perfecting, or enforcing any encumbrance or any kind against the Debtor or the Reorganized Debtor or their assets; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Debtor or to the Reorganized Debtor, except as may be allowed under the Bankruptcy Code; and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; *provided, however*, that each holder of a Contested Claim may continue to prosecute its proof of claim in the Bankruptcy Court and all holders of Claims shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan.

ARTICLE X
**MODIFICATION OF THE PLAN**

   10.01   **Post-Confirmation Modification.** The Debtor as proponent of the Plan may modify it at any time after Confirmation but before the Bankruptcy Case is fully administered, provided that the Plan, as modified, meets the requirements of §§ 1122 and 1123 of the Bankruptcy Code, that the Bankruptcy Court, after notice and hearing, confirms such modified Plan under § 1129, and that the circumstances warrant such modification.

   10.02   **Deemed Acceptance or Rejection.** A holder of a Claim or Equity Interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, the Plan as modified, unless within any time limit fixed by the Court such holder changes its previous acceptance or rejection.

ARTICLE XI
**POST CONFIRMATION MATTERS**

   11.01   **Application for Final Decree.** The Reorganized Debtor shall file an application for final decree as soon as is practicable but not later than six months after the Effective Date. If the Bankruptcy Case cannot be fully administered during this time period, or if there are still

pending matters to be ruled upon by the Bankruptcy Court, the Reorganized Debtor shall request the Bankruptcy Court to extend that deadline after notice to all parties in interest and opportunity for hearing. If the Reorganized Debtor fails to file an application for final decree prior to such deadline or fails to timely request an extension of the same, then the Bankruptcy Court, on its own motion or at the request of any party in interest, including the United States Trustee, may enter an order closing the Debtor's Bankruptcy Case.

11.02 **U.S. Trustee**

11.02(a) **Fees.** The Reorganized Debtor shall continue to pay U.S. Trustee fees until the Bankruptcy Case is closed, or if the case is converted to a case under Chapter 7 or dismissed. All outstanding U.S. Trustee fees shall be paid on the Effective Date.

11.02(b) **Reports.** The Reorganized Debtor shall file post-confirmation reports in the form prescribed by the United States Trustee until the Bankruptcy Case is closed or if it is dismissed or converted to a case under Chapter 7.

ARTICLE XII
**<u>DEFAULT</u>**

12.01 **Default other than with Respect to Classes 2, 3 and 4.** In the event of a default by the Reorganized Debtor under the Plan, all Creditors other than an agency of the State of Texas with respect to a Class 2 Claim and the Classes 3 and 4 Claimant, Travis County, may exercise any rights granted to them under documents executed to implement the Plan or any rights available to such Creditors under applicable non-bankruptcy law. In the absence of documents executed to implement the Plan, it may be enforced as a contract. Notwithstanding any other provision, any Creditor alleging a default shall give the Reorganized Debtor thirty (30) days notice and an opportunity to cure before exercising any rights available upon default.

12.02 **Default with Respect to Class 2.** A failure by the Debtor or Reorganized Debtor to make a plan payment to an agency of the State of Texas shall be an Event of Default. If the Debtor or Reorganized Debtor fails to cure an Event of Default as to an agency of the State of Texas within ten (10) days after service of a written notice of default, then that agency may (a) enforce the entire amount of its claim; (b) exercise any and all rights and remedies available under applicable non-bankruptcy law; and (c) seek such relief as may be appropriate in the Bankruptcy Court. The Debtor and/or Reorganized Debtor can receive up to three (3) notices of default per Class 2 Claim; however, the third default cannot be cured.

12.03 **Default with Respect to Class 3 and/or Class 4.** A failure to pay pre- or post-petition taxes in accordance with the terms of this Plan shall result in an event of default. If the default in not cured within twenty (20) days after Travis County gives written notice of the default to the Debtor, all outstanding tax, penalty and interest amounts will be immediately due and payable, and Travis County will be free to pursue its state law remedies for all amounts due. The Debtor will only be permitted to cure two (2) events of default over the life of the Plan; subsequent defaults will result in immediate acceleration of the due date for all outstanding amounts of tax, penalty and interest.

12.04 **Conversion to Chapter 7.** Conversion of the Bankruptcy Case to one under Chapter 7 shall be an additional remedy for default.

ARTICLE XIII
## RETENTION OF JURISDICTION

13.01  **Jurisdiction over Matters.** Until the Bankruptcy Case is closed, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtor arising prior to the Confirmation Date, to hear and determine all causes of action that exist in favor of the Debtor that arise prior to the Confirmation Date, to hear and determine all matters relating the administration of the Debtor's Estate, to modify the Plan, and to make such other orders as are necessary or appropriate to effectuate the provisions of the Plan in accordance with § 1142 of the Bankruptcy Code, including interpretation and implementation of the Plan and entry of a final decree.

ARTICLE XIV
## MISCELLANEOUS

14.01  **Request for Relief under 11 U.S.C. § 1129(b) --"Cramdown."**  In the event any impaired Class fails to accept the Plan in accordance with 11 U.S.C. § 1129(a), the Debtor reserves the right to, and does hereby, request the Court to confirm the Plan in accordance with 11 U.S.C. § 1129(b).

14.02  **Pre-Confirmation Amendment, Withdrawal/Revocation.**  The Debtor, as the proponent of the Plan, reserves the right to amend or withdraw/revoke the Plan at any time prior to the Confirmation Date.  If the Debtor withdraws or revokes the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor.

14.03  **Entire Agreement**.  The Plan, the Confirmation Order, and all other documents and instruments to effectuate the Plan constitute the entire agreement and understanding among the Debtor and its Creditors relating to the subject matter hereof and supersedes all prior discussions and documents.

14.05  **Payments.**

14.05(a)  **Delivery.** Any payments or distributions made by the Debtor pursuant to the Plan or as may be ordered by the Bankruptcy Court, to the extent delivered by the United States mail shall be deemed made when deposited into the mail. Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth the on the proofs of claim filed by such holders (or at the last known addresses of such holders if no proof of claim is filed) unless the Claimant files with the Bankruptcy Court and serves the Debtor with a change of address.  All Claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date.  After such date, all unclaimed property shall remain the property of the Debtor and the claim of any other holder with respect to such unclaimed property shall be discharged and forever barred.

14.05(b) **Voided Checks.**  Checks issued by the Debtor in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of delivery thereof. Requests for reissuance of any check shall be made to the Debtor's attorney Frank B. Lyon, at Two Far West

Plaza Suite 170, 3508 Far West Boulevard, Austin, Texas 78731, and by email to frank@franklyon.com, by the holder of the Allowed Claim to whom such check originally was issued. Any claim in respect of such a voided check must be made to the Debtor's attorney in writing within one-hundred eighty (180) days after the date of delivery of such check. After such date, all claims in respect of void checks shall be discharged and forever barred, and the amount of such checks shall be returned to the Debtor.

      14.06 **Governing Law.** Unless a rule or law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided by federal law, the internal laws of the Sate of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

      Dated: November 6, 2015.

Respectfully submitted,

4709 INCORPORATED,
Debtor in Possession

By:   _/ s / Selena Cash_      .
      Selena Cash,
      Its president and sole shareholder

DRAFTED AND APPROVED:         PLAN PROPONENT:

  _/ s / Frank B. Lyon_      .      4709 INCORPORATED,
Frank B. Lyon           DEBTOR IN POSSESSION
Texas State Bar No. 12739800
3508 Far West Boulevard, Suite 170
Austin, Texas 78731
512-345-8964 / 512-697-0047 (fax)     By: _____.
frank@franklyon.com              Selena Cash,
                         Its president and sole shareholder

ATTORNEY FOR THE DEBTOR IN
POSSESSION, 4709 INCORPORATED

## CERTIFICATE OF SERVICE

I, Frank B. Lyon, counsel for the Debtor in Possession, hereby certify that a true and correct copy of the foregoing Debtor's Amended Plan of Reorganization Dated July 15, 2015, as Modified on November 6, 2015, was forwarded by the methods indicated to each of the persons shown below, on November 6, 2015.

**By ECF notification:**

United States Trustee
Valerie Wenger
Valerie.L.Wenger@usdoj.gov

Attorney for Travis County

Kay D. Brock
Travis County Attorney's Office
kay.brock@co.travis.tx.us
bkecf@co.travis.tx.us

Former Attorney for Debtor
Jeffrey S. Kelly
The Kelly LegalGroup, PLLC
jkelly@kellylegalgroup.com

Former Attorneys for John Hoberman

Doug J. Powell
The Law Offices of Douglas Powell, P.C.
djpowell@dougpowelllaw.com
notices@swbell.net

Christopher M. Benjamin
McLeroy, Alberts & Benjamin, PC
chrisbenjamin@austin.rr.com

**By email:**

The Debtor
midtownaustin@yahoo.com

John and Susan Hoberman
finderfixer@sbcglobal.net

AdvanceMe, Inc., n/k/a CAN Capital
Terri Hallman
THallman@CANCapital.com

YellowStone Capital, LLC
Vadim Serebro, Esq.
Vserebro@yellowstonecapllc.com

**By email and ECF notification:**

Atty for Texas Comptroller of Public Accts

Jason A. Starks
Assistant Attorney General
Office of the Texas Attorney General
jason.starks@texasattorneygeneral.gov
sherri.simpson@texasattorneygeneral.gov

_/ s / Frank B. Lyon_____.
Frank B. Lyon

EXHIBIT "A"

**Lease Agreement
between John Hoberman and the Debtor**

# LEASE

BETWEEN

**JOHN HOBERMAN, LLC**

AND

**4709 INCORPORATED**

_____

# MIDTOWN LIVE CENTER

_____

**LEASE**

Between

**JOHN HOBERMAN, LLC**

AND

**4709 INCORPORATED**

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| **1.** | **DEMISE, TERM AND RENT** | **1** |
| 1.1. | DEMISE | 1 |
| 1.2. | TERM | 1 |
| 1.3. | RENT | 1 |
| 1.4. | REMEASUREMENT | 2 |
| 1.5. | NO SET OFF | 2 |
| **2.** | **DEFINITIONS** | **2** |
| **3.** | **TENANT'S COVENANTS** | **9** |
| 3.1. | COVENANT TO PAY | 9 |
| 3.2. | ALLOCABLE OPERATING COSTS | 9 |
| 3.3. | PAYMENT OF BUSINESS TAXES | 9 |
| 3.4. | ALLOCABLE TAXES | 10 |
| 3.5. | PAYMENT OF ESTIMATED ALLOCABLE TAXES AND ALLOCABLE OPERATING COSTS | 10 |
| 3.6. | ALLOCATION OF ALLOCABLE OPERATING COSTS AND ALLOCABLE TAXES | 11 |
| 3.7. | ACCRUAL OF RENT | 11 |
| 3.8. | ADDITIONAL RENT TREATED AS RENT | 11 |
| 3.9. | INTEREST ON AMOUNTS IN DEFAULT | 11 |
| 3.10. | UTILITIES | 11 |
| 3.11. | NET LEASE TO LANDLORD | 12 |
| 3.12. | LANDLORD'S RIGHT TO PAY TENANT'S OBLIGATIONS | 12 |
| **4.** | **BUILDING SERVICES AND COMMON AREAS** | **12** |
| 4.1. | HVAC, LIGHTING AND POWER | 12 |
| 4.2. | LOADING DOCK | **ERROR! BOOKMARK NOT DEFINED.** |
| 4.3. | BUILDING SYSTEMS | 12 |
| 4.4. | COMMON AREAS | 13 |
| 4.5. | SECURITY | 13 |
| 4.6. | JANITORIAL AND CLEANING | 13 |
| 4.7. | ALTERATIONS BY LANDLORD | 13 |
| 4.8. | REPAIRS TO CRITICAL OPERATIONS AREAS | 13 |
| 4.9. | ACCESS BY LANDLORD TO CRITICAL OPERATIONS AREAS | 13 |

**5.      USE** .......................................................................................................................... **14**

5.1.    PERMITTED USE ............................................................................................. 14
5.2.    NUISANCE ....................................................................................................... 14
5.3.    COMPLIANCE WITH APPLICABLE STATUTES, ETC. ................................. 14
5.4.    LEASEHOLD IMPROVEMENTS BY TENANT ................................................ 14
5.5.    INFLAMMABLE LIQUID OR DANGEROUS MATERIALS .............................. 14
5.6.    RESTRICTION ON TENANT'S TRADE FIXTURES ...................................... 15
5.7.    DEFACING OF WALLS, ETC. ........................................................................ 15
5.8.    LIENS, ETC. ..................................................................................................... 15
5.9.    INSURANCE ..................................................................................................... 15
5.10.   INSURANCE RISKS ........................................................................................ 16
5.11.   RULES AND REGULATIONS .......................................................................... 16

**6.      SIGNAGE, BUILDING NAME AND SATELLITE DISH / ANTENNAE** ............................ **16**

6.1.    TENANT'S SIGNS ........................................................................................... 16
6.2.    EXTERIOR SIGNAGE ...................................................................................... 17
6.3.    ALL SIGNS ....................................................................................................... 17
6.4.    COMPLIANCE WITH LAWS ............................................................................ 17
6.5.    BUILDING NAME ............................................................................................. 17
6.5.    SATELLITE DISH/ANTENNAE ....................................................................... 17

**7.      ENVIRONMENTAL** ............................................................................................ **17**

7.1.    ENVIRONMENTAL CONTAMINATION ........................................................... 17
7.2.    REMEDIATION OF ENVIRONMENTAL CONTAMINATION .......................... 17
7.3.    TENANT'S ENVIRONMENTAL REMEDIES .................................................... 18
7.4.    TENANT'S ENVIRONMENTAL COVENANTS ................................................. 18
7.5.    ASBESTOS ....................................................................................................... 18

**8.      REPAIR AND DAMAGE** ...................................................................................... **18**

8.1.    MAINTENANCE, MANAGEMENT AND REPAIR ............................................ 18
8.2.    DAMAGE - LANDLORD'S LIABILITY .............................................................. 18
8.3.    DAMAGE TO PREMISES AND TERMINATION ............................................. 19

**9.      ASSIGNMENT AND SUBLETTING** ..................................................................... **20**

9.1.    ASSIGNMENT OR SUBLETTING ................................................................... 20

**10.     STATUS CERTIFICATES, SUBORDINATION, ATTORNMENT AND REGISTRATION** ............ **20**

10.1.   STATUS CERTIFICATES ................................................................................. 20
10.2.   SUBORDINATION AND ATTORNMENT .......................................................... 20
10.3.   RECORDATION ................................................................................................ 21

**11.     LIMITATION OF LIABILITIES** ......................................................................... **21**

11.1.   APPLICATION OF UNAVOIDABLE DELAY .................................................... 21
11.2.   WAIVER ............................................................................................................ 21
11.3.   INDEMNITY BY TENANT ................................................................................. 21

**12.     ACCESS** ........................................................................................................... **21**

12.1.   ENTRY BY LANDLORD .................................................................................... 21
12.2.   LANDLORD'S RIGHT OF REPAIR AND TO ALTER COMMON AREAS ......... 21

**13.     DEFAULT** ......................................................................................................... **22**

13.1.   DEFAULT AND REMEDIES ............................................................................. 22
13.2.   CONTRACTUAL AND LANDLORD'S LIEN ..................................................... 22

Page 2

13.3.    COSTS ................................................................................................................ 23
13.4.    ALLOCATION OF PAYMENTS ..................................................................... 23
13.5.    SURVIVAL OF OBLIGATIONS ..................................................................... 23
13.6.    REMEDIES GENERALLY ............................................................................. 23

**14.    TENANT'S RIGHT OF TERMINATION** ................................................... **23**

14.1.    NOTICE OF TERMINATION ......................................................................... 23
14.2.    TERMINATION OF LEASE ............................................................................ 23

**15.    RENEWAL** ....................................................................................................... **24**

15.1.    OPTION TO RENEW ...................................................................................... 24
15.2.    RENEWAL PROVISIONS ............................................................................... 24

**16.    NOTICE OF SALE** ........................................................................................... **24**

**17.    IMMINENT DOMAIN** ..................................................................................... **24**

**18.    PARKING** ......................................................................................................... **24**

18.1.    TENANTS PARKING ...................................................................................... 24
18.2.    TENANT'S FURTHER RIGHTS ..................................................................... 25
18.3.    VISITOR PARKING ........................................................................................ 25

**19.    STANDARD OF PERFORMANCE** ............................................................... **25**

**20.    GENERAL PROVISIONS** ............................................................................... **25**

20.1.    HOLDINGOVER .............................................................................................. 25
20.2.    LANDLORD'S CONSENT .............................................................................. 25
20.3.    TENANT'S RIGHT AND OPTION TO PURCHASE THE PREMISES ......... 25
20.4.    NOTICES .......................................................................................................... 26
20.5.    SUCCESSORS .................................................................................................. 27
20.6.    QUIET ENJOYMENT ...................................................................................... 27
20.7.    CAPTIONS, SECTION NUMBERS AND TABLE OF CONTENTS ............. 27
20.8.    EXTENDED MEANINGS ................................................................................ 27
20.9.    APPLICABLE LAW ........................................................................................ 27
20.10.   PARTIAL INVALIDITY .................................................................................. 27
20.11.   ENTIRE AGREEMENT ................................................................................... 28
20.12.   TIME OF THE ESSENCE ................................................................................ 28

**SCHEDULES**:

SCHEDULE 1- AGREEMENT OF PURCHASE AND SALE
SCHEDULE 2 - LEGAL DESCRIPTION OF LANDS
SCHEDULE 3 - RULES AND REGULATIONS

THIS LEASE IS MADE effective as of the 1st day of March, 2015.


BETWEEN:


## JOHN HOBERMAN, LLC

(the "Landlord")

- and -


## 4709 INCORPORATED

(the "Tenant")


**1.    DEMISE, TERM AND RENT**


**1.1.    DEMISE**

In consideration of the covenants contained in this Lease, the Landlord hereby demises and leases to the Tenant the Premises for the Term and upon and subject to the covenants, conditions and agreements herein expressed.


**1.2.    TERM**

The Term of this Lease is Ten (10) years commencing on the 1st day of March, 2015, and continuing until the 28th day of February, 2025.


**1.3.    RENT**

All sums, monies or payments required to be paid by Tenant to Landlord pursuant to this Lease.  The rent payable by the Tenant to the Landlord during the Term shall be as follows:

| (a) | Period | Basic Rent per month |
|---|---|---|
| | 03/01/15 – 02/29/16 | $13,376.74 |
| | 03/01/16 – 02/28/17 | $13,589.66 |
| | 03/01/17 – 02/28/18 | $13,808.97 |
| | 03/01/18 – 02/28/19 | $14,034.86 |
| | 03/01/19 – 02/29/20 | $14,267.52 |
| | 03/01/20 – 02/28/21 | $ 8,227.76 |
| | 03/01/21 – 02/28/22 | $ 8,474.60 |
| | 03/01/22 – 02/28/23 | $ 8,728.83 |
| | 03/01/23 – 02/29/24 | $ 8,990.70 |
| | 03/01/24 – 02/28/25 | $ 9,260.42 |

(b) <u>Additional Rent</u>:  shall be all other sums due and payable pursuant to the terms of the Lease including property taxes and insurance.

**1.4.  REMEASUREMENT**

In the event that the Landlord makes any alterations or additions to the Premises, and if the Landlord is of the opinion, acting reasonably, that the alteration is necessary to maintain safety of the Premises, Tenant will reimburse Landlord for such alterations.

**1.5.  NO SET OFF**

The Base Rent, the Additional Rent and all other sums payable by the Tenant to the Landlord under this Lease shall be payable without any deduction, abatement, set off or compensation whatsoever.

## 2.  <u>DEFINITIONS</u>

In this Lease and in the Schedules to this Lease and unless the context otherwise dictates, the following words and phrases shall have the following meanings:

1.  **"Accounting Period"** means January through December 31.

2.  "**Additional Rent**" means all sums of money required to be paid by the Tenant under this Lease (except Basic Rent) whether or not the same are designated "Additional Rent" or are payable to the Landlord or otherwise, and includes any and all interest or penalties which the Landlord is entitled to collect hereunder.

3.  "**Allocable Operating Costs**" means the total, without duplication of all reasonable costs, expenses, fees, rentals, disbursements and outlays of every kind paid, payable or incurred by or on behalf of the Landlord, acting as a commercially responsible landlord of real estate of a similar character to the Midtown Live Center, directly or indirectly, in respect of the maintenance, repair, restoration, renovation, operation, administration, and management of the Midtown Live Center, excluding however, Excluded Operating Costs, and deducting therefrom in respect of any Accounting Period, all Operating Costs Proceeds received by the Landlord in such Accounting Period. Without limiting the foregoing, Allocable Operating Costs includes, without duplication, all of the following:

(a) the reasonable cost of all insurance costs, premiums and deductible payments under any insurance which the Landlord is obligated or permitted to obtain under this Lease. Any payments to be made by the Landlord as a result of it failing to obtain insurance as contemplated by section 5.10(c) hereof shall not be included as part of Allocable Operating Costs;

(b) the reasonable cost of providing security, traffic control, sweeping, janitorial, landscaping, window cleaning, waste collection, disposal and recycling, snow removal services and all associated supervision in connection with all the foregoing;

(c) the cost of supplies, tools, equipment and materials used exclusively in connection with the Midtown Live Center or any rentals thereof and acquired by the Landlord subsequent to the Commencement Date under the Lease;

(d) the cost of providing fuel, steam, heat, water, electricity, ventilation, air conditioning, sewage disposal, telephone and other utilities and services used in the maintenance, operation or administration of the Midtown Live Center, including charges and imposts related to such utilities to the extent such costs, charges and imposts are not recovered from other tenants or paid by the Tenant directly;

Page 2

(e) all reasonable employment costs, salaries, wages and other amounts paid or payable to or for all personnel, including on-site personnel involved in the repair, maintenance, operation, security, supervision or cleaning of the Midtown Live Center, or any part thereof, and all reasonable costs of hiring and retaining such personnel required to be employed by the Landlord in connection with the Midtown Live Center, including fringe benefits, employment and workmen's compensation insurance premiums, pension plan contributions and other employment costs; provided however that such costs shall exclude the employment costs of those employees who perform only off-site services or who provide accounting, leasing or other head office administration functions;

(f) the fair market rental value of Administrative Service Areas as determined by the Landlord, acting reasonably; provided however, that within ten (10) Business Days after receipt of written notice by the Tenant of the Landlord's determination, the Tenant may, if it is of the opinion that the fair market rental value of the Administrative Service Areas as determined by the Landlord is unreasonable, submit such determination for arbitration in accordance with the provisions of Section 21 hereof;

(g) the reasonable costs:

  (i) of repairing, repainting, operating, refurbishing and maintaining the Midtown Live Center and the equipment serving the Midtown Live Center and of all replacements and modifications to the Midtown Live Center or such equipment, including those made by the Landlord in order to comply with laws or regulations affecting the Midtown Live Center;

  (ii) incurred by the Landlord in providing and installing energy conservation equipment or systems and life safety systems;

  (iii) incurred by the Landlord to make alterations or additions to the Midtown Live Center intended to reduce operating costs, improve the operation of the Midtown Live Center or maintain its operation as a first class office building;

  (iv) incurred to replace machinery or equipment which by its nature requires periodic replacement; and

(h) reasonable amounts to be paid for contractors, auditors, accounting, legal and other professional and consulting fees and disbursements in connection with the maintenance, repair or operation of the Midtown Live Center, excluding third party management fees;

(i) all costs incurred by the Landlord in contesting or appealing Allocable Taxes or related assessments including legal appraisal and other professional fees, and administration and overhead costs;

(j) such part of the Landlord's corporation capital tax as can be identified with the Midtown Live Center by the Landlord, acting reasonably;

(k) depreciation or amortization of the costs referred to in subsection (h) hereof which have not been expensed in full in the year in which they were incurred, such depreciation or amortization to be calculated over such period as is applicable pursuant to GAAP in respect of each such item;

4. "**Allocable Taxes**" means all taxes, rates, duties, levies and assessments whatsoever whether municipal, parliamentary or otherwise, levied, imposed or assessed against the Midtown Live Center and the Midtown Live Center Lands or any portions thereof, or upon the Landlord in respect thereof or levied, imposed or assessed in the future in lieu thereof, or for which the Landlord is liable with respect to the Midtown Live Center and the Midtown Live Center Lands, including those for education, schools and local

improvements, and including all reasonable costs and expenses (including legal and other professional fees) incurred by the Landlord in contesting, resisting or appealing any amounts, but excluding Business Taxes, Landlord's Income Taxes, Tenant's Taxes and Goods and Services Tax.

5.  "**Alterations**" means all repairs, replacements, improvements or alterations to the Premises by the Tenant.

6.  "**Applicable Laws**" means:

    (a)     The laws of the United States; and

    (b)     The laws of the state of Texas; and

    (c)     The by-laws of the City of Austin.

7.  "**Architect**" means an independent professional architect from time to time named by the Landlord.

8.  "**Basic Local Telephone Services**" means dialtone.

9.  "**Basic Rent**" means the annual base rent payable by the Tenant under Section 1.3.

10. "**Building**" means the building located on the Midtown Live Center.

11. "**Building Security Agreement**" means the agreement or agreements with a supplier or suppliers of security for the provision of security to the Midtown Live Center, or any part thereof;

12. "**Building Standard**" means the reasonable management, maintenance, repair and operating standards and practices adhered to and observed by prudent owners of shopping centers in central Austin, Texas of similar character and size as the Building.   In applying the standards, the age of the Building, wear and tear and the existence and level of technology, facilities and amenities customarily incorporated in such comparable buildings shall be taken into consideration.

13. "**Building Systems**" means all mechanical, electrical, heating, ventilating, water, sewage, security, back-up and uninterrupted power supply systems contained in the Building.

14. "**Business Days**" means any day on which the majority of the United States National banks are open for business.

15. "**Business Hours**" means the hours from 7:00 A.M. to 11:59 P.M. on Mondays through Sundays unless any such day is a statutory holiday, or such longer hours as are determined by the Tenant as reasonable and prudent for the wellbeing of the Premises, acting reasonably;

16. "**Business Taxes**" means all taxes and license fees (whether imposed on the Landlord or Tenant) attributable to the personal property, Trade Fixtures, business, income, occupancy or sales of the Tenant or any other occupant of the premises leased to the Tenant hereunder and to any Leasehold Improvements installed in the Premises and to the use of the Building or Midtown Live Center by the Tenant.

17. "**Common Areas**" means the aggregate of BUILDING COMMON AREA and FLOOR COMMON AREA of the Premises.

18. "**Commencement Date**" means the date of commencement of this Lease as set forth in Section 1.2 hereof.

19. "**Critical Operations Areas**" means those parts of the Premises which contain equipment necessary for, or used in connection with, the operation of the business of the Tenant in the Premises, and as designated by

the Tenant from time to time during the Term, on reasonable written notice to the Landlord.

20.    "**Critical Systems**" mean machinery, appliances, equipment and apparatus located in the Critical Operations Areas.

21.    "**Environmental Contamination**" means the contamination of the Building, the Lands or the Premises with any hazardous substance or any pollutant or contaminant, toxic or dangerous waste, substance or material.

22.    "**Event of Default**" shall mean any of the following and occur whenever:

(a)    any Rent is in arrears and is not paid within 5 days after receipt of written notice from the Landlord to the Tenant demanding such payment;

(b)    the Tenant has breached any of its obligations in this Lease (other than the payment of Rent) and:

(i)    fails to remedy such breach within 30 days (or such shorter period as may be provided in this Lease) after receipt of written notice from the Landlord to the Tenant demanding such payment; or,

(ii)    if such breach cannot be reasonably remedied within 30 days (or such shorter period as may be provided in this Lease), and the Tenant fails to commence to remedy such breach within 30 days (or such shorter period as provided in this Lease) or thereafter fails to proceed diligently to remedy such breach; in each case after notice in writing from the Landlord;

(c)    an Event of Default occurs per the terms of any subtenants leases, and such Event of Default under the said leases is not remedied within the time period specified therefor;

(d)    the Tenant becomes bankrupt or insolvent or takes the benefit of any statute for bankrupt or insolvent debtors or makes any proposal, assignment or arrangement with its creditors, or any steps are taken or proceedings commenced by any Person for the dissolution, winding-up or other termination of the Tenant's existence or the liquidation of its assets which is not opposed by the Tenant;

(e)    a trustee, receiver, receiver/manager or like Person is appointed with respect to the business or assets of the Tenant and such appointment is not discharged within 3 Business Days after receipt of written notice from the Landlord to the Tenant;

(f)    the Lease or any of the Tenant's assets in the Premises are taken under a writ of execution;

(g)    the Tenant abandons or attempts to abandon the Premises, or the Premises become vacant and unoccupied for a period of 10 consecutive days or more without the written consent of the Landlord which consent shall not be unreasonably withheld;

(h)    any insurance policies covering any part of the Midtown Live Center or any occupant thereof are actually or threatened to be cancelled or adversely changed as a result of any use or occupancy of the Premises and the Tenant does not remedy the breach giving rise to the cancellation or threat of cancellation within 7 days after receipt of written notice from the Landlord demanding that such breach be remedied by the Tenant.

23.    "**Excluded Operating Costs**" means any of the following:

(a)    fines or penalties that the Landlord incurs in connection with any failure to perform its obligations

Page 5

to third parties;

(b)      interest and principal payments on and any costs associated with debt secured by the Premises;

(c)      basic annual ground rent or air rights rent payable by the Landlord to the lessor under a ground lease or air rights lease, if any, of the Premises or any other part of the Premises, provided however that any property taxes payable by the Landlord;

(d)      leasing costs, including brokerage and leasing agent commissions, advertising, marketing and promotion costs, demolition, construction and other costs, leasehold improvement costs, and tenant allowance and inducement payments;

(e)      any amount paid by the Landlord to an affiliate of the Landlord which is not at competitive market rates;

(f)      costs of utility consumption if the Tenant pays such costs directly;

(g)      all costs and expenses (excluding insurance deductibles) incurred as a result of the wrongful or negligent acts or omissions of the Landlord, its contractors, employees and all persons for whom the Landlord is responsible in law, and any costs and expenses which the Lease otherwise expressly provides shall be excluded;

(h)      costs for the direct account of any other tenant of the Premises;

(i)      charitable donations of any kind, direct or indirect;

(j)      board of directors fees or related expenses;

(k)      Landlord's Income Taxes;

(l)      Tenant's Business Taxes, unless the Landlord is required, by law, to collect the Tenant's Business Taxes from the Tenant;

(m)      professional fees (including legal fees) for negotiating, enforcing or interpreting the Landlord's rights under other leases with respect to the Premises;

(n)      cost of work which the Lease expressly provides is to be performed at the expense of the Landlord;

(o)      costs of any repair, replacement, alteration, improvement or addition to the Premises, the primary purpose of which is to expand, or enlarge the Premises or which exceeds the Building Standard in any material respects; provided however that costs referred to in paragraph 4(h) of this Section 2 or otherwise incurred by the Landlord to comply with its obligations under this Lease, or costs incurred for the primary purpose of preserving, protecting or maintaining the Premises in accordance with the Building Standard are not to be excluded from Allocable Operating Costs pursuant to this section;

(p)      costs of any maintenance, repairs or replacements to the Structural Elements of the Premises;

(q)      costs incurred with respect to the acquisition, development and construction of the Premises, or any expansion thereof;

(r)      costs incurred by the Landlord to correct work done in the Premises that was initially done by or

on behalf of the Landlord but not done in compliance with Applicable Laws; and

(s)    all association fees and dues paid by the Landlord in respect of memberships in professional organizations or associations.

24.    "**GAAP**" means generally accepted accounting principles.

25.    "**Goods and Services Tax**" means all goods and services taxes, sales taxes, value added taxes or any other taxes imposed on the Landlord with respect to any amounts payable by the Tenant to the Landlord under this Lease.

26.    "**HVAC**" means heating, ventilation and air conditioning.

27.    "**Landlord**" means the Landlord and its duly authorized representatives, agents, successors and assigns.

28.    "**Landlord's Income Taxes**" means income taxes, business taxes of the Landlord, place of business taxes, estate, inheritance or succession taxes, capital levy, large corporations tax, transfer tax, and/or other taxes which are personal to the Landlord.

29.    "**Lease**" means this lease, and any amendments hereto.

30.    "**Leasehold Improvements**" means leasehold improvements in the Premises determined according to common law, and shall include, without limitation, all fixtures, improvements, installations, Alterations and additions from time to time made, erected or installed in the Premises by or on behalf of the Tenant or any previous occupant of the Premises, including signs and lettering, partitions, doors and hardware however affixed and whether or not movable, all mechanical, electrical and utility installation and all carpeting and drapes with the exception only of furniture and equipment not in the nature of fixtures.

31.    "**Midtown Live Center**" means the real property and improvements located at 7408 Cameron Rd, Austin, Texas 78752, including the roof thereof and including all premises rented or intended to be rented therein, whether for office, retail, or other purposes; and facilities serving the Building or having utility in connection therewith located upon the Lands, as determined by the Landlord, including the BUILDING COMMON AREA and the FLOOR COMMON AREA, which areas and facilities may include, without limitation, sidewalks, exhibit areas, storage and mechanical and electrical rooms, stairways, escalators, elevators, truck and receiving areas, driveways, parking facilities, loading docks and corridors.

32.    "**Operating Costs Proceeds**" means any of the following:

(a)    net insurance proceeds received by the Landlord that reimburse the Landlord for costs of repair or replacement which have been charged as Allocable Operating Costs;

(b)    net recoveries by the Landlord in respect of warranties or guarantees relating to the construction or repair of the Midtown Live Center to the extent that the repair costs have been charged as Allocable Operating Costs;

(c)    net recoveries by the Landlord in respect of any recycling programs conducted in respect of the Midtown Live Center to the extent that the costs of such programs have been included in Allocable Operating Costs;

(d)    refunds and rebates received from suppliers and contractors of amounts that have been included in Allocable Operating Costs;

(e)    amounts recovered as a result of direct charges to the Tenant and other tenants in respect of

additional services (including any administration charges) to the extent that the amounts relate to costs included in Allocable Operating Costs;

(f)     all other recoveries from the Tenant and other tenants applicable to expenses included in Allocable Operating Costs, other than proportionate share contributions by the Tenant and other tenants pursuant to the operating costs provisions of their leases;

(g)     all amounts which otherwise would be included in Allocable Operating Costs which are recovered by the Landlord from tenants as a result of any act, omission, default or negligence of such tenants;

(h)     net proceeds after expenses (after Landlord's income taxes) received by the Landlord from the operation of the Fitness Centre;

(i)     any other recoveries by the Landlord from any other sources which have been previously included in Allocable Operating Costs.

33.     "**Person**" means any person, firm, partnership or corporation, or any group or combination or person, firms, partnerships or corporations.

34.     "**Premises**" means the space as detailed in Schedules 1 inclusive hereof, and includes Leasehold Improvements therein.

35.     "**Rent**" means the aggregate of Base Rent and Additional Rent.

36.     "**Rental Year**" means:

(a)     in the case of the first Rental Year, the period from the Commencement Date to the end of Landlord's fiscal year next occurring;

(b)     in the case of following Rental Years, consecutive 12 calendar month periods commencing one day after the end of the first Rental Year.

provided however that, the last Rental Year shall end on the expiration or earlier termination of this Lease.

37.     "**Rules and Regulations**" means the rules and regulations adopted and promulgated by the Landlord from time to time pursuant to Section 5.12. The Rules and Regulations existing as at the Commencement Date are those set out in Schedule 3.

38.     "**Service Providers**" means the provider of any utility, communication or other services provided to the Tenant or other tenants of the Lands and Building to accommodate and facilitate the use, occupation and enjoyment of the Lands and Building.

39.     "**Structural Elements**" means the footings, foundations, structural columns and beams, load-bearing stairwells (excluding stairwells within the Premises), load-bearing staircases, structural subfloors, bearing walls and roofs (excluding the membranes of the roofs) of the buildings in the Premises. Structural Elements shall not include the non-structural portions of the walls of the buildings in the Premises.

40.     "**Tenant**" means the party of the second part and includes the Tenant and its representatives, agents, successors and Permitted Transferees.

41.     "**Tenant's Proportionate Share**" means the ratio that the total number of square feet in the Premises bears to the total number of square feet in the Building.

Page 8

42. "**Tenant Wiring**" means the cabling, whether copper, fiber optical or coaxial, wires, cords and connecting hardware and any combination of these items and related telecommunications equipment such as, but not limited to, cabinets, racks and other electronic equipment as network facilities, provided to or by the Tenant to facilitate the use, occupation and enjoyment of the Premises, the Lands and the Building.

43. "**Tenant's Taxes**" means all taxes, rates, duties, levies and assessments (including Business Taxes) which are not part of Allocable Taxes and which the Proportionate Landlord is entitled to recover, in full, directly from the Tenant under this Lease.

44. "**Term**" means the period set out in Section 1.2 and includes any renewal thereof in accordance with the provisions of this Lease.

45. "**Trade Fixtures**" means trade fixtures as determined at common law, but for greater certainty, shall not include:

    (a)    heating, ventilating or air-conditioning systems, facilities and equipment in or serving the Premises;

    (b)    floor covering affixed to the floor of the Premises;

    (c)    light fixtures;

    (d)    internal stairways and doors;

    (e)    any fixtures, facilities, equipment or installations installed by or at the expense of the Landlord; and

    (f)    removable wall partitions installed by the Tenant in the Premises.

46. "**Unavoidable Delay**" means any cause beyond the control of any party which prevents the performance by it of any obligation hereunder and not caused by its default or act of commission or omission and not avoidable by the exercise of reasonable effort or foresight by such party, excluding financial inability.

## 3.     <u>TENANT'S COVENANTS</u>

The Tenant covenants with the Landlord as follows:

### 3.1.     COVENANT TO PAY

To pay to the Landlord the Rent in the amounts and in the manner set forth in this Lease.

### 3.2.     ALLOCABLE OPERATING COSTS

The Tenant covenants to pay to the Landlord yearly and in every year during the Term, at the times and in the manner provided in Section 3.5 hereof, the Tenant's Proportionate Share of Allocable Operating Costs allocated to the Building in accordance with Section 3.6 hereof.

### 3.3.     PAYMENT OF BUSINESS TAXES

    (a)    The Tenant shall pay when due all Tenant's Business Taxes. If the Tenant's Business Taxes are payable by the Landlord to the relevant taxing authority, the Tenant shall pay the amount thereof to the Landlord or as it directs. If no separate tax bills for Business Taxes are issued with respect to the Tenant or the Premises, the Landlord shall allocate Business Taxes charged, assessed or levied against the Building or the Lands to the Tenant on an equitable and reasonable basis;

provided however, that if the Tenant disputes such allocation, the Tenant shall be entitled to refer such dispute to arbitration in accordance with the provisions of Section 21 hereof.

(b)    The Tenant shall promptly deliver to the Landlord on request, copies of assessment notices, tax bills and other documents received by the Tenant relating to Tenant's Business Taxes and receipts for payment of Tenant's Business Taxes.

## 3.4. ALLOCABLE TAXES

(a)    The Tenant covenants to pay to the Landlord yearly and in every year during the Term, at the times and in the manner provided in Section 3.5 hereof, the Tenant's Proportionate Share of Allocable Taxes allocated to the Premises;

(b)    The Landlord shall pay all Allocable Taxes to the taxing authorities.

(c)    (i)    The Landlord may contest any Allocable Taxes and appeal any assessments with respect thereto; withdraw any such contest or appeal; and agree with the taxing authorities on any settlement or compromise with respect to Allocable Taxes. The Tenant will cooperate with the Landlord in respect of any such contest or appeal and will provide the Landlord with all relevant information, documents and consents required by the Landlord in connection with any such contest or appeal.

(ii)    Provided it is not in default under this Lease, the Tenant shall have the right to appeal any governmental assessment or determination of the value of the Premises or any portion thereof if the Tenant, acting reasonably, is not satisfied with such assessment and if required, the Landlord shall appoint the Tenant as its agent for this purpose and shall cooperate with the Tenant in preparing for such appeal. If the Tenant exercises its right of appeal, it shall keep the Landlord fully informed of its actions in connection with such appeal and shall provide the Landlord with copies of all relevant documents; the Tenant shall also consult with the Landlord on such appeal, and shall take into account the advice of the Landlord in this regard. The Tenant's cost of any appeal, if successful, shall be promptly reimbursed by the Landlord, with such cost being included in Allocable Taxes. If the Tenant is unsuccessful, the Tenant agrees to fully indemnify the Landlord for all costs and liabilities attributable to any such appeal, including all legal costs and any increase in Allocable Taxes resulting from such appeal.

## 3.5. PAYMENT OF ESTIMATED ALLOCABLE TAXES AND ALLOCABLE OPERATING COSTS

(a)    The Landlord shall, at least 60 days after the Commencement Date, and thereafter, at least 60 days prior to the commencement of each Accounting Period occurring subsequent to the Commencement Date provide the Tenant with its proposed estimated operating cost budget (which shall include all estimated Allocable Taxes and all estimated Allocable Operating Costs allocated to the Building pursuant to Section 3.6 hereof and which shall be reasonable in accordance with Building Standard) and both parties shall meet as often as reasonably possible to attempt to agree on such budget, both acting reasonably.

(b)    The estimated Tenant's Proportionate Share of Allocable Operating Costs and the estimated Tenant's Proportionate Share of Allocable Taxes payable by the Tenant in each Accounting Period as aforesaid shall be paid by the Tenant to the Landlord in equal monthly installments in advance on the first day of each month during the Term, without deduction, set-off or abatement.

(c)    Within 120 days after the end of each Accounting Period, the Landlord shall provide the Tenant with its final statement with respect to Allocable Operating Costs, Allocable Taxes and the Tenant's Proportionate Share thereof, plus such other items of Additional Rent and the Tenant's Proportionate Share thereof as the Landlord may have estimated in advance for the relevant

Accounting Period, together with an audit report of the Landlord's external auditor which certifies that such expenses have been properly calculated in accordance with the provisions of the Lease. If the total monthly installments paid by the Tenant are greater than the amount shown on the final statement, then the difference shall be paid by the Landlord to the Tenant within 60 days after the delivery of such final statement. If the total monthly installments paid by the Tenant are less than the amount shown on the final statement, then the difference shall be paid by the Tenant to the Landlord within 60 days after the delivery of such final statement

(d)     All sums payable by the Tenant pursuant to this Section 3.5 shall be deemed to be Rent and may be collected by the Landlord as such.

(e)     The obligations contained in this subsection shall survive the expiration or earlier termination of the Term. Failure of the Landlord to render any statement of Allocable Taxes or Operating Costs shall not prejudice the Landlord's right to render such statement thereafter or with respect to any other period. The rendering of any such statement shall also not affect the Landlord's right to subsequently render an amended or corrected statement.

### 3.6.    ALLOCATION OF ALLOCABLE OPERATING COSTS AND ALLOCABLE TAXES

(b)     Operating Costs and Taxes which apply shall be the responsibility of the Tenant;

(b)     In the event that the Tenant disputes:

(i)     the apportionment or allocation of Allocable Operating Costs and Allocable Taxes to Midtown Live Center Components as aforesaid by the Landlord; or

(ii)     the revised definitions by the Landlord of Midtown Live Center Components and Midtown Live Center Elements;

the Tenant shall be entitled to refer such disputes to arbitration in accordance with the arbitration provisions contained in Section 21 of this Lease.

### 3.7.    ACCRUAL OF RENT

Rent shall be considered as accruing from day to day hereunder, and where it becomes necessary for any reason to calculate Rent for an irregular period of less than one (1) year or less than one (1) calendar month, an appropriate apportionment and adjustment shall be made.

### 3.8.    ADDITIONAL RENT TREATED AS RENT

All Additional Rent shall be recoverable as Rent, and the Landlord shall have all rights against the Tenant for default in any such payment as in the case of arrears of Rent.

### 3.9.    INTEREST ON AMOUNTS IN DEFAULT

If the Tenant fails to pay when due any amount of Rent, the unpaid amount will bear interest calculated and payable monthly from the due date to the date of payment at the rate per annum which is equal to Five (5%) percent of the outstanding.

### 3.10.    UTILITIES

The Tenant shall provide utility services in quantities determined to constitute normal use for tenants of comparable space in the Premises, but not less than the quantities provided immediately prior to the Commencement Date.

### 3.11. NET LEASE TO LANDLORD

The Tenant acknowledges and agrees that, subject to the Landlord's obligations with respect to Excluded Operating Costs, Structural Elements and except as otherwise expressly set forth in this Lease, it is intended that this Lease shall be a completely net lease to the Landlord. The Tenant shall pay all costs, charges, expenses and outlays of every nature and kind relating to or affecting the Premises and the Tenants business in the Premises, and as provided in this Lease, the Tenant's Proportionate Share of all costs, charges, expenses and outlays relating to the Midtown Live Center (including without limitation the Building and the Premises) which are allocated to the Building in accordance with section 3.6 hereof.

### 3.12. LANDLORD'S RIGHT TO PAY TENANT'S OBLIGATIONS

If the Landlord is billed by any third party for any costs of any nature whatsoever arising from or relating to the Premises which, pursuant to the provisions of this Lease, are the Tenant's obligations to pay, the Landlord shall have the right, but not the obligation, upon 15 Business Days written notice to the Tenant, to pay the costs. Such costs so paid by the Landlord, plus an administrative charge of ten percent (10%) of such costs, shall be payable by the Tenant to the Landlord forthwith upon demand as Additional Rent; provided however, that if within the 15 Business Day period, the Tenant gives notice to the Landlord that the Tenant is disputing such liability, then, and in such event, but subject to the provisions of Section 5.8 hereof, the Landlord shall not have the right to pay such amount.

## 4. BUILDING SERVICES AND COMMON AREAS

### 4.1. HVAC, LIGHTING AND POWER

(a) The Tenant shall maintain, clean, light, heat, ventilate and air-condition the Premises during Business Hours in accordance with the reasonable requirements of the Tenant taking into account the nature of the Tenant's business, and in any event in accordance with the Building Standard.

(b) If, for any portion of the Premises, the Tenant requests interior climate control services that in the Landlord's reasonable opinion exceeds in any material respect the standard services provided to other comparable space in the Building or from that provided to the Tenant prior to the Commencement Date, the Landlord shall provide such services if the Landlord determines it is within the capacity of the HVAC system, is not reasonably required by the Landlord for other tenants of the Building, would not detrimentally affect the operation or structure of the Building, would not reduce the efficiency of such services provided to, or reasonably required by, other tenants and is feasible, or, notwithstanding the foregoing, if the Tenant pays the costs of upgrading the HVAC system to meet the Tenant's requirements. The Tenant shall pay the Landlord's cost of providing such excess services.

### 4.2. BUILDING SYSTEMS

In the event of an interruption in service provided by any of the Building Systems, the Landlord shall use all reasonable commercial efforts (including the authorization of overtime) to end such interruption as soon as reasonably possible. The Landlord acknowledges the importance of uninterrupted availability of the Building Systems to the Tenant and agrees that in the event that the Landlord is not using all reasonable commercial efforts to end such interruption, then the Tenant shall be entitled to take such action as may be necessary to cause the Landlord to comply with such obligations, including by way of injunction. Notwithstanding the foregoing, and for the purposes of meeting the Building Standard, the Landlord shall be entitled to shut down the Building Systems for planned maintenance upon not less than 90 days written notice to the Tenant. In such event, the Landlord shall diligently complete such maintenance and repairs to return the Building Systems to service.

Page 12

### 4.3. COMMON AREAS

Subject to the Rules and Regulations referred to in Section 5.12, the Landlord shall allow the Tenant the use of the Common Areas on a 24 hour, 7 days a week, basis throughout the Term. It is agreed that the Tenant and all other persons using such Common Areas shall do so at their sole risk and under no circumstance shall the Landlord be liable for any damage or injury resulting to any persons or property while using such Common Areas, or occasioned to any person by the use of the elevators or any of their appurtenances.

### 4.4. SECURITY

(a)     The Tenant shall provide security for the Premises in accordance with the Building Standard on a 24-hour, 7 days a week basis throughout the Term. The Tenant shall, however, have the option of requiring the Landlord to provide such additional security as it deems fit for the Premises provided that such additional security shall be at the sole cost and expense of the Tenant.

(b)     The Landlord shall further operate the Building so as not to interfere with, or derogate from the security requirements of the Tenant.

### 4.5. JANITORIAL AND CLEANING

The Tenant shall provide reasonable janitorial and cleaning services to the Building.

### 4.6. ALTERATIONS BY LANDLORD

The Landlord may:

(a)     alter, add to, subtract from, construct improvements to, rearrange, build additional stories on and construct additional facilities adjoining or near the Premises;

(b)     relocate facilities and improvements (excluding the Premises) contained in the Premises;

provided that notwithstanding anything contained in this Section, access to the Premises shall at all times be available.

### 4.7. REPAIRS TO CRITICAL OPERATIONS AREAS

If there is any breakdown in any Building System which creates an emergency situation that interrupts the Tenant's Critical Operations Areas and the Tenant, acting reasonably, determines that the Landlord cannot complete the repairs in the necessary timeframe, having regard to the Tenant's Critical Systems, the Tenant shall have the right to perform such work necessary to resolve the emergency and to maintain the Critical Systems in proper working order. The Landlord shall reimburse the Tenant within 15 days of receipt of all relevant invoices from the Tenant.

### 4.8. ACCESS BY LANDLORD TO CRITICAL OPERATIONS AREAS

The Landlord acknowledges that it is aware that the Critical Operations Areas contain Critical Systems which are of a highly sensitive and technical nature. The Landlord covenants in favor of the Tenant that in accessing or entering the Critical Operations Areas, the Landlord and all persons for whom the Landlord is responsible in law or over whom the Landlord has control including, without limitation, the Landlord's employees, contractors and janitorial staff, shall use the utmost precaution when entering the Critical Operations Areas so as not to disturb, interfere with or damage the Critical Systems. The Tenant shall approve of all persons entering the Critical Operations Areas for any purpose, such approval not to be unreasonably withheld.

# 5.     USE

### 5.1.    PERMITTED USE

   (a)     The Premises may be used for any lawful business engaged in by the Tenant which includes but is not limited to general office use, retail sales, storage purposes, restaurant and bar services and otherwise in keeping with the general character of the Premises, and such other lawful purposes as are consented to by the Landlord, such consent not to be unreasonably withheld.

   (b)     The Tenant shall be entitled to share the occupancy and use of the Premises, or any part thereof, with anyone with whom the Tenant is in partnership or joint venturing, subject to the Landlord's consent, which shall not be unreasonably withheld.

   (c)     The Landlord covenants that during the Term, the Landlord shall not rent any space in the Premises to any tenant that a prudent landlord of a similar building would not rent to or to any tenant who operates a restaurant, bar, night club or any other business in direct competition with Tenant.

### 5.2.    NUISANCE

The Tenant shall not carry on any business or do or suffer any act or thing which may constitute a nuisance or be offensive or any annoyance to the Landlord or other occupants of the Premises, or do or suffer any waste of damage, disfiguration or injury to the Premises or permit or suffer any overloading of the floor thereof.

### 5.3.    COMPLIANCE WITH APPLICABLE STATUTES, ETC.

The Tenant will promptly comply with and conform to the requirements of every applicable law, by-law, regulation, ordinance and order affecting in any way the use of the Premises or the Leasehold Improvements, Trade Fixtures, furniture and equipment installed by the Tenant.

### 5.4.    LEASEHOLD IMPROVEMENTS BY TENANT

   (a)     The Tenant shall, with the consent of the Landlord, such consent not to be unreasonably withheld, be entitled to install or alter any Leasehold Improvements or complete any other additions or Alterations in the Premises so long as such work does not adversely affect the structure or Building Systems of the Premises, is in compliance with the design criteria of the Premises (if design criteria for the Premises has been established by the Landlord and such design criteria has been communicated to the Tenant in writing) and is lawful.

   (b)     On the termination of the Term (or earlier termination of any full floor comprising the Premises pursuant to the provisions of Section 14 of this Lease) all Leasehold Improvements, including all demountable wall partitions installed in the Premises by the Tenant, shall be the property of the Landlord, and the Tenant may not remove, nor be obliged to remove any leasehold improvements. At the expiration or sooner termination of the Term, or earlier termination of any full floor forming part of the Premises pursuant to the provisions of Section 14 of this Lease, the Tenant shall leave the Premises and any and all full floors in neat and tidy condition, in good condition, reasonably wear and tear excepted, and free of debris.

### 5.5.    INFLAMMABLE LIQUID OR DANGEROUS MATERIALS

The Tenant shall not bring into or store in the Premises any inflammable liquid or dangerous or explosive materials, except, subject always to section 5.10, such reasonable quantities of such liquids as may be necessary for its normal business purposes.

### 5.6. RESTRICTION ON TENANT'S TRADE FIXTURES

The Tenant shall not bring into the Premises any articles or Trade Fixtures that by reason of their weight or size might damage or endanger the structure of the Premises. If any damage is caused to the Premises by any such articles or fixture, the Tenant shall, forthwith upon demand, pay to the Landlord, as Additional Rent, the Landlord's cost of making good the same together with an administrative charge equal to fifteen percent (15%) of such cost.

### 5.7. DEFACING OF WALLS, ETC.

Other than for the normal conduct of its business and the use of the Premises, the Tenant shall not drill into, or in any way deface, the walls, ceilings, partitions, floors, wood, stone or iron work within the Premises without the prior written consent of the Landlord. In the event of any violation of the provisions hereof, the Landlord may, in addition to any other remedies it may have hereunder, enter and repair any damage and the Tenant shall pay the cost thereof, together with an administrative charge equal to fifteen percent (15%) of such cost, to the Landlord, forthwith upon demand, as Additional Rent.

### 5.8. LIENS, ETC.

In connection with all work or installations made by or for the Tenant in the Premises the Tenant shall not allow liens to be placed on the Premises. If the Tenant defaults in its obligation to do so, the Landlord may lodge such security or make such payment into court as may be permitted by applicable lien legislation for the purpose of obtaining an order or like instrument discharging the registration of any such lien or certificate of action and the Tenant will, forthwith on demand and as Additional Rent, reimburse the Landlord for any such payment together with reasonable costs (including legal fees) related thereto.

### 5.9. INSURANCE

(a)     The Tenant shall maintain during the Term:

    (i)     all risks insurance upon all property owned by the Tenant or for which it is liable and which is located in the Building, including inventory or stock-in-trade in an amount equal to the full replacement cost thereof;

    (ii)     liability insurance against claims for death, personal injury and property damage in or about the Premises in an amount of not less than $1,000,000.00 per occurrence;

    (iii)     Liquor liability insurance in an amount of not less than $500,000.00 per occurrence; and

    (iv)     All policies required to be written on behalf of the Tenant shall: (a) contain a waiver of subrogation rights which the Tenant's insurers may have against the Landlord and those for whom the Landlord is at law responsible; (b) shall be non-contributing with, and shall apply only as primary, and not as excess to, any other insurance available to the Landlord or Mortgagee; (c) not be invalidated with respect to the interest of the Landlord and Mortgagee by reason of any breach or violation of any warranties, representation, declaration or conditions contained in the policies.

(b)     The insurance described in sub-sections (a) (i), (ii) and (iii) shall name the Landlord or anyone designated in writing by the Landlord who is a Mortgagee of the Building as additional insureds as their interest may appear. All property damage and public liability insurance shall contain a provision for cross-liability or severability of interest as between the Landlord and the Tenant. The Tenant hereby releases the Landlord from any liability for loss to the extent of all insurance proceeds paid under policies of insurance carried by the Tenant or which would have been paid if the Tenant had maintained the insurance it is required to maintain under this Lease. Such policies shall contain an endorsement requiring the insurers under such policies to notify the Landlord in

Page 15

writing at least thirty (30) days prior to any material change or cancellation thereof.  On request by the Landlord, the Tenant shall furnish to the Landlord with certificates of insurance evidencing the Tenant's insurance. The cost of premium for each and every such policy shall be paid by the Tenant.  If the Tenant fails to maintain such insurance, the Landlord shall have the right, but not the obligation or any liability, to do so, and to pay the cost or premium therefor, and in such event the Tenant shall repay to the Landlord, as Additional Rent, forthwith on demand the amount so paid.

(c)      The Landlord shall maintain during the Term such types of insurance coverage on the Building, in such amounts and with such deductibles as are carried by prudent owners of similar buildings in the same city having regard to the age, nature, location and character of the Building, and, in addition, shall be entitled, in its sole discretion, to maintain and procure such further insurance coverage in relation to the Landlord's obligations under this Lease, as it sees fit. Without derogating from the generality of the foregoing, the Landlord shall insure, and keep insured, the Building, during the Term, for the full replacement cost thereof, and which insurance shall, without limitation, include insurance coverage:

(i)      for loss or damage due to perils covered by broad form boiler and pressure vessel insurance policies which shall include provision for loss or damage against sudden and accidental breakdown of boiler or any vessel subject to pressure or vacuum, unfired pressure vessel, other fired pressure vessels and refrigeration systems (excluding however the insurance coverage referred to in Section 5.10(a)(iv) hereof); and

(ii)     against business interruption under which the period of indemnity will be not less than twelve (12) months providing for not less than One Hundred (100%) percent of the resulting loss of Rent.

## 5.10.   INSURANCE RISKS

The Tenant shall not do, omit to do or permit to be done or omitted to be done upon the Premises anything which would cause the cost to the Landlord or to any other tenant of any type of insurance on the Building to be increased (and, without waiving the foregoing prohibition, the Landlord may demand, and the Tenant shall pay to the Landlord upon demand, the amount of any such increase of cost caused by anything so done or omitted to be done) or which shall cause any policy of insurance of the Development or of any other tenant to be subject to cancellation.

## 5.11.   RULES AND REGULATIONS

The Tenant shall comply with the Rules and Regulations annexed hereto and marked Schedule 3, and to cause such Rules and Regulations to be observed and performed by everyone for whom the Tenant is in law responsible or over whom the Tenant might reasonably be expected to have control.  The Landlord shall have the right from time to time and at any time during the Term to make any and all reasonable amendments, deletions and additions to such Rules and Regulations, including Rules and Regulations relating to the use of the Common Areas on written notice being given to the Tenant, provided that such Rules and Regulations are not contrary to the terms and conditions of this Lease.

## 6.     SIGNAGE, BUILDING NAME AND SATELLITE DISH / ANTENNAE

## 6.1.   TENANT'S SIGNS

(a)      The Tenant, shall, during the term of this Lease and any renewals thereof have the right, within the Midtown Live Center, Building, Premises, and the common areas, to erect, install and maintain the Tenant's identification signage in the Tenant's distinctive style including, at the sole discretion of the Tenant banners and posters of a kind and size and in locations where considered necessary by

Page 16

the Tenant.  The Tenant shall at all times during the Term be entitled to change such signage at its discretion.

(b)     Except as expressly provided in this section 6, the Tenant shall not erect, install or display any signage without the consent of the Landlord not to be unreasonably withheld.

## 6.2.   EXTERIOR SIGNAGE

All costs and expenses relating to the Tenant's signage shall be borne and paid for by the Tenant.

## 6.3.   ALL SIGNS

All signs erected or installed in the Premises by or on behalf of the Tenant and other tenants of the Building shall be tasteful and in keeping with the character of the Building.

## 6.4.   COMPLIANCE WITH LAWS

All signs erected or installed by the Tenant, the Landlord or other tenants of the Building shall at all times comply with all Applicable Laws.

## 6.5.   BUILDING NAME

The Premises shall be known as Midtown Live Center.

## 6.5.   SATELLITE DISH/ANTENNAE

(a)     Subject to Section 6.5 (b), the Tenant shall have the exclusive right to install and maintain on the roof of the Premises, for the use of the Tenant, or the Tenant's customers, satellite dishes and telecommunications antennae.

(b)     Notwithstanding the provisions of Section 6.6 (a), the Landlord may, with the written consent of the Tenant, which consent shall not be unreasonably withheld, use or permit other tenants to use, the roof for the installation and maintenance of satellite dishes and telecommunications antennae.

# 7.   ENVIRONMENTAL

## 7.1.   ENVIRONMENTAL CONTAMINATION

The Landlord shall be responsible for all Environmental Contamination subsequent to the Commencement Date of the Lease to the extent of any fines, penalties, claims, demands, actions, suits, proceedings, damages, costs or liabilities being levied against, suffered by or accruing to the Tenant either directly or on account of Allocable Operating Costs, unless the Environmental Contamination has arisen from activities within the direction or control of the Tenant.

## 7.2.   REMEDIATION OF ENVIRONMENTAL CONTAMINATION

The Landlord will at its own expense promptly remove from the Building (including the Premises) or remediate all Environmental Contamination in accordance with all Environmental Laws, except if the Environmental Contamination has arisen from activities within the direction or control of the Tenant.  If the presence of the Environmental Contamination is, in the opinion of the state agency applicable or other governmental authority having jurisdiction, detrimental to human health to the extent that continued exposure to it constitutes a health hazard, the Tenant shall be entitled to vacate the Premises or affected portion or portions thereof and abate Rent on a pro rata basis until such time as the removal or remediation has been completed in accordance with the provisions of the Lease.  Any damages, costs or liabilities incurred by the Landlord relating to the above shall not be charged to the Tenant or included in Allocable

Page 17

Operating Costs.

### 7.3.    TENANT'S ENVIRONMENTAL REMEDIES

If the Landlord fails to promptly remove or remediate any Environmental Contamination as aforesaid within ten (10) days after receipt of written notice from the Tenant, the Tenant shall have the right to cause the Environmental Contamination to be removed or remediated.  The Landlord shall pay all costs incurred by the Tenant in so doing.

### 7.4.    TENANT'S ENVIRONMENTAL COVENANTS

The Tenant shall comply with all environmental laws and agrees to indemnify and save harmless the Landlord from and against all liabilities that the Landlord may directly incur or suffer as a result of, in connection with or arising from any Environmental Contamination resulting from activities within the direction or control of the Tenant.

### 7.5.    ASBESTOS

It is acknowledged that asbestos is contained in certain Floors of the Premises.  In the event that the Tenant renovates its Premises in any floor which contains asbestos, or in the event that the regulatory authorities require that such asbestos be removed, the Tenant shall cause the asbestos to be removed at its expense and in compliance with the provisions of Section 7.4 hereof.  Otherwise, neither the Tenant nor the Landlord shall have any obligation to remove the asbestos.

## 8.    REPAIR AND DAMAGE

### 8.1.    MAINTENANCE, MANAGEMENT AND REPAIR

(a)    The Tenant shall keep and maintain the Premises in good repair and in any event in a standard of maintenance, repair and utility consistent with the Building Standard.  In no event shall the Tenant permit any deterioration in respect of the Premises and amenities available to the Tenant, subject only to reasonable wear and tear.  In performing such obligations, the Tenant shall replace any item only if a prudent owner of real estate comparable to the Premises would replace it rather than repair such item.  The Tenant shall maintain the Building Systems in accordance with the Building Standard as would a prudent owner of real estate comparable to the Building.

(b)    If the Tenant fails to maintain or repair in accordance with the above within a reasonable time of notice by the Landlord, the Landlord may at its option, effect or make such maintenance or reparations at the Tenant's expense.  The Tenant shall reimburse the Landlord for such expenses incurred by the Landlord, which expenditure shall be included in Allocable Operating Costs.

(c)    The Tenant shall manage the Premises to a standard of management consistent with the Building Standard.

### 8.2.    DAMAGE - LANDLORD'S LIABILITY

(a)    Except to the extent of the insurance and insurance limits required to be obtained by the Landlord pursuant to the provisions of this Lease (whether actually obtained or not), and notwithstanding anything to the contrary contained in this Lease, including the obligations of the Landlord to repair and maintain as specified in this Lease, the Landlord shall not be in any way responsible, liable or accountable to the Tenant or anyone claiming by, through or under the Tenant, for:

(i)    any loss, injury or damage to property; or

(ii)    for any direct, indirect, consequential, business, economic or other loss, injury or

damage or for any inconvenience, interruption or discomfort;

that may be suffered or sustained by reason of:

> (A)  any interruption, cessation or suspension in the operation of the Building Systems or the back-up and uninterrupted power supply systems or in the provision of any utilities or service; or

> (B)  steam, water, rain, ice or snow which may leak into, issue or flow from any part of the Premises or from any other place whether or not by reason of breakages in or damage to plumbing or drainage works or sprinklers;

and whether or not resulting from or involving the negligence or wrongful acts of the Landlord, or its contractors, its contractor's subcontractors and their respective employees and agents and the Tenant hereby releases the Landlord from any such claims (except to the extent of the insurance and insurance limits required to be obtained by the Landlord pursuant to the provisions of this Lease, whether actually obtained or not).

(b)  Except to the extent the same is caused by the negligence, act or omission or unlawful acts of the Landlord, its agents, servants, employees, contractors, or for any person for whom the Landlord is responsible in law however, subject to Section 8.2 (a) hereof, the Landlord will not be liable for any damage suffered to the Premises or the contents thereof by reason of the Landlord, its agents, servants, employees or contractors, entering upon the Premises to undertake any examination thereof or any work therein or in the case of any emergency.

## 8.3.  DAMAGE TO PREMISES AND TERMINATION

(a)  In the event of damage to the Premises or to other portions of the Premises which affect access or services to the Premises, and if the damage is such that the Premises or any substantial part thereof is rendered, in the Tenant's reasonable opinion, not reasonably capable of use and occupancy by the Tenant for the purposes of its business, then:

> (i)  Rent shall abate from and after the occurrence of the damage until 60 days (Tenant refixturing period) beyond the time that the Premises are reasonably capable of use and occupancy in proportion to the part or parts of the Premises not reasonably capable of such use and occupancy; and

> (ii)  unless the Lease is terminated as provided for below, the Landlord or the Tenant (according to the nature of the damage and their respective obligations to repair) shall repair such damage with all reasonable diligence.

(b)  If either the Premises or premises of subtenants of the Premises comprising in the aggregate 50% or more of the total occupiable area in the Premises or any portion of the Premises which affects access or services essential thereto are substantially damaged or destroyed (the "Substantial Damage") and if, in the reasonable opinion of the Tenant, such damage cannot be repaired within 365 days of its occurrence, then the Landlord or the Tenant may at either of their options on 30 days notice to the other of them terminate the Lease and the Tenant shall vacate the Premises within 60 days. The Landlord shall only have the right of termination if it is also exercising such right against all other tenants in the Premises. In all other cases the Landlord or the Tenant as the case may be shall repair such damage with reasonable diligence.

# 9.   ASSIGNMENT AND SUBLETTING

### 9.1.   ASSIGNMENT OR SUBLETTING

(a)   The Tenant may not assign this Lease without the prior written consent of the Landlord, which consent shall not be unreasonably withheld or delayed.

(b)   Notwithstanding the provisions of subparagraph (a) hereof, no consent shall be required for an assignment to a related entity.

(c)   Notwithstanding the foregoing, and notwithstanding that the Landlord grants the consent to the assignment, any assignment (other than to related entities) shall be at the rates as specified herein and, in the event that the Tenant derives any profit from such assignment, such profit shall be Tenant's.

(d)   An assignment shall not release the Tenant's obligations contained in this Lease.

(e)   With regard to subletting, this is a "gross lease." Tenant shall be allowed to sublet any portion of or all of the Premises as Tenant believes appropriate with the Landlord's consent, which shall not be unreasonably withheld. Tenant does, however, understand that each of the leases and the rents therefrom of all subtenants shall be assigned to Landlord.  However, Landlord shall not be entitled to rents from any subleases unless a monetary default of the terms of this Lease by Tenant occurs, which continues for thirty (30) days without cure, after formal notice by Landlord.

# 10.   STATUS CERTIFICATES, SUBORDINATION, ATTORNMENT AND REGISTRATION

### 10.1.   STATUS CERTIFICATES

The Tenant shall at any time and from time to time upon not less than five (5) days' prior notice, execute and deliver to the Landlord or as the Landlord may direct a statement in writing certifying that this Lease is unmodified and in full force and effect (or if modified, stating the modification and stating that the same is in full force and effect as modified) the amount of, the annual rent and any other amounts than being paid hereunder, the dates to such rent and other charges payable hereunder have been paid, the particulars and amounts of insurance policies on the Premises and whether or not there is any existing default on the part of the Landlord of which the Tenant has notice.  Any such statement may be conclusively relied upon by any prospective purchaser or any Mortgagee or any prospective Mortgagee.

### 10.2.   SUBORDINATION AND ATTORNMENT

(a)   Subject to the provisions of subsection (b) hereof, this Lease and the rights of the Tenant hereunder shall be subject and subordinate to all existing or future Mortgages and to all renewals, modifications, consolidations, replacements and extensions thereof and, whenever requested by the Landlord, the Tenant will promptly subordinate this Lease and the rights of the Tenant hereunder in such form as the Landlord may require.  When requested by a Mortgagee, the Tenant will agree in writing with such Mortgagee, if such Mortgagee becomes a mortgagee in possession or realizes on its security, to attorn to such Mortgagee as a tenant upon all the terms of this Lease.

(b)   Upon the written request of the Tenant, and as a condition of the Tenant subordinating this Lease and the rights of the Tenant to a Mortgage, the Landlord shall obtain a subordination agreement from the Mortgagee, in form and substance acceptable to the Tenant (acting reasonably) to the effect that the Tenant will be permitted to remain in quiet possession of the Premises pursuant to the provisions of this Lease, without interruption or disturbance from the Mortgagee if the Tenant complies with all its obligations contained herein.

14-20200600dt-Db54803-Filed-04/08/16-21-Entered-04/08/16-21-15-82-03-Exhibit-A-Exhibit-Compiled-50
14-16940-hhd-Dr-dcf-43-1-Filed-01/06/21-Entered-01/06/21-15-10-27-37-Exhibit-A-Lease
Exhibits-1-nt-22-Pg-147-of-330
Agreement-Pg-26-of-87

## 10.3. RECORDATION

The Tenant will not record this Lease but may record a short form or abstract thereof for the purpose only of giving notice of the material terms of this Lease, the location of the Premises and the Term, but not any financial provisions of this Lease.

## 11. <u>LIMITATION OF LIABILITIES</u>

### 11.1. APPLICATION OF UNAVOIDABLE DELAY

Except as herein otherwise expressly provided, if an whenever and to the extent that either the Landlord or the Tenant shall be prevented, delayed or restricted in the fulfillment of any obligation hereunder other than the payment of rent or other monies due, by reason of Unavoidable Delay, the time for such fulfillment shall be extended during the period in which such circumstance operates to delay the fulfillment and the other party to this Lease shall not be entitled to compensation for any inconvenience, nuisance or discomfort thereby occasioned.

### 11.2. WAIVER

If the Landlord overlooks, excuses, condones or suffers any default by the Tenant of any of its obligations hereunder, or vice versa, this shall not operate as a waiver of such obligation in respect of any continuing or subsequent default, and no such waiver shall be implied but shall only be effective if expressed in writing. The subsequent acceptance of rent by the Landlord will not be considered to be a waiver of a preceding breach by the Tenant of a term, covenant or condition of this Lease, regardless of the knowledge of the Landlord of the preceding breach at the time of acceptance of the rent.

### 11.3. INDEMNITY BY TENANT

The Tenant will indemnify and save harmless the Landlord against and from any and all expenses, costs, damages, suits, actions or liabilities arising or growing out of any default by the Tenant hereunder, and from all claims and demands of every kind and nature made by any person or persons to or against the Landlord, for all and every manner of costs, damages or expenses incurred by or injury or damage to such person or persons or his, her or their property, which claims or demands may arise howsoever out of the use and occupation of the Premises or the use of any part of the Premises by the Tenant or any subtenant or occupant or any of them or their respective servants, agents, assistants, employees, invitees, or by any person for whom the Tenant is responsible in law, who may enter the Premises to attend at the Premises, and from all costs, legal fees, expenses and liabilities incurred in or about any such claim or any action or proceeding brought thereon; provided however, that this indemnity shall only apply to the extent of the insurance and insurance limits required to be obtained by the Tenant pursuant to this Lease (whether actually obtained or not), including, without limitation, the Tenant's legal liability insurance.

## 12. <u>ACCESS</u>

### 12.1. ENTRY BY LANDLORD

The Landlord shall be permitted, at any time and from time to time, to enter the Premises for the purpose of inspection, providing janitor services, maintenance, making repairs, Alterations or improvements to the Premises or the Premises or to have access to utilities and services, and the Tenant shall not be entitled to compensation for any inconvenience, nuisance or discomfort caused thereby.

### 12.2. LANDLORD'S RIGHT OF REPAIR AND TO ALTER COMMON AREAS

The Landlord shall have the right to install, maintain and/or repair pipes, wires, ducts or other installations in, under or through the Premises for or in connection with the supply of any services to the Premises or the

Page 21

Premises or any part thereof; and to alter the Common Areas from time to time as the Landlord may desire and to conduct repairs, renovations or additions to the Premises or any part thereof including the Premises, and none of the above shall constitute a breach by the Landlord of any of the Landlord's covenants for quiet enjoyment or shall entitle the Tenant to any damages, diminution of rent or any other remedies, provided however, that in so doing, the Landlord shall not interfere with any of the Tenant's wiring, conduits, electrical or telecommunications wires or fibers which the Tenant has installed in any part of the Premises or the Lands.

## 13.   DEFAULT

### 13.1.   DEFAULT AND REMEDIES

If and whenever an Event of Default occurs, then without prejudice to any other rights which it has pursuant to this Lease or at law, the Landlord shall have the following rights and remedies, which are cumulative and not alternative:

(a)      to terminate this Lease by notice to the Tenant;

(b)      to enter the Premises as agent of the Tenant and to re-let the Premises for whatever term, and on such terms as the Landlord in its discretion may determine and to receive the rent therefore and as agent of the Tenant on the Premises, to store such property at the expense and risk of the Tenant or to sell or otherwise dispose of such property in such manner as the Landlord may see fit without notice to the Tenant; to make Alterations to the Premises to facilitate their re-letting; and to apply the proceeds of any such sale or re-letting first, to the payment of any expenses incurred by the Landlord with respect to any such re-letting or sale; second, to the payment of any indebtedness of the Tenant to the Landlord other than rent; and third, to the payment of Rent in arrears; with the residue to be held by the Landlord and applied in payment of future Rent as it becomes due and payable.  The Tenant shall remain liable for any deficiency to the Landlord;

(c)      to remedy or attempt to remedy any default of the Tenant under this Lease for the account of the Tenant and to enter upon the Premises for such purposes.  No notice of the Landlord's intention to perform such covenants need be given the Tenant unless expressly required by this Lease.  The Landlord shall not be liable to the Tenant for any loss, injury or damage caused by acts of the Landlord in remedying or attempting to remedy such default and the Tenant shall pay to the Landlord all expenses incurred by the Landlord in connection with remedying or attempting to remedy such default;

(d)      to notify all subtenants present on Premises to immediately begin payment of the assigned rents to Landlord directly without setoff or payment to Tenant of any kind.

(e)      to recover from the Tenant all damages, and expenses incurred by the Landlord as a result of any breach by the Tenant, including, without limitation, if the Landlord terminates this Lease, damages resulting from the loss of the benefit of the unexpired portion of the Term had this lease not been terminated; and

(f)      in the event of bankruptcy or insolvency of the Tenant, to recover from the Tenant the full amount of the current month's Rent together with the next 3 months' installments of Rent, all of which shall accrue on a day-to-day basis and shall immediately become due and payable as accelerated Rent.

### 13.2.   CONTRACTUAL AND LANDLORD'S LIEN

Notwithstanding any provision of this Lease or any provision of applicable legislation, none of the goods

and chattels of the Tenant or of any subtenants on the Premises at any time during the Term shall be exempt from contractual or landlord lien for Rent in arrears, and the Tenant waives any such exemption. If the Landlord makes any claim against the goods and chattels of the Tenant by way its liens, this provision may be pleaded as an estoppel against the Tenant in any action brought to test the right of the Landlord to levy such lien.

### 13.3.  COSTS

The Tenant shall pay to the Landlord all damages and costs (including, without limitation, all legal fees and court costs) incurred by the Landlord in enforcing the terms of this Lease, or with respect to any matter or thing which is the obligation of the Tenant under this Lease, or in respect of which the Tenant has agreed to insure, or to indemnify the Landlord.

### 13.4.  ALLOCATION OF PAYMENTS

The Landlord may at its option apply sums received from the Tenant against any amounts due and payable by the Tenant under this Lease in such manner as the Landlord sees fit.

### 13.5.  SURVIVAL OF OBLIGATIONS

If the Tenant has failed to fulfill its obligations under this Lease with respect to the maintenance, repair and alteration of the Premises, such obligations and the Landlord's rights in respect thereto shall remain in full force and effect notwithstanding the expiration or sooner termination of the Term.

### 13.6.  REMEDIES GENERALLY

The mention in this lease of any particular remedy or remedies of the Landlord in respect of any Event of Default by the Tenant shall not preclude the Landlord from any other remedy in respect thereof, whether available at law or in equity, or by statute, or expressly provided for herein.  No remedy shall be exclusive or dependent upon any other remedy, but the Landlord may from time to time exercise any one or more of such remedies generally or in combination, such remedies being cumulative and not alternative.

## 14.  TENANT'S RIGHT OF TERMINATION

### 14.1.  NOTICE OF TERMINATION

Notwithstanding anything to the contrary contained in this Lease:

(a)  The Tenant shall be entitled to terminate this Lease, effective anytime within the term of this Lease or any extension thereof (the "First Termination Date"), in the event Tenant elects to exercise its right to purchase the Midtown Live Center;

(b)  The termination referred to in subsection (a) shall be effected by the Tenant giving written notice of its intent to purchase the Premises and desire to terminate this Lease (the "First Termination Notice") to the Landlord, which First Termination Notice shall be delivered to the Landlord in writing along with an executed copy of the attached Agreement of Purchase and Sale.

### 14.2.  TERMINATION OF LEASE

Upon the First Termination Notice being given by the Tenant to the Landlord pursuant to the provisions of Section 14.1, then, and in such event, and on the First Termination Date this Lease shall terminate upon the closing of the purchase and sale of the Premises.

# 15. <u>RENEWAL</u>

**15.1.** **OPTION TO RENEW**

The Tenant shall have the option to renew this Lease with respect to all or any portion of the Premises for one five (5) year term, provided that the Tenant gives the Landlord written notice not later than six (6) months prior to the expiration of the then Term and not earlier than twelve (12) months prior to the expiration of the then Term, which written notice shall stipulate those portions of the Premises in respect whereof this Lease is being renewed.

**15.2.** **RENEWAL PROVISIONS**

All provisions, terms and conditions of the Lease shall be applicable during the renewal terms, except that there shall be no further rights to renew the Lease beyond the final renewal period and the yearly Base Rent payable during the renewal term shall be equal to the greater of $9,53823 per month for the fair market rent for the Premises. Fair market rent shall mean the most probable rent which would be obtainable by the Landlord for a lease of the Premises for the relevant renewal term in an open and competitive market, the Landlord and such tenant each acting prudently and knowledgeably. In determining such fair market rent the parties shall take into account all relevant factors, including, without limitation (i) the age and condition of the Premises on the commencement date of the renewal term; (ii) rent that would be payable by such tenant to lease comparable premises in a comparable location for the relevant renewal term; and (iii) the Building Systems and other features and attributes of the Premises. If the parties cannot agree on the fair market rent for the Premises, it shall be determined by arbitration in accordance with the arbitration provisions set forth in Section 21 hereof.

# 16. <u>NOTICE OF SALE</u>

In the event that the Landlord is desirous of selling the Midtown Live Center after Tenant's option to purchase has expired, the Landlord covenants and agrees that at least thirty (30) days prior to the Landlord retaining any agent or third party for the sale of the Premises, the Landlord shall give written notice to the Tenant that the Landlord intends to sell the Premises, it being the intent of this Section that the Tenant shall have thirty (30) days notice of the Landlord's intent to sell the Premises before the Landlord retains an agent to market the Lands and Premises for sale.

# 17. <u>IMMINENT DOMAIN</u>

If the whole or any material part of the Premises is taken by imminent domain, the Landlord may at its option give notice to the Tenant terminating this Lease on the date when the Tenant or Landlord is required to surrender possession thereof to the governmental authority. Upon such termination, or upon termination by operation of law, as the case may be, the Tenant shall immediately surrender the Premises and all its interest therein, and the rent shall abate and be apportioned to the date of termination and the Tenant shall forthwith pay to the Landlord the apportioned rent and all other amounts which may be due to the Landlord up to the date of termination. The Tenant shall have a claim upon the Landlord for the value of its property or the unexpired term of this Lease. Both the Landlord and the Tenant shall each retain their individual rights to claim damages from the expropriation authorities as a result of such expropriation.

# 18. <u>PARKING</u>

**18.1.** **TENANTS PARKING**

Throughout the Term, and as required by the Tenant or its employees and subtenants the Landlord shall on the Commencement Date make available for the use of the Tenant or its employees and subtenants all parking which exists on the Premises.

**18.2.  TENANT'S FURTHER RIGHTS**

> (i)     to designate the number of parking stalls for each subtenant; and
>
> (ii)    to designate the number of parking stalls which are to be reserved designated parking stalls;

**18.3.  VISITOR PARKING**

> Tenant shall address all issues associated with visitor parking during the Term of this Lease.

# 19.     STANDARD OF PERFORMANCE

Subject to the terms of this Lease, the Landlord, in carrying out its obligations, exercising its discretion and making decisions relative to the Premises, will act, and will direct its agents, employees, contractors and representatives to act, in a commercially prudent and reasonable manner as would an experienced, sophisticated landlord of buildings of similar character, size and age and in so doing will meet or exceed, in all material respects, the Building Standard and shall make itself available to receive and respond to suggestions and requests made by the Tenant with respect to the standard of operation and condition of the Lands, the Premises.  Subject to the terms of this Lease, the Tenant in carrying out its obligations, exercising its discretion and making decisions relative to the Premises, will act and will direct its agents, employees, contractors and representatives to act in a commercially prudent and reasonable manner.

# 20.     GENERAL PROVISIONS

**20.1.  HOLDINGOVER**

> If the Tenant remains in possession of the Premises after the end of the Term with the consent of the Landlord but without having executed and delivered a new lease or an agreement extending the Term, there shall be no tacit renewal of this Lease, and the Tenant shall be deemed to be occupying the Premises as a month to month tenant at a monthly Rent payable in advance on the first day of each month equal to the greater of (i) an amount equal to one hundred ten (110%) percent of the monthly amount of Rent payable during the last month of the Term, or (ii) the market rent for similar premises as determined by the Landlord in its sole discretion and otherwise upon the same terms as are set forth in this Lease, so far as these are applicable to a monthly tenancy.

**20.2.  LANDLORD'S CONSENT**

> Whenever the Landlord's or Tenant's consent is to be provided in accordance with the provisions of this Lease, unless the context otherwise specifically dictates, such consent shall not be unreasonably withheld or delayed.

**20.3.  TENANT'S RIGHT AND OPTION TO PURCHASE THE PREMISES**

> At any time during the term of this Lease or any extension thereof that Tenant is not in default under this Lease, Tenant, Selena Cash, Mike Cash and Mernet Cash shall have the exclusive right to purchase the Premises on the terms of this provision and the specific terms of the Agreement to Purchase and Sale Agreement attached hereto and made a part of this Lease as Schedule 2.
>
> > (a)     The purchase price shall be the greater of
> >
> > (i)     the then current appraised value as determined by an MAI appraiser familiar with the Austin, Texas commercial real estate market; and
> >
> > (ii)    $1,575,000; provided, however that if closing for the purchase occurs prior to February 29,

Page 25

2020, the purchase price shall be $1,575,000.00 plus $6,279.40 for each month remaining prior to February 29, 2020. For a partial month remaining prior to February 29, 2020, $6,279.40 shall be prorated as of closing. If closing occurs after the Rent for February 2020 has been paid, the purchase price shall be $1,575,000.00.

**20.4    RIGHT OF FIRST REFUSAL**

At any time during the term of this Lease or any extension thereof that Tenant is not in default under this Lease, Tenant, Selena Cash, Mike Cash and Mernet Cash shall have the exclusive right to match the terms of a bona fide offer from a third party to purchase the Midtown Live Center provided that the Landlord desires to accept such third party offer.

In such event, Landlord shall give Tenant written notice of its receipt of and desire to accept such offer within three (3) days of Landlord's receipt of such offer. Tenant shall then have ten (10) days to provide Landlord written notice of its decision whether or not to exercise its right of first refusal.

Any third party who makes an offer to purchase the Midtown Live Center must be notified in writing by Landlord of Tenant's rights under Section 20.4 within three (3) days of Landlord's receipt of such offer.

The relevant terms of the Agreement of Purchase and Sale attached hereto and made a part of this Lease as Schedule 2 are incorporated herein.

**20.5    RIGHT TO MANAGE MIDTOWN LIVE CENTER**

Provided that Tenant is not in default under the terms of this Lease, Tenant shall have the exclusive right to manage the Midtown Live Center on the terms set out in the Management Agreement attached hereto and made a part hereof as Schedule 4.

**20.6    NOTICES**

Any notice, statement or request given by either party to the other shall be in writing and shall be deemed to have been effectually given if signed by or on behalf of the party giving the notice and delivered or mailed by registered prepaid post, or sent by facsimile transmission:

(a)        in the case of notice to the Landlord, to it at:

John Hoberman, LLC
XXXXXXXXXXXXXXX
XXXXXXXXXXXXXXX
Attention:  John Hoberman
Fax No.:        (512) XXXXXXXXXXXXXX

With a copy to:

McLeroy Alberts & Benjamin, P.C.
608 W. 12th Street, Suite A
Austin, TX 78702
Attention:  Chris Benjamin
Fax No.:        (512) 472-1622

Page 26

(b)     in the case of notice to the Tenant, to it at.

> 4709 Incorporated
> XXXXXXXXXXXXXXX
> XXXXXXXXXXXXXXX
> Attention:  XXXXXXXXXXXXXX
> Fax No.:      (512) XXXXXXXXXXXXXX
>
> With a copy to:
>
> Frank B. Lyon, Attorney at Law
> 3508 Far West Blvd., Suite 170
> Attention:  Frank Lyon
> Austin, Texas 78734
> Fax No.:      (512) 697-0047

Any such notice given as aforesaid shall be conclusively deemed to have been given, if delivered, on the first Business Day following the date of such delivery or, if mailed, on the third Business Day following the date of such mailing. Any notice sent by facsimile transmission shall be deemed to be received on the date it is received by the recipient's facsimile machine. Any party may from time to time by notice to the other change the address to which notices are to be given.  During any interruption, threatened interruption, or substantial delay in postal service, such notice shall be delivered by hand or sent by facsimile transmission as aforesaid.

## 20.7    SUCCESSORS

The rights and liabilities created by this Lease extend to and bind the successors and assigns of the Landlord and the permitted successors and assigns of the Tenant.

## 20.8    QUIET ENJOYMENT

If the Tenant pays Rent, fully performs all of its obligations under this Lease, and there has been no Event of Default, the Tenant shall be entitled to peaceful and quiet enjoyment of the Premises for the Term without interruption or interference by the Landlord or any Person claiming through the Landlord.

## 20.9    CAPTIONS, SECTION NUMBERS AND TABLE OF CONTENTS

The captions, section numbers and table of contents appearing in this Lease are inserted only as a matter of convenience and in no way affect the substance of this Lease.

## 20.10    EXTENDED MEANINGS

The words "hereof", "hereto", and "hereunder" and similar expressions used in this Lease relate to the whole of this Lease and not only to the provisions in which such expressions appear.  This Lease shall be read with all changes in number and gender as may be appropriate or required by the context.   Any reference to the Tenant includes, where the context allows, the employees, agents, invitees and licensees of the Tenant and all others over whom the Tenant might reasonably be expected to exercise control.

## 20.11    APPLICABLE LAW

This Agreement shall be interpreted according to the laws of the state of Texas.

## 20.12    PARTIAL INVALIDITY

All of the provisions of this Lease are to be construed as covenants even though not expressed as such.  If any such provision is held or rendered illegal or unenforceable it shall be considered separate and severable

Page 27

from this Lease and the remaining provisions of this Lease shall remain in force and bind the parties as though the illegal or unenforceable provision had never been included in this Lease.

**20.13    ENTIRE AGREEMENT**

This Lease and the Schedules attached hereto set forth the entire agreement between the Landlord and Tenant concerning the Premises and there are no agreements or understandings between them other than as are herein set forth.  This Lease and its Schedules may not be modified except by agreement in writing executed by the Landlord and Tenant.

**20.14    TIME OF THE ESSENCE**

Time is of the essence of this Lease.

IN WITNESS WHEREOF the parties hereto have executed this Lease as of the day and year first above written.

**LANDLORD:**

**JOHN HOBERMAN, LLC**

By:_____
    JOHN HOBERMAN
    Its: <u>Manager</u>

**TENANT:**

**4709 INCORPORATED**

By: _____
    SELENA CASH

Its: <u>President</u>_____

**SCHEDULE 1**

**LEGAL DESCRIPTION OF MIDTOWN LIVE CENTER SHOWING THE PREMISES**

**SCHEDULE 2**

**AGREEMENT OF SALE AND PURCHASE**

**SCHEDULE 3**

**RULES AND REGULATIONS**

1.

2.

**SCHEDULE 4**

**MANAGEMENT AGREEMENT**

# **EXHIBIT 14**

**Proof of Claim No. 8 in 4709 Incorporated's 2014 Bankruptcy Case**

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT    Western District of Texas | PROOF OF CLAIM |
|---|---|

Name of Debtor:

**4709 Incorporated**

Case Number:

**14-10340-tmd**

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

Pride of Austin High Yield Fund I, LLC

Name and address where notices should be sent:
Eric J. Taube
Hohmann, Taube & Summers, LLP
100 Congress Avenue, 18th Floor, Austin, TX 78701

Telephone number: (512) 472-5997    email: erict@hts-law.com

Name and address where payment should be sent (if different from above):
Pride of Austin High Yield Fund I, LLC, Attn: Robert Buchanan
401 Congress Ave., Suite 1540
Austin, Texas 78701

Telephone number: (512) 472-5997    email: rib@prideofaustin.com

**COURT USE ONLY**

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____
(*If known*)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ 1,401,432.59 *

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

*To the extent claimant is over-secured, claimant asserts its right to collect post-petition interest and attorneys fees as they accrue.

☑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Promissory Note (see attached)
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:**
_____
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
_____
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$ 1,401,432.59

Nature of property or right of setoff: ☑Real Estate  ☐Motor Vehicle  ☑Other
Describe: Deed of Trust; Assignment of Rights, Warranties, Permits, Licenses, and Contracts

Basis for perfection: recordation

Value of Property: $ unknown

Amount of Secured Claim: $ unknown

Annual Interest Rate 18.000 % ☑Fixed  or  ☐Variable
(when case was filed)

Amount Unsecured: $ unknown

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

Amount entitled to priority:

$ _____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10 (Official Form 10) (04/13)                                                                                                                   2

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.    ☑ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor,    ☐ I am a guarantor, surety, indorser, or other codebtor.
                                                                    or their authorized agent.           (See Bankruptcy Rule 3005.)
                                                                    (See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:   Robert J. Buchanan
Title:        Managing Member
Company:      Pride of Austin Capital Partners, LLC                 _____   6-17-14
Address and telephone number (if different from notice address above):   (Signature)                 (Date)

Telephone number:                    email:

*Penalty for presenting fraudulent claim:*  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in this amount.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

B10 (Official Form 10) (04/13)

3

_____DEFINITIONS_____                                                                    _____INFORMATION_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. § 506 (a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507 (a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

**Amounts due under 4709, Inc.'s Promissory  Note**
**to Pride of Austin High Yield Fund I, LLC as of 3/3/14**

| | |
|---|---|
| Principal | $1,359,854.57 |
| Interest | $41,578.02 |
| | |
| Total as of petition date | $1,401,432.59 * |

\* Pride of Austin reserves the right to collect post-petition interest and attorneys' fees to the extent permitted under 11 U.S.C. § 506.   Current per diem at the 18% default rate is $670.61.  Current per diem at the 12.9% non-default rate is $480.61.

## COMMERCIAL
## CONSTRUCTION LOAN AGREEMENT

This Commercial Construction Loan Agreement (the "Agreement") is entered into by and between Pride of Austin High Yield Fund I, LLC (the "Lender") and by 4709 Incorporated, d/b/a Midtown Live (the "Borrower"), and is effective on the effective date set forth below.

### RECITALS AND CONSIDERATION

The Borrower has applied to the Lender for a loan to aid the Borrower in the construction of the Improvements on the Premises, and the Lender is willing to make that loan upon the terms and conditions set forth in this Agreement. In consideration of the mutual covenants and agreements contained in this Agreement, the Lender and the Borrower agree as follows:

### AGREEMENTS, COVENANTS, WARRANTIES, AND REPRESENTATIONS

### I
### Definitions

As used in this Agreement, the following terms shall have the respective meanings indicated:

1.  The "Lender" and the "Borrower" shall mean the parties identified above.

2.  The "Premises" shall mean the real property described on Attachment 1 to this Agreement.

3.  The "Note" shall mean collectively the real estate lien note in the form and substance of the real estate lien note attached to this Agreement as Attachment 2, and all extensions, renewals, and modifications of that note. The Note will be executed and delivered by the Borrower on the Closing Date.

4.  The "Deed of Trust" shall mean the Deed of Trust and Security Agreement, in the form and substance of the document attached to this Agreement as Attachment 3, covering the Premises and certain personal properties and fixtures, and all extensions, renewals, and modifications of that deed of trust and security agreement. The Deed of Trust will be executed and delivered by the Borrower on the Closing Date to secure the Note.

5.  The "Plans" shall mean the final plans and specifications for the construction of the Improvements on the Premises and all amendments and modifications to those final plans and specifications approved by the Lender. This term shall include the final plans and specifications for segments of the work. A true and correct copy of the current version of the Plans is attached to this Agreement as Attachment 5.

6.  "Requests for Advance" shall mean a certificate or draw request, signed and submitted by the Borrower and the General Contractor, in such form as the Lender may require, setting

forth the parties to whom money is owed and the amount owed to each. Each certificate or draw request shall certify among other things that those amounts represent payments due for services actually rendered or materials actually acquired or furnished in connection with construction of the Improvements. Each certificate or draw request shall state whether the sum requested is within the Approved Budget and whether the unadvanced portion of the Approved Budget for the item(s) requested is sufficient to complete such item(s) pursuant to the Plans. Each certificate or draw request shall be accompanied by copies of billing statements, vouchers, or invoices from the parties named in the certificate or draw request, in a form satisfactory to the Lender.

7.    The "Approved Budget" shall mean the budget and loan draw schedule and Use of Funds spreadsheet, which are part of the Construction Agreement attached to this Agreement as Attachment 4.

8.    "Governmental Authority" includes the United States, the State of Texas, the County of Travis, the City of Austin, and any political subdivision of any of those entities, and any agency, department commission, board, bureau, or instrumentality of any of them which exercises jurisdiction over the Premises and/or construction on the Premises. This term shall also include any property owners' associations and utility districts which exercise jurisdiction over the Premises and/or construction on the Premises.

9.    "Governmental Requirement" shall mean any law, ordinance, order, rule, or regulation of a Governmental Authority.

10.    The "Improvements" shall mean the improvements described in the Construction Agreement and the Plans, consisting of finish out improvements of Meadowglen Plaza Retail Center.

11.    The "Completion Date" shall mean the date the construction of the Improvements is to be completed under the Construction Contracts.

12.    The "Closing Date" shall mean the time of the execution and delivery of this Agreement by the Borrower and the Lender.

13.    "Financial Statements" shall mean statements of the Borrower and each Guarantor.

14.    The "General Contractor" shall mean Capital City Homes, LLC.

15.    The "Construction Contracts" shall mean the Plans and the Construction Agreement, along with all other contracts between the Borrower and the General Contractor relating to rendering services and furnishing materials in connection with the construction of the Improvements; contracts between the General Contractor and any subcontractors, laborers, and suppliers (including, but not limited to the Fixed Fee Contract); and contracts between

2

any of the foregoing and any other person or entity relating to the rendering of services and/or the furnishing of materials in connection with the construction of the Improvements.

16. The "Construction Agreement" shall mean the Building Construction Agreement between Selena Cash/4709 Incorporated, d/b/a Midtown Live, and Capital City Homes, LLC for the construction of the Improvements, dated February 4, 2011, a copy of which is attached to this Agreement as Attachment 4.

17. "Assignment of Construction Contracts" shall mean an Assignment of Rights, Warranties, Permits, Licenses, and Contracts executed by the Borrower and the General Contractor, and assignments of any other contracts between the Borrower and any other general contractor.

18. The "Security Instruments" shall mean this Agreement, the Note, the Deed of Trust, the Assignment of Rights, Warranties, Permits, Licenses, and Contracts, the Guaranty of Selena Cash, and any other instrument executed in connection with or as security for the payment of the Note and/or the performance of the obligations under this Agreement.

19. The "Title Insurer" shall mean First American Title Company, LLC and its underwriter, First American Title Insurance Company.

20. The "Owner's Interest" shall mean the fee simple estate and other rights, titles, and interests of the Borrower in the Premises.

21. "Title Insurance" shall mean a paid loan policy of title insurance in form and substance satisfactory to the Lender, issued by the Title Insurer in the aggregate amount of the Note (which may include a clause, rider, or endorsement limiting the coverage to the aggregate amounts actually advanced) covering the lien on the Owner's Interest described in the policy.

22. "Affidavit of Owner and Contractor" shall mean a sworn affidavit of the Borrower and the General Contractor in a form and substance satisfactory to the Lender, to the effect that no construction has commenced and no materials for use in connection with the Improvements have been delivered to the Premises prior to the recording of the Deed of Trust.

23. "Owner's Affidavit" shall mean a sworn affidavit of the Borrower, in form and substance satisfactory to the Lender, to the effect that all labor and material bills of every kind and character incurred by the Borrower to the date of that affidavit in connection with the Improvements have been paid in accordance with the payment provisions of each contract, except for the unpaid bills to be paid from the proceeds of the current advance requested. Such affidavits shall be supported by appropriate waivers of lien rights satisfactory to the Lender, executed by the General Contractor and all other contractors, subcontractors,

3

laborers, and materialmen who have furnished labor and/or materials to date and for payment of whom prior Requests for Advance have been made and received.

## II
## Commitment of the Lender

Subject to the terms, provisions, and conditions of this Agreement:

1. The Lender will make and the Borrower will accept, loans in the aggregate amount of up to One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00). To evidence those loans, the Borrower will sign and deliver to the Lender a real estate lien note in the face amount of $1,100,000.00, in the form of Attachment 2 to this Agreement. The Note will be dated the Closing Date and will be payable and bear interest and otherwise be in form and substance of Attachment 2 to this Agreement. The Lender may seek to have one or more other lenders and/or funds to participate in the loans, through participation agreements. Such participation agreements are not required to be signed or approved by the Borrower. The Lender may assign all of its rights in this Agreement, negotiate the Note, and assign the liens contained in the Deed of Trust before or after the closing, and before or after any one or more of loan sums are actually funded to the Borrower. If the assignee of those rights assumes the obligations contained in this Agreement, the Note, and the Deed of Trust, the Borrower will be relieved of all of its obligations contained in those contracts without any further agreement or consent of the Borrower. In any case, Pride of Austin Capital Partners, LLC will be the servicing agent for the loan, unless that company assigns the right to act as that servicing agent. Pride of Austin Capital Partners, LLC may assign that right without notice to or the consent of the Borrower. When the Note is paid, whether voluntarily or involuntarily, the Borrower will be liable for and will pay a sum equal to seven percent (7%) of the principal balance of the Note. That payment will not be a charge or payment of interest, but will be used to defray the Lender's costs in monitoring the construction of the Improvements and insuring that draws should be funded as requested by the Borrower. Property taxes for the Premises for the calendar year 2011 and for the calendar year 2010 (if any are unpaid and due on the Closing Date) shall be collected at the closing and paid to the appropriate authorities. An escrow will be set up to pay all further property taxes for the Premises, in accordance with the Deed of Trust.

2. Interest provided in the Note shall be calculated on sums actually advanced to the Borrower under the terms of this Agreement and only from the date or dates of those advances. The Borrower's liability for payment of principal and interest provided in the Note shall be limited to principal amounts actually advanced to or for the benefit of the Borrower under this Agreement and interest on those amounts calculated as previously stated. At the closing of the loan, an interest reserve account will be set up. On the Closing Date, the Borrower will deposit Sixty-Five Thousand Five Hundred and No/100 Dollars ($65,500.00) into that account. During the construction of the Improvements, interest payments that become due and payable under this Agreement and the Note will be paid out

4

of that interest reserve account. All other interest payments must be made directly by the Borrower from other funds.

3.  Prior to the closing of the loan, and as a condition to the Lender's obligation to make any loan advances, the Borrower shall provide the Lender with the following documents:

    a.  an "All Bills Paid Affidavit", signed by the General Contractor: stating that all subcontractors, employees, materialmen, and suppliers have been paid for work completed, labor performed, and materials supplied on and to the Improvements as of the date of the closing of the loan, except for amounts described in the next clause; and further stating that the General Contractor will provide proof of any amounts owed to such subcontractors, employees, materialmen, and suppliers, and requesting that such amounts be paid by the Title Insurer at the closing out of the loan proceeds; and

    b.  a Builder's Risk and General Liability Insurance Policy, naming the Lender as a loss payee, in a form acceptable to the Lender.

4.  After the closing of the loan, all advances under this Agreement shall be made by the Lender in order to pay for portions of the Improvements that have been completed in accordance with the Construction Contracts and Approved Budget. No advance shall be made unless the Lender has received a proper Request for Advance and an Owner's Affidavit at least three days before the advance is made. The Lender shall not be required to make any advance for payment of sums not within the Approved Budget, item by item. Further, the Lender shall not be obligated to make any advance if the unadvanced loan proceeds under the Note and in the Approved Budget for any particular item shall at any time appear, in the judgment of the Lender to be less than the amount which will be required for that item prior to completion of the Improvements pursuant to the Plans or if any other expenses are required for completion of the Improvements pursuant to the Plans which were not scheduled in the Approved Budget. If the Borrower defaults in the payment of the Note, or under any other obligation contained in this Agreement, the Note, the Deed of Trust, or any other agreement between the Lender and the Borrower, the Lender shall not be obligated to pay any further draw requests until the Borrower cures that default to the satisfaction of the Lender. Thereafter, the Lender shall not be required to resume the advancement of loan proceeds unless and until the Borrower shall have complied with all terms and conditions of this Agreement and the Security Instruments, including the provisions of Paragraph 17 of Section IV of this Agreement. In order to ensure that the conditions of this paragraph have been met before an advance is made, the Lender may cause its own representative(s) to inspect the Premises, the Improvements, and the status of the construction project. The Borrower, the General Contractor, and the Construction Manager will give all of the Lender's representatives full access to the Premises and the Improvements for this purpose, upon reasonable request by the representative. In addition, the following are conditions to the funding by the Lender of draw requests by the Borrower:

    a.  The Borrower must provide a down-date title report from the Title Insurer to verify

5

that the Borrower still owns full fee simple title to the Premises and that there are no new liens on the Premises, and pay a $50.00 fee for that report; and

b.    The Borrower pays a $500.00 fee to the Lender. That fee will be used to reimburse the Lender for having the Lender's representative inspect the Premises and the Improvements to ensure that construction has been performed as stated in the draw request. That fee may be deducted from the amount to be paid to by the Lender under the draw request.

5.    At the option of the Lender, the Lender is authorized to charge interest payment advances directly against the Note, in the event that the Borrower has not paid that interest by the due date. Any and all of those advances shall be considered advances under this Agreement and under the Note.

6.    The Lender shall not be obligated to advance to the Borrower any sums under this Agreement after funds have been advanced by a permanent lender to purchase or pay the Note, or after maturity (however that maturity is brought about) of the Note, whichever occurs first.

### III
### Representations and Warranties of the Borrower

In order to induce the Lender to enter into this Agreement, the Borrower makes the following material representations and warranties. These representations and warranties are in effect as of the date that this Agreement is signed by the Lender and as of the effective date of this Agreement, and shall survive the closing of the loan, and shall continue after the Closing Date and through the life of this Agreement. These representations and warranties shall continue and survive after the maturity of the Note.

1.    The Plans are satisfactory to the Borrower and to the extent required by applicable law or any effective restrictive covenant have been approved by all Governmental Authority and by the beneficiaries of any such covenants. No violation of any Government Requirement exists with respect to the Premises. The anticipated use of the Premises complies with all applicable zoning ordinances, regulations, restrictive covenants, and association rules which affect the Premises. All Governmental Requirements for that anticipated use have been satisfied.

2.    The Financial Statements that have been delivered to the Lender are true and correct in all respects, have been prepared in accordance with generally accepted accounting principles consistently followed, and fully and accurately present the financial condition of the subjects of those statements as of the dates set forth in those statements. No materially adverse change has occurred in the financial condition reflected in those statements since the dates of those statements.

6

3.  There are no actions, lawsuits, or proceedings pending, or to the knowledge of the Borrower threatened, against or affecting the Borrower or the Premises, or involving the validity or enforceability of the Security Instruments or the priority of the Lender's lien against the Premises granted by the Deed of Trust, at law or in equity, or before any Governmental Authority except actions, lawsuits, and proceedings fully covered by insurance or which, if adversely determined, would not substantially impair the ability of the Borrower to complete construction of the Improvements by the Completion Date or to cause to be paid when due any amounts which may become payable in respect to the Note. The Borrower is not in default with respect to any order, judgment, writ, injunction, decree, or demand of any court or any Governmental Authority. The consummation of the transactions contemplated by this Agreement, and the execution, delivery, and performance of the Security Instruments will not result in any breach of, or constitute a default under, any mortgage, lien, deed of trust, lease, bank loan or credit agreement, partnership agreement, or other instrument to which the Borrower is a party or by which the Borrower may be bound or affected.

4.  All utility services necessary for the construction of the Improvements and the operation of those services for their intended purpose are available at the Premises, including water supply, storm and sanitary sewer facilities, gas, electric, and telephone facilities.

5.  The Borrower has made no verbal or written contract or arrangement of any kind, the performance of which by any other party thereof would give rise to a lien on the Premises and/or Improvements of equal or greater priority than the liens created under the Deed of Trust; provided that this covenant shall not be applicable if the Borrower shall have disclosed to the Lender, prior to the effective date of this Agreement, and in writing, any contract or arrangement affecting or potentially affecting the liens created under the Deed of Trust, and if the Lender shall have indicated, prior to the effective date of this Agreement, and in writing, its approval of that disclosure.

6.  The Borrower is duly authorized and empowered to execute, create, sign, issue, and deliver the Note and the Security Instruments to which the Borrower is a party. All actions of the Borrower's part requisite for the execution, creation, signing, issuance, and delivery of this Agreement, the Note, the Security Instruments, and all other documents required by the Title Insurer have been duly and effectively taken.

## IV
### Covenants of Borrower

The Borrower covenants with the Lender as follows:

1.  The legal and/or beneficial title and ownership of the Premises and the Improvements will not be conveyed or encumbered in any way without the express, written consent of the Lender.

2.   All Governmental Requirements will be complied with promptly, and the Lender will be furnished on demand, evidence of that compliance.

3.   The Lender and its representatives, upon reasonable notice, will be permitted to enter upon the Premises, inspect the Improvements and all materials to be used in the construction of the Improvements, and to examine all detailed plans, shop drawings, construction logs, and other documents related to the Improvements which are or may be kept at the construction site.

4.   All costs and expenses required to satisfy the conditions of this Agreement will be paid by the Borrower. Without limitation of the generality of the foregoing, the Borrower will pay: (a) all taxes and recording expenses, if any; (b) the fees and commissions, if any, lawfully due to brokers in connection with the transaction; and (c) the reasonable fee and expenses of lawyers for the Lender in connection with this Agreement and all transactions in connection with this Agreement.

5.   The construction of the Improvements will be pursued by the Borrower with diligence and continuity, and the Borrower will complete the Improvements in accordance with the Plans on or before the Completion Date, free and clear of liens and claims for liens for material supplied and for labor and services performed in connection with the construction of the Improvements.

6.   The Borrower will cause all conditions of Section VI of this Agreement to be satisfied to the extent that it has the power to do so.

7.   The Borrower will indemnify the Lender from claims of brokers arising by reason of the execution of this Agreement and/or the consummation of the transactions contemplated by this Agreement.

8.   The Borrower will deliver to the Lender, on demand, all contracts, bills of sale, invoices, account statements, receipted vouchers, and agreements under which the Borrower claims title to any materials, fixtures, and other articles used in the construction of the Improvements.

9.   The Borrower will, upon demand of the Lender, correct: (a) all structural defects in the Improvements (b) all substantial departures from the Plans not approved by the Lender in writing; (c) and all encroachments by any part of the Improvements on any other structures on or over any building lines, easements, property lines, and other restricted areas which any survey or inspection reflects. The advance of any loan proceeds shall not constitute a waiver of the Lender's right to require compliance with this covenant with respect to any such defects, departures from the Plans, and/or encroachments not theretofore discovered by the Lender or called to the attention of the Lender (orally or in writing).

8

10. The Borrower will comply with all restrictive covenants, association rules, and Governmental Requirements that affect the Premises and the Improvements.

11. The Lender may apply loan proceeds under this Agreement to the satisfaction of any covenant or condition of this Agreement, and proceeds so applied shall be part of the loan and shall be secured by the Security Instruments.

12. The Borrower will not execute or otherwise agree to any contract, or become party to any arrangement for the performance of work on the Premises except with persons and entities approved by the Lender.

13. The insurance will be provided as required by the Deed of Trust. In addition and without limitation, the Borrower will obtain a Builder's Risk Insurance Policy with a company approved by the Lender covering the construction of the Improvements in a face amount of not less than the insurable value of the Improvements, containing a loss payable clause in favor of the Lender as its interest may appear.

14. If requested by the Lender, the Borrower agrees to maintain a special account with the Lender' approved bank into which all advances under this Agreement (but no other funds) shall be deposited and against which only checks shall be drawn for payment of all bills for labor and materials incident to the construction of the Improvements.

15. If in the sole good faith judgment of the Lender it appears at any time or from time to time that the unadvanced loan proceeds under the Note as reflected in the Approved Budget for the Improvements or for any particular item on the Approved Budget including interest will be insufficient to complete the Improvements or any particular item, substantially in accordance with the Plans, and to pay for all labor and materials comprising the cost of such Improvements or any item of the Improvements, or if any other expenses are required for completion of the Improvements pursuant to the Plans which were not scheduled in the Approved Budget, the Borrower shall make arrangements satisfactory to the Lender for the deposit of, or shall deposit with the Lender's approved bank, such additional monies as, in the sole good faith judgment of the Lender, shall, when added to the unadvanced loan proceeds under the Note, be sufficient to complete and/or otherwise cover the cost of such Improvements or item of the Improvements. The Lender shall have the absolute right to apply the proceeds deposited by the Borrower for construction costs prior to advancing any further funds under this loan.

16. The Borrower shall expend the proceeds of each advance under this Agreement for the cost of construction and completion of the Improvements in accordance with the Plans and for other costs contemplated by the Approved Budget. No funds advanced by the Lender shall ever be used to defray living expenses, to anticipate profit, or to defray any other item not directly connected with the construction costs of the Improvements.

9

17.   Each contract entered into by the Borrower with the General Contractor, the Construction Manager, and/or any other person or entity for the construction of the Improvements shall contain a provision specifically subordinating any right to a lien against the Premises by reason of materials supplied or services rendered, to the liens and security interests created under the Deed of Trust. Alternatively, such liens shall be subordinated to the liens and security interests created under the Deed of Trust by separate instruments, all in form and substance satisfactory to the Lender.

18.   The Borrower shall furnish to the Lender, if the Lender so requests, immediately after the installation of forms for the pouring of each concrete slab on the building site and again upon the completion of the foundation for each structure, a survey certified to by a licensed surveyor showing that the location of the slab or foundation, as the case may be, is entirely within the property lines, and does not encroach upon any easement or breach or violate any covenant, condition, or restriction of record, nor any applicable building or zoning ordinance that covers the Premises.

19.   Promptly after the execution and recording of the Deed of Trust, the Borrower will enter into a contract with the General Contractor and other contractors sufficient to provide for construction of the Improvements in accordance with the Plans. If any such contracts have been signed before the recording of the Deed of Trust, the Borrower will cause all contractors to sign subordination agreements in accordance with Part IV, Paragraph 17, above.

20.   The Borrower will execute such additional instruments as may be reasonably requested by the Lender and by the Title Insurer in order to carry out the intent of this Agreement and to perfect or give further assurances of any of the rights granted or provided for under this Agreement, under the Note, and/or under the Security Instruments.

21.   The Borrower assumes full responsibility for the compliance of the Plans with Governmental Requirements and with sound architectural practice. Notwithstanding any approval by the Lender of the Plans, the Lender shall have no responsibility in connection with that compliance.

22.   The Borrower shall not at any time during the performance of the work make or cause to be made, or permit the General Contractor or any other contractor, supplier, or laborer to make, any contract for materials or equipment of any kind or nature whatsoever to be incorporated in or to become part of the Improvements, title to which is not good or which is subject to any lien or title retention arrangement.

23.   The Borrower will comply with and furnish the Lender with all official notices and clams made by any Governmental Authority. The Borrower will also notify the Lender of any substantial fire, casualty, or notice of any taking by eminent domain affecting any part of

10

the Premises or the Improvements. Any such event shall conclusively be deemed substantial if the cost of repair or restoration of the value of the property damaged or taken shall exceed $2,500.00.

24.    The Borrower will promptly take all steps to discharge and/or release any lien, assessment, or encumbrance not permitted by this Agreement on any part of the Premises or Improvements or any rights intended to be covered by any of the Security Instruments.

25.    The Borrower will promptly pay and discharge prior to the date when any interest or penalties shall accrue thereon, all taxes, levies, charges, impositions, water and sewer rents, and assessments of every kind and nature, whether foreseen or unforeseen, and whether general or special, which are now or shall hereafter be charged or assessed against the Premises and/or the Improvements, or any part thereof, or which may become a lien thereon. Upon request, the Borrower will furnish to the Lender satisfactory evidence of all such payments made.

26.    If the construction or the use or occupancy of the Premises or the Improvements shall, pursuant to any Governmental Requirement, restrictive covenant, association rule, or otherwise, be permitted only so long as any special conditions or agreements shall be kept, the Borrower will so advise the Lender and will cause all such conditions to be continuously fulfilled.

27.    The Borrower will promptly advise the Lender if and when the cost of completing the Improvements in accordance with the Plans shall exceed or appear likely to exceed the amount of unadvanced loan proceeds under this Agreement, and shall give the Lender sufficiently detailed information with respect thereto.

28.    The Borrower will furnish or cause to be furnished performance bonds, labor and material payment bonds, and lien avoidance bonds, with corporate sureties satisfactory to the Lender, as the Lender in its absolute discretion may request. The Lender shall either be a co-obligee under those bonds or those bonds shall be assigned to, or made for the benefit of the Lender, as shall be satisfactory to the Lender.

## V
## Events of Default and Remedies

1.    The following shall constitute Events of Default under this Agreement

    a.    if there is a failure to comply with any of the covenants contained in this Agreement or any of the Security Instruments;

    b.    if any installment of principal or interest on the Note is not paid when it is due and payable;

    c.    if at any time any representation or warranty which has been made by the Borrower in this Agreement or in any of the Security Instruments shall be incorrect;

11

d.    if the construction of the Improvements be at any time discontinued or not carried on with reasonable dispatch to such an extent that it is unlikely in the Lender's judgment that the Improvements will be completed by the Completion Date;

e.    if of the materials, fixtures, or articles used in the construction of the Improvements or the appurtenances thereto, or to be used in the operation thereof, be not in accordance with the Plans as approved by the Lender and any architect and engineer;

f.    if the Improvements, in the exclusive judgment of the Lender, not be fully in accordance with the Plans and/or not be completed on or before the Completion Date;

g.    if the Borrower is unable to satisfy any condition of the right to receipt of an advance under this Agreement for a period of excess of thirty days;

h.    if the Borrower shall: (1) apply for or consent in writing signed by the Borrower or the Borrower's duly authorized attorney to the appointment of a receiver, trustee, or liquidator of the Borrower, the Premises, the Improvements, or any part of the Premises and/or Improvements, (2) file a voluntary petition in bankruptcy, or admit in writing the Borrower's ability to pay the Borrower's debts as they come due, (3) make a general assignment for the benefit of creditors, (4) file a petition or answer seeking reorganization or rearrangement with creditors or taking advantage of any insolvency law, (5) file an answer admitting the material allegations of a petition filed against the Borrower in any bankruptcy, reorganization, insolvency, or similar proceedings, or (6) allow an order, judgment, or decree to continue unstayed and in effect for any period of thirty consecutive days, which is entered by a court of competent jurisdiction, or by any other duly authorized authority, on the application of a creditor or otherwise, adjudicating the Borrower as bankrupt or insolvent, approving a petition seeking the reorganization of the Borrower, or appointing a receiver, trustee, or liquidator of the Premises, the Improvements, and/or all or any substantial part of the assets of the Borrower; or

i.    if for any reason the Lender, in good faith, reasonably believes that repayment in full of the indebtedness of the Borrower created or to be created under this Agreement is unlikely or insecure without foreclosure by the Lender under the Security Instruments.

2.    The Lender shall have the right, upon the occurrence of any Event of Default under this Agreement, in addition to all rights and remedies available to the Lender under any of the Security Instruments, to take possession of the Premises, to perform all work necessary to complete the Improvements substantially in accordance with the Plans by using any persons and entities that it deems appropriate, and to secure and protect the Premises and the Improvements. All funds spent by the Lender to accomplish any of those tasks shall be deemed to have been paid to the Borrower under this Agreement and the Note, the repayment of which shall be secured by the Security Instruments. For this purpose, the Borrower hereby constitutes and appoints the Lender as the Borrower's true and lawful

attorney-in-fact with full power of substitution to complete, or cause to be completed, the Improvements in the name of the Borrower, and hereby empowers that attorney or attorneys as follows: to use such sums as are necessary, including funds of the Borrower, including any balance which may be held in escrow, and including any funds which may remain unadvanced under this Agreement, for the purpose of completing the Improvements in the manner called for by the Plans; to make any changes and corrections in the Plans which shall be necessary or desirable to complete the Improvements in substantially the manner contemplated by the Plans; to employ such contractors, subcontractors, material suppliers, laborers, agents, architects, engineers, and inspectors as shall be required for those purposes; to pay, settle, or compromise all existing bills, invoices, and claims which are or may be liens against the Premises and/or Improvements, or which may be necessary or desirable for the completion of the work or the clearance of title; to execute all applications and certificates in the name of the Borrower which may be required by the Construction Contracts and/or any other contracts; and to do any and every act with respect to the construction of the Improvements which the Borrower may do on its own behalf. It is understood and agreed that this power of attorney shall be deemed to be a power coupled with an interest which cannot be revoked. That attorney-in-fact shall also have the power to prosecute and defend all lawsuits, actions, and proceedings in connection with the construction of the Improvements, and to take all actions and require all performances as is deemed necessary in the sole and absolute discretion of the Lender or the attorney-in-fact.

3.   The Lender shall also have the right, upon the occurrence of any Event of Default, at its sole election, to declare the Note to be immediately due and payable in full without presentment, protest, notice of intent to accelerate maturity, notice of acceleration of maturity, or any other notice of any kind, all of which are expressly waived by the Borrower.

4.   Upon the occurrence of any Event of Default, any obligation of the Lender to advance funds under this Agreement, and all other obligations of the Lender (if any) under this Agreement shall immediately cease and terminate unless and until the Lender shall reinstate any obligation in writing.

5.   Any of the Lender's funds that are used for the purposes referred to in this Section V shall be deemed to be advances under the Note, under this Agreement, and/or under the Security Instruments, as the case may be, and in any event shall bear interest at the maximum rate permitted by law.

## VI
### Conditions to the Lender's Obligations to Make Loan Advances

The Lender shall not be obligated to make any advance, including any advances subsequent to the first advance, of loan proceeds under this Agreement unless and until the following conditions

shall have been satisfied (with proof thereof in form and sufficiency as may be reasonably requested by the Lender):

1.  The Lender shall have received and approved: (a) copies of the Plans and, the Construction Contracts, and any other contracts that are requested by the Lender; (b) all authorizations and permits required by all Governmental Authorities for the construction of the Improvements, including those so required for the use and operation of the Premises and/or the Improvements for the purposes contemplated by the Plans which are presently procurable; (c) a current title report or commitment for loan policy of title insurance from the Title Insurer which shall describe the Premises and shall have attached thereto copies of all instruments which appear as exceptions in that report or commitment; (d) an original current survey of the Premises certified to the Lender and the Title Insurer showing the locations of the perimeter of the Premises by courses and distances, all easements and rights-of-way (identified with recording information in public records), the proposed building lines, the lines of streets abutting the Premises and the width thereof, encroachments and the extent thereof in feet and inches upon the Premises, the relation of the proposed Improvements by distances to the perimeter of the Premises, the proposed building lines, and the street lines, and if the Premises are described as being on a filed map or plat, a legend relating the survey to that map; (e) the Financial Statements; (f) advice from the architect who prepared the Plans that the Plans have been approved by him or her and that the Construction Contracts are acceptable to him or her and satisfactorily provide for the construction of the Improvements; and (g) policies of insurance required by the Deed of Trust and/or this Agreement, accompanied by evidence of the payment of the premiums required by those policies.

2.  The Deed of Trust shall have been executed by the Borrower and shall have been recorded in the official public records of the county where the Premises are located, all prior to the commencement of any construction on any part of the Premises and the placing of any material or equipment on the Premises.

3.  The Lender shall have received such financing statements with such proof of filing in the appropriate offices in the State of Texas and such other things and instruments as are necessary or appropriate in the opinion of the Lender to perfect a security interest in the property covered by the Deed of Trust under the Texas Uniform Commercial Code, and the Lender shall have received proof that no prior financing statements from the Borrower as debtor or from any other party affecting any of that property shall have been filed in any such office in favor of any other party.

4.  The Lender shall have received the Title Insurance which shall show the lien on the Owner' Interest in favor of the Lender as the holder of the Note, to be a valid, first, and prior lien on the Premises free and clear of all defects and encumbrances except those that the Lender approves. That Title Insurance shall contain no survey exceptions not previously approved by the Lender. and the status of title to the Owner's Interest shown

14

on the policy shall otherwise be satisfactory to the Lender.

5.    The representations and warranties made in Section III of this Agreement shall be true and correct on and as of the date of the advance with the same effect as if made on that date.

6.    There shall be no default under this Agreement, the Note, or any of the Security Instruments.

7.    The Lender shall have received the Note, the Deed of Trust, the Assignment of Construction Contracts, and the financing statements referred to above, all properly executed and, if required, acknowledged by the respective parties to those instruments.

8.    There shall have been, as of the date of the advance, no change in the state of title of the Property and no survey exceptions not previously approved by the Lender.

9.    The Improvements, to the extent that any have been made prior to the date of the advance, shall not have been materially injured or damaged by fire or other casualty unless there shall have been received by the Lender insurance proceeds sufficient in the judgment of the Lender and of any architect, to effect the satisfactory restoration of the Improvements and to permit the completion of the Improvements by the Completion Date.

10.    The Lender shall have received: (a) a proper Request for Advance and Owner's Affidavit; (b) if construction has been performed prior to the advance, advice from the architect who designed the Improvements to the effect that in his or her opinion the construction of all portions of the Improvements has been performed in accordance with the Plans; (c) as to advances after the first advance, a current survey if required by the Title Insurer; (d) as to advances after the first advance, the Lender shall have received a notice of title continuation or an endorsement with respect to the Title Insurance previously delivered indicating that after the date of the last preceding advance there has been no change in the state of title of the Premises and no survey exceptions not previously approved by the Lender. That endorsement shall have the effect of increasing the coverage of the Title Insurance by an amount equal to the advance then being made if the Title Insurance does not by its terms provide for such additional coverage without such an endorsement.

11.    All legal matters incident to this Agreement and the transactions contemplated by this Agreement shall be satisfactory to the Lender's attorney.

12.    The Borrower and the General Contractor have executed an Affidavit of Owner and Contractor, duly and truthfully subscribed and sworn to, and that affidavit has been recorded in the official public records of the county where the Premises are located. That affidavit must prove that the lien that is created by the Deed of Trust is superior to all liens and lien rights held by the General Contractor, the Construction Manager, all other original contractors, all subcontractors, all sub-subcontractors, all material suppliers, all

15

architects, all engineers, and all laborers who have or will provide labor and/or materials for the construction of the Improvements. If the circumstances do not allow the Borrower and the General Contractor to sign such a document, the General Contractor will execute and deliver a Subordination of Lien Rights, in which it agrees that any liens that it holds or may hold against the Premises shall be subordinate to the deed of trust lien to be granted by the Borrower in favor of the Lender, and any other liens held by the Lender against the Premises.

13.     The Lender, if it so requests, shall have received one or more photographs of the Premises taken on or after the date of the filing of the Deed of Trust with the County Clerk of the county where the Premises are located, and, if on the date of that filing, on or after the exact time of that filing. Those photographs must clearly show that there has not been actual commencement of construction of the Improvements or any other construction on the Premises, or any delivery of materials to the Premises. Those photographs must be signed on the back by the photographer for identification, and accompanied by a statement from the photographer attesting to the date and time that the photographs were taken and describing the location where each photograph was taken. If the photographs are delivered only in digital form, the photographer must provide that same information in the e-mail message which delivered the photographs, or in a separate document contained in the media on which the photographs were stored.

14.     The Lender, if it so requests, shall have received a performance bond from the General Contractor, naming the Lender as a co-obligee, and a payment bond from the General Contractor for the benefit of all subcontractors, sub-subcontractors, material suppliers, and laborers. Those bonds must be in form and substance acceptable to the Lender.

15.     The Lender shall not be obligated to make the final advance under this Agreement and the Approved Budget unless and until the Borrower has executed an affidavit of completion and recorded that affidavit in the official public records of the county where the Premises are located. That affidavit must meet the requirements of Section 53.106 of the Texas Property Code, or the successor statute. The Lender shall not be obligated to make that final advance unless and until the Borrower has supplied the Lender with lien releases, lien waivers, and/or receipts acknowledging payment in full, executed by the General Contractor, all other original contractors, all subcontractors, all sub-subcontractors, all material suppliers, all laborers, and all other persons and entities who have provided labor and/or materials in connection with the construction of the Improvements. Those instruments must be in form and substance acceptable to the Lender.

## VII
### General Terms and Provisions

1.      No advance of loan proceeds under this Agreement shall constitute a waiver of any of the conditions of the Lender's obligation to make further advances nor, in the event that the

16

Borrower is unable to satisfy any such condition, shall any such waiver have the effect of precluding the Lender frm thereafter declaring that inability to be an Event of Default as provided in this Agreement. Without limiting the generality of the foregoing, it is recognized that the Lender may, at its sole and absolute discretion, advance proceeds necessary to permit the Borrower to purchase the Premises prior to the satisfaction of some conditions under this Agreement for that advance, while intending to require compliance with those conditions thereafter.

2.   No work shall be commenced with respect to any particular segment of the construction of the Improvements until the Plans for that segment shall have been submitted to and approved by the Lender.

3.   All proceedings taken in connection with the transactions provided for in this Agreement, such as surveys, appraisals, and documents required or contemplated by this Agreement, the Security Instruments, or otherwise, and the persons responsible for the taking of those proceedings and the preparation and execution of those documents, must be approved by the Lender. All subcontractors, sub-subcontractors, material suppliers, laborers, sureties, and insurers must be approved by the Lender. The Construction Contracts, policies of insurance, and bonds must be satisfactory in form, substance, and coverage to the Lender, and the Lender must be given copies (which shall be certified where appropriate in the Lender's judgment) of all documents which it might request in connection with this Agreement.

4.   All conditions to the obligations of the Lender to make advances under this Agreement are imposed solely and exclusively for the benefit of the Lender and its assignees, and no other person or entity shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that the Lender will refuse to make advances in the absence of strict compliance with any or all of those conditions. Any or all of those conditions may be freely waived in whole or in part by the Lender at any time if in its sole and absolute discretion it deems it advisable to do so. No provision in this Agreement is intended to create any rights or benefits in favor of any third party.

5.   All notices under this Agreement must be in writing, and shall be deemed to have been sufficiently given or served for all purposes when presented personally, 3 days after they have been deposited in the United States Mail with the proper postage affixed and addressed to the party at the address set forth below, or 3 days after they are sent by e-mail or telefax (if a party has provided an e-mail address or telefax number in accordance with this Agreement). A party may change its address for purposes of notice under this Agreement by sending a notice to the other party in accordance with this paragraph. All notices to Pride of Austin High Yield Fund I, LLC must be sent c/o Robert J. Buchanan, 401 Congress Ave., Suite 1540, Austin, Travis County, Texas 78701-3851, with a copy to Bruce R. Hardesty, 1411 West Ave., Suite 100, Austin, Texas 78701-1537. All notices to 4709 Incorporated, d/b/a Midtown Live, must be sent c/o Selena Cash, 7602

17

Brookhollow Cv., Austin, Texas 78752-2103.

6.  This Agreement may not be amended, altered, waived (in whole or in part), or terminated without the written approval of all of the parties who have signed this Agreement. The parties to this Agreement will execute all necessary documents to carry out the terms and intent of this Agreement. However, failure of a party to execute the necessary documents will not prevent that party from being bound by the terms of this Agreement. This Agreement shall be governed by, enforced according to, and construed in accordance with the laws of the state of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the state of Texas or any other jurisdiction) that would cause this Agreement to be governed by, enforced according to, and/or construed in accordance with the laws of any jurisdiction other than the state of Texas. In case any one or more of the provisions contained in this Agreement shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, to the extent that the unenforceability does not destroy the basis of the bargain among the parties to this Agreement, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if the invalid, illegal, or unenforceable provision had never been included in the Agreement. All parties have had an equal opportunity to negotiate the terms of this Agreement, and all parties have contributed to the drafting of this Agreement. Therefore, this Agreement shall not be construed more strictly against or more favorably toward any party. The section headings and the numbering of the paragraphs and sections of this Agreement are for convenience only, and shall not affect the interpretation of this Agreement. This Agreement constitutes the sole and only agreement of the parties to this Agreement with respect to the subject matter of this Agreement, and supersedes all prior understandings and written and oral agreements between the parties respecting the subject matter of this Agreement. If, as a result of an alleged breach of this Agreement by any party or parties, any party or parties to this Agreement employs or employ an attorney or attorneys to enforce or defend its or their rights under this Agreement, then the non-prevailing party(ies) agrees to pay the prevailing party(ies) the reasonable attorney's fees, taxable court costs, and other litigation expenses incurred by the prevailing party(ies) in any legal or administrative proceeding.

7.  The rights and remedies of the Lender under this Agreement, the Note, and/or any of the Security Instruments shall be cumulative. The exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy. Any waiver by the Lender of any right or remedy under this Agreement shall not be deemed to be a waiver of any other or future right or remedy, and the Lender may insist on strict compliance with this Agreement by any other party after any such waiver.

8.  In establishing the charges by the Lender to the Borrower in connection with this loan and the services of the Lender with respect to the transactions contemplated and mentioned in this Agreement, the Borrower provided to the Lender a schedule of the Approved Budget which estimated the amounts and times of Requests for Advances under this Agreement.

That schedule was used by the Lender and the Borrower in negotiating and approving the charges for those services and that loan. It is the intention of the parties to this Agreement to conform strictly to the usury laws of the State of Texas. Accordingly, notwithstanding anything to the contrary in the Note, this Agreement, any of the Security Instruments, or any other agreement entered into in connection with this Agreement, it is agreed as follows: (a) The aggregate of all charges which constitute interest under the laws of the State of Texas that are contracted for, chargeable, or receivable under the Note, this Agreement, any of the Security Instruments, or otherwise in connection with this loan transaction on sums advanced (less compensating balances, if any) from the date of advancement shall under no circumstances exceed the maximum amount of interest permitted by law, and any excess shall be deemed a mistake in calculation and cancelled automatically and, if paid, shall be refunded to the Borrower or credited on the principal amount of the Note. (b) In the event that the maturity of the Note is accelerated by reason of an election by the Lender resulting from an Event of Default under the Note, this Agreement, any of the Security Instruments, or any agreement entered into in connection with this Agreement, or prepayment by the Borrower, then earned interest may never include more than the maximum amount permitted by law, and unearned interest, if any, provided for in the Note, this Agreement, any of the Security Instruments, or otherwise shall be cancelled automatically and, if previously paid, shall either be refunded to the Borrower on credited on the principal amount of the Note.

9.     This Agreement, along with all of the Borrower's representations, warranties, promises, and agreements shall survive the closing of the loan, and shall not be merged into the Note, the Deed of Trust, or any other contracts between the Borrower and the Lender.

Effective date: September ___, 2011.

LENDER: PRIDE OF AUSTIN HIGH
YIELD FUND I, LLC

By: _____
Robert J. Buchanan, Manager

19

BORROWER:
4709 INCORPORATED,
D/B/A MIDTOWN LIVE

By: _____
    Selena Cash, Director and President

**Real Estate Lien Note**

Date: September ___9___, 2011

Borrower: 4709 Incorporated, d/b/a Midtown Live, a Texas corporation

Borrowers' Mailing Address: 7602 Brookhollow Cv., Austin, Travis County, Texas 78752-2103

Lender: Pride of Austin High Yield Fund I, LLC

Place for Payment: 401 Congress Ave., Suite 1540, Austin, Travis County, Texas 78701-3851

Principal Amount: One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00)

Annual Interest Rate: Fourteen percent (14%)

Maturity Date: October 1, 2012. The Maturity Date may be extended, at the option of the Borrower, until April 1, 2013. In order to exercise that option, the Borrower must give the Lender written notice of the Borrower's intent to exercise the option on or before March 1, 2013, and must pay to the Lender, on or before March 1, 2013, an amount equal to two percent (2%) of the principal balance of this note on the date of that payment. Such a payment will be deemed to be a fee that is used to defray the Lender's expenses in extending the loan and this promissory note, and shall not be credited toward principal or interest due under this promissory note. Notwithstanding any of the foregoing, the Borrower may not exercise the option to extend the Maturity Date if the Borrower is in default under the terms of this note or has been in default under the terms of this note at any time before the Maturity Date, without the express, written consent and waiver of default by the Lender.

Annual Interest Rate on Matured, Unpaid Amounts: Eighteen percent (18%) or the highest amount allowed by law, whichever is less

Terms of Payment (principal and interest): The Principal Amount, or if a lesser amount has been advanced under the Commercial Construction Loan Agreement between the Borrower and the Lender, which is dated on or before the date of this note, as of the Maturity Date, that lesser amount, is due and payable on the Maturity Date. Interest accrues at the Annual Interest Rate on each amount advanced under the Commercial Construction Loan Agreement between the Borrower and the Lender from the date of the advance until the principal amount of that advance is repaid. Accrued interest is due and payable monthly on the first day of each calendar month, beginning on November 1, 2011 and ending on the Maturity Date, when all principal and accrued interest is due and payable. Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

Prepayment: The Borrower may not prepay any portion of this note prior to the 180th day after the date of this note, unless the Borrower pays a prepayment penalty equal to three percent (3%) of

that prepayment amount. After the 180th day from the date of this note, the Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium. Prepayments will be applied first to accrued interest and the remainder to the principal balance of this note.

Security for Payment: This note is secured by the liens contained in a deed of trust and security agreement, which has the same date as this note, from the Borrower, to Bruce R. Hardesty, Trustee, for the benefit of the Lender, which covers the real property located at 7400 Cameron Rd., Austin, Travis County, Texas 78752 (including all improvements and fixtures on that real property), which has the following legal description:

> Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas.

(the "Real Property"),

> Together with the following personal property: All fixtures, supplies, building materials, and other goods of every nature now or hereafter located, used, or intended to be located or used on the Real Property; all plans and specifications for development or construction of improvements on the Real Property; all contracts and subcontracts relating to the construction of improvements on the Real Property; all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions relating to the Real Property; all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Real Property; all proceeds payable or to be payable under each policy of insurance relating to the Real Property; and all products and proceeds of the foregoing. The Real Property and the personal property described in this paragraph are collectively referred to in this note as the "Property". Notwithstanding any other provision in this note, the term "Property" does not include personal effects used primarily for personal, family, or household purposes.

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

Borrower will be in default under this note if a payment is not actually received by Lender within five (5) days after that payment is due. If any payment is not received by that deadline, Lender may, at its sole and absolute option, accept the late payment if Borrower pays a late fee equal to five percent (5%) of the amount of the payment. Such a late fee may be charged in order

2

to defray the expense of handling the delinquent payment, and shall not be deemed to be interest.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on any property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party (subject to the immediately preceding paragraph of this note); (2) any warranty, covenant, or representation in this note or in any other written agreement between Lender and Borrower or any Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is dissolved, begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; or (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees, taxable court costs, and other collection and litigation expenses incurred by the Lender if this note is placed in the hands of an attorney who is not an employee of lender to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or,

if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

4709 INCORPORATED,
D/B/A MIDTOWN LIVE

By: _____
Selena Cash, Director and President

4

ELECTRONICALLY RECORDED                    2011137642
                                TRV        11      PGS

9/First American Title/GF# 606375

### Deed of Trust, Security Agreement, and Assignment of Rents

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

**Terms**

Date: September ___9___, 2011

Grantor: 4709 Incorporated, d/b/a Midtown Live, a Texas corporation

Grantors' Mailing Address: 7602 Brookhollow Cv., Austin, Travis County, Texas 78752-2103

Trustee: Bruce R. Hardesty

Trustee's Mailing Address: 1411 West Ave., Suite 100, Austin, Travis County, Texas 78701-1537

Lender: Pride of Austin High Yield Fund I, LLC

Lender's Mailing Address: 401 Congress Ave., Suite 1540, Austin, Travis County, Texas 78701-3851

Obligations

    1. Note

        Date: The same date as this deed of trust

        Original principal amount: One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00)

        Borrower: 4709 Incorporated, d/b/a Midtown Live

        Lender: Pride of Austin High Yield Fund I, LLC

        Maturity date: October 1, 2012

    2.    Commercial Construction Loan Agreement between Pride of Austin High Yield Fund I, LLC, as Lender, and 4709 Incorporated, d/b/a Midtown Live, as Borrower, which is dated on or before this deed of trust.

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on JUN 1 1 2014

Dana DeBeauvoir, County Clerk
By _____ S. WILLIAMS

Property:

Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas

(the "Real Property"),

Together with the following personal property: All fixtures, supplies, building materials, and other goods of every nature now or hereafter located, used, or intended to be located or used on the Real Property; all plans and specifications for development or construction of improvements on the Real Property; all contracts and subcontracts relating to the construction of improvements on the Real Property; all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions relating to the Real Property; all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Real Property; all proceeds payable or to be payable under each policy of insurance relating to the Real Property; and all products and proceeds of the foregoing. The Real Property and the personal property described in this paragraph are sometimes collectively referred to in this deed of trust as the "Property". Notwithstanding any other provision in this deed of trust, the term "Property" does not include personal effects used primarily for personal, family, or household purposes.

Exceptions to Conveyance and Warranty: Validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; and all presently recorded and validly existing instruments, other than conveyances of the surface fee estate.

Prior Liens: None

For value received and to secure payment of the Obligations, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Exceptions to Conveyance and Warranty. On payment of the Obligations and all other amounts secured by this deed of trust, and upon satisfaction of all other covenants and conditions in the Obligations, this deed of trust will have no further effect, and Lender will release it at Grantor's expense. In addition to creating a deed-of-trust lien on all the real and other property described above, to secure the Obligations Grantor also grants to Lender a security interest in all of the above-described personal property and all its proceeds, pursuant to and to the greatest extent permitted by the Texas Uniform Commercial Code. Grantor authorizes Lender to file one or more financing statements describing that collateral. In the event of a default under the Obligations, whether or not there is a foreclosure sale under this deed of trust, Grantor agrees that all or part of the personal property described above may be sold as a whole or in parcels at Lender's option, and that the property to be sold need not be present at the place of sale.

2

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

JUN 1 1 2014

Dana DeBeauvoir County Clerk
By Deputy J. S. WILLIAMS

Clauses and Covenants

**A. Grantor's Obligations**

Grantor agrees to—

1. keep the Property in good repair and condition;

2. pay all taxes and assessments on the Property before delinquency;

3. defend title to the Property subject to the Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4. maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;

5. obey all laws, ordinances, and restrictive covenants applicable to the Property;

6. keep any buildings occupied as required by the Required Insurance Coverages;

7. if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8. notify Lender of any change of address.

**B. Lender's Rights**

1. Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee. Such written appointments need not be filed in the Official Public Records of the county where the Property is located or in any other public or governmental records in order to be effective.

2. If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3. Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligations or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender

3

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on JUN 1 1 2014

Dana DeBeauvoir, County Clerk
By Deputy U.S. WILLIAMS

reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

4.  Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligations or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligations, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5.  If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.  If there is a default in any of the Obligations or if Grantor fails to perform any of Grantor's other obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may—

    a.  declare the unpaid principal balance and earned interest on the Obligations immediately due;

    b.  direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

    c.  purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligations.

7.  Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

C.  **Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will—

1.  either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.  sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

4

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

JUN 11 2014

Dana DeBeauvoir County Clerk
By Deputy
O. S. WILLIAMS

3. from the proceeds of the sale, pay, in this order—

    a. expenses of foreclosure, including a reasonable commission to Trustee;

    b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

    c. any amounts required by law to be paid before payment to Grantor; and

    d. to Grantor, any balance; and

4. be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## D. General Provisions

1. If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2. Recitals in any trustee's deed conveying the Property will be presumed to be true.

3. Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4. This lien will remain superior to liens later created even if the time of payment of all or part of the Obligations is extended or part of the Property is released.

5. If any portion of the Obligations cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6. Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligations. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7. Grantor assigns to Lender absolutely, not only as collateral, all present and future

5

JUN 1 1 2014

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on _____

_____ Deputy _____ County Clerk
By _____ J. S. WILLIAMS

rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default with respect to the Obligations or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Obligations and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligations and the deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Obligations or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations with respect to the Obligations and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law. This section is intended to create an assignment of rents to the greatest extent permitted under Chapter 64 of the Texas Property Code, and to grant to Lender all rights of an assignee under that chapter.

8.   Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9.   In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.   Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

Grantor may not cause or permit any Property to be encumbered by any liens, security

6

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

JUN 1 1 2014

J. S. WILLIAMS

interests, or encumbrances other than the liens securing the Obligations and the liens securing ad valorem taxes not yet due and payable without the prior written consent of Lender. If granted, consent may be conditioned upon Grantor's executing, before granting such lien, a written modification agreement containing any terms Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

Grantor may not grant any lien, security interest, or other encumbrance (a "Subordinate Instrument") covering the Property that is subordinate to the liens created by this deed of trust without the prior written consent of Lender. If granted, consent may be conditioned upon the Subordinate Instrument's containing express covenants to the effect that—

    a.    the Subordinate Instrument is unconditionally subordinate to this deed of trust;

    b.    if any action is instituted to foreclose or otherwise enforce the Subordinate Instrument, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of Lender, and that consent, if granted, may be conditioned in any manner Lender determines;

    c.    rents, if collected by or for the holder of the Subordinate Instrument, will be applied first to the payment of the Obligations then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order Lender may determine, before being applied to any indebtedness secured by the Subordinate Instrument;

    d.    written notice of default under the Subordinate Instrument and written notice of the commencement of any action to foreclose or otherwise enforce the Subordinate Instrument must be given to Lender concurrently with or immediately after the occurrence of any such default or commencement; and

    e.    in the event of the bankruptcy of Grantor, all amounts due on or with respect to the Obligations and this deed of trust will be payable in full before any payments on the indebtedness secured by the Subordinate Instrument.

Grantor may not cause or permit any of the following events to occur without the prior written consent of Lender: if Grantor is (a) a corporation, the dissolution of the corporation or the sale, pledge, encumbrance, or assignment of any shares of its stock; (b) a limited liability company, the dissolution of the company or the sale, pledge, encumbrance, or assignment of any of its membership interests; (c) a general partnership or joint venture, the dissolution of the

7

JUN 1 1 2014

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

Dana _____ County Clerk
By _____

J. S. WILLIAMS

partnership or venture or the sale, pledge, encumbrance, or assignment of any of its partnership or joint venture interests, or the withdrawal from or admission into it of any general partner or joint venturer; or (d) a limited partnership, (1) the dissolution of the partnership, (2) the sale, pledge, encumbrance, or assignment of any of its general partnership interests, or the withdrawal from or admission into it of any general partner, (3) the sale, pledge, encumbrance, or assignment of a controlling portion of its limited partnership interests, or (4) the withdrawal from or admission into it of any controlling limited partner or partners. If granted, consent may be conditioned upon (a) the integrity, reputation, character, creditworthiness, and management ability of the person succeeding to the ownership interest in Grantor (or security interest in such ownership) being satisfactory to Lender; and (b) the execution, before such event, by the person succeeding to the interest of Grantor in the Property or ownership interest in Grantor (or security interest in such ownership) of a written modification or assumption agreement containing such terms as Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

11. When the context requires, singular nouns and pronouns include the plural.

12. The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

13. This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

14. If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

15. Grantor and each surety, endorser, and guarantor of the Obligation waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

16. This conveyance is made in trust also to secure payment of all other present and future debts that Grantor may owe to Lender, regardless of how any other such debt is incurred or evidenced. This conveyance is also made to secure payment of any renewal or extension of any present or future debt that Grantor owes to Lender, including any loans and advancements from Lender to Grantor under the provisions of this deed of trust. When Grantor repays all debts owed to Lender, this deed-of-trust lien will terminate only if Lender releases this deed of trust at the request of Grantor. Until Lender releases it, this deed of trust will remain fully in effect to secure other present and future advances and debts, regardless of any additional security given for any debt and regardless of any modification. Grantor is not entitled to any partial releases of this deed-of-trust lien without the express, written consent of Lender.

17. Grantor agrees to make an initial deposit in a reasonable amount to be determined

8

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on JUN 1 1 2014

Dana DeBeauvoir County Clerk
By Deputy

J. S. WILLIAMS

by Lender and then make monthly payments to an escrow fund for taxes and insurance premiums on the Property. Monthly payments will be thereafter made on the first day of each calendar month, and each payment will be one-twelfth of the amount that Lender estimates will be required annually for payment of taxes and insurance premiums. The fund will accrue no interest, and Lender will hold it without bond in escrow and use it to pay the taxes and insurance premiums. If Grantor has complied with the requirements of this paragraph, Lender must pay taxes before delinquency. Grantor agrees to make additional deposits on demand if the fund is ever insufficient for its purpose. If an excess accumulates in the fund, Lender may either credit it to future monthly deposits until the excess is exhausted or refund it to Grantor. When Grantor makes the final payment on the Note, Lender will credit to that payment the whole amount then in the fund or, at Lender's option, refund it after the Note is paid. If this deed of trust is foreclosed, any balance in the fund over that needed to pay taxes, including taxes accruing but not yet payable, and to pay insurance premiums will be paid under part C, "Trustee's Rights and Duties." If the Property is transferred, any balance then in the fund will still be subject to the provisions of this paragraph and will inure to the benefit of the transferee. Deposits to the fund described in this paragraph are in addition to the payments provided for in the Note.

18. Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

19. In case any one or more of the provisions contained in this deed of trust shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, to the extent that the unenforceability does not destroy the basis of the bargain among the parties to this deed of trust, such invalidity, illegality, or unenforceability shall not affect any other provision of this deed of trust, and this deed of trust shall be construed as if the invalid, illegal, or unenforceable provision had never been included in this deed of trust.

20. The term *Lender* includes any mortgage servicer for Lender.

## E. Construction Loan Mortgage

1. This deed of trust is a "construction mortgage" within the meaning of section 9.334 of the Texas Business and Commerce Code. The liens and security interests created and granted by this deed of trust secure an obligation incurred for the construction of improvements on land, including the acquisition cost of the land.

2. Grantor agrees to comply with the covenants and conditions of the commercial construction loan agreement, if any, executed in connection with the Note and this deed of trust. All advances made by Lender under the commercial construction loan agreement will be indebtedness of Grantor secured by the liens created by this deed of trust, and such advances are conditioned as provided in the commercial construction loan agreement.

9

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

JUN 1 2014

Dana DeBeauvoir County Clerk
By Deputy

J. S. WILLIAMS

3. All amounts disbursed by Lender before completion of the improvements to protect the security of this deed of trust up to the principal amount of the Note will be treated as disbursements under the commercial construction loan agreement. All such amounts will bear interest from the date of disbursement at the rate stated in the Note, unless collections from Grantor of interest at that rate would be contrary to applicable law, in which event such amounts will bear interest at the rate stated in the Note for matured, unpaid amounts and will be payable on notice from Lender to Grantor requesting payment.

4. From time to time as Lender deems necessary to protect Lender's interests, Grantor will, on request of Lender, execute and deliver to Lender, in such form as Lender directs, assignments of any and all rights or claims that relate to the construction of improvements on the Property.

5. In case of breach by Grantor of the covenants and conditions of the construction loan agreement, Lender, at its option, with or without entry on the Property, may (a) invoke any of the rights or remedies provided in the construction loan agreement, (b) accelerate the amounts secured by this deed of trust and invoke the remedies provided in this deed of trust, or (c) do both.

6. If, after commencement of amortization of the Note, the Note and this deed of trust are sold by Lender, after the sale the commercial construction loan agreement will cease to be a part of this deed of trust, and Grantor will not assert any right of setoff, counterclaim, or other claim or defense arising out of or in connection with the commercial construction loan agreement against the obligations of the Note and this deed of trust.

> 4709 INCORPORATED,
> D/B/A MIDTOWN LIVE
>
> By _____
> Selena Cash, Director and President

10

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

JUN 1 1 2014

Dana DeBeauvoir County Clerk
By _____ J. S. WILLIAMS

**Acknowledgment**

STATE OF TEXAS §
§
COUNTY OF TRAVIS §

This instrument was acknowledged before me on September 9, 2011 by Selena Cash, as a director and the president of 4709 Incorporated, d/b/a Midtown Live, a Texas corporation, on behalf of that corporation.

DEBBIE J. PEEK
MY COMMISSION EXPIRES
June 3, 2014

_____
Notary Public, State of Texas

AFTER RECORDING, RETURN TO:

First American Title
1221 S. MoPac Expy Ste 150
Austin TX 78746

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on **JUN 1 1 2014**

Dana DeBeauvoir, County Clerk
By Deputy **J. S. WILLIAMS**

11

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
September 21 2011 10:21 AM
FEE: $ 56.00   **2011137642**

## ASSIGNMENT OF RIGHTS, WARRANTIES, PERMITS, LICENSES, AND CONTRACTS

This Assignment of Rights, Warranties, Permits, Licenses, and Contracts (the "Assignment") is executed by 4709 Incorporated, d/b/a Midtown Live ("4709 Inc.") and by Capital City Homes, LLC ("Capital City Homes"), to Pride of Austin High Yield Fund I, LLC (the "Assignee"), and is effective on the date set forth below. 4709 Inc. and Capital City Homes are sometimes collectively referred to in this Assignment as the "Assignors".

### RECITALS

A.    4709 Inc. has executed and delivered to the Assignee a real estate lien note (the "Note"), which has the same date as this Assignment, payable to the order of the Assignee, in the original principal amount of One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00). As security for the Note, 4709 Inc. has executed and delivered to the Assignee a deed of trust (the "Deed of Trust"), which has the same date as this Assignment, covering the following described property:

> Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas

(the "Real Property"),

> Together with the following personal property: All fixtures, supplies, building materials, and other goods of every nature now or hereafter located, used, or intended to be located or used on the Real Property; all plans and specifications for development or construction of improvements on the Real Property; all contracts and subcontracts relating to the construction of improvements on the Real Property; all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions relating to the Real Property; all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Real Property; all proceeds payable or to be payable under each policy of insurance relating to the Real Property; and all products and proceeds of the foregoing. The Real Property and the personal property described in ths paragraph is collectively referred to as the "Property". Notwithstanding any other provision in this Assignment, the term "Property" does not include personal effects used primarily for personal, family, or household purposes.

This Assignment, the Deed of Trust, and any other documents now or hereafter evidencing, governing, securing, or executed in connection with the loan evidenced by the Note are sometimes collectively referred to in this Assignment as the "Security Documents".

B.     As further security for the Note, the Assignee has required that the Assignors assign to the Assignee all of the Assignors' right, title, and interest in, to, and under all building permits, licenses, and similar items, all warranties and guaranties covering all personal property and equipment constituting all or any portion of the Property, along with all contracts of any kind affecting or related to the Property including, but not limited to, construction contracts and subcontracts, whether written or oral, for the construction, renovation, and/or preparation of tenant finish of or for any improvements located or to be located on the Property. The Assignors desire and intend by this instrument to assign to the Assignee all of the Assignors' right, title, and interest in, to, and under such items as further described in Paragraph 1 of this Assignment. Such items are collectively referred to in this Assignment as the "Assigned Properties".

## CONSIDERATION

In consideration of the loan made by the Assignee to 4709 Inc., which is evidenced by the Note (the "Loan"), and in order to further secure the obligations contained in the Note, the Deed of Trust, and the other Security Documents, the Assignors, enter into this Assignment. All parties acknowledge the receipt and adequacy of the consideration that they have received under this Assignment for the consideration that they have given.

## PROMISES, COVENANTS, AND AGREEMENTS

1.     Assignment. The Assignors do hereby assign, grant, bargain, transfer, sell, convey, and set over to the Assignee all of the right, title, and interest of the Assignors in and to the following:

(a) (1) All building permits, surveys, governmental approvals, licenses, agreements with utility companies, and all other consents and approvals which the Assignors may now own or hereafter own with respect to or in connection with the Property; (2) all intangible property now or hereafter owned by the Assignors and used in connection with the Property; and (3) all rights, privileges, and appurtenances now or hereafter owned by the Assignors and in any way related to the Property, any improvements now or hereafter located on the Real Property, and other properties and interests described in this Assignment.

(b) (1) All engineering studies, environmental studies, soil tests, site plans, subdivision plats, architectural plans and specifications, engineering plans and calculations, drawings, and other specifications; (2) and all amendments, modifications, supplements, general conditions, and addenda to those items; (3) engineering contracts, construction contracts, architectural contracts, developmental contracts, drainage studies, surveys, and maps; and (4) all other construction and developmental documentation now or hereafter pertaining to the Property.

(c) All warranties and guaranties covering appliances, fixtures, and other personal property now or hereafter located or placed on the Real Property, including without limitation, air conditioning components, ventilation components, heating components, and all other appliances

2

and equipment.

(d) All contracts of any kind affecting or related to the Property including, but not limited to, construction contracts and subcontracts, whether written or oral, for the construction, renovation, and/or preparation of tenant finish of or for any improvements located or to be located on the Real Property or for the custom construction of any improvements located or to be located on the Real Property, residential or commercial, and all contracts for the sale of the Property to any other party (the "Contracts").

(e) All payment and performance bonds relating to the construction of improvements on the Real Property, and payment for all labor, subcontracts, materials, and specially fabricated materials performed or furnished in connection with the construction of improvements on the Real Property.

(f) All renewals and replacements for any of the items described above, and proceeds from those items.

2.  Rights of Assignors. This Assignment shall be in full force and effect as of the effective date of this document, but until the occurrence of an event of default as defined or outlined in the Security Documents ("Event of Default"), the Assignors shall have the right to take all actions with respect to the Assigned Properties. Upon the occurrence of an Event of Default, the Assignee man, at its sole option, exercise from time to time any and all rights and remedies available to the Assignee under this Assignment or under the Security Documents. The Assignee shall have the right, upon the occurrence of an Event of Default, to take possession of the Property and to exercise any of the rights and privileges granted to the Assignee under this Assignment and/or under the Security Documents. The Assignors do hereby appoint the Assignee as their agent and attorney-in-fact for the purpose of taking such actions. The Assignors shall pay all of the costs and expenses incurred by the Assignee in enforcing the Assignee's rights under this Assignment and/or under the Security Documents, including reasonable attorney's fees and other legal and litigation expenses, through and including any appellate proceedings. The Assignee shall not be deemed to have assumed or guaranteed any of the obligations of the Assignors under the Assigned Properties by such exercise or performance. Notwithstanding any other provision of this Assignment, Capital City Homes, LLC does not and will not relinquish or waive any claims, rights, or lawsuits that it has for payment for work that has been performed, labor that has been provided, and/or materials that have been delivered or installed at the Real Property, as long as all employees, subcontractors, materialmen, and suppliers have been paid for that work, labor, and materials. In addition, Capital City Homes, LLC does not and will not relinquish or waive any claims, rights, or lawsuits for damages that it has or might have against 4709 Incorporated, d/b/a Midtown Live.

3.  Assignors' Covenants and Representations. The Assignors covenant as follows: (a) The Assignors will not, without the prior written consent of the Assignee (1) change, amend, alter, or modify any of the Assigned Properties or change, amend, alter, or modify any of the terms of

3

the Assigned Properties; (2) consent to the reduction or release of any of the obligations of any party under the Assigned Properties; or (3) assign, pledge, encumber, or otherwise transfer any of the Assigned Properties or any of the Assignors' rights under the Assigned Properties. (b) The Assignors shall (1) fully disclose to the Assignee all of the terms and conditions of the Assigned Properties and provide accurate copies thereof to the Assignee; (2) maintain all of the Assigned Properties in full force and effect; (3) remain liable for responsibilities and liabilities of the Assignors under the Assigned Properties including, but not limited to, the payment of all costs and expenses therein required to be borne by the Assignor, the completion of the improvements to be built on the Real Property, and the fulfillment of all requirements as set forth in the Assigned Properties; and (4) do or cause to be done all proceedings, acts, and things necessary and proper to effect performance and/or recovery under the Assigned Properties at the Assignors' own cost and expense. The Assignors represent to the Assignee that true and correct copies of the Assigned Properties have been delivered to the Assignee, and that the Assignors' interest in the Assigned Properties is not subject to any claim, setoff, or encumbrance.

4. <u>Liabilities of Assignee</u>. The acceptance by the Assignee of this Assignment, with all of the rights, powers, privileges, and authority created in this Assignment, shall not impose any obligations whatsoever upon the Assignee to perform any of the terms or provisions to be performed by the Assignors under the Assigned Properties. Nothing contained in this Assignment shall be construed to impose any liability, obligations, or duties upon the Assignee by reason of this Assignment unless such liability, obligation(s) or duty(ies) is/are specifically assumed by the Assignee in writing. It is the intent of the Assignors and the Assignee that no rights are or shall be granted to any other party by this Assignment.

5. <u>Assignment and Binding Effect</u>. This Assignment shall be assignable by the Assignee. This Assignment shall not be assignable by the Assignors, without the express, written consent of the Assignee. All agreements, covenants, promises, representations, warranties, powers, obligations, and rights under this Assignment shall be binding on and shall inure to the benefit of the Assignors and the Assignee, along with their respective agents, employees, servants, successors, assignees (where permitted), attorneys, parent companies, subsidiaries, owners, members, shareholders, managers, directors, and officers, including any purchasers upon foreclosure under the Security Documents.

6. <u>Amendment</u>. This Assignment may not be changed, amended, modified, waived, discharged, or terminated orally, but only by an instrument in writing that is signed by the party against whom enforcement of the change, amendment, modification, waiver, discharge, and/or termination is sought.

7. <u>Counterparts</u>. This Assignment may be executed, acknowledged, and delivered in any number of counterparts. Each such counterpart shall constitute an original, but together such counterparts shall constitute only one instrument.

8. <u>Governing Law</u>. This Assignment shall be governed by, enforced according to, and

4

construed in accordance with the laws of the state of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the state of Texas or any other jurisdiction) that would cause this Assignment to be governed by, enforced according to, and/or construed in accordance with the laws of any jurisdiction other than the state of Texas.

9.  Waiver. Neither the existence of this Assignment nor the exercise of the privileges granted to the Assignee shall be construed as a waiver of the Assignee of its right to enforce payment of the Note and/or performance of the Security Documents in strict accordance with the terms and provisions of those items. The rights and remedies of the Assignee under this Assignment, the Note, and/or any of the Security Documents shall be cumulative. The exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy. Any waiver by the Assignee of any right or remedy under this Assignment shall not be deemed to be a waiver of any other or future right or remedy, and the Assignee may insist on strict compliance with this Assignment by any other party after any such waiver.

10.  Transfer of Property. Upon the sale, conveyance, transfer, or exchange of all or any portion of the Property, the term "Assignors" as used in this Assignment shall include the transferee or grantee in that transaction (unless the Assignee is the transferee or grantee). The preceding sentence shall not be deemed to permit any sale, conveyance, transfer, or exchange which is prohibited or restricted by the terms of any Security Documents.

11.  Miscellaneous. In case any one or more of the provisions contained in this Assignment shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, to the extent that the unenforceability does not destroy the basis of the bargain among the parties to this Assignment, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assignment, and this Assignment shall be construed as if the invalid, illegal, or unenforceable provision had never been included in the Assignment. All parties have had an equal opportunity to negotiate the terms of this Assignment, and all parties have contributed to the drafting of this Assignment. Therefore, this Assignment shall not be construed more strictly against or more favorably toward any party. The section headings and the numbering of the paragraphs and sections of this Assignment are for convenience only, and shall not affect the interpretation of this Assignment.

DATED: September *9*, 2011

4709 INCORPORATED,
D/B/A MIDTOWN LIVE

By: _Selena Cash_

Selena Cash, Director and President

5

CAPITAL CITY HOMES, LLC

By: _____

Frank McCullough, President

6

**Acknowledgment**

STATE OF TEXAS          §
                                  §

COUNTY OF TRAVIS      §

    This instrument was acknowledged before me on September ____, 2011 by Selena Cash, as a director and the president of 4709 Incorporated, d/b/a Midtown Live, a Texas corporation, on behalf of that corporation.

DEBBIE J. PEEK
MY COMMISSION EXPIRES
June 3, 2014

Notary Public, State of Texas

**Acknowledgment**

STATE OF TEXAS          §
                                  §

COUNTY OF TRAVIS      §

    This instrument was acknowledged before me on September ____, 2011 by Frank McCullough, as the president of Capital City Homes, LLC, a Texas limited liability company, on behalf of that limited liability company.

DEBBIE J. PEEK
MY COMMISSION EXPIRES
June 3, 2014

Notary Public, State of Texas

7

## Renewal and Extension Promissory Note

Date: January  9  , 2012

Borrower: 4709 Incorporated, d/b/a Midtown Live, a Texas corporation

Borrowers' Mailing Address: 7602 Brookhollow Cv., Austin, Travis County, Texas 78752-2103

Lender: Pride of Austin High Yield Fund I, LLC

Place for Payment: 401 Congress Ave., Suite 1540, Austin, Travis County, Texas 78701-3851

Principal Amount: One Million Two Hundred Thirty-Six Thousand Nine Hundred Fifty-Six and 52/100 Dollars ($1,236,956.52)

Annual Interest Rate: Fourteen percent (14%)

Maturity Date: February 1, 2013. The Maturity Date may be extended, at the option of the Borrower, until August 1, 2013. In order to exercise that option, the Borrower must give the Lender written notice of the Borrower's intent to exercise the option on or before July 1, 2013, and must pay to the Lender, on or before July 1, 2013, an amount equal to two percent (2%) of the principal balance of this note on the date of that payment. Such a payment will be deemed to be a fee that is used to defray the Lender's expenses in extending the loan and this promissory note, and shall not be credited toward principal or interest due under this promissory note. Notwithstanding any of the foregoing, the Borrower may not exercise the option to extend the Maturity Date if the Borrower is in default under the terms of this note or has been in default under the terms of this note at any time before the Maturity Date, without the express, written consent and waiver of default by the Lender.

Annual Interest Rate on Matured, Unpaid Amounts: Eighteen percent (18%) or the highest amount allowed by law, whichever is less

Terms of Payment (principal and interest): The Principal Amount, or if a lesser amount has been advanced under the Commercial Construction Loan Agreement between the Borrower and the Lender, which is dated on or before the date of this note, as of the Maturity Date, that lesser amount, is due and payable on the Maturity Date. Interest accrues at the Annual Interest Rate on each amount advanced under the Commercial Construction Loan Agreement between the Borrower and the Lender from the date of the advance until the principal amount of that advance is repaid. Accrued interest is due and payable monthly on the first day of each calendar month, beginning on February 1, 2012 and ending on the Maturity Date, when all principal and accrued interest is due and payable. Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

Prepayment: The Borrower may not prepay any portion of this note prior to the 180th day after the

date of this note, unless the Borrower pays a prepayment penalty equal to three percent (3%) of that prepayment amount. After the 180th day from the date of this note, the Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium. Prepayments will be applied first to accrued interest and the remainder to the principal balance of this note.

Security for Payment: This note is secured by the liens contained in a Renewal and Extension Deed of Trust, Security Agreement, and Assignment of Rents (the "Renewal and Extension Deed of Trust"), which has the same date as this note, from the Borrower, to Bruce R. Hardesty, Trustee, for the benefit of the Lender, which covers the real property located at 7400 Cameron Rd., Austin, Travis County, Texas 78752 (including all improvements and fixtures on that real property), which has the following legal description:

> Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas.

(the "Real Property"),

> Together with the following personal property: All fixtures, supplies, building materials, and other goods of every nature now or hereafter located, used, or intended to be located or used on the Real Property; all plans and specifications for development or construction of improvements on the Real Property; all contracts and subcontracts relating to the construction of improvements on the Real Property; all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions relating to the Real Property; all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Real Property; all proceeds payable or to be payable under each policy of insurance relating to the Real Property; and all products and proceeds of the foregoing. The Real Property and the personal property described in this paragraph are collectively referred to in this note as the "Property". Notwithstanding any other provision in this note, the term "Property" does not include personal effects used primarily for personal, family, or household purposes.

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

Borrower will be in default under this note if a payment is not actually received by Lender within five (5) days after that payment is due. If any payment is not received by that deadline,

2

Lender may, at its sole and absolute option, accept the late payment if Borrower pays a late fee equal to five percent (5%) of the amount of the payment. Such a late fee may be charged in order to defray the expense of handling the delinquent payment, and shall not be deemed to be interest.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on any property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party (subject to the immediately preceding paragraph of this note); (2) any warranty, covenant, or representation in this note or in any other written agreement between Lender and Borrower or any Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is dissolved, begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; or (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees, taxable court costs, and other collection and litigation expenses incurred by the Lender if this note is placed in the hands of an attorney who is not an employee of lender to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount

3

of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

This note and the Renewal and Extension Deed of Trust are given for the following purposes:

1. To renew and extend the principal balance of One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00) that Borrower owes on a prior promissory note in the original principal amount of One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00), which is dated on or about September 9, 2011, executed by 4709 Incorporated, d/b/a Midtown Live, a Texas corporation, and payable to the order of Pride of Austin High Yield Fund I, LLC. That prior note is more fully described in and secured by a lien on the Property that was granted by the Borrower in a Deed of Trust, Security Agreement, and Assignment of Rents, which is dated September 9, 2011, and recorded under document number 2011137642 in the Official Public Records of Travis County, Texas.

2. To provide evidence of the Borrower's promise to repay an additional One Hundred Thirty-Six Thousand Nine Hundred Fifty-Six and 52/100 Dollars ($136,956.52) loaned by the Lender to the Borrower on or about the date of this note. This note supplements the Commercial Construction Loan Agreement between the Lender and the Borrower that is described above. The Lender and the Borrower agree that Seventy-Five Thousand and No/100 Dollars ($75,000.00) will be paid to Capital City Homes, LLC immediately after this note and all related documents are signed by the Borrower, for expenses involved with construction of improvements on the Real Property. The Lender and the Borrower further agree that when the Borrower has deposited a minimum of One Hundred Thousand and No/100 Dollars ($100,000.00) in its operating account to get its business on the Property open, and has provided proof of that deposit to the Lender, the Lender will release an additional Fifty Thousand and No/100 Dollars ($50,000.00) directly to the Borrower, to be used only for the purchase of equipment and other items of personal property that will be used in the operation of the Borrower's business on the Property.

Borrower acknowledges that the lien securing the prior note described above is valid, that that lien subsists against the Property, and that by a Renewal and Extension Deed of Trust, Security Agreement, and Assignment of Rents which has the same date as this note that lien will be renewed and extended in full force to secure the payment of this note.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

4

4709 INCORPORATED,
D/B/A MIDTOWN LIVE


By: _Selena Cash_____

    Selena Cash, Director and President

5

TRV     2012004604

11 PGS

# Renewal and Extension
## Deed of Trust, Security Agreement, and Assignment of Rents

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

## Terms

Date: January **10**, 2012

Grantor: 4709 Incorporated, d/b/a Midtown Live, a Texas corporation

Grantors' Mailing Address: 7602 Brookhollow Cv., Austin, Travis County, Texas 78752-2103

Trustee: Bruce R. Hardesty

Trustee's Mailing Address: 1411 West Ave., Suite 100, Austin, Travis County, Texas 78701-1537

Lender: Pride of Austin High Yield Fund I, LLC

Lender's Mailing Address: 401 Congress Ave., Suite 1540, Austin, Travis County, Texas 78701-3851

Obligations

    1. Renewal and Extension Promissory Note

        Date: The same date as this deed of trust

        Original principal amount: One Million Two Hundred Thirty-Six Thousand Nine Hundred Fifty-Six and 52/100 Dollars ($1,236,956.52)

        Borrower: 4709 Incorporated, d/b/a Midtown Live

        Lender: Pride of Austin High Yield Fund I, LLC

        Maturity date: February 1, 2013

    2.    Commercial Construction Loan Agreement between Pride of Austin High Yield Fund I, LLC, as Lender, and 4709 Incorporated, d/b/a Midtown Live, as Borrower, which is dated on or before this deed of trust.

Property:

    Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas

(the "Real Property"),

    Together with the following personal property: All fixtures, supplies, building materials, and other goods of every nature now or hereafter located, used, or intended to be located or used on the Real Property; all plans and specifications for development or construction of improvements on the Real Property; all contracts and subcontracts relating to the construction of improvements on the Real Property; all accounts, contract rights, instruments, documents, general intangibles, and chattel paper arising from or by virtue of any transactions relating to the Real Property; all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Real Property; all proceeds payable or to be payable under each policy of insurance relating to the Real Property; and all products and proceeds of the foregoing. The Real Property and the personal property described in this paragraph are sometimes collectively referred to in this deed of trust as the "Property". Notwithstanding any other provision in this deed of trust, the term "Property" does not include personal effects used primarily for personal, family, or household purposes.

Exceptions to Conveyance and Warranty: Validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; and all presently recorded and validly existing instruments, other than conveyances of the surface fee estate.

Prior Liens: None

    For value received and to secure payment of the Obligations, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Exceptions to Conveyance and Warranty. On payment of the Obligations and all other amounts secured by this deed of trust, and upon satisfaction of all other covenants and conditions in the Obligations, this deed of trust will have no further effect, and Lender will release it at Grantor's expense. In addition to creating a deed-of-trust lien on all the real and other property described above, to secure the Obligations Grantor also grants to Lender a security interest in all of the above-described personal property and all its proceeds, pursuant to and to the greatest extent permitted by the Texas Uniform Commercial Code. Grantor authorizes Lender to file one or more financing statements describing that collateral. In the event of a default under the Obligations, whether or not there is a foreclosure sale under this deed of trust, Grantor agrees that all or part of the personal property described above may be sold as a whole or in parcels at Lender's option, and that the property to be sold need not be present at the place of sale.

2

## Clauses and Covenants

### A. Grantor's Obligations

Grantor agrees to—

1.  keep the Property in good repair and condition;

2.  pay all taxes and assessments on the Property before delinquency;

3.  defend title to the Property subject to the Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4.  maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;

5.  obey all laws, ordinances, and restrictive covenants applicable to the Property;

6.  keep any buildings occupied as required by the Required Insurance Coverages;

7.  if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8.  notify Lender of any change of address.

### B. Lender's Rights

1.  Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee. Such written appointments need not be filed in the Official Public Records of the county where the Property is located or in any other public or governmental records in order to be effective.

2.  If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3.  Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligations or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender

3

reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

    4.    Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligations or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligations, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

    5.    If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

    6.    If there is a default in any of the Obligations or if Grantor fails to perform any of Grantor's other obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may—

        a.    declare the unpaid principal balance and earned interest on the Obligations immediately due;

        b.    direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

        c.    purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligations.

    7.    Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

## C.    Trustee's Rights and Duties

    If directed by Lender to foreclose this lien, Trustee will—

    1.    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

    2.    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

4

3.     from the proceeds of the sale, pay, in this order—

    a.     expenses of foreclosure, including a reasonable commission to Trustee;

    b.     to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

    c.     any amounts required by law to be paid before payment to Grantor; and

    d.     to Grantor, any balance; and

4.     be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## D.   General Provisions

1.     If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.     Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.     Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.     This lien will remain superior to liens later created even if the time of payment of all or part of the Obligations is extended or part of the Property is released.

5.     If any portion of the Obligations cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6.     Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligations. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.     Grantor assigns to Lender absolutely, not only as collateral, all present and future

rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default with respect to the Obligations or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Obligations and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligations and the deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Obligations or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations with respect to the Obligations and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law. This section is intended to create an assignment of rents to the greatest extent permitted under Chapter 64 of the Texas Property Code, and to grant to Lender all rights of an assignee under that chapter.

8. Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9. In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10. Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

Grantor may not cause or permit any Property to be encumbered by any liens, security

6

interests, or encumbrances other than the liens securing the Obligations and the liens securing ad valorem taxes not yet due and payable without the prior written consent of Lender. If granted, consent may be conditioned upon Grantor's executing, before granting such lien, a written modification agreement containing any terms Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

Grantor may not grant any lien, security interest, or other encumbrance (a "Subordinate Instrument") covering the Property that is subordinate to the liens created by this deed of trust without the prior written consent of Lender. If granted, consent may be conditioned upon the Subordinate Instrument's containing express covenants to the effect that—

    a.    the Subordinate Instrument is unconditionally subordinate to this deed of trust;

    b.    if any action is instituted to foreclose or otherwise enforce the Subordinate Instrument, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of Lender, and that consent, if granted, may be conditioned in any manner Lender determines;

    c.    rents, if collected by or for the holder of the Subordinate Instrument, will be applied first to the payment of the Obligations then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order Lender may determine, before being applied to any indebtedness secured by the Subordinate Instrument;

    d.    written notice of default under the Subordinate Instrument and written notice of the commencement of any action to foreclose or otherwise enforce the Subordinate Instrument must be given to Lender concurrently with or immediately after the occurrence of any such default or commencement; and

    e.    in the event of the bankruptcy of Grantor, all amounts due on or with respect to the Obligations and this deed of trust will be payable in full before any payments on the indebtedness secured by the Subordinate Instrument.

Grantor may not cause or permit any of the following events to occur without the prior written consent of Lender: if Grantor is (a) a corporation, the dissolution of the corporation or the sale, pledge, encumbrance, or assignment of any shares of its stock; (b) a limited liability company, the dissolution of the company or the sale, pledge, encumbrance, or assignment of any of its membership interests; (c) a general partnership or joint venture, the dissolution of the

7

partnership or venture or the sale, pledge, encumbrance, or assignment of any of its partnership or joint venture interests, or the withdrawal from or admission into it of any general partner or joint venturer; or (d) a limited partnership, (1) the dissolution of the partnership, (2) the sale, pledge, encumbrance, or assignment of any of its general partnership interests, or the withdrawal from or admission into it of any general partner, (3) the sale, pledge, encumbrance, or assignment of a controlling portion of its limited partnership interests, or (4) the withdrawal from or admission into it of any controlling limited partner or partners. If granted, consent may be conditioned upon (a) the integrity, reputation, character, creditworthiness, and management ability of the person succeeding to the ownership interest in Grantor (or security interest in such ownership) being satisfactory to Lender; and (b) the execution, before such event, by the person succeeding to the interest of Grantor in the Property or ownership interest in Grantor (or security interest in such ownership) of a written modification or assumption agreement containing such terms as Lender may require, such as a principal pay down on the Obligations, an increase in the rate of interest payable with respect to the Obligations, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligations.

11.    When the context requires, singular nouns and pronouns include the plural.

12.    The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

13.    This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

14.    If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

15.    Grantor and each surety, endorser, and guarantor of the Obligation waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

16.    This conveyance is made in trust also to secure payment of all other present and future debts that Grantor may owe to Lender, regardless of how any other such debt is incurred or evidenced. This conveyance is also made to secure payment of any renewal or extension of any present or future debt that Grantor owes to Lender, including any loans and advancements from Lender to Grantor under the provisions of this deed of trust. When Grantor repays all debts owed to Lender, this deed-of-trust lien will terminate only if Lender releases this deed of trust at the request of Grantor. Until Lender releases it, this deed of trust will remain fully in effect to secure other present and future advances and debts, regardless of any additional security given for any debt and regardless of any modification. Grantor is not entitled to any partial releases of this deed-of-trust lien without the express, written consent of Lender.

17.    Grantor agrees to make an initial deposit in a reasonable amount to be determined

8

by Lender and then make monthly payments to an escrow fund for taxes and insurance premiums on the Property. Monthly payments will be thereafter made on the first day of each calendar month, and each payment will be one-twelfth of the amount that Lender estimates will be required annually for payment of taxes and insurance premiums. The fund will accrue no interest, and Lender will hold it without bond in escrow and use it to pay the taxes and insurance premiums. If Grantor has complied with the requirements of this paragraph, Lender must pay taxes before delinquency. Grantor agrees to make additional deposits on demand if the fund is ever insufficient for its purpose. If an excess accumulates in the fund, Lender may either credit it to future monthly deposits until the excess is exhausted or refund it to Grantor. When Grantor makes the final payment on the Note, Lender will credit to that payment the whole amount then in the fund or, at Lender's option, refund it after the Note is paid. If this deed of trust is foreclosed, any balance in the fund over that needed to pay taxes, including taxes accruing but not yet payable, and to pay insurance premiums will be paid under part C, "Trustee's Rights and Duties." If the Property is transferred, any balance then in the fund will still be subject to the provisions of this paragraph and will inure to the benefit of the transferee. Deposits to the fund described in this paragraph are in addition to the payments provided for in the Note.

18.     Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

19.     In case any one or more of the provisions contained in this deed of trust shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, to the extent that the unenforceability does not destroy the basis of the bargain among the parties to this deed of trust, such invalidity, illegality, or unenforceability shall not affect any other provision of this deed of trust, and this deed of trust shall be construed as if the invalid, illegal, or unenforceable provision had never been included in this deed of trust.

20.     The term *Lender* includes any mortgage servicer for Lender.

21.     Grantor represents that this deed of trust and the Renewal and Extension Promissory Note are given for the following purposes:

1. To renew and extend the principal balance of One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00) that Borrower owes on a prior promissory note in the original principal amount of One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00), which is dated on or about September 9, 2011, executed by 4709 Incorporated, d/b/a Midtown Live, a Texas corporation, and payable to the order of Pride of Austin High Yield Fund I, LLC. That prior note is more fully described in and secured by a lien on the Property that was granted by the Borrower in a Deed of Trust, Security Agreement, and Assignment of Rents, which is dated September 9, 2011, and recorded under document number 2011137642 in the Official Public Records of Travis County, Texas.

2. To provide evidence of the Borrower's promise to repay an additional One Hundred Thirty-Six Thousand Nine Hundred Fifty-Six and 52/100 Dollars ($136,956.52) loaned by the

9

Lender to the Borrower. The Renewal and Extension Promissory Note supplements the Commercial Construction Loan Agreement between the Lender and the Borrower that is described in this deed of trust.

Grantor acknowledges that the lien securing the prior note described above is valid; that that lien subsists against the Property; and that by this Renewal and Extension Deed of Trust, Security Agreement, and Assignment of Rents that lien will be renewed and extended in full force to secure the payment of the Renewal and Extension Promissory Note.

**E.    Construction Loan Mortgage**

1.    This deed of trust is a "construction mortgage" within the meaning of section 9.334 of the Texas Business and Commerce Code. The liens and security interests created and granted by this deed of trust secure an obligation incurred for the construction of improvements on land, including the acquisition cost of the land.

2.    Grantor agrees to comply with the covenants and conditions of the commercial construction loan agreement, if any, executed in connection with the Note and this deed of trust. All advances made by Lender under the commercial construction loan agreement will be indebtedness of Grantor secured by the liens created by this deed of trust, and such advances are conditioned as provided in the commercial construction loan agreement.

3.    All amounts disbursed by Lender before completion of the improvements to protect the security of this deed of trust up to the principal amount of the Note will be treated as disbursements under the commercial construction loan agreement. All such amounts will bear interest from the date of disbursement at the rate stated in the Note, unless collections from Grantor of interest at that rate would be contrary to applicable law, in which event such amounts will bear interest at the rate stated in the Note for matured, unpaid amounts and will be payable on notice from Lender to Grantor requesting payment.

4.    From time to time as Lender deems necessary to protect Lender's interests, Grantor will, on request of Lender, execute and deliver to Lender, in such form as Lender directs, assignments of any and all rights or claims that relate to the construction of improvements on the Property.

5.    In case of breach by Grantor of the covenants and conditions of the construction loan agreement, Lender, at its option, with or without entry on the Property, may (a) invoke any of the rights or remedies provided in the construction loan agreement, (b) accelerate the amounts secured by this deed of trust and invoke the remedies provided in this deed of trust, or (c) do both.

6.    If, after commencement of amortization of the Note, the Note and this deed of trust are sold by Lender, after the sale the commercial construction loan agreement will cease to be a part of this deed of trust, and Grantor will not assert any right of setoff, counterclaim, or other claim or defense arising out of or in connection with the commercial construction loan agreement

against the obligations of the Note and this deed of trust.

> 4709 INCORPORATED,
> D/B/A MIDTOWN LIVE

> By: _____
> Selena Cash, Director and President

### Acknowledgment

STATE OF TEXAS                    §
                                  §
COUNTY OF TRAVIS                  §

This instrument was acknowledged before me on January \10\ , 2012 by Selena Cash, as a director and the president of 4709 Incorporated, d/b/a Midtown Live, a Texas corporation, on behalf of that corporation.

_____
Notary Public, State of Texas

AFTER RECORDING, RETURN TO:

```
LINDA ASHLEY HESTER
Notary Public, State of Texas
My Commission Expires
July 07, 2015
```

Bruce R. Hardesty
1411 West Ave Ste 100
Austin TX 78701-1537

## FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

*Dana DeBeauvoir*

Jan 11, 2012  02:19 PM    2012004604
HAYWOODK: $56.00
Dana DeBeauvoir, County Clerk
Travis County  TEXAS

34-1 Donor's Claim - Filed 07/27/24 - Main Document Re: Exhibit - Compiled
Exhibits 1 - 22 Pg 228 of 330

## *MODIFICATION AND EXTENSION AGREEMENT*

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY  BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**Date:** January 3 1, 2013

**Holder of Note and Lien:**  PRIDE OF AUSTIN HIGH YIELD FUND I, LLC

**Holder's Mailing Address:**  401 Congress Ave, Suite 1540, Austin, Travis County, TX 78701-3851

**Obligor:**  4709 INCORPORATED, d/b/a MIDTOWN LIVE, a Texas corporation

**Obligor's Mailing Address:**  7602 Brookhollow Cv, Austin, Travis County, TX 78752-2103

**Note:**

      **Date:**  January 9, 2012

      **Original principal amount:**  $1,236,956.52

      **Maturity Date:**  February 1, 2013

**Unpaid Principal and Interest on Note:**  $1,360,214.57

**Lien Documents:**  Deed of Trust dated January 10, 2012, executed by 4709 INCORPORATED, d/b/a MIDTOWN LIVE, a Texas corporation, to BRUCE R. HARDESTY, Trustee, for the benefit of PRIDE OF AUSTIN HIGH YIELD FUND I, LLC, recorded on January 11, 2012 in County Clerk's File No. 2012004604, Official Public Records, Travis County, Texas.

**Property (including any improvements):**  Lot 2, RESUBDIVISION OF LOT 11, REAGAN HILL, Travis County, Texas, according to the map or plat thereof, recorded in Volume 92, Page 65, Plat Records, Travis County, Texas.

**Extended Maturity Date of Note:**  January 1, 2014

**Modified Terms:**  Interest accrues at the annual Interest Rate of 12.9% on the unpaid balance and is payable monthly beginning March 1, 2013, and continuing on the same day of each month until Extended Maturity Date, when all principal and unpaid interest will be fully due and payable.

      The Lien described herein is renewed as a first and superior lien and the second lien indebtedness payable to JOHN HOBERMAN and SUSAN HOBERMAN remains second and inferior to the Lien evidenced hereby.

The Note is secured by liens against the Property. Whether Obligor is primarily liable on the Note or not, Obligor nevertheless agrees to pay the Note and comply with the obligations expressed in the Lien Documents.

For value received, Obligor renews the Note and promises to pay to the order of Holder of Note and Lien, according to the Modified Terms, the Unpaid Principal and Interest on Note. All unpaid amounts are due by the Extended Maturity Date of Note. Obligor also extends the liens described in the Lien Documents.

The Note and Lien Documents continue as written, except as provided in this agreement.

Obligor warrants to Holder of Note and Lien that the Note and the Lien Documents, as modified, are valid and enforceable and represents that they are not subject to rights of offset, rescission, or other claims.

Guarantor affirms the extension of the Note and extends Guarantor's obligations as described in Guaranty dated January 9, 2012.

When the context requires, singular nouns and pronouns include the plural.

**Obligor**

4709 INCORPORATED, d/b/a MIDTOWN LIVE, a Texas corporation

SELENA CASH, Director and President

**Guarantor**

SELENA CASH

**Holder**

PRIDE OF AUSTIN HIGH YIELD FUND I, LLC, a Texas limited liability company
By: PRIDE OF AUSTIN CAPITAL PARTNERS, LLC, a Texas limited Liability company, its Manager

DAVID F. OWEN, Manager

Page 2 of 3

**STATE OF TEXAS**  §

§

**COUNTY OF TRAVIS**  §

This instrument was acknowledged before me on January 31, 2013, by SELENA CASH, Director and President, of 4709 INCORPORATED, d/b/a MIDTOWN LIVE, a Texas corporation, on behalf of said corporation.

_____
Notary Public, State of Texas
My commission expires: _____

**STATE OF TEXAS**  §

§

**COUNTY OF TRAVIS**  §

This instrument was acknowledged before me on January 31, 2013, by SELENA CASH.

_____
Notary Public, State of Texas
My commission expires: _____

**STATE OF TEXAS**  §

§

**COUNTY OF TRAVIS**  §

This instrument was acknowledged before me on January 31, 2013, by DAVID F. OWEN, Manager of PRIDE OF AUSTIN CAPITAL PARTNERS, LLC, a Texas limited Liability Company, Manager of PRIDE OF AUSTIN HIGH YIELD FUND I, LLC, a Texas limited liability company, on behalf of said company.

_____
Notary Public, State of Texas
My commission expires: July 07, 2015

LINDA ASHLEY HESTER
Notary Public, State of Texas
My Commission Expires
July 07, 2015

Page 3 of 3

# EXHIBIT 15

**Proof of Claim No. 10 in 4709 Incorporated's 2014 Bankruptcy Case**

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT   WESTERN DISTRICT OF TEXAS | | **PROOF OF CLAIM** |
|---|---|---|

| Name of Debtor: **4709 Incorporated** | Case Number: **14-10340** | |
|---|---|---|

*NOTE: Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property): **John W. Hoberman** | **COURT USE ONLY** |
|---|---|

Name and address where notices should be sent:
**7801 Chimney Corners**
**Austin, TX  78731**

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number:  _____
*(if known)*

Telephone number:  **(512) 673-2021**     email:**finderfixer@sbcglobal.net**

Filed on:  _____

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:               email:

**1. Amount of Claim as of Date Case Filed:**        $162,653.40

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim.  Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**   Money loaned
(See instruction #2)

| **3. Last four digits of any number** by which creditor identifies debtor:  _____ | **3a. Debtor may have scheduled account as:** (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** (See instruction #3b) |
|---|---|---|

**4. Secured Claim**   (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$12,653.40

**Nature of property or right of setoff:**   ☑ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**   Lot 2, Resub. of Lot 11, Reagan Hill, Travis Co.

Basis for perfection:
Deed of Trust Securing the Note

**Value of Property:**      $1,353,090.00

**Amount of Secured Claim:**   $162,653.40

**Annual Interest Rate:**  _____  ☐ Fixed  or  ☐ Variable
(when case was filed)

**Amount Unsecured:**   $0.00

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier - 11 U.S.C. §507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

Amount entitled to priority:

_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a)(____).

*Amounts are subject to adjustment on 4/1/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits:**   The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10 (Official Form 10) (04/13)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☑ I am the creditor.　　☐ I am the creditor's authorized agent.　　☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)　　☐ I am a guarantor, surety, indorser, or other codebtor (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:　John W. Hoberman
Title:
Company:
Address and telephone number (if different from notice address above):
**7801 Chimney Corners**
**Austin, TX 78731**

(Signature) _____ John W. Hober _____　7-28-17　(Date)

Telephone number: **512-673-2021**　　email: finderfixer@sbcglobal.net

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien

documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicers as the company. Criminal penalties apply for making a false statement on a proof of claim.

B 10 (Official Form 10) (04/13)

| _____DEFINITIONS_____ | | _____INFORMATION_____ |

**Debtor**

A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**

A creditor is a person, corporation, or other entity to whom the debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. § 101(10).

**Claim**

A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. § 101(5). A claim may be secured or unsecured.

**Proof of Claim**

A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. § 506(a)**

A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**

An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507(a)**

Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**

Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**

To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**

Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

4709 Incorporated

Case No. 14-10340

## **OTHER CHARGES INCLUDED IN THE CLAIM**

Interest charged for March, 2014     $1,880.00

Legal fees – Chris Benjamin      10,273.40

Bankruptcy attorney fee       500.00

                         _____

Total other charges       $12,653.40

## REAL ESTATE LIEN NOTE

**DATE:**     June 5, 2012

**MAKER:**     4709 INCORPORATED dba MIDTOWN LIVE

**MAKER'S MAILING ADDRESS:**

>   7602 Brookhollow Cove
>   Austin, Texas 78752

**PAYEE:**     JOHN HOBERMAN and SUSAN HOBERMAN

**PLACE FOR PAYMENT:**

>   7801 Chimney Corners
>   Austin, Texas 78731

**PRINCIPAL AMOUNT:**     ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,000.00)

**ANNUAL INTEREST RATE ON UNPAID PRINCIPAL FROM DATE:**

>   A fixed rate of fifteen percent (15.0%).

**ANNUAL INTEREST RATE ON MATURED, UNPAID AMOUNTS:**

>   Highest interest rate allowed by applicable law.

**TERMS OF PAYMENT** (principal and interest):

>   The principal shall be due and payable two years after the date hereof, and interest shall be payable monthly as it accrues, on the first day of each month, beginning August 1, 2012 and continuing regularly thereafter.

>   Payment will be applied first to accrued interest and other non-principal amounts due and owing pursuant to this Note or a related document, then to reduction of principal.

**SECURITY FOR PAYMENT:**



EXHIBIT

*B*

Deed of Trust of even date herewith, executed by Maker, to ROBERT E. BLACK, Trustee, upon the following property:

Lot 2, RESUBDIVISION of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 92, Page(s) 65 of the Plat Records of Travis County, Texas.

Maker promises to pay to the order of Payee at the place for payment and according to the terms of payment the principal amount plus interest at the rates stated above. All unpaid amounts shall be due by the final scheduled payment date.

If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues after Payee gives Maker notice of the default and the time within which it must be cured, as may be required by law or by written agreement, then Payee may declare the unpaid principal balance and earned interest on this note immediately due. Maker and each surety, endorser, and guarantor waive all demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law.

If this note or any instrument securing or collateral to it is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Maker shall pay Payee all costs of collection and enforcement, including reasonable attorney's fees and court costs, in addition to other amounts due.

Interest on the debt evidenced by this note shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. However, prior to any such credit or refund, the total of all consideration which constitutes interest under applicable law that is contracted for, charged or received, shall be amortized, prorated, allocated and spread through the entire period that the indebtedness evidenced by this note is outstanding to the extent possible without exceeding the maximum lawful rate in effect from time-to-time during such period. This provision shall control every other provision of all agreements between the undersigned and the holder hereof.

Each Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

Interest shall be computed on the basis of a year of three hundred sixty (360) days, and accrued on the number of days funds are actually outstanding.

2

Maker reserves the right to prepay this Note in any amount at any time prior to maturity. All prepayments shall be applied to the installments last falling due under the terms hereof.

**Late Charge**. If any payment or installment becomes overdue for more than ten (10) days, at Payee's option, five percent (5%) of the overdue payment, with a minimum of $25.00, may be charged in order to defray the expense of handling the delinquent payment.

**This loan is payable in full on or before two years after date hereof. At maturity you, as Borrower, must repay the entire principal balance of the loan and unpaid interest then due. The Lender is under no obligation to refinance the loan at that time. You will, therefore, be required to make payments out of other assets that you might own, or you will have to find a Lender, which may be the Lender you have the loan with, willing to lend you the money. If you refinance this loan at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain refinancing from the same Lender.**

4709 INCORPORATED dba MIDTOWN LIVE

By

SELENA CASH, Its President

3

ELECTRONICALLY RECORDED          2012173363
                                    TRV      7     PGS

## DEED OF TRUST

"NOTICE OF CONFIDENTIALITY RIGHTS:
IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL
OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT
TRANSFERS ANY INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR
RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR
YOUR DRIVER'S LICENSE NUMBER."          2430003343

**DATE:**      June 5, 2012

**GRANTOR:** 4709 INCORPORATED dba MIDTOWN LIVE

**GRANTOR'S MAILING ADDRESS:**

      7602 Brookhollow Cove
      Austin, Travis County, Texas 78752

**TRUSTEE:** ROBERT E. BLACK

**TRUSTEE'S MAILING ADDRESS:**

      500 W. 16th Street, Suite 120
      Austin, Travis County, Texas 78701

**LENDER:** JOHN HOBERMAN and SUSAN HOBERMAN

**LENDER'S MAILING ADDRESS:**

      7801 Chimney Corners
      Austin, Travis County, Texas 78731

**NOTE(S):**

      Date:  EVEN DATE HEREWITH

      Original Principal Amount:  $150,000.00

      Borrower:  GRANTOR

**EXHIBIT**
C

STATE OF TEXAS            §
                         §
COUNTY OF _TRAVIS___      §

This instrument was acknowledged before me on the ___5th___ day of ___June_____, 2012, by Selena Cash, as President of 4709 Incorporated dba Midtown Live.



ROBERT EARL BLACK
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
04-29-2014

_____
NOTARY PUBLIC

**AFTER RECORDING RETURN TO:**

AUSTIN TITLE COMPANY
901 Cypress Creek Road, Suite 204
Cedar Park, TX 78613

**PREPARED IN THE LAW OFFICE OF:**

ROBERT E. BLACK
500 W. 16th Street, Suite 120
Austin, Texas 78701
(512) 477-1964

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS
October 12 2012 03:30 PM
FEE: $ 40.00    2012173363

# DEED OF TRUST

"NOTICE OF CONFIDENTIALITY RIGHTS:
IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS ANY INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER." 2430003343

**DATE:**     June _5_ , 2012

**GRANTOR:** 4709 INCORPORATED dba MIDTOWN LIVE

**GRANTOR'S MAILING ADDRESS:**

> 7602 Brookhollow Cove
> Austin, Travis County, Texas 78752

**TRUSTEE:** ROBERT E. BLACK

**TRUSTEE'S MAILING ADDRESS:**

> 500 W. 16th Street, Suite 120
> Austin, Travis County, Texas 78701

**LENDER:** JOHN HOBERMAN and SUSAN HOBERMAN

**LENDER'S MAILING ADDRESS:**

> 7801 Chimney Corners
> Austin, Travis County, Texas 78731

**NOTE(S):**

> Date: EVEN DATE HEREWITH
>
> Original Principal Amount: $150,000.00
>
> Borrower: GRANTOR

Lender:       BENEFICIARY

Maturity Date:       TWO YEARS AFTER DATE HEREOF

**PROPERTY (including any improvements)**:

    Lot 2, RESUBDIVISION of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 92, Page(s) 65 of the Plat Records of Travis County, Texas.

**PRIOR LIEN (S)**:

    Deed of Trust recorded under Document No. 2011137642, Official Public Records of Travis County, Texas, securing a Note in the original principal sum of $1,100,000.00, executed by Grantor, and payable to the order of Pride of Austin High Yield Fund I, LLC.

Other Exceptions to Conveyance and Warranty:

    Easements, rights of way, and prescriptive rights, whether of record or not; All presently recorded instruments, other than liens and conveyances, that affect the Property.

    For value received and to secure payment of the Note, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Note and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

**Clauses and Covenants**

A.  **Grantor's Obligations**

Grantor agrees to:

1.  keep the Property in good repair and condition;
2.  pay all taxes and assessments on the Property before delinquency;
3.  defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;
4.  maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;
5.  obey all laws, ordinances, and restrictive covenants applicable to the Property;
6.  keep any buildings occupied as required by the Required Insurance Coverages;

    7.    if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

    8.    notify Lender of any change of address.

## B.    Lender's Rights

    1.    Lender may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

    2.    If the proceeds of the Note are used to pay any debt secured by prior liens, Lender is subrogated to all of the rights and liens of the holders of any debt so paid.

    3.    Lender may apply any proceeds received under the insurance policy either to reduce the Note or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the insurance proceeds available to Grantor for repairs.

    4.    Notwithstanding Note terms to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor under the Note or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender under the Note, to be applied to late charges, principal, or interest in the order Lender in it's discretion determines.

    5.    If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

    6.    If there is a default on the Note or if Grantor fails to perform any of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may:

    a.    declare the unpaid principal balance and earned interest on the Note immediately due;

    b.    direct Trustee to foreclose this lien, in which case Lender or Lender's agent will give notice of the foreclosure sale as provided by the Texas Property Code as then in effect; and

    c.    purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Note.

    7.    Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

## C.    Trustee's Rights and Duties

If directed by Lender to foreclose this lien, Trustee will:

    1.    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

    2.    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Liens and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by

Trustee;

    3.    from the proceeds of the sale, pay, in this order:

        a.    expenses of foreclosure, including a reasonable commission to Trustee;

        b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

        c.    any amounts required by law to be paid before payment to Grantor; and

        d.    to Grantor, any balance.

    4.    be indemnified by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## D.    General Provisions

    1.    If any of the Property is sold under this deed of trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

    2.    Recitals in any trustee's deed conveying the Property will be presumed to be true.

    3.    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

    4.    This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the Property is released.

    5.    If any portion of the Note cannot be lawfully secured by this deed of trust, payments shall be applied first to discharge that portion.

    6.    Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees, Lender will either release any remaining sums to Grantor or apply such amounts to reduce the Note. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

    7.    Grantor assigns to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default under the Note or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Note and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due under the Note and deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Note or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender shall apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations under the Note and this deed of

trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

8.      Interest on the debt secured by this deed of trust shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. However, prior to any such credit or refund, the total of all consideration which constitutes interest under applicable law that is contracted for, charged or received, shall be amortized, prorated, allocated and spread through the entire period that the indebtedness evidenced by this note is outstanding to the extent possible without exceeding the maximum lawful rate in effect from time-to-time during such period. This provision overrides other provisions in this and all other instruments concerning the debt.

9.      In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.      When the context requires, singular nouns and pronouns include the plural.

11.      The term *Note* includes all extensions and renewals of the Note and all amount secured by this deed of trust.

12.      This deed of trust binds, benefits, and may be enforced by the successor in interest of all parties.

13.      If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

14.      Grantor and each surety, endorser, and guarantor of the Note waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

15.      Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

16.      If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

17.      Grantor represents that this deed of trust and the Note are given for the following purposes, and/or with the following covenants, conditions and terms:

      a.      Lender may remedy any default, without waiving same, or may waive any default without waiving any prior or subsequent default.

      b.      Lender may declare the debt secured by this deed of trust immediately payable and invoke any remedies provided in this deed of trust for default if Grantor transfers any of the Property to a person who is not a permitted transferee without Lenders consent or, if Grantor is not a natural person, if any person owning a direct or indirect interest in Grantor transfers such interest to a person that is not a "permitted transferee" without Lender's consent. "Permitted transferee" for a natural person means that person's spouse or children, any trust for that person's benefit or the benefit of the person's spouse or children, any trust for that person's benefit or the

benefit of the person's spouse or children, or any corporation, partnership, or limited liability company in which the direct and beneficial owner of all the equity interest is a natural person or that person's spouse or children or any trust for the benefit of them; and the heirs, beneficiaries, executors, administrators, or personal representatives of a natural person on the death of that person or on the incompetency or disability of that person for purposes of the protection and management of that person's assets; and for a person that is not a natural person, any other person controlling, controlled by, or under common control with that person.

c. In the event any portion of the indebtedness herein described cannot be lawfully secured by the liens herein given and created upon the herein described Property, it is agreed that the first payments made on said indebtedness shall be applied to the discharge of that portion of said indebtedness.

d. Hazardous Substances. Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Grantor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of quantities of Hazardous Substances that are generally recognized to be appropriate to normal uses appropriate to the Property and to maintenance of the Property.

Grantor shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantor has actual knowledge. If Grantor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Grantor shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

4709 INCORPORATED dba MIDTOWN LIVE

By: _____
SELENA CASH, Its President

STATE OF TEXAS      §
                    §
COUNTY OF *TRAVIS*    §

      This instrument was acknowledged before me on the **5th** day of **June**, 2012, by Selena Cash, as President of 4709 Incorporated dba Midtown Live.



_____
NOTARY PUBLIC

**AFTER RECORDING RETURN TO:**

        AUSTIN TITLE COMPANY
        901 Cypress Creek Road, Suite 204
        Cedar Park, TX 78613

**PREPARED IN THE LAW OFFICE OF:**

ROBERT E. BLACK
500 W. 16th Street, Suite 120
Austin, Texas 78701
(512) 477-1964

copy for back up

McLeroy, Alberts & Benjamin, P.C.
Attorneys at Law
608 West 12th Street
Austin, Texas 78701-1730
(512) 472-7893

Mr. John Hoberman
7801 Chimney Corners
Austin TX 78731

July 14, 2014

In Reference To:     File No. 14-0042
                     Matters Related to 4709 Incorporated Bankruptcy (Cameron
                     Road)

Invoice #      31075

       Professional services

3/3/14- Follow up on property taxes owed (personal and real). Follow up calls to client and Jeff
        Kelly.
      - Work on property purchase matters. Follow up call to client regarding          NO CHARGE
        pending bankruptcy. Call to counsel for Pride of Austin.
3/4/14- Follow up with clients. Want to stop expenses as best we can in light of        NO CHARGE
        where we are.
3/5/14- Review online bankruptcy docket report on 4709 Inc bankruptcy. Advise          NO CHARGE
        client regarding timing for Sec. 341 Meeting of Creditors.
3/7/14- Review status of bankruptcy filings. Call to Jeff Kelly regarding same.        NO CHARGE
3/10/14- Follow up on bankruptcy matter. Call to Jeff Kelly regarding status.          NO CHARGE
3/12/14- Work on bakruptcy issues. Call to Jeff Kelly. New attorneys are involved. Call to client
         regarding 341 hearing and new counsel issues.
3/20/14- Call from Frank Lyon. He is handling bankrutcy for 4709 Incorporated. Review
         background matters with him and where we go from here.
3/25/14- Work on matters related to pending 341 hearing. Review bankrutcy docket sheet.
3/31/14- Preparations for 341 hearing. Call to client regarding logistics. Review docket sheet for
         new filings.
4/1/14- Pre-341 meeting with John Hoberman regarding status.                           NO CHARGE
      - Attempt to attend 341 hearing at Federal Courthouse with John Hoberman. Turned out
        it had been rescheduled even though we had no notice and nothing noted in Docket.

new charges  2688.25
previous bal  $ 7585.25
              $ 10,273.50

Mr. John Hoberman

4/1/14- Follow up with court personnel, US Attorney's Office and counsel for debtor regarding hearing matters and rescheduling thereof.
- Call to counsel for the Cashes regarding hearing and use of cash collateral issues.
4/2/14- Follow up on 341 Hearing matters. Call from Catherine Lennox regarding same. Review pleadings filed. They have no cooperation from Pride of Austin.
- Work on bankrutpcy issues. Call to client regarding status.              NO CHARGE
- Follow up calls and emails to and from Frank Lyon. They still want John Hoberman to buy the property. They believe its the best bet for the bankruptcy resolution.
4/3/14- Set up time to talk further with Frank Lyon regarding pending bankruptcy. NO CHARGE
4/7/14- Call to Frank Lyon regarding pending bankruptcy and desired goals. We can talk further at 341 hearing tomorrow. Does not expect Pride of Austin to budge. Eric Taube is tough negotiator.
4/8/14- Pre-341 meeting conference with client. Travel to and from 341 hearing.    NO CHARGE
- Attend 341 Creditors Meeting with client. Work with counsel for debtor and Pride of Austin. Listen to debtor questioning by all concerned. Discussions with all counsel regarding how to proceed from here.
- Review updated bankruptcy filings prior to 341 hearing.
4/9/14- Work on issues related to 4709 Incorporated bankruptcy. Attempt to verify pay-off on first lien. Emails and calls to Frank Lyon and Eric Taube. Review figures supplied. Request clarification. Forward information to client.
- Follow up calls to Frank Lyon regarding pay-off figures. Review options based on loan amounts. Increases are due to the fact that during rebuild phase they borrowed money from Pride to pay Pride. There was no revenue until operations could begin.
4/10/14- Follow up with Frank Lyon regarding needed pay-off to Pride. Request confirmation. Emails to and from Frank Lyon regarding same. Call from C. Lennox regarding findings.
4/11/14- Extended telephone conference with Frank Lyon regarding 4709 Incorporated bankruptcy. Review options moving forward. Still want to consider all options. Have someone looking for a new loan to make everyone happy. He will keep us posted.
4/14/14- Telephone call to John Hoberman. Ran through status. Deal is as we envisioned... not a loan. Barry is soon to receive the pay-out figure broken down from Pride. He is prepared to share with us. We discussed possible usury implications based on shift from 1.1 mil to 1.4 mil. Told him I would communicate with the attorneys for 4709 and run this all by them.
- Call to John Hoberman regarding moving forward under old deal structure. He is willing to do so but not as a loan deal. Told him I would get with Frank Lyon and report our position.
- Call and email to Frank Lyon regarding possible deal structuring.
4/15/14- Follow up with Frank Lyon and Cleve Burke on bankruptcy status and efforts to move forward. Follow up email to Cleve Burke regarding pay-off information.

Mr. John Hoberman

4/16/14- Work with Eric Taube and Frank Lyon on increases in pay-off and understanding
    thereof. Calls and emails to and from counsel regarding same. Call to client with
    information establishing claim of Pride of Austin.

   - Work on bakruptcy matters. Review additional filings and docket sheet.  NO CHARGE

4/17/14- Work with Frank Lyon. Told him we can proceed if their loan connection does not come
    through. Indicated client will need to have his concerns addressed before we do though.

4/22/14- Follow up with Frank Lyon on pending bankruptcy. They are using a 'friend' (Barry) to
    try to secure financing. They are expecting results and they are hoping results will be
    soon. Pride is holding off for the time being.

   - Follow up on bankrutcy matter. Review docket sheet.  NO CHARGE

4/28/14- Telephone call from Johnny LaTouf. Ran through all options. He has a call with Barry at
    10:30 tomorrow to go over where we stand.  Outlined what Frank Lyon and I had
    already discussed.

   - Follow up with Frank Lyon regarding status of bankrutcy and possible sale to client.
   ·Explored numbers and timing. He requested that I check with client on numbers to move
    forward.

4/29/14- Telephone conference with John Hoberman regarding deal status. He will do 1.25 mil
    and not a penny beyond that and what he is already loaned to the biz. Ran through
    various structuring issues. He is not happy with how this has progressed.

   - Follow up with Frank Lyon regarding client's position.

   - Telephone conference with Johnny Latouf regarding deal status, discussions with Barry,
    and how to proceed from here. He is confident they will go along with management
    change demands.

4/30/14- Follow up discussions with client and Frank Lyon regarding bankruptcy  NO CHARGE
    options to proceed.

|  | Amount |
|---|---|
| For professional services rendered | $2,667.50 |
| Additional charges: | |
| 4/4/14- Secretary of State; Web inquiry | 4.00 |
| 4/30/14- General Expenses (copies, postage, fax & scanning transmissions) | 16.75 |
| Total costs | $20.75 |
| Total amount of this bill | $2,688.25 |

McLeroy, Alberts & Benjamin, P.C.
Attorneys at Law
608 West 12th Street
Austin, Texas 78701-1730
(512) 472-7893

Mr. John Hoberman
7801 Chimney Corners
Austin TX 78731

July 14, 2014

In Reference To:     File No. 14-0004
Invoice #     31011     Matters Related to Purchase of Cameron Property

|  | Amount |
|---|---|
| Previous balance | $7,585.25 |
| Balance due | $7,585.25 |

Note to Our Clients --- Please note that this billing statement reflects BOTH MARCH's and APRIL's billing entries.  Any time entries billed AFTER APRIL will be billed on your next statement.  However, any payments or trust postings regarding your account will be current as of this statement date.  Thank you.

## **EXHIBIT 16**

**Proof of Claim No. 11 in 4709 Incorporated's 2014 Bankruptcy Case**

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT   WESTERN DISTRICT OF TEXAS | | **PROOF OF CLAIM** |
|---|---|---|

| Name of Debtor: **4709 Incorporated** | Case Number:<br>**14-10340** | |
|---|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**John W. Hoberman**

**COURT USE ONLY**

Name and address where notices should be sent:
**7801 Chimney Corners**
**Austin, TX  78731**

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____
*(if known)*

Filed on: _____

Telephone number:  **(512) 673-2021**      email:**finderfixer@sbcglobal.net**

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim.  Attach copy of statement giving particulars.

Telephone number:                    email:

**1. Amount of Claim as of Date Case Filed:**        $101,750.00

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**   **Money loaned**
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**
_____

**3a. Debtor may have scheduled account as:**
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
(See instruction #3b)

**4. Secured Claim**   (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$1,750.00

**Nature of property or right of setoff:**   ☑ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**   Lot 2, Resub. of Lot 11, Reagan Hill, Travis Co.

Basis for perfection:
**Deed of Trust Securing the Note**

**Value of Property:**      $1,353,090.00

**Amount of Secured Claim:**   $101,750.00

**Annual Interest Rate:** _____  ☐ Fixed  or  ☐ Variable
(when case was filed)

**Amount Unsecured:**      $0.00

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier - 11 U.S.C. §507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

Amount entitled to priority:

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. §507(a)(_____).

_____

*Amounts are subject to adjustment on 4/1/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits:**   The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10 (Official Form 10) (04/13)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☑ I am the creditor.  ☐ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  John W. Hoberman
Title:
Company:
Address and telephone number (if different from notice address above):
**7801 Chimney Corners**
**Austin, TX 78731**

(Signature)  _(signed)_  (Date) 7-28-14

Telephone number: **512-673-2021**    email: **finderfixer@sbcglobal.net**

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

---

### INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien

documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicers as the company. Criminal penalties apply for making a false statement on a proof of claim.

B 10 (Official Form 10) (04/13)

_____DEFINITIONS_____

**Debtor**

A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**

A creditor is a person, corporation, or other entity to whom the debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. § 101(10).

**Claim**

A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. § 101(5). A claim may be secured or unsecured.

**Proof of Claim**

A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. § 506(a)**

A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**

An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507(a)**

Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**

Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

_____INFORMATION_____

**Acknowledgment of Filing of Claim**

To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**

Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

4709 Incorporated

Case No. 14-10340

**OTHER CHARGES INCLUDED IN THE CLAIM**

Interest charged for March, 2014    $1,250.00

Bankruptcy attorney fee          500.00

                                _____

Total other charges         $1,750.00

# LOAN AGREEMENT

**DATE:**          September _5_ , 2013

**BORROWER:**       **4709 INCORPORATED dba MIDTOWN LIVE**

**LENDER:**          **SELF DIRECTED IRA SERVICES INC. CUSTODIAN FBO JOHN HOBERMAN IRA** _2013/4763_ .

**LOAN:**

          That certain loan from Lender to Borrower of even date herewith, in the original principal sum of $100,000.00.

**Escrow Notice**. Borrower is aware that it will be Borrower's responsibility to pay property taxes on Borrowers real estate each year and to keep Borrower's property adequately insured; said property being described in the Deed of Trust executed in connection with the promissory note evidencing this loan.

Borrower has been advised that Lender will not be escrowing for the taxes and insurance on Borrower's real estate loan. It is Borrower's responsibility to pay the taxes and insurance and furnish Lender with proof of payment each year.

**Collateral Insurance.** Borrower's credit agreement with Lender, which includes this notice, gives Lender a security interest in Borrower's collateral. Borrower is required to maintain insurance on this collateral in the amount at least equal to Borrower's indebtedness. Borrower agrees to purchase the collateral insurance from an insurer authorized to do business in Texas or an eligible surplus lines insurer. Borrower will name Lender as loss payee under the policy. Borrower shall be required to deliver to Lender a copy of the collateral protection insurance policy and proof of payment of premiums. If Borrower fails to meet any of these requirements, Lender may obtain collateral protection insurance on Lenders behalf. If Lender purchases insurance for the collateral, Borrower will be responsible for the cost of that insurance, including interest and any other charges incurred by Lender in connection with the placement of collateral protection insurance.

**Balloon Notice.** This loan is payable in full on the maturity date. At maturity, Borrower must repay the entire principal balance of the loan and unpaid interest then due. Lender is under no obligation to refinance this loan at that time. Borrower will, therefore, be required to make payment out of other assets that Borrower owns, or Borrower will have to find another Lender willing to lender Borrower the money. If Borrower refinances this loan at maturity, Borrower may have to pay some or all of the closing costs normally associated with a new loan even if Borrower obtains financing from the same Lender.

**Errors and Omissions**. In the event any of the documents evidencing or securing the debt on the above referenced loan misrepresents or inaccurately reflects the truth and the



EXHIBIT

_B_

correct terms and/or provisions of the loan and said mistake or inaccuracy is due to an error on the part of the Lender, Borrower, or clerical error, then in such event Borrower shall upon request by Lender and in order to correct such mistake or execute such new documents or initial corrected, original documents as Lender may deem necessary to remedy said errors or mistakes. Borrower(s) failure to initial or execute said documents as requested shall constitute default under the note evidencing the loan and Deed of Trust securing the loan.

**Statement Regarding Attorney's Fees**. In connection with the real property transaction you are closing today, a loan has been obtained to finance the purchase of certain real property. The Lender used the services of the Law Office of Robert E. Black to prepare various legal instruments and loan documents in connection with this transaction. Robert E. Black may have an ongoing "legal relationship" with the Lender. By signing below you are acknowledging that Robert E. Black has not represented you or given you any legal advice concerning any contract to sell and purchase the property, the condition of the property, the inspection of the property, any repair or improvement of the property, the legal instruments and loan documents executed in connection with the transaction, or the closing of the transaction itself.

**BUSINESS AND COMMERCE CODE SEC. 26.02 DISCLOSURES.** THIS WRITTEN LOAN AGREEMENT, INCLUDING THE NOTE, DEED OF TRUST AND RELATED DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**BORROWER:**

4709 INCORPORATED dba MIDTOWN LIVE

By: _____
SELENA CASH, Its President

**LENDER:**

SELF DIRECTED IRA SERVICES, INC.
CUSTODIAN FBO JOHN HOBERMAN IRA _____

By: _____
_____, Its _____

2

copy of
original
deed of trust

TRV    2013192673
7 PGS

# CORRECTION DEED OF TRUST

"**NOTICE OF CONFIDENTIALITY RIGHTS:**
IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL
OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT
TRANSFERS ANY INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR
RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR
YOUR DRIVER'S LICENSE NUMBER."

**EFFECTIVE DATE:**    September 5, 2013

**GRANTOR:**  4709 INCORPORATED dba MIDTOWN LIVE

**GRANTOR'S MAILING ADDRESS:**

> 7602 Brookhollow Cove
> Austin, Texas 78752

**TRUSTEE:**   ROBERT E. BLACK

**TRUSTEE'S MAILING ADDRESS:**

> 500 W. 16th Street, Suite 120
> Austin, Travis County, Texas 78701

**LENDER:**    SELF DIRECTED IRA SERVICES INC. CUSTODIAN FBO JOHN
> HOBERMAN IRA _████████████_____.

**LENDER'S MAILING ADDRESS:**

> 600 Congress Avenue, Ste. 400
> Austin, Texas 78701

**NOTE(S):**

> Date:  EVEN DATE HEREWITH

> Original Principal Amount:  $100,000.00

> Borrower:   GRANTOR

**EXHIBIT**

tabbies

C

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office
FEB 13 2014
Dana DeBeauvoir, County Clerk
By J. S. WILLIAMS

Lender:    BENEFICIARY

Maturity Date:    THREE YEARS AFTER DATE HEREOF

## PROPERTY (including any improvements):

Lot 2, RESUBDIVISION of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 92, Page(s) 65 of the Plat Records of Travis County, Texas.

## PRIOR LIEN(S):

Deed of Trust recorded under Document No. 2011137642, Official Public Records of Travis County, Texas, securing a Note in the original principal sum of $1,100,000.00 executed by Grantor and payable to the order of Pride of Austin High Yield Fund I, LLC. Deed of Trust recorded among the Real Property Records of Travis County, Texas, securing a Note in the original principal sum of $100,000.00, executed by Grantor, dated June 5, 2012, and payable to the order of John Hoberman and Susan Hoberman

Other Exceptions to Conveyance and Warranty:

Easements, rights of way, and prescriptive rights, whether of record or not; All presently recorded instruments, other than liens and conveyances, that affect the Property.

For value received and to secure payment of the Note, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Note and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

### Clauses and Covenants

A.    **Grantor's Obligations**

Grantor agrees to:

1.    keep the Property in good repair and condition;
2.    pay all taxes and assessments on the Property before delinquency;
3.    defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;
4.    maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required

I, Dana Debeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on
FEB 1 3 2014
Dana Debeauvoir County Clerk
By Deputy
J. S. WILLIAMS

           Insurance Coverages;

5.     obey all laws, ordinances, and restrictive covenants applicable to the Property;

6.     keep any buildings occupied as required by the Required Insurance Coverages;

7.     if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8.     notify Lender of any change of address.

B.   **Lender's Rights**

1.     Lender may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

2.     If the proceeds of the Note are used to pay any debt secured by prior liens, Lender is subrogated to all of the rights and liens of the holders of any debt so paid.

3.     Lender may apply any proceeds received under the insurance policy either to reduce the Note or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the insurance proceeds available to Grantor for repairs.

4.     Notwithstanding Note terms to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor under the Note or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender under the Note, to be applied to late charges, principal, or interest in the order Lender in it's discretion determines.

5.     If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.     If there is a default on the Note or if Grantor fails to perform any of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may:

      a.    declare the unpaid principal balance and earned interest on the Note immediately due;

      b.    direct Trustee to foreclose this lien, in which case Lender or Lender's agent will give notice of the foreclosure sale as provided by the Texas Property Code as then in effect; and

      c.    purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Note.

7.     Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

C.   **Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will:

1.     either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on — FEB 1 3 2014

Dana DeBeauvoir, County Clerk
By Deputy. S. WILLIAMS

2.    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Liens and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.    from the proceeds of the sale, pay, in this order:

    a.    expenses of foreclosure, including a reasonable commission to Trustee;

    b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

    c.    any amounts required by law to be paid before payment to Grantor; and

    d.    to Grantor, any balance.

4.    be indemnified by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

### D.   General Provisions

1.    If any of the Property is sold under this deed of trust, Grantor shall immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor shall become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.    Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.    This lien shall remain superior to liens later created even if the time of payment of all or part of the Note is extended or part of the Property is released.

5.    If any portion of the Note cannot be lawfully secured by this deed of trust, payments shall be applied first to discharge that portion.

6.    Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees, Lender will either release any remaining sums to Grantor or apply such amounts to reduce the Note. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.    Grantor assigns to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default under the Note or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Note and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due under the Note and deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Note or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under



I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on

Dana DeBeauvoir County Clerk
By Deputy

FEB 1 3 2014

J. S. WILLIAMS

this paragraph without taking possession of the Property. Lender shall apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations under the Note and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

8.    Interest on the debt secured by this deed of trust shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. However, prior to any such credit or refund, the total of all consideration which constitutes interest under applicable law that is contracted for, charged or received, shall be amortized, prorated, allocated and spread through the entire period that the indebtedness evidenced by this note is outstanding to the extent possible without exceeding the maximum lawful rate in effect from time-to-time during such period. This provision overrides other provisions in this and all other instruments concerning the debt.

9.    In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.    When the context requires, singular nouns and pronouns include the plural.

11.    The term *Note* includes all extensions and renewals of the Note and all amount secured by this deed of trust.

12.    This deed of trust binds, benefits, and may be enforced by the successor in interest of all parties.

13.    If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

14.    Grantor and each surety, endorser, and guarantor of the Note waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

15.    Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

16.    If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

17.    Grantor represents that this deed of trust and the Note are given for the following purposes, and/or with the following covenants, conditions and terms:

    a.    Lender may remedy any default, without waiving same, or may waive any default without waiving any prior or subsequent default.

    b.    Lender may declare the debt secured by this deed of trust immediately payable and invoke any remedies provided in this deed of trust for default if Grantor transfers any of the Property to a person who is not a permitted transferee without Lenders consent or, if Grantor is not a natural person, if any person owning a direct or indirect interest in Grantor transfers such interest to a person that is not a "permitted transferee" without Lender's

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on FEB 1 3 2014

Dana DeBeauvoir, County Clerk
By Deputy
J. S. WILLIAMS

consent. "Permitted transferee" for a natural person means that person's spouse or children, any trust for that person's benefit or the benefit of the person's spouse or children, any trust for that person's benefit or the benefit of the person's spouse or children, or any corporation, partnership, or limited liability company in which the direct and beneficial owner of all the equity interest is a natural person or that person's spouse or children or any trust for the benefit of them; and the heirs, beneficiaries, executors, administrators, or personal representatives of a natural person on the death of that person or on the incompetency or disability of that person for purposes of the protection and management of that person's assets; and for a person that is not a natural person, any other person controlling, controlled by, or under common control with that person.

c. In the event any portion of the indebtedness herein described cannot be lawfully secured by the liens herein given and created upon the herein described Property, it is agreed that the first payments made on said indebtedness shall be applied to the discharge of that portion of said indebtedness.

d. Hazardous Substances. Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Grantor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of quantities of Hazardous Substances that are generally recognized to be appropriate to normal uses appropriate to the Property and to maintenance of the Property.

Grantor shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantor has actual knowledge. If Grantor learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Grantor shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

18. This is a correction document given in place of and to correct a Deed of Trust recorded under Document No. 2013166967, Official Public Records of Travis County, Texas. By mistake, the prior Deed of Trust indicated that the Lender was John Hoberman instead of the true and correct Lender as set forth above. This document is given in place of and to correct the prior

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on FEB 1 3 2014

Dana DeBeauvoir, County Clerk
By Deputy W. B. WILLIAMS

document, is effective on September 5, 2013, and except as corrected and modified herein confirms the prior document in all respects.

4709 INCORPORATED dba MIDTOWN LIVE

By: _____

SELENA CASH, Its President

STATE OF TEXAS      §
                           §
COUNTY OF _TRAVIS_     §

This instrument was acknowledged before me on the _23rd_ day of _September_, 2013, by Selena Cash, as President of 4709 Incorporated dba Midtown Live.



NOTARY PUBLIC

ROBERT EARL BLACK
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
-29-2014

ROBERT EARL BLACK
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
06-29-2014

AFTER RECORDING RETURN TO:

LAW OFFICE OF ROBERT E. BLACK
500 W. 16TH ST., STE. 120
AUSTIN, TX 78701

PREPARED IN THE LAW OFFICE OF:

ROBERT E. BLACK
500 W. 16th Street, Suite 120
Austin, Texas 78701
(512) 477-1964

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on FEB 1 3 2014

Dana DeBeauvoir County Clerk
By Deputy O.S. WILLIAMS

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS

Dana DeBeauvoir

Oct 22, 2013   03:07 PM     2013192673
CLINTONB: $50.00
Dana DeBeauvoir, County Clerk
Travis County TEXAS

## EXHIBIT 17

**Notice of Removal in Cash v. Sheridan et al. Adversary Proceeding**

THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-10355-tmd |
| | § | |
| CCS ASSET MANAGEMENT, INC., | § | |
| | § | |
| DEBTOR | § | CHAPTER 11 PROCEEDING |

---

| | | |
|---|---|---|
| ARLETHA CASH, Independent | § | |
| Executor of the Estate of | § | |
| Selena D. Cash, Deceased, | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | |
| ANTHONY L. SHERIDAN, | § | ADVERSARY NO. |
| WILLIAM SHERIDAN, | § | |
| LINDA SHERIDAN, | § | |
| CEAIRA C. SHERIDAN, | § | |
| CCS ASSET MANAGEMENT, INC., | § | |
| JOHN HOBERMAN and | § | |
| ALMAGEN LLC, | § | |
| *Defendants* | § | |

## NOTICE OF REMOVAL

Plaintiff, Arletha Cash, Independent Executor of the Estate of Selena D. Cash, pursuant to 28 U.S.C. §§1334 and 1452, Federal Rule of Bankruptcy Procedure 9027, and Local Rule of Bankruptcy Procedure 9027(b)(1), hereby files this Notice of Removal of Cause No. C-1-PB-19-002179, from the Probate Court of Travis County, Texas, where this action was commenced, to this Court and as grounds for such removal, states as follows:

1.     On November 13, 2019, Plaintiff filed her Original Petition in the Probate Court (the "State Court"), thus initiating the "State Court Lawsuit." The State Court Lawsuit names as Defendants Anthony L. Sheridan, William Sheridan, Linda Sheridan, Ceaira C. Sheridan, CCS Asset Management, Inc., John Hoberman and Almagen LLC.

2.       On May 3, 2021, (the "Petition Date"), the Debtor, CCS Asset Management, Inc., filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas, Austin Division.

3.       Plaintiff timely files this Notice of Removal within 90 days of the Petition Date pursuant to Federal Rule of Bankruptcy Procedure 9027(a)(2).

4.       The United States District Court for the Western District of Texas has original jurisdiction over this action pursuant to 28 U.S.C. §1334, and removal to this Bankruptcy Court is proper pursuant to 28 U.S.C. §§1334 and 1452 and Federal Rule of Bankruptcy Procedure 9027.

5.       Statement Pursuant to Federal Rule of Bankruptcy Procedure 9027(a)(1): Removal is proper pursuant to 28 U.S.C. §§1334 and 1452 because the issues raised in the State Court Lawsuit are core matters pursuant to, inter alia, 28 U.S.C. §157(b)(2)(A), (K) and (O). To the extent that any claim or cause of action in the State Court Lawsuit is deemed to be non-core, or it is otherwise determined that the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution, Plaintiff consents to the entry of final orders or judgments by the Court.

6.       The State Court Lawsuit was filed in Travis County, Texas. Pursuant to Federal Rule of Bankruptcy Procedure 9027 and 28 U.S.C. §§1334 and 1452, the United States Judicial District for the Western District of Texas, Austin Division, is the United States district and division embracing that county, and removal to this Bankruptcy Court is proper pursuant to 28 U.S.C. §1452 and Federal Rule of Bankruptcy Procedure 9027.

7.       A copy of the State Court Lawsuit Docket Sheet is attached as **Exhibit A**. Copies of the State Court Lawsuit pleadings have not been attached at this time, because such copies are voluminous. Such pleadings will be filed with the Court on a CD.

8.       As set forth in the attached Certificate of Service, Plaintiff has given written notice to all parties to the State Court Lawsuit, through their counsel, of the filing of this Notice of Removal. Furthermore, Movants will promptly file a copy of this Notice of Removal with the Clerk of the Probate Court of the State of Texas, County of Travis, the court from which the State Court

Lawsuit was removed.  In addition to the parties to the State Court Lawsuit, the U.S. Trustee is being served with this Notice of Removal.

WHEREFORE, Plaintiff hereby removes the civil action pending in Cause No. C-1-PB-19-002179, from the Probate Court of Travis County, Texas to this Court.

Respectfully submitted,

*/s/ Kemp W. Gorthey*
Kemp W. Gorthey
State Bar No. 08221275
Kendall L. Bryant
State Bar No. 24058660
Elizabeth von Kreisler
State Bar No. 24047273
THE GORTHEY LAW FIRM, PLLC
604 West 12th Street
Austin, Texas 78701
Tel: 512- 699-8006
Fax: 512-479-6417
Email: kemp@gortheylaw.com

-and-

C. Daniel Roberts
State Bar No. 16999200
C. DANIEL ROBERTS, P.C.
1602 E. Cesar Chavez
Austin, Texas 78702
Tel: 512-494 8448
Fax: 512-494 8712
Email: droberts@cdrlaw.net

ATTORNEYS FOR ARLETHA CASH

## CERTIFICATE OF SERVICE

By my signature above, I hereby certify that on July 27, 2021, a true and correct copy of the foregoing *Notice of Removal* was forwarded to counsel of record as follows:

*Via Email: lwoods@dwmrlaw.com*
Leonard W. Woods
DUGGINS WREN MANN & ROMERO, LLP
600 Congress Avenue, Suite 1900
P. O. Box 1149
Austin, Texas 78767-1149
-and-
*Via Email: service@kellylegalgroup.com*
Jeffrey S. Kelly
Keith McMahon
Christian A. Davila
THE KELLY LEGAL GROUP, PLLC
P.O. BOX 2125
Austin, Texas 78768-2125
ATTORNEYS FOR ANTHONY L. SHERIDAN,
WILLIAM SHERIDAN, LINDA SHERIDAN,
CEAIRA C. SHERIDAN and CCS ASSET MANAGEMENT, INC.

*Via Email: dbrenner@bajb.com*
David Brenner
BURNS ANDERSON JURY & BRENNER, L.L.P.
P. O. Box 26300
Austin, Texas 78755-0300
ATTORNEY FOR JOHN HOBERMAN
and ALMAGEN, LLC

*Via Email: anthony@icenoglefirm.com*
Anthony Icenogle
ICENOGLE & BOGGINS, PLLC
6907 Capital of Texas Hwy., Suite 220
Austin, Texas 78731
STATE COURT APPOINTED RECEIVER

*Via Email: rshannon@parkinslee.com*
R. J. Shannon
PARKINS LEE & RUBIO LLP
Pennzoil Place
700 Milam Street, Suite 1300
Houston, Texas 77002
ATTORNEY FOR CCS ASSET MANAGEMENT, INC.

Office of The United States Trustee
903 San Jacinto Blvd, Room 230
Austin, TX 78701

# Exhibit A

Select Language ▼    A A A

# All Probate Events

<< Return to Details

## Causes and Parties

| Full Name | Atto... | Party Type |
|---|---|---|
| SHER... ANT... L | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF1 |
| SHER... ANT... L | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF1 |

## Probate Order Events

| Event Date | Event Seq. No. | Party Type | Event Description | Amount |
|---|---|---|---|---|
| 11/13/2019 | 1 | | OPN:ORIGINAL PETITION | |
| 11/14/2019 | 1 | PL1 | ASM:PB OTHER TRUST/CV ACTION | $240.00 |
| 11/14/2019 | 2 | PL1 | ASM:PB ISSUANCE FEE | $20.00 |
| 11/14/2019 | 3 | | MSC:PB CALL TO COUNSEL LESS 15 | |
| 11/14/2019 | rcpt | | PMT:PB OTHER TRUST/CV ACTION | $240.00 |
| 11/14/2019 | rcpt | | PMT:PB ISSUANCE FEE | $20.00 |
| 11/15/2019 | 1 | | ORD:PB TEMP RESTRAINING ORD | |
| 11/21/2019 | 1 | | PLD:PB PLEADING OR MOTION | |

| Full Name | Atto... | Party Type | Event Date | Event Seq. No. | Party Type | Event Description | Amount |
|---|---|---|---|---|---|---|---|
| SHER... WILLI... | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF2 | 11/21/2019 | 2 | | PLD:PB PLEADING OR MOTION | |
| | | | 11/21/2019 | 3 | | ORD:PB TEMP RESTRAINING ORD | |
| | | | 11/25/2019 | 1 | PL1 | ORD:CASH BOND | $100.00 |
| | | | 11/25/2019 | rcpt | | PMT:PB CASH BOND | $100.00 |
| SHER... WILLI... | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF2 | 12/16/2019 | 1 | | PLD:PB RULE 11 AGREEMENT | |
| | | | 01/10/2020 | 1 | | MOT:PB CONTEMPT | |
| | | | 01/10/2020 | 2 | | PLD:PB AMENDED PETITION | |
| | | | 01/13/2020 | 1 | PL1 | ASM:CONSTABLE SERVICE FEE | $160.00 |
| | | | 01/13/2020 | 2 | PL1 | ASM:PB ISSUANCE FEE | $8.00 |
| | | | 01/13/2020 | 3 | PL1 | ASM:PB COPY FEE | $44.00 |
| | | | 01/13/2020 | 4 | PL1 | ISS:PB CIVIL CITATION | |
| | | | 01/13/2020 | 5 | | ISS:PB FILE COPY OF ISSUANCE | |
| | | | 01/13/2020 | 6 | | ISS:PB FILE COPY OF ISSUANCE | |

| Full Name | Atto... | Party Type |
|---|---|---|
| SHER... LINDA | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF3 |
| SHER... LINDA | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF3 |

| Event Date | Event Seq. No. | Party Type | Event Description | Amount |
|---|---|---|---|---|
| 01/13/2020 | rcpt | | PMT:CONSTABLE SERVICE FEE | $160.00 |
| 01/13/2020 | rcpt | | PMT:PB COPY FEE | $44.00 |
| 01/13/2020 | rcpt | | PMT:PB ISSUANCE FEE | $8.00 |
| 01/23/2020 | 1 | | PLD:PB CITATION RET SERVED | |
| 01/23/2020 | 2 | | PLD:PB CITATION RET SERVED | |
| 02/04/2020 | 1 | | MOT:PB SUBSTITUTED SERVICE | |
| 02/06/2020 | 1 | | PLD:PB NOTICE OF HEARING | |
| 02/11/2020 | 1 | | MOT:PB SHOW CAUSE | |
| 02/11/2020 | 2 | PL1 | ASM:PB COPY FEE | $4.00 |
| 02/11/2020 | 3 | | ORD:PB SHOW CAUSE | |
| 02/11/2020 | 4 | | ORD:PB SUBSTITUTED SERVICE | |
| 02/11/2020 | rcpt | | PMT:PB COPY FEE | $4.00 |

| Full Name | Atto... | Party Type |
|---|---|---|
| SHER... CEAI... C | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF4 |
| SHER... CEAI... C | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF4 |

| Event Date | Event Seq. No. | Party Type | Event Description | Amount |
|---|---|---|---|---|
| 02/12/2020 | 1 | | ISS:PB FILE COPY OF ISSUANCE | |
| 02/19/2020 | 1 | | PLD:PB PLEADING OR MOTION | |
| 02/24/2020 | 1 | | PLD:PB CITATION RET SERVED | |
| 02/24/2020 | 2 | | PLD:PB CITATION RET SERVED | |
| 02/24/2020 | 3 | | PLD:PB ATTORNEY VACATION LTR | |
| 03/06/2020 | 1 | | PLD:PB ANSWER | |
| 03/09/2020 | 1 | DF6 | ASM:CV JURY DEMAND FEE | $40.00 |
| 03/09/2020 | 2 | | PLD:PB ANSWER | |
| 03/09/2020 | rcpt | | PMT:CV JURY DEMAND FEE | $40.00 |
| 04/16/2020 | 1 | | PLD:PB PLEADING OR MOTION | |
| 04/16/2020 | 2 | | PLD:PB PLEADING OR MOTION | |
| 04/22/2020 | 1 | | PLD:PB PLEADING OR MOTION | |

| Full Name | Atto... | Party Type |
|---|---|---|
| CCS ASSET MAN... INC | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF5 |
| CCS ASSET MAN... INC | TAGT... BRIAN JAMES & KELLY JEFFR... SCOTT & MCM... KEITH STEV... & DAVI... CHRI... ADRI... | DF5 |
| HOB... JOHN | BREN... DAVID L. | DF6 |
| HOB... JOHN | BREN... DAVID L. | DF6 |
| ALM... LLC | BREN... DAVID L. | DF7 |

| Event Date | Event Seq. No. | Party Type | Event Description | Amount |
|---|---|---|---|---|
| 04/27/2020 | 1 | | PLD:PB LETTER TO JUDGE | |
| 06/19/2020 | 1 | | MSC:PB CRT RPT EXHIBITS | |
| 07/10/2020 | 1 | TP1 | PC1:APPT RECEIVER | $1000.00 |
| 07/13/2020 | 1 | | ORD:PB ORDER | |
| 07/13/2020 | 2 | | ORD:PB DENYING | |
| 08/05/2020 | 1 | | PLD:PB OATH | |
| 08/05/2020 | 2 | TP1 | ORD:CASH BOND | $1000.00 |
| 08/05/2020 | rcpt | | PMT:PB CASH BOND | $1000.00 |
| 08/06/2020 | 1 | | PLD:PB DOCUMENT FILING | |
| 08/07/2020 | 1 | | ORD:PB APPROVING BOND | |
| 08/07/2020 | 2 | TP1 | PC1:GDN GP CASH BOND APRV | $1000.00 |
| 09/15/2020 | 1 | | MOT:PB FOR LEAVE | |
| 09/16/2020 | 1 | | PLD:PB NOTICE OF HEARING | |

| Full Name | Atto... | Party Type |
|---|---|---|
| ALM... LLC | BREN... DAVID L. | DF7 |
| CASH ARLE... MER... | GOR... KEMP W. | PL1 |
| CASH ARLE... MER... | GOR... KEMP W. | PL1 |
| ICEN... ANT... LEE | | TP1 |
| ICEN... ANT... LEE | | TP1 |

| Event Date | Event Seq. No. | Party Type | Event Description | Amount |
|---|---|---|---|---|
| 09/18/2020 | 1 | | PLD:PB NOTICE OF HEARING | |
| 09/22/2020 | 1 | | MOT:PB CONTINUANCE | |
| 09/24/2020 | 1 | | PLD:PB PLEADING OR MOTION | |
| 09/25/2020 | 1 | | PC1:HEARING HELD | |
| 10/07/2020 | 1 | | ORD:PB CONTINUANCE | |
| 10/19/2020 | 1 | | MOT:PB SANCTIONS | |
| 10/22/2020 | 1 | | MOT:PB COMPEL | |
| 10/22/2020 | 2 | | PLD:PB NOTICE OF HEARING | |
| 11/03/2020 | 1 | | PLD:PB NOTICE OF HEARING | |
| 11/03/2020 | 2 | | PLD:PB NOTICE OF HEARING | |
| 11/20/2020 | 1 | | PLD:PB RESPONSE TO | |
| 11/20/2020 | 2 | | PLD:PB RESPONSE TO | |
| 11/23/2020 | 1 | | PLD:PB PLEADING OR MOTION | |

| Event Date | Event Seq. No. | Party Type | Event Description | Amount |
|---|---|---|---|---|
| 11/24/2020 | 1 | | PLD:PB RESPONSE TO | |
| 11/25/2020 | 1 | | PC1:HEARING HELD | |
| 11/30/2020 | 1 | | ORD:PB LEAVE | |
| 11/30/2020 | 2 | | PLD:PB PLEADING OR MOTION | |
| 11/30/2020 | 3 | | PLD:PB PLEADING OR MOTION | |
| 11/30/2020 | 4 | | PLD:PB LETTER TO JUDGE | |
| 11/30/2020 | 5 | | MSC:PB PROP ORD SENT TO CT | |
| 12/01/2020 | 1 | | PLD:PB LETTER TO JUDGE | |
| 12/03/2020 | 1 | | PLD:PB PLEADING OR MOTION | |
| 12/14/2020 | 1 | | PLD:PB LETTER TO CLERK | |
| 12/15/2020 | 1 | PL1 | ASM:PB COPY FEE | $1.00 |
| 12/15/2020 | rcpt | | PMT:PB COPY FEE | $1.00 |
| 12/30/2020 | 1 | | PLD:PB PLEADING OR MOTION | |

| Event Date | Event Seq. No. | Party Type | Event Description | Amount |
|------------|----------------|------------|------------------|--------|
| 12/30/2020 | 2 | | PLD:PB PLEADING OR MOTION | |
| 01/28/2021 | 1 | | PLD:PB AMENDED APPLICATION | |
| 01/28/2021 | 2 | | NTC:PB OF APPEARANCE | |
| 01/28/2021 | 3 | | PLD:PB PLEADING OR MOTION | |
| 01/28/2021 | 4 | | MSC:PB PROP ORD SENT TO CT | |
| 02/01/2021 | 1 | | PC1:HEARING HELD | |
| 02/01/2021 | 2 | | PLD:PB PLEADING OR MOTION | |
| 02/01/2021 | 3 | | PLD:PB PLEADING OR MOTION | |
| 02/03/2021 | 1 | | MSC:PB PROP ORD SENT TO CT | |
| 04/29/2021 | 1 | | ORD:PB COMPEL | |
| 04/29/2021 | 2 | | ORD:PB COMPEL | |
| 04/30/2021 | 1 | | MOT:PB TRANSFER VENUE | |

| Event Date | Event Seq. No. | Party Type | Event Description | Amount |
|------------|----------------|------------|-------------------|--------|
| 06/11/2021 | 1 | | PLD:PB DOCUMENT FILING | |
| 06/30/2021 | 1 | | PLD:PB DOCUMENT FILING | |

The Travis County Clerk maintains the county's records, administers elections, and oversees legal documentation (such as property deeds, marriage licenses and assumed name certificates).

**Main Phone Line:** *(512) 854-9188* | **24 Hour Voter Hotline:** *(512) 238-VOTE (8683)* | **Election Division:** *(512) 854-4996* | **Misdemeanor Division:** *(512) 854-9440*



Copyright © 2021. Travis County Clerk. Designed by Shape5.com Joomla Templates

## **EXHIBIT 18**

**Order Dismissing 4709 Incorporated's 2014 Bankruptcy Case**



**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: November 21, 2016.**

_____

**TONY M. DAVIS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re 4709 INCORPORATED | § | CASE NO. 14-10340-tmd |
| Reorganized Debtor | § | Chapter 11 |

<u>ORDER DISMISSING CASE</u>

Came on for consideration the United States Trustee's Motion to Dismiss Case Pursuant to 11 U.S.C. § 1112(b) or, in the Alternative to Convert Case to a Case Under Chapter 7. The Court finds that the Motion has merit, and it is therefore

ORDERED that the above-styled and numbered case be, and is hereby, dismissed. It is

FURTHER ORDERED that Debtor shall pay the United States Trustee the sum of $5,841.84 for that amount owed pursuant to 28 U.S.C. § 1930 within 10 days of entry of this order. Quarterly fees shall continue to accrue until the case is closed, dismissed, or converted.

### ###

Order submitted by
Deborah A. Bynum
Office of the United States Trustee
(512) 916-5346
deborah.a.bynum@usdoj.gov

# UNITED STATES BANKRUPTCY COURT
## Western District of Texas
## Austin Division

**Bankruptcy Case No.:** 14–10340–tmd
**Chapter No.:** 11
**Judge:** Tony M. Davis

**In Re:** Debtor(s) (name(s) used by the debtor(s) in the last 8 years, including married, maiden, trade, and address):
4709 Incorporated
7602 Brookhollow Cove
Austin, TX 78752
**SSN/TAX ID:**
 74–2568435

---

## NOTICE OF DISMISSAL

You are hereby notified that an Order Dismissing the above case was entered:

    for Debtor on **11/21/16**                          for Joint Debtor (if any) on **N/A**

Dated:  11/21/16

                                  Yvette M. Taylor
                                  Clerk, U. S. Bankruptcy Court

[Notice of Dismissal (BK)] [NtcDsmBKapac]

# EXHIBIT 19

**Sheridan Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CCS ASSET MANAGEMENT, INC. | ) | Case No. 21-10355 |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | |
| CCS ASSET MANAGEMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 21-01030 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN HOBERMAN, SUSAN HOBERMAN, | ) | |
| and STRATA TRUST COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF ANTHONY SHERIDAN

I, Anthony Leo Sheridan, declare under penalty of perjury as follows:

1.      My name is Anthony Sheridan. I am of sound mind, capable of making this Declaration, and have personal knowledge of the facts set forth in this Declaration. If called upon to testify, I would testify competently as set forth in this Declaration.

2.      I am the vice president of CCS Asset Management, Inc. ("CCS"), the debtor and debtor-in-possession in the above-captioned bankruptcy case and plaintiff in the above-captioned adversary proceeding. I am familiar with CCS's property, including the real property located at 7400 Cameron Road, Austin, Texas (the "Cameron Road Property"), and the acquisition and attempted transactions related thereto.

3.      CCS holds title to the Cameron Road Property pursuant to a deed from its previous owner, 4709 Incorporated, to CCS (the "Cameron Road Deed").

4.      The consideration paid by CCS to 4709 Incorporated for the Cameron Road Property included, among other things:

    a.      Payment by CCS or its principals on behalf of CCS of obligations of 4709 Incorporated that were secured by liens on the Cameron Road Property, the non-payment of which by 4709 Incorporated had placed the Cameron Road Property on the brink of foreclosure or other action by John Hoberman. Attached as Exhibit 1 hereto is a true and correct copy of a check in the amount of $20,040.30 dated April

1 of 4

5, 2018, from William Sheridan (an equity holder in CCS) to Hunter Kelsey of Texas, the agent to a lender from which 4709 Incorporated borrowed money to satisfy ad valorem taxes and which was subrogated to such lien.

b.  Satisfaction Texas Comptroller tax debt for which 4709 Incorporated's former principal, Selena Cash, may have had personal liability. Attached as <u>Exhibit 2</u> hereto is a true and correct copy of the Notice of Seizure from the Texas Comptroller of Public Accounts, showing an obligation of 4709 Incorporated for sales taxes in the amount of $86,519.20, and payment of such amount from proceeds of a loan taken by CCS (for which CCS put up other collateral). Attached as <u>Exhibit 3</u> hereto is a true and correct tax payment receipt dated October 4, 2018, from the Texas Comptroller showing a payment of $70,000 to the Texas Comptroller on account of taxes owed by 4709 Incorporated that was made with the proceeds of a loan taken by CCS (for which CCS put up other collateral). Attached as <u>Exhibit 4</u> hereto is a true and correct copy of a cashier's check dated November 8, 2019, in the amount of $81,000 from AEL Capital, LLC to the Texas Comptroller on account of taxes owed by 4709 Incorporated, which reflects the proceeds of a loan taken by CCS (for which CCS put up other collateral, which other collateral has been foreclosed upon).

c.  Interacting with John Hoberman who asserted rights with respect to various loan and security documents and/or 4709 Incorporated's plan of reorganization (the "<u>4709 Plan</u>"). My understanding, based on my review of the Transfer of Note and Lien (and Other Rights) attached as <u>Exhibit 5</u>, is that among John Hoberman's rights were those related to a personal guarantee executed by Ms. Cash of the obligations under the note made by 4709 Incorporated that had been assigned to Mr. Hoberman from Pride of Austin High Yield Fund I LLC.

d.  Non-pecuniary consideration to Selena Cash who desired that the Cameron Road Property and the business 4709 Incorporated operated at the Cameron Road Property continue to have African American ownership.

5.     By taking title to the Cameron Road Property, CCS was able to accomplish the above and reduce the claims against 4709 Incorporated and Selena Cash in an pecuniary amount exceeding 4709 Incorporated's equity in the Cameron Road Property and Selena Cash's equity in 4709 Incorporated.

6.     No court has ordered, adjudged, or decreed that the Cameron Road Deed be vacated or set aside. Nor has any party, to my knowledge, asserted that the Cameron Road Deed is void. As Vice President of CCS, I would be aware of any such order, judgment, or decree and likely be aware of such assertion.

7.     It is my understanding that the Official Records of Travis County indicate that John Hoberman, Susan Hoberman, and Self Directed IRA Services Inc. (the "<u>Hoberman IRA</u>"), which I understand has merged into Strata Trust Company hold liens against the Cameron Road Property (the "<u>Ostensible Liens</u>").

8.     John and Susan Hoberman (collectively, "<u>Hoberman</u>"), have asserted that the Ostensible Liens remain valid and enforceable by Hoberman, or in the alternative, that Hoberman has title to the Cameron Road Property under 4709 Incorporated's plan of reorganization from 4709 Incorporated's 2014 bankruptcy case.

9.     The Ostensible Liens have and continue to affect CCS's title to the Cameron Road Property. In connection with attempts to resolve certain disputes between CCS and the estate of Selena Cash, CCS had obtained potential financing to be secured by a lien in the Cameron Road Property. Due to the Ostensible Liens being reflected in the Official Records of Travis County, the potential lender required Hoberman's consent before allowing a distribution of proceeds to other parties.

10.     Similarly, Hoberman's assertion with respect to title of the Cameron Road Property affects CCS' title to the Cameron Road Property. I believe that the Debtor would be required to disclose such assertion.

11.     I am not aware of any suit for the recovery of real property under a real property lien or the foreclosure of a real property lien brought by Hoberman or any related person with respect to the Cameron Road Property, prior to Hoberman's counterclaim currently pending before the U.S. Bankruptcy Court for the Western District of Texas. As Vice President of CCS, I would be aware of any such suit.

12.     No sale of the Cameron Road Property since under any power of sale in a mortgage or deed of trust has been conducted. As Vice President of CCS, I would be aware of any such suit.

13.     To the best of my knowledge, John Hoberman and Susan Hoberman are alive. I do not believe any of these parties died at any relevant time.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  August, _17th_, 2021           By: _____
       Austin, Texas                        Anthony Sheridan

## **EXHIBIT 1 TO SHERIDAN AFFIDAVIT**



# Bank of America

WILLIAM E SHERIDAN   |   Account # 0039 1837 7592   |   March 28, 2018 to Apr

## Check images

**Account number: 0039 1837 7592**
Check number: 9466   |   Amount: $20,040.30



## EXHIBIT 2 TO SHERIDAN AFFIDAVIT


00-338
(Rev.1-18/10)

## CONFIDENTIAL

# NOTICE OF SEIZURE

By the COMPTROLLER OF PUBLIC ACCOUNTS
STATE OF TEXAS

*THIS NOTICE IS EFFECTIVE UPON RECEIPT*

Taxpayer name and address

4709 INCORPORATED, D/B/A MIDTOWN LIVE
7408 CAMERON RD STE E
AUSTIN, TX 78752

d.b.a  MIDTOWN LIVE SPORTS CAFE

Taxpayer number
17425684358

Type of tax
Sales/Mix Bev Sales & Gross

Date of service
March 08, 2018

You now owe the following delinquent amount for the tax specified.

TAX DUE _ _ _ _ _ _ _ _ _ _ _ _ _ _ _      $ 39,627.83
PENALTY _ _ _ _ _ _ _ _ _ _ _ _ _ _       $ 9,398.73
INTEREST                                  $ 1,317.64
  (Calculated through 03/08/2018 ) -
BOND _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _      $ 36,175.00

AhS

TOTAL DUE AS OF DATE OF NOTICE _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    $ 86,519.20
  Additional charges assessed after the date of notice may include accrued interest and costs of seizure.

This is to notify you that the Comptroller of Public Accounts is seizing your property, either real or
personal, which is not exempt from civil execution. This seizure is in accordance with the provisions
of the law

The seized property will be returned to you only if the total amount due, including costs of the seizure,
is paid before this property is sold according to the law.



GLENN HEGAR
COMPTROLLER OF PUBLIC ACCOUNTS

*This notice has been issued by and all correspondence should be directed to:*

Enforcement Officer  RAY CASTILLA

Phone  512-463-4291

Date  March 08, 2018

APPROVED BY

Field Manager
sign here ▶



## Comptroller of Public Accounts

March 26, 2018

## TAX PAYMENT RECEIPT

Office ID: 2H17    Device: 999
Printed by: BGUE457

Taxpayer ID: 17425684358
Name: 4709 INCORPORATED, D/B/A MIDTOWN LIVE
Address: 13276 N HIGHWAY 183 STE 208
AUSTIN, TX 78750 3241

Affiliate TP ID:
Affiliate Name:

Date: 03/26/2018
Time: 15:55
Receipt #: 1708518000023          Postmark Date: 03/26/2018

### Payment(s) Applied To

| | |
|---|---:|
| SALES AND USE TAX period ending 05/31/2016 | 588.59 |
| SALES AND USE TAX period ending 11/30/2017 | 405.15 |
| SALES AND USE TAX period ending 12/31/2017 | 474.78 |
| SALES AND USE TAX period ending 07/31/2016 | 2,686.04 |
| SALES AND USE TAX period ending 02/28/2018 | 1,401.69 |
| SALES AND USE TAX | 485.08 |
| MIXED BEVERAGE SALES TAX period ending 05/31/2016 | 3,291.35 |
| MIXED BEVERAGE SALES TAX period ending 06/30/2016 | 2,988.88 |
| MIXED BEVERAGE SALES TAX period ending 07/31/2016 | 3,886.57 |
| SALES AND USE TAX period ending 01/31/2018 | 896.15 |
| MIXED BEVERAGE SALES TAX period ending 11/30/2017 | 3,429.09 |
| MIXED BEVERAGE SALES TAX period ending 12/31/2017 | 4,202.64 |
| MIXED BEVERAGE SALES TAX period ending 01/31/2018 | 5,230.36 |
| MIXED BEVERAGE SALES TAX period ending 02/28/2018 | 5,692.24 |
| MIXED BEVERAGE SALES TAX | 15,000.00 |
| MIX BVG GROSS RCPTS period ending 11/30/2017 | 3,244.00 |
| MIX BVG GROSS RCPTS period ending 12/31/2017 | 4,875.77 |
| MIX BVG GROSS RCPTS period ending 01/31/2018 | 4,247.69 |
| MIX BVG GROSS RCPTS period ending 02/28/2018 | 4,632.17 |
| MIX BVG GROSS RCPTS | 15,000.00 |
| MIXED BEVERAGE SALES TAX period ending 08/31/2016 | 3,860.96 |

### Payment(s)

| | |
|---|---:|
| Cashier's Check - 0811001950 | 86,519.20 |

| | | |
|---|---:|---:|
| | **Total Payment:** | 86,519.20 |

SERIAL #: 0811001950

ACCOUNT#: 4861-512861

**CASHIER'S CHECK**

0008110

11-24

Office AU #    1210(8)

Remitter:          STEWART TITLE COMPANY ESCROW ACCOUNT
Purchaser:         ANTHONY LEO SHERIDAN
Purchaser Account:  b0006514
Operator I.D.:     u563743
Funding Source:    Cash, Paper Items(s)

PAY TO THE ORDER OF  ***COMPTROLLER OF PUBLIC ACCOUNTS ***
***STATE OF TEXAS***

**March 26, 2018**

***Eighty-six thousand five hundred nineteen dollars and 20 cents***

Payee Address:
Memo:          179372

**WELLS FARGO BANK, N.A.**
605 W 15TH ST
AUSTIN, TX 78701
FOR INQUIRIES CALL (480) 394-3122

**\*\*$86,519.20\*\***

VOID IF OVER US $   86,519.20

**NON-NEGOTIABLE**

NOTICE TO PURCHASER -- IF THIS INSTRUMENT IS LOST,
STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
AND REISSUANCE. AS A CONDITION TO CANCELLATION AND
REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
REQUIRE AN INDEMNITY AGREEMENT AND BOND.

**Purchaser Copy**

004   M4353  70146550

## EXHIBIT 3 TO SHERIDAN AFFIDAVIT



| Comptroller of Public Accounts | | October 4, 2018 |
|---|---|---|
| **TAX PAYMENT RECEIPT** | Office ID: 2H17    Device: 999<br>Printed by: BGUE457 | |

Taxpayer ID:  17425684358
Name:  4709 INCORPORATED, D/B/A MIDTOWN LIVE
Address:  13276 N HIGHWAY 183 STE 208
AUSTIN, TX  78750 3241

Affiliate TP ID:
Affiliate Name:

Date:  10/04/2018
Time:  17:27
Receipt #:  1727718000029          Postmark Date:  10/04/2018

| *Payment(s) Applied To* | |
|---|---|
| SALES AND USE TAX period ending 06/30/2018 | 888.73 |
| SALES AND USE TAX period ending 08/31/2018 | 1,994.14 |
| MIXED BEVERAGE SALES TAX period ending 05/31/2016 | 1,559.61 |
| SALES AND USE TAX period ending 07/31/2018 | 701.52 |
| MIXED BEVERAGE SALES TAX period ending 07/31/2016 | 1,703.98 |
| MIXED BEVERAGE SALES TAX period ending 08/31/2016 | 772.21 |
| MIXED BEVERAGE SALES TAX period ending 11/30/2017 | 959.95 |
| MIXED BEVERAGE SALES TAX period ending 12/31/2017 | 1,824.19 |
| MIXED BEVERAGE SALES TAX period ending 03/31/2018 | 6,597.31 |
| MIXED BEVERAGE SALES TAX period ending 06/30/2016 | 1,291.38 |
| MIXED BEVERAGE SALES TAX period ending 05/31/2018 | 6,202.85 |
| MIXED BEVERAGE SALES TAX period ending 06/30/2018 | 5,329.37 |
| MIXED BEVERAGE SALES TAX period ending 07/31/2018 | 4,510.83 |
| MIXED BEVERAGE SALES TAX period ending 08/31/2018 | 4,012.30 |
| MIX BVG GROSS RCPTS period ending 03/31/2018 | 5,357.81 |
| MIX BVG GROSS RCPTS period ending 04/30/2018 | 4,480.27 |
| MIX BVG GROSS RCPTS period ending 05/31/2018 | 5,037.48 |
| MIX BVG GROSS RCPTS period ending 06/30/2018 | 4,337.49 |
| MIX BVG GROSS RCPTS period ending 07/31/2018 | 3,663.35 |
| MIX BVG GROSS RCPTS period ending 08/31/2018 | 3,258.48 |
| MIXED BEVERAGE SALES TAX period ending 04/30/2018 | 5,516.75 |

| *Payment(s)* | |
|---|---|
| Cashier's Check - 0335802316 | 70,000.00 |

**Total Payment:**          70,000.00

**<u>EXHIBIT 4 TO SHERIDAN AFFIDAVIT</u>**



RH 194

THIS DOCUMENT HAS AN ARTIFICIAL WATERMARK PRINTED ON THE BACK. THE FRONT OF THE DOCUMENT HAS A HOLOGRAM AND THERMOCHROME. ABSENCE OF THESE FEATURES WILL INDICATE A COPY.

Frost Bank
P.O. Box 1600  San Antonio, Texas 78296

Name
Branch #  240

Cashier's Check

No. 240008205

November 08, 2019
109
1140

Remitter:  AEL CAPITAL, LLC

PAY
TO THE
ORDER OF

TEXAS COMPTROLLER OF PUBLIC ACCOUNTIN

****EIGHTY ONE THOUSAND DOLLARS AND 00 CENTS****

$81,000.00

PAYABLE THRU:
FROST BANK
SAN ANTONIO, TX 78296

TRAVIER FROST BANK
AUTHORIZED SIGNATURE
ISSUER ACCEPTS AS DRAWER/DRAWEE

⑈240008205⑈  ⑈114000093⑈: 0⑈6⑈1⑈29⑈96⑈⑈

---

Frost Bank

240

Op:  0194
Payee:  TEXAS COMPTROLLER OF PUBLIC ACCOUNTING

Remitter:  AEL CAPITAL, LLC

**CUSTOMER S COPY**
**NON-NEGOTIABLE**

240008205

November 08, 2019

Amount:      $81,000.00
Fee:
Total:       $81,000.00

## EXHIBIT 5 TO SHERIDAN AFFIDAVIT

ELECTRONICALLY RECORDED            2015025866

TRV      **6**      PGS

## Transfer of Note and Lien (and Other Rights)

| | |
|---|---|
| Effective Date: | February 13, 2015 |
| Holder of Note and Lien (and Other Rights): | Pride of Austin High Yield Fund I LLC, a Texas limited liability company |
| Holder's Mailing Address: | c/o Robert J. Buchanan<br>401 Congress Avenue, Suite 1540<br>Austin, Travis County, Texas 78701-3851 |
| Transferee: | John W. Hoberman |
| Transferee's Mailing Address: | 2413 Thornton Road<br>Austin, Travis County, Texas 78704 |

Real Estate Lien Note

| | |
|---|---|
| Original Date: | September 9, 2011 |
| Original Principal Amount: | $1,100,000.00 |
| Borrower: | 4709, Incorporated d/b/a Midtown Live, a Texas corporation |
| Lender: | Pride of Austin High Yield Fund I LLC |

Renewal and Extension Promissory Note

| | |
|---|---|
| Renewal & Extension Date: | January 9, 2012 |
| Renewal & Extension Amt.: | $1,236,956.52 |
| Borrower: | 4709, Incorporated d/b/a Midtown Live, a Texas corporation |
| Lender: | Pride of Austin High Yield Fund I LLC |
| Unpaid principal and interest as of March 3, 2014: | $1,401,432.59 |

Note and Lien (and Other Rights)
of Holder Are Described in the
Following Documents:

1. Commercial Construction Loan Agreement dated September 9, 2011 (the "Loan Agreement") entered into by and between Borrower and Lender;

2. Deed of Trust, Security Agreement, and Assignment of Rents dated September 9, 2011 (the "Deed of Trust") executed by Borrower as Grantor naming Bruce R. Hardesty as Trustee for the benefit of Lender and which Deed of Trust is recorded under Document No. 2011137642 of the Official Public Records of Travis County, Texas;

3. The Deed of Trust was renewed and extended by that certain Renewal and Extension Deed of Trust, Security Agreement, and Assignment of Rents dated January 10, 2012 (the "Renewal Deed of Trust") executed by Borrower as Grantor naming Bruce R. Hardesty as Trustee for the benefit of Lender and which Renewal Deed of Trust is recorded under Document No. 2012004604 of the Official Public Records of Travis County, Texas;

4. The Real Estate Lien Note, the Renewal and Extension Promissory Note, the Deed of Trust, and the Renewal Deed of Trust were further modified by the terms of that certain Modification and Extension Agreement dated January 31, 2013 (the "Modification Agreement") executed by Borrower, Lender, and Selena Cash as Guarantor;

5. Assignment of Rights, Warranties, Permits, Licenses , and Contracts dated September 9, 2011 (the "Assignment of Rights") entered into by and between Borrower and Capital City Homes, LLC for the benefit of Lender;

6. The personal Guaranty of Selena Cash dated September 9, 2011 (the "Guaranty"); and

7. The personal Guaranty of Selena Cash dated January 9, 2012 (the "Updated Guaranty").

Property (including
any improvements): Lot 2, Resubdivision of Lot 11, REAGAN HILL, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas.

Prior Lien(s):        None

Pending Bankruptcy Proceeding
and Rights Related Thereto:        Holder and Transferee acknowledge that there is a pending
bankruptcy Court proceeding of Borrower filed on March 3,
2014 under case number 14-10340-tmd in the United States
Bankruptcy Court - Western District of Texas - Austin
Division (the "Bankruptcy Case"). Holder has filed a proof
of claim (the "Claim") in the Bankruptcy Case. With regards
to the Property, Holder and Borrower entered into an Agreed
Motion for Relief From the Automatic Stay Against Real
Estate and Related Property on September 2, 2014 (the
"Agreed Motion"). The Agreed Motion was approved by the
Court by Order dated September 22, 2014 (the "Lift Stay
Order"). In connection with the Agreed Motion, Holder
agreed to waive any deficiency claim or recovery against
Selena Cash under the Guaranty or the Updated Guaranty in
connection with Selena Cash's individual Chapter 13
bankruptcy proceeding. Based on the Motion and as allowed
by the Lift Stay Order, Holder posted the Property for
foreclosure on February 3, 2015. Pursuant to agreement and
at the request of Transferee, Holder passed the scheduled
February 3, 2015 foreclosure sale setting without waiving its
right to re-post the Property again for foreclosure on any date
thereafter. Holder acknowledges that it has been paid in full
by Transferee for the transfer of the Note and Lien (and Other
Rights) as set forth herein. In addition to the Lift Stay Order
related to the Agreed Motion, Holder and Transferee
acknowledge that there is also and Agreed Final Order on
Debtor's Motion to Use of Cash Collateral (the "Cash
Collateral Order"). Accordingly, and as part of the transfer of
rights to Transferee contemplated herein, Holder transfers and
assigns over to Transferee, as of the Effective Date, any and
all additional rights that may have accrued to Holder under
the pending Bankruptcy Case specifically including by way of
example but not limitation, all rights to any other payments to
be made to Holder from Borrower under the Cash Collateral
Order after the Effective Date. For the purposes hereof, the
rights outlined herein related to the pending Bankruptcy Case
specifically those rights accruing to Holder under the Lift Stay
Order and the Cash Collateral Order shall be considered part
of the "Other Rights" held by Holder and transferred hereby
to Transferee.

For value received, Holder of Note and Lien (and Other Rights) transfers them to Transferee. Such transfer is without any representation or warranty of any kind and character, including, without limitation, validity or priority of the Deed of Trust, the Renewal Deed of Trust, the amount of the debt on the Real Estate Lien Note, the collectability of the Real Estate Lien Note, or the appropriateness of Purchaser's purchase of the Note and Lien (and Other Rights), the enforceability of the Claim or any other rights transferred hereby. Seller's sole warranty is that Seller owns the Real Estate Lien Note, the Deed of Trust, the Renewal Deed of Trust, and the Claim and has not transferred the Real Estate Lien Note, the Deed of Trust, the Renewal Deed of Trust, or the Claim prior to the Effective Date. Transferee warrants and represents that he has conducted his own investigation of the facts and circumstances surrounding the purchase of the Note and Lien (and Other Rights) and has not relied upon any representation or statement of Holder of Note and Lien (and Other Rights). Specifically, Transferee has conducted his own investigation of the events that have occurred in the Bankruptcy Case, and is relying on the advice of his own counsel in proceeding with the purchase of the Note and Lien (and Other Rights) as provided herein and not on any representations of Holder of Note and Lien (and Other Rights), except the limited representation of ownership of the Note and Lien (and Other Rights) provided in this paragraph alone.

Except as specifically enumerated herein, this transfer is without recourse on Holder of Note and Lien (and Other Rights).

Holder of Note and Lien (and Other Rights) expressly waives and releases all present and future rights to establish or enforce the Lien (and Other Rights) described in this instrument as security for payment of any future or other indebtedness and for any other reason.

When the context requires, singular nouns and pronouns include the plural.

Pride of Austin High Yield Fund I LLC,
a Texas limited liability company

By: _____

     Robert J. Buchanan

Its:   Manager

STATE OF TEXAS        §
                                   §
COUNTY OF TRAVIS    §

     This instrument was acknowledged before me on the 13 day of February, 2015 by Robert J. Buchanan, Manager of Pride of Austin High Yield Fund I LLC, a Texas limited liability company, on behalf of said limited liability company.



_____
Notary Public, The State of Texas

AFTER RECORDING RETURN TO:

Christopher M. Benjamin
McLeroy, Alberts & Benjamin, PC
608 W. 12th Street
Austin, TX 78701

Transfer of Note and Lien (and Other Rights)                                         Page 5 of 5

**FILED AND RECORDED**
OFFICIAL PUBLIC RECORDS

DANA DEBEAUVOIR, COUNTY CLERK
TRAVIS COUNTY, TEXAS

February 24 2015 11:42 AM

FEE: $  46.00  **2015025866**

# **EXHIBIT 20**

**Shannon Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| CCS ASSET MANAGEMENT, INC. | ) | Case No. 21-10355 |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | |
| CCS ASSET MANAGEMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 21-01030 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN HOBERMAN, SUSAN HOBERMAN, | ) | |
| and STRATA TRUST COMPANY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF ROBERT SHANNON

I, Robert Joseph Shannon, declare under penalty of perjury as follows:

1.     My name is Robert Shannon. I am of sound mind, capable of making this Declaration, and have personal knowledge of the facts set forth in this Declaration. If called upon to testify, I would testify competently as set forth in this Declaration.

2.     I am submitting this Declaration in connection with motion for summary judgment to which this Declaration will be attached (the "Motion for Summary Judgment"). Capitalized terms used but not defined in this Declaration have the meanings ascribed to such terms in the Motion for Summary Judgment.

3.     I am the attorney at Parkins Lee & Rubio LLP in charge of the representation of CCS Asset Management, Inc. (the "Debtor"), the debtor and debtor-in-possession in the above-captioned bankruptcy case and adversary proceeding. I am licensed in Maryland and Texas.

4.     I am familiar with the real property recordation system of Texas, and in particular, Travis County. I have conducted such searches numerous times in connection with performing lien analyses in connection with chapter 11 bankruptcy cases.

5.     In connection with the representation of the Debtor in the above-captioned bankruptcy case, prior to preparing and filing the above-captioned adversary proceeding, I searched the real property records of Travis County for all recorded documents indexed—both as grantor and grantee—for the following entities: (a) CCS Asset Management, (b) 4709

1 of 3

Incorporated, (c) John Hoberman, and (c) Susan Hoberman. With respect to the Debtor, I have personally reviewed and analyzed every document recorded in the real property records of Travis County in reference to the Debtor. With respect to 4709 Incorporated, I have personally reviewed an analyzed every document recorded in the real property records of Travis County in reference to 4709 Incorporated since October 14, 2010.

6.      My review and analysis of the Travis County real property records uncovered no recorded renewal and extension agreement pursuant to Tex. Civ. Prac. & Rem. Code § 16.036 with respect to the June 2012 Note.

7.      My review and analysis of the Travis County real property records uncovered no recorded renewal and extension agreement pursuant to Tex. Civ. Prac. & Rem. Code § 16.036 with respect to the September 2013 Note.

8.      My review and analysis of the Travis County real property records uncovered two renewal and extension agreements pursuant to Tex. Civ. Prac. & Rem. Code § 16.036 with respect to the POA Note. The first, Document #2012004604 in the Travis County real property records, indicated that the maturity date of the POA Note had been extended to October 1, 2012. The second, Document #2013019734 in the Travis County real property records, indicated that the maturity date of the POA Note had been extended to January 1, 2014. I did not uncover any other renewal and extension agreements pursuant to Tex. Civ. Prac. & Rem. Code § 16.036, with respect to the POA Note.

9.      After receiving the Hoberman Answer, I conducted an additional analysis of the Travis County real property records to confirm that I had not overlooked any renewal and extension agreements pursuant to Tex. Civ. Prac. & Rem. Code § 16.036. My additional review and analysis uncovered no previously overlooked renewal and extension agreement.

10.     Based on the foregoing, I believe that no renewal and extension agreements pursuant to Tex. Civ. Prac. & Rem. Code § 16.036 other than the two referenced in paragraph 8 above exist with respect to the POA Note, June 2021 Note, or September 2013 Notes or the related deeds of trust.

11.     Additionally, after receiving the Hoberman Answer, I reviewed and analyzed the Travis County real property records with respect to (a) CCS Asset Management, (b) 4709 Incorporated, and (c) John Hoberman, for any recorded document indicating the Cameron Road Property had been conveyed to John Hoberman. My review and analysis uncovered no documents indicating that the Cameron Road Property had been conveyed to Hoberman. Based on the foregoing, I believe that no such recorded document exists.

12.     Additionally, after receiving the Hoberman Answer, I reviewed and analyzed the Travis County real property records with respect to 4709 Incorporated for any recorded document indicating that 4709 Incorporated had been involved in a bankruptcy proceeding, and specifically, any reference to the 4709 Plan. My review and analysis uncovered no such documents. Based on the foregoing, I believe that no such recorded document exists.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

Dated:  August 17, 2021                                By: _____
        Houston, Texas                                          Robert Joseph Shannon

# EXHIBIT 21

**Hoberman's Motion for Leave to Foreclose Notwithstanding Receiver**

Filed: 9/15/2020 12:20 PM
Dana DeBeauvoir
Travis County Clerk
C-1-PB-19-002179
Victoria Limon

NO. C-1-PB-19-002179

| | | |
|---|---|---|
| ARLETHA CASH, Independent | § | IN THE PROBATE COURT |
| Executor of the Estate of | § | |
| Selena D. Cash, Deceased, | § | |
| *Plaintiff*, | § | |
| | § | |
| v | § | |
| | § | |
| | § | |
| ANTHONY L. SHERIDAN, | § | |
| WILLIAM SHERIDAN, | § | NO. 1 OF |
| LINDA SHERIDAN, | § | |
| CEAIRA C. SHERIDAN, | § | |
| and | § | |
| CCS ASSET MANAGEMENT, INC., | § | |
| JOHN HOBERMAN and ALMAGEN LLC | § | |
| *Defendants*, | § | TRAVIS COUNTY, TEXAS |

[Estate of Selena D. Cash,
Cause No. C-1-PB-19-001700]

## DEFENDANTS' MOTION FOR LEAVE TO PROCEED WITH FORECLOSURE

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES JOHN HOBERMAN, a Defendant in the above-entitled and numbered cause, and files this Motion for Leave to Proceed with non-judicial foreclosure and would respectfully show the Court as follows:

### I.

### INTRODUCTION AND FACTUAL BACKGROUND

1.      Plaintiff in this case purports to have a beneficial ownership interest in stock issued in a Texas Corporation, 4709 Incorporated dba Midtown Live, and rights to land the corporation owned, Meadowglen Shopping Center located at 7408 Cameron Road, Austin, Texas 78752, through that beneficial stock ownership.

2.      Defendant John Hoberman is a secured creditor holding three notes with related deeds of trust to land, fixtures and an assignment to income and equipement formerly owned by 4709

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on      **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy: _____
J. WALKER

Incorporated, dba Midtown Live ("4709 Incorporated"), and now purportedly owned by Defendant CCS Asset Management, Inc., all subject to John Hoberman's liens and secuirty interest.

3.      The deed records and documents presented to the Court by Plaintiff's pleadings, and which can be presented at an evidentiary hearing if necessary, establish, three loans were entered into by 4709 Incorporated secured by the Meadowglen Shopping Center located at 7408 Cameron Road, Austin, Texas 78752. The first loan from Pride of Austin, the next two from John Hoberman. The records reflect that Pride of Austin filed a notice of intent to foreclose in 2014, which resulted in 4709 Incorporated seeking protection in bankruptcy. The Bankruptcy Court entered an order lifting stay recognizing the validity of the debt and permitting Pride of Austin to proceed in foreclosure. John Hoberman then acquired Pride of Austin's loan and lien in February 15, 2015. At that time, Pride of Austin's lien balance, recognized by the Bankruptcy Court and Trustee for 4709 Incorporated was $1,401,432.59 and accrued interest at 14%. Mr. Hoberman's second and third lien had a combined balance of $303,765.00. The reorganization plan presented by 4709 Incorporated and approved by order of the Bankruptcy Court clearly acknowledged the debt reflected by the three notes held by Mr. Hoberman, and planned to address the debt by transferring the secured property to Mr. Hoberman by deed in lieu of foreclosure in exchange for a leaseback agreement. However, the bankruptcy was shortly thereafter dismissed, and the transfer did not occur. During the bankruptcy, it was agreed that payments would be made at $19,490.74 per month, to be applied to interest on the 14% note and interest and principal on the 15% notes. Attached hereto as Exhibit A is a schedule of payments and interest applications. The schedule reflects these payments. In 2019, payments stopped being made on a regular basis, and no payments have made since December of 2019.

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy: J. WALKER

2

4.      The loans are clearly in default and the outstanding principle and interest due on the loans, as of August 2019 is $2,563,791.78. Mr. Hoberman has the legal right to foreclose. Notice of default and intent to foreclose was provided to all parties, the debtors and the receiver in compliance with the Texas Property Code. A Notice of Foreclosure was posted on September 15, 2020, and is attached hereto as Exhibit B.

5.      Generally, a secured creditor need not obtain judicial authority for a non-judicial foreclosure permitted under the deed of trust and the Texas Property Code. However, on July 10, 2019 this Court issued an order appointing Anthony Icenogle as receiver over 4709 Incorporated and also:

> The real property and all improvements located thereon at Lot 2, Re-subdivision of Lot 11, Reagan Hill, a subdivision in Travis County, Texas, according to the map or plat thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, Texas (the "Property").

Which is the real property subject to the notes and deed of trust and posted for foreclosure. Since the court issued the order, no steps have been taken by any party herein to resolve the disputes or to cure the default. Because of the existence of a receivership, common law consideration require court approval prior to proceeding with foreclosure. The receivership does not extinguish the mortgagee's security interest; it simply preserves the status quo pending this Court's approval. See, *First Southern Properties, Inc. v. Vallone*, 533 S.W.2d 339 (Tex. 1976).

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy:
J. WALKER

3

**PRAYER**

WHEREFORE, Defendant John Hoberman prays that the Court grant his Motion for Leave to Proceed with Foreclosure, and that he have such other and further relief to which he may show himself to be justly entitled.

Respectfully submitted,

BURNS ANDERSON JURY & BRENNER, L.L.P.
P.O. Box 26300
Austin, Texas 78755-0300
512-338-5322
512-338-5363 telecopier

By: _____

David Brenner
State Bar No. 02958020
dbrenner@bajb.com
Belinda May Arambula
State Bar No. 24060241
barambula@bajb.com

Attorneys for Defendants John Hoberman and Almagen, LLC.

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy:
J. WALKER

4

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing pleading has been

forwarded to counsel of record this the 15th day of September 2020, in accordance with Rules 21

and 21a, Texas Rules of Civil Procedure.

**VIA E-SERVICE:**
Kemp W. Gorthey
604 West 12th Street
Austin, TX  78701
Attorney for Plaintiff

**VIA E-SERVICE:**
Leonard Woods
600 Congress Avenue, Suite 1900
Austin, TX 78767-1149
Attorney for Defendants:
Anthony Sheridan, William Sheridan,
Linda Sheridan, Ceaira Sheridan,
And CCS Asset Management, INC.

**VIA E-SERVICE:**
Anthony Icenogle
Icenogle & Boggins PLLC
6907 N. Capital of Texas Highway, Suite 220
Austin, TX  78731

David Brenner

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on  **AUG 12 2021**

Dana DeBeauvoir, County Clerk
By Deputy
J. WALKER

5

Note 1 - 2nd Lien; June 5, 2012 pr

outstanding principal #$303765 a:

Pride of Austin
Note - Assignment date February 13, 2015, balance $1,401,432.59

contractual interest rate 14%

prinicipal adjusted to 1420432.59 due to attorney fees

Parties agreed to montly payment of 19,490.74 on all three notes, which was interest only on Pride the 2nd and 3rd lien after 60 months.

Notes 1 and 2

| payment | interest pd | principal | balance |
|---|---|---|---|
|  |  |  | 303765.00 |
| 0.00 | 3797.06 | 0.00 | 307562.06 |
| 19490.74 | 3844.53 | -925.50 | 308487.56 |
| 19490.74 | 3856.09 | -937.07 | 309424.63 |
| 19490.74 | 3867.81 | -948.78 | 310373.41 |
| 19490.74 | 3879.67 | -960.64 | 311334.05 |
| 19490.74 | 3891.68 | -972.65 | 312306.70 |
| 19490.74 | 3903.83 | -984.81 | 313291.51 |
| 19490.74 | 3916.14 | -997.12 | 314288.63 |
| 19490.74 | 3928.61 | -1009.58 | 315298.21 |
| 19490.74 | 3941.23 | -1022.20 | 316320.41 |

Exhibit A

Feb 20,2015

Pride of Austin note

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on AUG 1 2 2021
Dana DeBeauvoir, County Clerk
By Deputy
J. WALKER

2015

Pride of Austin Note

| month | Interest accrue | balance |
|---|---|---|
| Feb |  |  |
| Feb | 0.00 | 1420432.59 |
| Mar | 16571.71 | 1420432.59 |
| Apr | 16571.71 | 1420432.59 |
| May | 16571.71 | 1420432.59 |
| June | 16571.71 | 1420432.59 |
| July | 16571.71 | 1420432.59 |
| Aug | 16571.71 | 1420432.59 |
| Sep | 16571.71 | 1420432.59 |
| Oct | 16571.71 | 1420432.59 |
| Nov | 16571.71 | 1420432.59 |
| Dec | 16571.71 | 1420432.59 |

| payment | interest pd | principal | balance |
| --- | --- | --- | --- |
| 19490.74 | 3954.01 | -1034.98 | 317355.38 |
| 19490.74 | 3966.94 | -1047.92 | 318403.30 |
| 19490.74 | 3980.04 | -1061.01 | 319464.31 |
| 19490.74 | 3993.30 | -1074.28 | 320538.59 |
| 19490.74 | 4006.73 | -1087.71 | 321626.30 |
| 19490.74 | 4020.33 | -1101.30 | 322727.60 |
| 19490.74 | 4034.10 | -1115.07 | 323842.67 |
| 19490.74 | 4048.03 | -1129.01 | 324971.68 |
| 19490.74 | 4062.15 | -1143.12 | 326114.80 |
| 19490.74 | 4076.43 | -1157.41 | 327272.20 |
| 19490.74 | 4090.90 | -1171.88 | 328444.08 |
| 19490.74 | 4105.55 | -1186.52 | 329630.60 |

| payment | interest pd | principal | balance |
| --- | --- | --- | --- |
| 19490.74 | 4120.38 | -1201.35 | 330831.96 |
| 19490.74 | 4135.40 | -1216.37 | 332048.33 |
| 19490.74 | 4150.60 | -1231.58 | 333279.91 |
| 19490.74 | 4166.00 | -1246.97 | 334526.88 |
| 19490.74 | 4181.59 | -1262.56 | 335789.44 |
| 0.00 | -4197.37 | 0.00 | 339986.81 |
| 14494.94 | 4249.84 | -4249.84 | 344236.65 |
| 19488.00 | 4302.96 | -1604.25 | 345840.90 |
| 28597.00 | 4323.01 | 7484.70 | 338356.20 |
| 14488.00 | 4229.45 | -4229.45 | 342585.65 |
| 14616.00 | 4282.32 | -4282.32 | 346867.97 |
| 0.00 | -4335.85 | 0.00 | 351203.82 |

| payment | interest pd | principal | balance |
| --- | --- | --- | --- |
| 20000.00 | 4390.05 | -1350.69 | 352554.50 |
| 20000.00 | 4406.93 | -1367.57 | 353922.07 |
| 20000.00 | 4424.03 | -1384.66 | 355306.74 |
| 20000.00 | 4441.33 | -1401.97 | 356708.71 |

Exhibit A

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on AUG 1 2 2021
Dana DeBeauvoir, County Clerk
By Deputy: [signature]
J. WALKER

| 2016 | Interest | balance |
| --- | --- | --- |
| Jan | 16571.71 | 1420432.59 |
| Feb | 16571.71 | 1420432.59 |
| Mar | 16571.71 | 1420432.59 |
| Apr | 16571.71 | 1420432.59 |
| May | 16571.71 | 1420432.59 |
| June | 16571.71 | 1420432.59 |
| July | 16571.71 | 1420432.59 |
| Aug | 16571.71 | 1420432.59 |
| Sep | 16571.71 | 1420432.59 |
| Oct | 16571.71 | 1420432.59 |
| Nov | 16571.71 | 1420432.59 |
| Dec | 16571.71 | 1420432.59 |

| 2017 | Interest | balance |
| --- | --- | --- |
| Jan | 16571.71 | 1420432.59 |
| Feb | 16571.71 | 1420432.59 |
| Mar | 16571.71 | 1420432.59 |
| Apr | 16571.71 | 1420432.59 |
| May | 16571.71 | 1420432.59 |
| Jun | 16571.71 | 1420432.59 |
| july | 16765.05 | 1437004.30 |
| Aug | 16789.29 | 1439082.01 |
| Sep | 16789.29 | 1439082.01 |
| Oct | 16789.29 | 1441383.30 |
| Nov | 16816.14 | 1443583.44 |
| Dec | 16841.81 | 1453769.00 |

| 2018 | Interest | balance |
| --- | --- | --- |
| Jan | 16960.64 | 1453769.00 |
| Feb | 16960.64 | 1453769.00 |
| Mar | 16960.64 | 1453769.00 |
| Apr | 16960.64 | 1453769.00 |

| Month | interest | balance | payment | interest pd | principal | balance |
|---|---|---|---|---|---|---|
| May | 16960.64 | 1453769.00 | 20000.00 | 4458.86 | -1419.50 | 358128.21 |
| Jun | 16960.64 | 1453769.00 | 20000.00 | 4476.60 | -1437.24 | 358905.04 |
| july | 18791.55 | 1453769.00 | 20000.00 | 4486.31 | -3277.86 | 362182.90 |
| Aug | 16960.64 | 1453769.00 | 20000.00 | 4527.29 | -1487.92 | 363670.82 |
| Sep | 16960.64 | 1453769.00 | 20000.00 | 4545.89 | -1506.52 | 365177.35 |
| Oct | 16960.64 | 1453769.00 | 20000.00 | 4564.72 | -1525.36 | 366702.70 |
| Nov | 16960.64 | 1453769.00 | 20000.00 | 4583.78 | -1544.42 | 368247.13 |
| Dec | 16960.64 | 1453769.00 | 20000.00 | 4603.09 | -1563.73 | 369810.85 |

**2019**

| Month | interest | balance | payment | interest pd | principal | balance |
|---|---|---|---|---|---|---|
| Jan | 16960.64 | 1470729.64 | 0.00 | -4622.64 | 0 | 371730.40 |
| Feb | 17158.51 | 1470729.64 | 20000.00 | 4646.63 | -1805.14 | 373535.54 |
| Mar | 17158.51 | 1470729.64 | 20000.00 | 4669.19 | -1827.71 | 375363.25 |
| Apr | 17158.51 | 1487888.15 | 0.00 | 4692.04 | -21850.55 | 397213.80 |
| May | 17158.51 | 1505046.66 | 0.00 | 4965.17 | -22123.69 | 419337.49 |
| June | 17358.70 | 1522405.36 | 0.00 | 5241.72 | -22600.41 | 441937.90 |
| July | 17558.88 | 1539964.24 | 0.00 | 5524.22 | -23083.10 | 465021.01 |
| Aug | 17761.40 | 1557725.63 | 0.00 | 5812.76 | -23574.16 | 488595.16 |
| Sep | 17966.25 | 1575691.88 | 0.00 | 6107.44 | -24073.69 | 512668.85 |
| Oct | 18173.47 | 1593865.35 | 0.00 | 6408.36 | -24581.83 | 537250.68 |
| Nov | 18383.07 | 1612248.42 | 0.00 | 6715.63 | -25098.71 | 562349.38 |
| Dec | 18595.10 | 1614109.25 | 16734.27 | 7029.37 | -7029.37 | 569378.75 |

**2020**

| Month | interest pd | Lie balance | payment | interest pd | principal | balance |
|---|---|---|---|---|---|---|
| Jan | 18831.27 | 1632940.52 | 0.00 | 7117.23 | -25948.51 | 595327.26 |
| Feb | 19050.97 | 1651991.49 | 0.00 | 7441.59 | -26492.56 | 621819.83 |
| Mar | 19273.23 | 1671264.73 | 0.00 | 7772.75 | -27045.98 | 648865.81 |
| Apr | 19498.09 | 1690762.82 | 0.00 | 8110.82 | -27608.91 | 676474.72 |
| May | 19725.57 | 1710488.38 | 0.00 | 8455.93 | -28181.50 | 704656.22 |
| June | 19955.70 | 1730444.08 | 0.00 | 8808.20 | -28763.90 | 733420.12 |

Exhibit A

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on  AUG 1 2 2021

Dana DeBeauvoir, County Clerk
By Deputy:
J. WALKER

Exhibit A

| | | | | | | Total owed on both liens |
|---|---|---|---|---|---|---|
| July | 0.00 | 9167.75 | -29356.27 | 762776.39 | 2563791.78 | 20188.51 1750632.59 |
| Aug | 0.00 | 9534.70 | -29958.75 | 792735.14 | | 20424.05 1771056.64 |

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on

AUG  1 2 2021

Dana DeBeauvoir, County Clerk
By Deputy:
J. WALKER

# Notice of Trustee's Foreclosure Sale

Please take notice that I, David Brenner, Substitute Trustee, hereinafter referred to as the "Trustee or Substitute Trustee," acting under the authority of the terms of the hereinafter described Deeds of Trust, will conduct a public non-judicial foreclosure of the sale of certain property, the details of which are as follows:

**Property to be sold**.

The property to be sold is described as follows:

Lot 2, Resubdivision of Lot 11, Reagan Hill, a subdivision in Travis county, Texas, according to the map or plot thereof recorded in Volume 92, Page 65, of the Plat Records of Travis County, and

All improvements and fixtures on and under those tracts of land, including but not limited to buildings (both residential and commercial, streets and utility systems

(collectively, the property)

**Instruments to be Foreclosed**

| | |
|---|---|
| Grantor: | **4709 Incorporated dba Midtown Live** |
| Trustees: | **Bruce R. Hardesty, Trustee; 1411 West Ave., Suite 100, Austin, Texas 78701-1537; and Robert E. Black, Trustee, 500 W.16th Street, Austin, Texas 78701(substituted as set forth herein)** |
| Lenders: | **John Hoberman as assignee of Pride of Austin High Yield Fund I, LLC; and** |
| | **John Hoberman and Susan Hoberman** |
| Recorded in: | The instruments to be foreclosed are a Renewal and Extension of Deed of Trusts and Deeds of Trust, Document Numbers 2011137642, 2012004604 and 2012173369, of the real property records of Travis County, Texas. |
| Obligations Secured: | June 5, 2012; Real Estate Lien Note ("Note") in the original principal amount of $150,000.00, executed by 4709 Incorporated d/b/a Midtown Live by its President, Selena Cash ("Borrower") and payable to the order of John Hoberman and Susan Hoberman, and all other indebtedness of Borrower to Lender. |
| | September 5, 2013; Real Estate Lien Note ("Note") in the original principal amount of $100,000.00, executed by 4709 Incorporated d/b/a Midtown Live by its President, Selena Cash ("Borrower") and |

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy: _____  Exhibit B
J. WALKER

payable to the order of John Hoberman and Susan Hoberman, and all other indebtedness of Borrower to Lender,

September 9, 2011; Transfer of Note and Lien (and Other Rights) ("Note") originally dates September 9, 2011 in the original principal amount of $1,100,000.00, executed by 4709, Incorporated d/b/a Midtown Live, a Texas Corporation, ("Borrower") and payable to the order of Lender Pride of Austin High Yield Fund I, LLC, and all other indebtedness of Borrower to Lender, but assigned on February 15, 2015 to John W. Hoberman.

As of August 31, 2020, the total amount owed on all notes referenced above to Lender was $2,563,791.78. After August 31, 2020, interest accrues and continues to accrue on the amount of $2,563,791.78 at the rate of $998.70 per day, pursuant to the terms of the foregoing instruments. In addition, the amount due under the Obligations includes reasonable attorney fees and other costs incurred by the Lender in the collection of the indebtness owed under the foregoing instruments.

Question concerning the foreclosure sale may be directed to the undersigned substitute trustee or the Lenders lawyer, David Brenner, 4807 Spicewood Springs Rd, Bldg 4, Austin TX 78759. Telephone number: 512-338-5322. dbrenner@bajb.com.

**Appointment of Substitute Trustee**

[Substitute] Trustee:   **David Brenner**

[Substitute] Trustee's
Address:                         **4807 Spicewood Springs Rd, Bldg 4**
                                      **Austin, Travis County, Texas 78701**

**Date, Time and Place of Foreclosure Sale:**

Date:                            **October 6, 2020**

Time:                            The sale of the Property will be held between the hours of 10:00 a.m. and 4:00 p.m. local time; **the earliest time at which the Foreclosure Sale will begin is** 10:00 a.m. **and not later than three hours thereafter**.

Place:                           The west steps of the Travis County Courthouse located at 1000 Guadalupe Street, Austin, Texas.

Terms of Sale:              The Foreclosure Sale will be conducted as a public auction and the Property will be sold to the highest bidder for cash, except that Lender's bid may be by credit against the indebtedness secured by the lien of the Deed of Trust. Those desiring to purchase the property

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy: _____          Exhibit B
J. WALKER

will need to demonstrate their ability to pay their bid immediately in cash if their bid is accepted.

Default has occurred in the payment of the Note and in the performance of the obligations of the Deeds of Trust. Because of that default, Lender the owner and holder of the Note, has requested Substitute Trustee to sell the Property.

The Deed of Trust may encumber both real and personal property. Formal notice is hereby given of Lender's election to proceed against and sell both the real property and any personal property described in the Deed of Trust in accordance with Lender's rights and remedies under the Deed of Trust and section 9.604(a) of the Texas Business and Commerce Code.

Therefore, notice is given that on and at the Date, Time, and Place for the Foreclosure Sale described above, Substitute Trustee will sell the Property in accordance with the Terms of Sale described above, the Deed of Trust, and applicable Texas law.

If Lender/Beneficiary passes the Foreclosure Sale, notice of the date of any rescheduled foreclosure sale will be reposted and refiled in accordance with the posting and filing requirements of the Deed of Trust and the Texas Property Code.

The Foreclosure Sale will be made expressly subject to any title matters set forth in the Deed of Trust, but prospective bidders are reminded that by law the Foreclosure Sale will necessarily be made subject to all prior matters of record affecting the Property, if any, to the extent that they remain in force and effect and have not been subordinated to the Deed of Trust. For the avoidance of doubt, the Foreclosure Sale will not cover any part of the Property that has been released of public record from the lien and/or security interest of the Deed of Trust by Lender. Prospective bidders are strongly urged to examine the applicable property records to determine the nature and extent of such matters, if any.

Pursuant to section 51.009 of the Texas Property Code, the Property will be sold **"AS IS," without any expressed or implied warranties, except as to the warranties (if any) provided for under the Deed of Trust.** Prospective bidders are advised to conduct an independent investigation of the nature and physical condition of the Property.

Pursuant to section 51.0075(a) of the Texas Property Code, Substitute Trustee reserves the right to set further reasonable conditions for conducting the Foreclosure Sale. Any such further conditions shall be announced before bidding is opened for the first sale of the day held by Substitute Trustee.

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.**

**THIS INSTRUMENT APPOINTS THE SUBSTITUTE TRUSTEE(S) IDENTIFIED TO SELL THE PROPERTY DESCRIBED IN THE SECURITY INSTRUMENT**

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy:
J. WALKER

Exhibit B

IDENTIFIED IN THIS NOTICE OF SALE. THE PERSON SIGNING THIS NOTICE IS
THE ATTORNEY OR AUTHORIZED AGENT OF THE MORTGAGEE.

**Dated:** September 15, 2020.

David Brenner, Attorney for Lender and
Substitute Trustee
Burns Anderson Jury & Brenner LLP
P.O. Box 26300
Austin TX 78755-6300
Tel: 512-203-2734
dbrenner@bajb.com

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy:
J. WALKER

Exhibit B

Filed: 9/16/2020 2:33 PM
Dana DeBeauvoir
Travis County Clerk
C-1-PB-19-002179
Blair Hicks

NO. C-1-PB-19-002179

| | | |
|---|---|---|
| ARLETHA CASH, Independent | § | IN THE PROBATE COURT |
| Executor of the Estate of | § | |
| Selena D. Cash, Deceased, | § | |
| *Plaintiff,* | § | |
| | § | |
| v | § | |
| | § | |
| | § | |
| ANTHONY L. SHERIDAN, | § | |
| WILLIAM SHERIDAN, | § | NO. 1 OF |
| LINDA SHERIDAN, | § | |
| CEAIRA C. SHERIDAN, | § | |
| and | § | |
| CCS ASSET MANAGEMENT, INC., | § | |
| JOHN HOBERMAN and ALMAGEN LLC | § | |
| *Defendants,* | § | TRAVIS COUNTY, TEXAS |

[Estate of Selena D. Cash,
Cause No. C-1-PB-19-001700]

## **NOTICE OF HEARING**

TO:  All Parties of Record through their Undersigned Counsel of Record.

The above entitled and numbered cause is set for oral hearing on Defendants' Motion for

Leave to Proceed with Foreclosure in the No. 1 Probate Court of Travis County, Texas, on the

**25th day of September 2020 at 10:00 a.m.** The hearing can take place via Zoom or by

telephonic means dependent upon the courts discretion.

1. Time Announcement: 1 Hour.
2. Telephone Numbers for Counsel:
    a. David Brenner ; (512) 338-5322
    b. Kemp W. Gorthey ; (512) 236-8007
    c. Leonard Woods ; (512) 744-9300
    d. Anthony Icenogle ; (512) 342-9519
3. Email Addresses for Counsel:
    a. David Brenner ; dbrenner@bajb.com
    b. Kemp W. Gorthey ; kemp@gortheylaw.com
    c. Leonard Woods ; lwoods@dwmrlaw.com
    d. Anthony Icenogle ; Anthony@icenoglefirm.com

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy:

4. Whether the party is ready or not ready: Ready.

5. Whether an interpreter is required: No.

6. The number of witnesses to be called: Potentially 2.

7. The total number of participants in the call: up to 6.

8. Whether a record is required: Yes.

Respectfully submitted,

BURNS ANDERSON JURY & BRENNER, L.L.P.
P.O. Box 26300
Austin, Texas 78755-0300
512-338-5322
512-338-5363 telecopier

By: _____
David Brenner
State Bar No. 02958020
dbrenner@bajb.com
Belinda May Arambula
State Bar No. 24060241
barambula@bajb.com

Attorneys for Defendants John Hoberman
and Almagen, LLC.

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on
AUG 1 2 2021
Dana DeBeauvoir, County Clerk
By Deputy
J. WALKER

2

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing pleading has been forwarded to counsel of record this the 16th day of September 2020, in accordance with Rules 21 and 21a, Texas Rules of Civil Procedure.

**VIA E-SERVICE:**
Kemp W. Gorthey
604 West 12th Street
Austin, TX  78701
Attorney for Plaintiff

**VIA E-SERVICE:**
Leonard Woods
600 Congress Avenue, Suite 1900
Austin, TX 78767-1149
Attorney for Defendants:
Anthony Sheridan, William Sheridan,
Linda Sheridan, Ceaira Sheridan,
And CCS Asset Management, INC.

**VIA E-SERVICE:**
Anthony Icenogle
Icenogle & Boggins PLLC
6907 N. Capital of Texas Highway, Suite 220
Austin, TX  78731

_____
David Brenner

I, Dana DeBeauvoir, County Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office on AUG 1 2 2021

Dana DeBeauvoir, County Clerk
By Deputy:
J. WALKER

3

## **EXHIBIT 22**

**Order on Hoberman's Motion for Leave to Foreclose**

FILED FOR RECORD
2020 NOV 30 PM 04:49

DANA DEBEAUVOIR
COUNTY CLERK
TRAVIS COUNTY, TEXAS

Cause No.   C-1-PB-19-002179

| | | |
|---|---|---|
| ARLETHA CASH, Independent | § | IN THE PROBATE COURT |
| Executor of the Estate of | § | |
| Selena D. Cash, Deceased, | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | NO. 1 OF |
| ANTHONY L. SHERIDAN, | § | |
| WILLIAM SHERIDAN, | § | |
| LINDA SHERIDAN, | § | |
| CEAIRA C. SHERIDAN, | § | |
| CCS ASSET MANAGEMENT, INC., | § | |
| JOHN HOBERMAN and ALMAGEN LLC, | § | |
| *Defendants* | § | TRAVIS COUNTY, TEXAS |

[Estate of Selena D. Cash,
Cause No. C-1-PB-19-001700]

### ORDER ON DEFENDANT JOHN HOBERMAN'S MOTION
### FOR LEAVE TO PROCEED WITH FORECLOSURE

On November 24, 2020, this matter came before the Court for consideration of Defendant John Hoberman's Motion for Leave to Proceed with Foreclosure.  Having considered the Motion, the Court finds that it should be GRANTED in part as to the right of foreclosure, and DENIED in part as to the date of the foreclosure. The Court authorizes the foreclosure to occur on February 2nd, 2021, at 10:00 a.m.

It is so ORDERED that John Hoberman is authorized to exercise his right of foreclosure on February 2nd, 2021, at 10:00 a.m.

All other relief in the Motion is DENIED.

11/30/2020

GUY S. HERMAN, Judge Presiding

| |
|---|
| HONORABLE PROBATE JUDGE |
| TRAVIS COUNTY PROBATE COURT |

I, Dana DeBeauvoir, County Clerk, Travis County,
Texas, do hereby certify that this is a true and
correct copy as same appears of record in my office.
Witness my hand and seal of office on **AUG 1 2 2021**

Dana DeBeauvoir, County Clerk
By Deputy:
J. WALKER